FILED

2015 Sep-28  AM 10:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM BRUCE MARSHALL, | ) |
| | ) |
|       Petitioner, | ) |
| | ) |
| v. | ) |
| | )   Civil Action No.: _____ |
| JEFFERSON S. DUNN, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
|       Respondent. | ) |

---

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY UNDER SENTENCE OF DEATH

---

Glenn E. Glover
C. Jason Avery
Tiffany deGruy
Leigh Anne Fleming
Anna Manasco
Taryn Ely Hodinka
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

*Attorneys for Petitioner*

Petitioner William Bruce Marshall ("Marshall"), now incarcerated on death row at Holman State Prison in Atmore, Alabama, respectfully petitions this Court for relief from his unconstitutional conviction and sentence.

## I.   INTRODUCTION

1.    Marshall applies to this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Marshall was convicted in 2006 by a jury of two counts of capital murder (both murder while committing burglary in the first degree, and murder while committing sexual abuse in the second degree), and one count of murder (as the lesser included charge of capital murder while committing or attempting rape). He was sentenced to death by lethal injection.

2.    Marshall's conviction and sentence are unreliable and unconstitutional for multiple reasons. Most egregiously, Marshall's sentence is unconstitutional. It is no exaggeration to say that Marshall's counsel did nothing to attempt to save his life at sentencing. Counsel failed to present any mitigation evidence of any kind, at all. In addition, they failed to present evidence to demonstrate the falsity of the State's contention that Marshall was on probation at the time of his crime – a contention that defense counsel knew to be untrue, and that the trial court expressly considered as an aggravating factor.

3.    To be clear, Marshall's petition is not the classic kind, where the petitioner seeks habeas relief because, he argues, his counsel did not do enough at sentencing to establish mitigating factors. *Marshall's petition presents an extraordinary case – one where his defense counsel did* nothing *at sentencing to establish mitigating factors.* If ever there were a set of circumstances where defense counsel offered unconstitutionally deficient and ineffective assistance in the penalty phase, this is it.

1

4.     Although defense counsel's failure to offer mitigating evidence and failure to correct the inaccurate aggravating evidence would have been unconstitutionally derelict standing alone, defense counsel's utterly ineffective assistance at sentencing did not end there.  At the sentencing hearing, Marshall's counsel actually commended the inculpatory evidence, saying, "I don't know if [Marshall] may somehow someday be able to see the error of his ways and do right … in this situation the evidence is *overwhelming*."  (TR. 771-72; 744-92; 799) (emphasis added).[1]

5.     In addition, Marshall was denied effective assistance of counsel at the guilt phase of his trial because defense counsel failed in multiple respects, including (1) to present critical defense evidence; (2) to hire a forensic pathologist to rebut the State's forensic pathologist; and (3) to hire a neuropsychologist or utilize a mitigation expert.  In addition, three independent instances of grave juror misconduct seriously compromise the reliability of the jury's verdict.

6.     The complete lack of assistance from counsel during the penalty phase of Marshall's trial renders his sentence unconstitutional.  Together with the guilt-phase trial improprieties and juror misconduct that compromise Marshall's conviction, the sentencing-phase defect requires habeas relief.

## II.     PROCEDURAL BACKGROUND

7.     On April 22, 2005, a Jefferson County grand jury indicted Marshall on three counts of capital murder in the death of his stepdaughter (who was also a relative of his), "AB": murder committed in the course of a burglary, murder committed during the commission or at-

---

[1]  Evidentiary citations are provided to the Record on Appeal in the Alabama Supreme Court. They are formatted as follows: "C" numbers refer to the Clerk's Record; "C. Supp." numbers refer to supplements to the Clerk's Record; "HR" numbers refer to the portion of the Rule 32 hearing held February 16-17, 2010; "HR Hall" numbers refer to the portion of the Rule 32 hearing held April 1, 2010; and "TR" numbers refer to the trial transcript.

tempted commission of a rape, and murder during the commission or attempted commission of sexual abuse under Ala. Code § 13A-5-40 (a)(4), (a)(3), and (a)(8), respectively.

8.      On January 12, 2006, after a 5-day trial in the Circuit Court of Jefferson County, Alabama ("the trial court"), during which defense counsel[2] called no witnesses for Marshall's case and engaged in only minimal, ineffective cross-examination of 10 of the State's 18 witnesses, a jury found Marshall guilty of capital murder, murder while committing burglary in the first degree, of murder (as the lesser included charge of capital murder during rape), and of capital murder, murder while committing sexual abuse in the second degree.  (C. 94-99).

9.      The very next day, on January 13, 2006, after a short penalty phase hearing during which Marshall's defense counsel failed to present one single shred of mitigation evidence and described for the jury the evidence against Marshall as "overwhelming," the jury returned an 11-1 verdict of death. (TR. 771-72, 744-92, 799).   One of the aggravating factors the court considered in sentencing Marshall to death was that Marshall was on probation at the time of the crime.  That was not true, and his defense counsel knew it was not true.  (HR. 154-55; TR. 757-59).

10.      On February 23, 2006, Marshall was sentenced to death by lethal injection. (TR. 809).

11.      Marshall timely appealed his conviction and sentence, with no success.   On August 31, 2007, the Alabama Court of Criminal Appeals affirmed Marshall's conviction and sentence. Marshall v. State, 992 So. 2d 762 (Ala. Crim. App. 2007). On April 25, 2008, the Alabama Supreme Court denied certiorari in Marshall's case. Ex parte Marshall, No. CR-05-

---

[2] On January 5, 2005, Erskine Mathis was appointed as Marshall's lead trial counsel. (C. 4119). On May 17, 2005, the court appointed Linda Hall to assist Mathis. (HR.123). Mathis and Hall are collectively referred to herein as "defense counsel."

1035 (Ala. Apr. 25, 2008). On October 6, 2008, the United States Supreme Court did likewise. Marshall v. Alabama, 129 S. Ct. 277 (2008).

12.     On April 23, 2009, Marshall timely filed a petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Jefferson County, Alabama. (C. 71-139).

13.     On July 10, 2009, Marshall filed an Amended Rule 32 petition. (C. 144-217). Marshall's original petition was timely and proper; the amendment merely added grounds to the original filing.

14.     Marshall's Rule 32 proceedings also were unsuccessful.  On July 31, 2009, the State of Alabama filed an Answer and Motion to Summarily Dismiss Marshall's Rule 32 petition. (C. 337-98).  On September 8, 2009, the Court held a hearing on the State's motion. At the hearing, the Court summarily dismissed many of Marshall's claims.  (C. 17-22).  On October 2, 2009, Marshall filed a Motion to Reconsider. The trial court never ruled on that Motion.  On December 2, 2009, on the State's Motion for Partial Dismissal, the Court summarily dismissed Marshall's ineffective assistance of appellate counsel claims. (C. 29-30).  The trial court held a Rule 32 evidentiary hearing on February 16-17, 2010, and April 1, 2010, on Marshall's limited remaining claims of (1) ineffective assistance of counsel for failing to put on a defense and failing to offer any mitigation evidence and (2) juror misconduct claims.[3]  On June 3, 2010, Marshall filed his Post-Hearing Brief in Support of his Rule 32 Petition. (C. 730-833). The lower court denied Marshall's Petition on December 21, 2010. (C. 979-1039).

---

[3] The Rule 32 Hearing was held on split dates because one of Marshall's defense counsel, Linda Hall, was unavailable on the February hearing dates.

15.     Marshall timely appealed the denial of his Rule 32 Petition, and the Alabama Court of Criminal Appeals affirmed the trial court's denial on May 2, 2014.  Marshall v. State, No. CR-10-0696, 2014 WL 1744103 (Ala. Crim. App. May 2, 2014).  On July 11, 2014, the Court of Criminal Appeals overruled Marshall's Application for Rehearing.

16.     On August 15, 2014, Marshall petitioned the Alabama Supreme Court for a Writ of Certiorari to the Court of Criminal Appeals.  On April 17, 2015, the Alabama Supreme Court denied Marshall's petition.  Ex parte Marshall, No. 1131145 (Ala. Apr. 17, 2015).

17.     This petition follows.  It represents Marshall's first and only application for habeas corpus relief.

### III.     GROUNDS SUPPORTING THE PETITION FOR RELIEF

18.     Habeas relief should be granted to persons, such as Marshall, in custody under the judgment of a State court when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  See also Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (observing that "[section] 2254(d)(1) places a [] constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" because "the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States").  Marshall's petition identifies multiple constitutional defects that satisfy this exacting standard.

### A. Marshall Has Been Denied Effective Assistance of Counsel Throughout the Proceedings Against Him.

19.    The Sixth Amendment's guarantee of adequate, effective counsel to indigent persons accused of crimes is "among the most fundamental of rights" because "it is through counsel that all other rights of the accused are protected." Penson v. Ohio, 488 U.S. 75, 84 (1988). Indeed, "of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." Id. For the same reason, the constitutional right to effective assistance of counsel is a cornerstone of the adversarial criminal justice system in the United States. Powell v. Alabama, 287 U.S. 45 (1932).

20.    The constitutional guarantee is satisfied when counsel provides "reasonably effective assistance," and no less. Strickland v. Washington, 466 U.S. 668, 687 (1984). Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

21.    In keeping with these standards, "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." Id. at 687. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial [including sentencing], a trial whose result is reliable." Id.

22.     Marshall's case easily meets both standards. As is explained more fully below, defense counsel's performance was deficient by any measure, particularly at the penalty phase of Marshall's trial, where defense counsel presented *no* mitigating evidence and failed to correct inaccurate statements about aggravating factors.   In addition, there can be no question that defense counsel's errors gravely prejudiced Marshall.   The available mitigating evidence was substantial, and the incorrect aggravating factor was material.   Had defense counsel presented that evidence, the balance of mitigating and aggravating factors would have been dramatically different, and it is probable that additional jurors would have voted to spare Marshall's life.

1.     *Marshall was denied effective assistance of counsel at the penalty phase of his trial.*

23.     The most glaring constitutional defect underlying Marshall's petition is that he was denied effective assistance of counsel at the penalty phase of his trial because his defense counsel literally did nothing to attempt to save his life.   It is no exaggeration to say that the failures of Marshall's defense counsel at the penalty phase of Marshall's trial were numerous, gross and extreme.   They fall into three categories: (1) a complete failure to offer mitigating evidence; (2) a failure to correct an inaccurate statement (both by the State and the trial court) about an aggravating factor that defense counsel knew to be inaccurate and nevertheless failed to correct; and (3) an improper emphasis by defense counsel on the evidence *against* their own client.   This section considers each category in turn.

24.     *First,* the jury heard no mitigating evidence at the penalty phase of Marshall's trial.   At all.   They did not hear about any aspect of Marshall's life, other than the commission of the crime.   Defense counsel did not investigate Marshall's background, childhood, family history, social history, educational history or medical history for use in his defense, despite the

7

fact that, as they later testified, they knew that all of these things can lead to mitigating evidence. (HR. 118-19).

25.     The following list reflects the key failures of Marshall's defense attorneys:

- They did not seek his school, employment, or foster home records. (HR. 146).

- Although defense counsel hired a novice investigator and a mitigation expert to prepare for the guilt phase of Marshall's trial, they did not use any information obtained from those individuals at the penalty phase.  They did not speak to key family members who knew Marshall and could provide information about his childhood or life. (HR. 146).

- More specifically, despite knowing about their existence, defense counsel did not contact Marshall's sister, Berguitta Marshall, his brother, Charles Allan Wilkins, his mother, Beverley Charlton, his grandmother, Cleo Brasted, his aunt, Beverley Charlton or his niece Stephanie Blankenship. All of these witnesses provided testimony at the Rule 32 hearing. (HR. 274-96, 237-274, 296-334; C. 4972, 4986; C. Supp. 111).

- Defense counsel did not speak to or attempt to locate Marshall's foster parents, Reverend Gerald Scott and his wife, Marlene, who also provided testimony favorable to Marshall at the Rule 32 hearing.

- Likewise, they did not locate or talk to the former director of the boys' home that Marshall lived in when he was a teenager and who also provided testimony in favor of Marshall for the Rule 32 hearing. (C. Supp. 106).[4]

26.     Defense counsel's failures materially impacted Marshall's sentence.  Each and every one of these people had favorable and positive things to say about Marshall; each would have given the jurors a glimpse into Marshall's history of extreme physical and emotional abuse during childhood; each would have provided testimony to "humanize" Marshall; and each was available and willing to testify at the 2005 trial. (C. 4972, 4986, 4997, 5007; C. Supp. 106-07, 111-12). Yet, not a single one of them was contacted by defense counsel prior to trial. (C. 4977, 4990, 5000, 5010; C. Supp. 106-07, 112).

27.     Marshall's defense counsel also failed to adequately collect documentation of Marshall's life, including school records, military records, juvenile services records, his mother's

---

[4] The mitigating nature of this evidence is discussed more fully *infra* at paragraph 28.

medical records, probation records, social services records, and family birth and marriage records. (HR. 150, HR. Ex. 22). All of these records were available in 2005 and should have been obtained by defense counsel.

28.     Had defense counsel interviewed Marshall's family or obtained records, they would have discovered a wealth of mitigating evidence. Ultimately, the evidence at the Rule 32 hearing established what defense counsel missed before trial. To say the least, it is a substantial volume of mitigating evidence:

- From age two to fifteen, Marshall's father figure was his mother's second husband, Dean Johnson. (HR. 239). At the Rule 32 hearing, the Marshall family described Dean as "violent," (HR. 240) "a heavy drinker," (HR. 241), and a father who taught right from wrong "with a belt," (HR. 249), often leaving physical evidence of beatings on his victims, including Marshall. (HR. 276).

- As revealed at the Rule 32 Hearing, Dean even threatened Marshall's mother with a gun in front of Marshall when he was only 5 years old. (HR. 273). Perhaps the most shocking episode of drunken violence witnessed by Marshall involved a drunken Dean trying to run over Marshall's mother with a car in which the children were all riding. (HR. 276).

- Marshall often got the worst, and the most repeated beatings, from Dean. (HR. 276). It was not uncommon for Marshall to be hit, slapped and punched in the face or head. (HR. 272, 276, 304). Beverley testified that Dean "hit Bruce upside his head with his fists. He would use a belt or something. It didn't make any difference where it hit, a leg, an arm. It didn't matter." (HR. 304). She testified that these "beatings" occurred weekly. (HR. 304-05). Dean would leave physical marks on Marshall during these beatings. (HR. 304). In fact, Marshall's mother testified that she eventually stopped trying to get Dean to quit beating Marshall or the other kids because, when she did try, the beatings just got worse. (HR. 305-06).

- Despite knowing the violence towards Marshall, his mother voluntarily left Marshall in the care of the very man perpetrating the violence. Mrs. Charlton also gave up emotionally on Marshall, resulting in abandonment and extreme emotional abuse towards Marshall. Once Mrs. Charlton's marriage to Dean ended, the family split up, with Marshall and his brother remaining in Dean's household, while Berguitta continued to live with their mother. (HR. 248). For years thereafter, Marshall had only limited contact with his mother. (HR. 307).

- The physical abandonment of Marshall came on the heels of severe neglect. Specifically, Cleo testified regarding a time when Marshall was four or five years old, and she was called over to his house by a neighbor because something was

wrong. (C. 4975-76).  When Ms. Brasted arrived, she found a little four or five year-old at home while his mother was in bed with a random man and "Bruce was drunk." Id.  Based on this event, Ms. Brasted testified that after that incident she contacted a lawyer and considered keeping the children since they were not "taken care of." Id.[5]

- The violence and emotional and physical abuse did not end when Marshall eventually returned to live with his mother.  Rather, they continued at the hands of Mrs. Charlton's subsequent romantic partner, Jerry Aires. Berguitta testified that Aires was "abusive and evil" to Marshall. (HR. 278).  She said he was "very, very mean when he would drink. He would just hit for no reason." (HR. 278).  He would hit Marshall in the face and in the head. (HR. 278-79).  He would leave physical marks on Marshall and would hit him with things other than his hands, including a belt with metal rings. Id.  Ms. Marshall further testified that fear ruled the household with Jerry, eventually leading Marshall to run away from home. (HR. 280).  She said that she and Marshall "were always scared." (HR. 279-80). Marshall was not just the subject of abuse, but he was a witness to the violence and abuse inflicted on his loved ones, including his mother and sister, whom he oftentimes tried to protect. (HR. 251, 277, 279).

- Marshall, by the time he was a teenager, had lived in four states and somewhere between ten and fifteen cities. (HR. 246, 307).  In addition to his constant moves, during Ms. Charlton's time with Dean, the family went from place to place within a city desperately looking for shelter. In the words of Marshall's brother, "we didn't have a place to live." (HR. 239, 253).

- As a teenager, Marshall was sent to live at the Braddock House.  Ms. Louise Hostetler is the "former director of Braddock House, a state facility for children who were designated as either CINS ("Child In Need of Services") cases or juvenile delinquents." (C. Supp. 107).[6]

- Had Ms. Hostetler been asked to testify on Marshall's behalf, she would have testified that the Braddock House was not a facility for children who had committed violent crimes, but rather a facility for "basically good kids who needed structure to learn socially acceptable ways to live." Id.  Ms. Hostetler would have explained to the jury that in this structured environment, Marshall "did not exhibit any really bad behavior" and in fact counseled another boy into staying at the Braddock House instead of running away. Id.

- Additionally, Ms. Hostetler could have told the jury of how Marshall's mother essentially abandoned him to the home. Id. at 108.  Although the Braddock House encouraged family visits, Ms. Hostetler does "not recall Bruce's mother or any

---

[5] Ms. Brasted also testified that Marshall suffered abandonment from her son, Bruce's biological father. (C. 4975-76); see also HR. 239, 300.

[6] Hostetler's affidavit was filed in open court during the Rule 32 Hearing.

other family member visiting Marshall during the time he lived at Braddock House." Id.

- After leaving the Braddock House, Marshall went to live with his foster parents, the Reverend Gerald and Marlene Scott. (C. 4999). Reverend Scott has testified that Marshall lived with him and his wife in 1982 as a part of a "Family Oriented Group Home" as a "family model home" after Marshall completed his stay at the Braddock House in order for him to be better equipped when he returned "into the family life." (C. 5009). Reverend Scott stated that his role was to be "the father figure" and that the boys called him "dad". (C. 5009).

- Had Reverend Scott have been contacted for mitigation evidence, he would have testified that in this structured environment with a family who loved and cared for him, Marshall "was fabulous." (C. 5009.) Reverend Scott would have testified that they had "no difficulties with him" and that he cannot "remember any situation that [he] even had to correct him" and noted that "he was super." (C. 5008). Reverend Scott could have explained to the jury that Marshall would help look after his mentally challenged son, Mikey, and that his daughter considered Marshall another brother in the family. (C. 5009). Further, Reverend Scott testified that he absolutely never saw any violent tendencies in Marshall. Id. Reverend Scott would have told the jury that he does not recall Marshall ever receiving a visit, telephone call, or single piece of mail from Beverley. (C. 5010). In fact, Reverend Scott explained that it was like there "was no home for him to go to." (C. 5010).

- Reverend Scott's wife, Marlene Scott, testified that Marshall called her "Mom." (C. 4999). Mrs. Scott would have explained that her role was to help boys such as Marshall "see how an ordinary home functioned, how husband and wife reacted and how they reacted with the children and how discipline came about, and how there was much love, that love was something that could be expressed." Id. Mrs. Scott would have testified that while Marshall lived with her he did his chores and was always willing to do anything she asked. Id. Mrs. Scott could have explained to the jury that in such a structured environment surrounded by a loving family, she did not recall any problems with Marshall and that "[o]ut of the 44 boys" that she acted as a foster parent to, that "if you would have ever asked me which ones would be in trouble, he would have never made that list. He was just – he was what you wished all of them would be." Id.

29.     This is not merely a piece – or even a narrative – of mitigating evidence that counsel failed to investigate or present to the trial court. This is a *lifetime* of mitigating evidence that was widely known within Marshall's family but simply left alone by the lawyers entrusted with his defense at trial. It is of such a nature and extent that its complete omission had to be prejudicial to Marshall, and by definition, the omission undermines the confidence in the resulting jury verdict. Accordingly, it warrants habeas relief.

30.     When defense counsel was confronted with this failure at Marshall's Rule 32 hearing, they could not defend it.  They literally had no explanation for why they did not follow up.  One said only that "[t]his all comes back on me. I was lead counsel." (HR. 132), that he "should have [followed up on potential mitigation evidence]," and that he didn't do it. (HR. 154).

31.     Had defense counsel presented any of this mitigating evidence about Marshall, it is probable that additional jurors would have voted to spare his life.  Evidence Marshall offered at the Rule 32 hearing demonstrates the kind of conclusions that the mitigating evidence supports.  For the Rule 32 hearing, Marshall hired Jan Vogelsang, a licensed clinical social worker, to conduct a bio-psychosocial assessment of Marshall.  She opined as follows:[7]

> The accumulation of events in Bruce's childhood left him as an adult with a pattern of problems in relationships.  The intergenerational family history reveals a pattern of unusual sexual relationships and molestation. Born to parents who literally swapped spouses, [Marshall's] childhood and adolescence were spent witnessing violent and aggressive acts between his mother and male figures none of whom modeled healthy or nurturing behavior.  Abandoned first by his father and later by his mother, Bruce developed into an adult who wanted a family but didn't know how to choose the right person, develop the relationship, maintain it using skills learned during developmental stages, and survive the rejection if and when the relationship fails.

> It is my opinion that this accumulation of overwhelming life events placed Bruce at high risk to act out behaviorally and without long-term intervention, to deteriorate in his behavior and his ability to function. This accumulation left [Marshall] with poor judgment, poor insight and an inability to handle rejection wherein he would resort to sex, intimidation and aggression all of which he either witnessed or learned from the adults in his life.

---

[7] Because the Rule 32 court denied Marshall's request to depose Jan Vogelsang, Marshall introduced a proffer of her testimony at the Rule 32 hearing. (HR. 394-402). Notwithstanding the Rule 32 court's erroneous denial, references to (HR. Ex 36) are to Ms. Vogelsang's proffered testimony. The proffer of Ms. Vogelsang's testimony can be located beginning at C. Supp. 117.

(HR. Ex. 36).   Had the jury drawn similar conclusions from the mitigating evidence underlying Vogelsang's opinion, it is likely that additional jurors would have spared Marshall's life.

32.     *Second*, Marshall's defense counsel failed to correct the trial court's reliance on a critical aggravating factor that defense counsel actually knew to be inaccurate and untrue.  More particularly, Marshall's defense counsel failed to establish that Marshall was not on probation at the time of the murder; one of the aggravating circumstances argued by the State and considered by the Court was the State's claim that Marshall was under a sentence of imprisonment in Florida at the time of the murder. (HR. 154-55; TR. 757-59).

33.     Marshall's defense counsel actually, demonstrably knew that he was not on probation at the time of the crime.  (HR. 155; TR. 757-59).  Indeed, Marshall's defense counsel *told* the Court that Marshall was not under a sentence of imprisonment at the time of this crime. Nevertheless, Marshall's defense counsel failed to prove that key fact, outright admitting that they did not possess any documentation supporting the assertion. (TR. 757-59).

34.     Such evidence was readily available to Marshall's defense counsel – indeed, they held it in their hands.  At Marshall's Rule 32 hearing, Marshall presented this evidence to the Court. (HR Hall 5-12).   That evidence conclusively established that in fact, Marshall's probationary sentence for assault in Florida ended on September 18, 1992. At  the  time  of Marshall's trial, all defense counsel needed to do to obtain this evidence was to read the documents they possessed. (HR Ex. 27; C. Supp. 401).  The court records from the Circuit Court in and for Seminole County, Florida, that were provided to defense counsel by the State clearly showed that Marshall's initial 27-year probation sentence was converted to 2 years of Community Control on September 19, 1990. (C. 710-22). The same records also show that on June 26, 1991, Marshall moved the Florida court to modify his sentence by converting the 18

months remaining on his Community Control sentence to probation and transferred his probation to Tennessee. (C. 716-717). That motion was granted on July 1, 1991.  Id.

35.     Thus, Marshall's defense counsel had in their hands at the time of his trial in 2005 evidence demonstrating that in 1991, he had only 18 months of a probationary sentence left to serve.  Accordingly, that Marshall's defense counsel did not rebut the State's contention that Marshall was on probation at the time of the crime in 2004 was derelict in the extreme.

36.     Had Marshall's defense counsel had any doubt that Marshall had actually served out his probationary sentence, they could have contacted the Tennessee Department of Corrections, which would have advised counsel that Marshall served out his probation sentence and that his probation was considered terminated by that State. (HR. Ex. 6). The Tennessee records were offered, but not admitted into evidence by the Rule 32 court.

37.     Alternatively, Marshall's defense counsel could have contacted the Circuit Court in Seminole County, Florida, as Marshall's current counsel did, to confirm and obtain an order clarifying that the State of Florida terminated Marshall's probation on September 18, 1992, more than a decade before the crime. (C. 716-717).

38.     *Third*, Marshall's defense counsel improperly emphasized at the penalty phase of Marshall's trial the inculpatory evidence against Marshall.  Indeed, Marshall's defense counsel commended such evidence, saying to the trial judge, "I don't know if [Marshall] may somehow someday be able to see the error of his ways and do right … in this situation the evidence is *overwhelming*."  (TR. 771-72; 744-92; 799) (emphasis added).

39.     Marshall's defense counsel's failures at the penalty phase of Marshall's trial warrant habeas relief.  Taken together, defense counsel's utter failure to offer mitigating evidence and the failure to correct the inaccurate aggravating factor that Marshall was on

14

probation at the time of the crime effectively deprived Marshall of the assistance of counsel. Indeed, having made these grave and egregious errors, Marshall's defense counsel was so ineffective as to be essentially absent.  Except that ultimately, Marshall's defense counsel was worse than absent, as it assumed a position antagonistic to Marshall's interests and emphasized the "overwhelming" evidence against him.

40.     It simply cannot reasonably be disputed that the balance between a life sentence and death sentence would have been materially altered had the jury heard even some of the mitigation evidence that was available to defense counsel at the time of trial and later presented at the Rule 32 hearing.

41.     Put differently, the balance of mitigation and aggravating evidence in 2005 was as follows:

Mitigating factors
    *NONE*
Aggravating factors:
- Probation
- Prior violent crimes
- Commission of burglary and potential sexual assault

If counsel had not been ineffective, the balance of mitigation and aggravating evidence should have been as follows:

Mitigating factors
- Abusive childhood, wrought by extreme violence to Marshall, his siblings and his mother, starting at the age of 3
- Rejected and abandoned by his father at 1 ½ years old
- Unstable and transient childhood, having moved 15 times before he was 15 years old
- Little to no formal education
- Deserted by his mother and left in a foster home
- Taught to steal and had to eat food out of dumpsters
- Never taught boundaries or appropriate behavior
- Suffered from medical conditions that affect mood and judgment, such as sleep apnea and hypothyrodism
- Loved and protected his sister and mother

15

Aggravating factors:

- Prior violent crimes, dating 10 and 20 years before the incident
- Commission of burglary

42.     Marshall's defense counsel's failures warrant habeas relief as a matter of law. Had Marshall been represented by effective counsel, "there is [a] reasonable probability of a different result, meaning one sufficient to undermine our confidence in the outcome [of Marshall's penalty phase]." Ford v. Hall, 546 F.3d 1326, 1338 (11th Cir. 2008).  Indeed, had the trial court known that Marshall was in fact not on probation at the time of the crime, or heard from a single (let alone several) mitigation witnesses, the balance of aggravating and mitigating factors certainly would have been dramatically different.  This undermines the confidence in Marshall's death sentence and warrants habeas relief.  Id.

43.     To be clear, Marshall's case is not the typical case in which a petitioner urges that his counsel should have called *additional* witnesses to present mitigation evidence, when in truth such testimony would have been cumulative, repetitive, and ineffective.  See, e.g., Robinson v. Moore, 300 F.3d 1320, 1348 (11th Cir. 2002); Mulligan v. Kemp, 771 F.2d 1436, 1444 n. 6 (11th Cir. 1985).

44.     Instead, Marshall's case is consistent with a long line of Eleventh Circuit cases in which grave failures by counsel to present significant amounts of available mitigating evidence during the penalty phase deprived their clients of effective assistance of counsel.  See, e.g., Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008) (counsel ineffective because there was considerably more mitigating evidence that could have been presented but went undiscovered because of counsel's failure to follow up on red flags in files counsel actually possessed); Hardwick v. Crosby, 320 F.3d 1127 (11th Cir. 2003) (counsel ineffective for failure to present mitigating evidence at the penalty phase despite the existence of evidence related to petitioner's

mental health, alcohol, drug abuse, erratic behavior, dysfunctional family life, mental and

physical abuse, and suicide attempts); Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995)

(counsel ineffective for failure to present more mitigating evidence at sentencing phase,

including evidence regarding circumstances of petitioner's upbringing); Cave v. Singletary, 971

F.2d 1513 (11th Cir. 1992) (counsel's failure to prepare for penalty phase and specifically to

offer family member character witnesses was ineffective); Middleton v. Dugger, 849 F.2d 491

(11th Cir. 1989) (counsel ineffective for failure to chronicle during penalty phase childhood of

brutal treatment and neglect, sexual and drug abuse, and mental illness of petitioner).

45.     Marshall's case – as one where *no* mitigating evidence or witnesses were offered

at the penalty phase, although defense counsel demonstrably possessed such evidence and knew

about such witnesses – appears virtually unprecedented in the Eleventh Circuit.  Indeed, the only

other such case appears to be Hardwick, in which the petitioner obtained a writ because his

counsel was ineffective for failing to present *any* mitigation case in the penalty phase.  See

Hardwick v. Sec'y, Fla. Dep't of Corr., No. 97-2319, 2015 WL 5474275, at *1 (11th Cir. Sept.

18, 2015).

There, as here, "Hardwick's attorney did not call any witnesses or present any evidence

during the penalty phase, in mitigation or otherwise." Id. at *2.  Instead, Hardwick's defense

counsel offered only a closing argument to the jury, attacking the aggravating circumstances the

state had presented and appealing for mercy based on Hardwick's age (he was twenty-five at the

time of the crime). Id.  The failures of Hardwick's counsel are strikingly similar to the failures of

Marshall's.  Hardwick's defense counsel:

> (1) "presented no mitigating evidence at the sentencing proceeding"; (2) did not
> obtain any school, medical, mental health, or juvenile justice records, or any
> social service records about Hardwick's foster home placements and abuse; (3)
> did not ask [their expert] or anyone else to investigate or evaluate mitigation

> evidence relative to the sentencing phase; and (4) indeed failed "to investigate, obtain, or present *any* mitigating evidence to the jury, let alone the powerful mitigating evidence, including Hardwick's deprived and abusive upbringing.

Id. at *3 (internal citations omitted).  Indeed, in the words of the appeals court, Hardwick's defense counsel "*appear[ed] to have given up on defending Hardwick and seemingly expended no effort, either in presentation of mitigating evidence or in understanding mitigation law*." Id. (emphasis added).   Hardwick's defense counsel's failures had a powerful ripple effect: "Counsel's failure to investigate and present even the least bit of this powerful mitigating evidence enabled the prosecutor to emphasize repeatedly in closing arguments that there were no mitigating circumstances in Hardwick's case." Id.

The Hardwick court ultimately ordered habeas relief because it was "left with the distinct sense that, had the jury been presented with this copious and powerful mitigating evidence a reasonable investigation would have uncovered, there is at least a reasonable probability that Hardwick would not have received a death sentence." Id.  Marshall's case leaves the same, haunting impression – that had his defense counsel not given up on him, there is at least a reasonable probability that the jury would have spared his life.

46.    Other Circuits addressing similar cases have ordered writs to issue.  For example, when the Sixth Circuit considered a case in which the only mitigating evidence defense counsel presented at the penalty phase was his client's own unsworn statement, the appeals court concluded that counsel's decision was plainly deficient and necessarily prejudicial:

> Given the fact that the only evidence placed before the jury by the petitioner during the sentencing phase of the trial was Johnson's own unsworn statement … almost any other mitigation testimony offered would be considered both stronger and more substantial than what [defense counsel] proffered. In addition to the testimony of numerous family members—individuals whose identity was known to, or easily ascertained by, defense counsel and who could have provided a more compassionate tint to the portrait of the petitioner—even the most basic of investigations would have revealed other important mitigation evidence as well.

Johnson v. Mitchell, 585 F.3d 923, 943 (6th Cir. 2009).  In Johnson, the evidence that defense

counsel failed to investigate and present was strikingly similar to what Marshall's defense

counsel missed here.  The Sixth Circuit reasoned that by any measure, defense counsel's failure

to present *any* mitigating evidence deprived their client of effective assistance:

> Each of these items of information about Johnson and his social and emotional
> development differed in a substantial way ... from the evidence actually presented
> at sentencing." When combined, moreover, a drastically different portrait of the
> petitioner emerges. At trial, counsel's failure to investigate left Johnson with only
> his own unsworn, antagonistic statement to the jury to counteract the evidence of
> aggravating circumstances attendant to the crime. As a result, the jurors were left
> with no choice but to view Johnson as a calculating individual, apparently a loner
> without human connection even with his family, and willing to murder anyone
> standing in the way of his acquisition of money that could be used to purchase
> drugs or alcohol.
>
> The presence of other information easily uncovered by the investigation of an
> effective advocate, however, would have allowed the jurors to see that the
> petitioner's relatives did care about Johnson, that as a child he had endured many
> hardships and traumatic experiences, and that he suffered from a personality
> disorder that, although not absolving him of responsibility for his crimes, helped
> explain why certain circumstances would be viewed by the petitioner in certain
> ways and would prompt certain abnormal responses. … *To hold in this case that
> serious consideration of such evidence could not have changed the calculation the
> jury previously made when weighing the aggravating and mitigating
> circumstances of the murder is—in our judgment—to ignore reality.*

Johnson v. Mitchell, 585 F.3d 923, 945 (6th Cir. 2009) (emphasis added).  Just so here.  To hold

that defense counsel's utter failure to present mitigating evidence at sentencing was not

ineffective and prejudicial to Marshall would be "to ignore reality."  Id.

47.    If there is any possibility of a meritorious habeas petition arising from ineffective

assistance of counsel at the penalty phase of a capital proceeding, Marshall's case must meet it.

The law cannot be that defense counsel who actually possesses substantial, compelling

mitigating evidence, yet presents *none*, thereby failing to save his client's life, is nevertheless

constitutionally "effective."  Such a scenario is not simply "contrary" to Strickland; it is the exact

opposite of what Strickland demands.  When, as here, defense counsel's failure affected not only

the mitigating factor side of the scale, but also the aggravating factor side, there can be no confidence in the outcome of the process.

48.    Marshall's Sixth Amendment right to effective assistance of counsel was violated in multiple ways at the penalty phase of his trial.  See Strickland, 466 U.S. at 687.  The state court's determination that Marshall was not entitled to relief on this claim was both an unreasonable determination of the facts and contrary to or an unreasonable application of clearly established federal law, e.g., Strickland.  Marshall is thus entitled to habeas corpus relief on this ground.  See 28 U.S.C. § 2254(d).

   *2.    Marshall was denied effective assistance of counsel at the guilt phase, too.*

49.    Marshall's defense counsel's failures began much earlier than the penalty phase of his trial.  In truth, Marshall was deprived of effective assistance of counsel from the get-go, as his lawyers failed to prepare a defense for the guilt phase of his trial.  More particularly, his defense counsel failed to conduct a reasonable investigation into available mitigation evidence and witnesses.

50.    When confronted with his professional failure, Marshall's defense counsel said only that they depended "on a lot of other people in preparing Marshall's case (HR. 142) and "had a lot of [other] cases."  Although his defense counsel claimed to make a "strategic decision" to focus on preserving Marshall's life (HR. 116), a series of failures to develop mitigating evidence or witnesses demonstrates otherwise.

51.    *First*, Marshall's defense counsel failed to contact Marshall's family about the possibility of any mitigating evidence from them.  Defense counsel's file contains names of family members from the State of Florida records and from Tonya Bentley's letters. (HR. Ex. 22,

HR. 163).[8]  But as defense counsel testified at Marshall's Rule 32 hearing, they "did not track

them down."  (HR. 146).  Most notably, defense counsel never contacted Marshall's brother,

Charles Allan. (HR. 259).  Investigator Armour had Charles Allan's telephone number in his

files, and simply never made the call.

52.     Had defense counsel contacted Charles Allan, they could have learned a plethora

of mitigating evidence, and obtained contact information for Marshall's other immediate family

members, including Marshall's mother, his sister, his grandmother, his aunt (Barbara Carlton),

and his niece (Stephanie Blankenship). An interview with these family members would have led

defense counsel to other mitigating witnesses and evidence, such as Louise Hostetler and Rev.

and Mrs. Scott.  All of these people were available and willing to testify and would have testified

on Marshall's behalf, if they had been contacted.

53.     *Second*, Marshall's defense counsel ignored – indeed, never investigated or

presented to the court or jury – mitigating evidence they actually held in their hands.  Defense

counsel retained a mitigation expert for the guilt phase of Marshall's trial by the name of Dr.

Ackerson.  Dr. Ackerson's report (HR. Ex. 1) contained crucial mitigation evidence that was

ignored by defense counsel – namely, that Marshall suffered severe physical and mental abuse

"in all areas of the body, including the face, by an assortment of objects, including belts and

switches."  (HR. 130-31).   Further, Dr. Ackerson's report detailed Marshall's unstable home

life, the names of his immediate family members, the fact that he moved 15 times before the age

of 15, that he was repeatedly beaten as a child and that he suffered from serious medical

conditions, including, drug abuse. (HR. Ex. 1).   Nevertheless, Marshall's defense counsel

conducted no investigation of this violent childhood abuse or unstable home life.  Defense

---

[8] Tonya Bentley was Marshall's first wife and mother to two of his children.

counsel obtained no records of any kind in follow-up - no school records and no medical records (HR. 133, 134).

54.     *Third*, when the time for Marshall's trial arrived, Marshall's defense counsel failed to hire a forensic expert to rebut the State's arguments about Marshall's alleged sexual contact with AB, which served as part of the basis for Marshall's capital conviction.  This failure was extreme, and it had a significant ripple effect: Having failed to hire a forensic expert, even with whom to consult, trial counsel had no ability to conduct even a minimally effective cross of the State's witness, Dr. William Shores, who testified that a tear found in AB's vaginal wall occurred within 24-48 hours of her death.  (TR. 590).

55.     That said, the most startling aspect of defense counsel's failure may be his stated reason for it: defense counsel testified at the Rule 32 hearing that they did not hire a forensic pathologist because they simply *believed* the State's medical examiner. (HR. 189-90).

56.     Marshall's defense counsel's failure came on the heels of their promise to the jury that they would exculpate Marshall on this issue.  Defense counsel Mathis argued in his opening statement that there would be no evidence of sexual contact between Marshall and AB. (TR. 252). Indeed, he specifically stated that he would "prove this through the coroner and through a forensics examiner." Id.  Despite making such promises, defense counsel did nothing to establish this proof.  Without a pathologist who could counter the State's assertion that the tear in AB's vaginal wall happened in the hours preceding her death, the jury had no reason to call the State's expert's testimony into question.

57. Because the trial court refused to allow testimony at the Rule 32 hearing from Dr. George R. Nichols, II, whom Marshall retained as an expert forensic pathologist, Marshall

proffered the testimony.   The testimony establishes that had Marshall's defense counsel attempted to offer a rebuttal pathologist at trial, it could have done so. (HR. 390).[9]

58.     At the Rule 32 hearing, defense counsel admitted that they should have hired a forensic pathologist to rebut critical State evidence.  Defense counsel Mathis testified that, "if [he] had it to do again, [he] would do just that."  (HR 166).  Moreover, defense counsel admitted at the Rule 32 hearing that his failure was indefensible, saying only "[i]t was not done.  I can't give an explanation as to why . . . I may have just missed it.  I don't know."  Id.

59.     Marshall's defense counsel's failure in this regard was, by definition, prejudicial: It left the jury with the only option to surmise that Marshall was the source of this vaginal tear.  In addition, failing to hire a forensic pathologist severely hampered defense counsel's attempt to have admitted two sexually charged notes from the victim to her boyfriend, which supported a

_____

[9] Because the Court denied Marshall's request to allow Dr. Nichols to testify, Marshall proffered Dr. Nichols' testimony. (C. Supp. II 350-53). The proffer stated that if Dr. Nichols had been allowed to testify he would have testified that he is a board certified forensic pathologist, formerly served as the Chief Medical Examiner of the Commonwealth of Kentucky, has performed thousands of post-mortem examinations, has supervised the performance of approximately 20,000 autopsies and has testified in hundreds of criminal trials dealing with lethal and non-lethal injuries including asphyxial deaths and injuries to female genitalia. (C. Supp. II 350-53, at 4, 6, and 7). Dr. Nichols would have testified that based on his review of the trial testimony, the autopsy report, and his "education, experience, knowledge, background, training and skills, in the field of forensic pathology, it is [his] opinion that Dr. Shores did not have an adequate foundation for opining that the genital lesion on [AB] occurred 24-48 prior to his examination of [AB], because he did not perform a histological examination of the tissue samples of the lesion." (C. Supp. II 350-53, at ¶¶ 8, 9). Without "a histological examination of the genital lesion in question to assess if the lesion was an injury, and if so, what type of injury and when did it occur", Dr. Shores could not "correctly ascertain the approximate time frame during which the lesion occurred". Thus, Dr. Shores "did not have any basis for concluding that the genital lesion present on AB's body occurred 24-48 prior to his examination of AB." (C. Supp. II 350-53, at ¶¶ 18, 19, and 20).  Further, Dr. Nichols would have testified that forensic pathologists such as himself were available to testify in capital murder cases at the time of Marshall's trial and if he "had been contacted by Marshall's trial counsel at that time, [he] would have been available to testify and would have provided testimony consistent with what is in [his] affidavit." (C. Supp. II 350-53, at ¶ 21).

theory that the cause of the vaginal tear was not Marshall; instead, the tear was a result of sexual contact between the victim and her boyfriend.  At Marshall's Rule 32 hearing, defense counsel admitted that hiring a forensic pathologist to first testify about the timing of the vaginal tear would have given him greater support for his motion *in limine* regarding why the notes from AB's boyfriend should be admitted since they tended to show that her tear resulted from sexual relations with her boyfriend in the days prior to her death and not from Marshall. (HR. 205-207).

60.     *Fourth*, Marshall's defense counsel ineffectively utilized at trial two experts to investigate and prepare mitigation evidence for that phase: Investigator Armour and Dr. Ackerson.  Investigator Armour was hired "to locate family members in regard to this capital murder case." (HR. 210-211), and Dr. Ackerson was hired as the "sole source of mitigation." (HR. 118).  However, the work performed by these witnesses was demonstrably deficient and underutilized, ultimately depriving Marshall of substantial mitigating evidence that could have changed the outcome of his case.

61.     Prior to working on Marshall's case, Armour had never done any work regarding investigating family members for a capital case. (HR. 211).   He did not even know what the phrase "penalty phase" meant. (HR. 210-11).  Moreover, defense counsel provided Armour no information about the potential whereabouts of any family members, (HR Ex. 4, HR. 212-13), even though defense counsel had such information in their files.

62.     Armour located Marshall's biological father, Charles Marshall. (HR. 214). Although defense counsel testified that Armour told him that Charles Marshall did not want to help Marshall, id., in truth Charles Marshall did help. He provided Armour with a list of family members to contact "in order to give them an opportunity to show their support or non-support for their brother." (HR. 214).

24

63.     Ultimately however, this list was simply – and inexplicably – never pursued by Armour or defense counsel. (HR. 138).  Indeed, Armour admitted at the Rule 32 hearing that he did not make any attempts to contact Marshall's sister, Berguitta, or his grandmother, Cleo. (HR. 234-35).  Although Armour claimed that he did try to call Marshall's family, and that he would leave a message if he got voicemail, he could not recall a name of a single person that he called and he admitted that if such calls had been made they would have been noted in his file. (HR. 231). His file, however, indicated that nothing had been done. (HR. 233).  When asked why he did not ask for this list of names from Armour, defense counsel Mathis testified that "I just didn't. I didn't ask for the list. I didn't ask for it. I don't know why." (HR. 138).

64.     Similarly, defense counsel's use of Dr. Ackerson as their "sole source of mitigation" was substandard and prejudicial to Marshall. (HR. 118).   More particularly, it was unreasonable for defense counsel to rely solely on Dr. Ackerson for mitigation while, at the same time, fail to provide Dr. Ackerson with the materials she needed to conduct a complete and accurate evaluation of Marshall. Defense counsel failed to provide Dr. Ackerson with Marshall's school records, military records, foster care records or medical records. (HR. 151, HR Ex. 1). Defense counsel failed to provide Dr. Ackerson with a loving letter from Marshall's brother, Charles Allan. (HR. Ex. 1).  In fact, the only materials defense counsel provided to Dr. Ackerson were negative (such as a letter from the Seminole County, Florida district attorney and other documents prepared by law enforcement officials). (HR. 125-26).

65.     Ultimately, defense counsel decided not to call Dr. Ackerson as a witness at Marshall's trial.  There was no meaningful conversation between defense counsel and Dr. Ackerson about her report or findings before this significant decision was made and implemented. (HR. 127-29).

66.     *Fifth*, defense counsel was unconstitutionally ineffective for not hiring a neuropsychologist, or conducting any other kind of mental health investigation for use at trial. The information contained in Mr. Armour and Dr. Ackerson's reports should have alerted Marshall's defense counsel that Marshall's mental health needed professional evaluation. Marshall's Florida criminal records (which defense counsel had in their files) established that Marshall thought he needed medical help, (HR. Ex. 27), and defense counsel Mathis testified at the Rule 32 hearing that he agreed with that assessment. (HR. 162).   Nevertheless, defense counsel did nothing to pursue an evaluation or investigation.  Id.

67.     More particularly, defense counsel had medical records from a Dr. Peaslee that were obtained by Armour that showed Marshall suffered from Graves disease (a thyroid condition) and severe sleep apnea, both of which could have affected his mood and judgment. (HR. 350).   In addition, defense counsel also knew about the severe childhood abuse and drug abuse that plagued Marshall's life, which affected Marshall emotionally and cognitively.

68.     Had defense counsel investigated Marshall's mental health, it unquestionably would have uncovered substantial mitigating evidence.   Ultimately, it was established by a medical expert at the Rule 32 hearing, Dr. Walker, that Marshall's inconsistent treatment of his thyroid condition had significant cognitive and emotional affects on Marshall, including making him more anxious, agitated, and irritable, and causing him to have memory loss, problems with attention and difficulty solving problems. (HR. 345-46).   Similarly, according to Dr. Walker, Marshall's severe sleep apnea[10] causes severe depression and anxiety and leads to other cognitive difficulties, affecting his ability to exercise good judgment. (HR. 347-50).   Dr. Walker

---

[10] Medical records from Dr. Peaslee show that Marshall had an oxygen saturation level of 69%, indicating he had severe sleep apnea, or failure to get oxygen to the brain. (HR. 349-350).

also testified that the severe physical and mental abuse inflicted on Marshall during his formative years, combined with the neglect and abandonment, could have affected his judgment on the day of the murder. (HR. 363).

69.     There is no reasonable explanation for the repeated and major professional failures of Marshall's defense counsel.  At Marshall's Rule 32 hearing, his counsel repeatedly admitted their own failures, and never once offered a strategic rationale underlying any one of them, let alone the whole lot.  Instead, Mathis's explanation was that he "[didn't] know how come" and that he "may have just missed" this wealth of mitigating evidence.  (HR. 164, 167.) He occasionally referenced a busy practice, as though to suggest that Marshall received unconstitutionally ineffective assistance because his defense counsel was too busy to offer constitutionally acceptable representation.   (HR. 138.)   Later, he offered a geographical explanation for the deficiencies: "we in Jefferson County, Alabama, don't know a whole lot about mitigation."  (HR. 183.)  Ultimately, Marshall's defense counsel testified that he "didn't know that he had" a "theory of mitigation in Mr. Marshall's case."  (HR. 117).

70.     Marshall's Sixth Amendment right to effective assistance of counsel was violated on multiple occasions at the guilt phase of his trial.  See Strickland, 466 U.S. at 687.  The state court's determination that Marshall was not entitled to relief on this claim was both an unreasonable determination of the facts and contrary to or an unreasonable application of clearly established federal law, e.g., Strickland.  Marshall is thus entitled to habeas corpus relief on this ground.  See 28 U.S.C. § 2254(d).

### B.     Multiple Instances of Grave Juror Misconduct Seriously Compromise the Jury's Verdict.

71.     When an accused is tried before a jury for alleged crimes, he enjoys a constitutional right to fair, impartial jurors.  "In essence, the right to jury trial guarantees to the

27

criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722 (1961). Indeed, "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." Turner v. Louisiana, 379 U.S. 466, 472 (1965) (internal quotation marks omitted).

72. The right to trial by an impartial jury is violated when jurors fail to properly respond to questions during voir dire. Voir dire plays a critical role in selecting the fair and impartial jury necessary to make judgments between life and death in a capital case. See, e.g., Turner v. Murray, 476 U.S. 28 (1986); Gray v. Mississippi, 481 U.S. 648 (1987). Accordingly, that right is violated when jurors fail to respond properly to voir dire questions asked of them. See McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 55–56 (1984).

73. The right to trial by an impartial jury also is violated when jurors introduce extraneous information during jury deliberations. Turner, 379 U.S. at 472. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Id. at 472-73. When jurors rely on information extraneous to the record developed in the courtroom, the defendant's right to trial by an impartial jury is violated. Id. See also Remmer v. United States, 347 U.S. 227, 229 (1954) ("[T]he integrity of jury proceedings must not be jeopardized by unauthorized invasions."); Patterson v. Colorado, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence,

whether of private talk or public print."); <u>Mattox v. United States</u>, 146 U.S. 140, 149 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.").

74.     Marshall's right to a fair trial by an impartial jury was violated not once, but twice during his trial.  The first violation occurred when multiple jurors refused to answer questions asked of them during voir dire, and the second presented when the jury considered extraneous information during its deliberations.  As explained more fully below, both violations were prejudicial to Marshall.  From all appearances, the jury rested its conviction of Marshall and recommendation for his death on information that was not evidence developed during the trial, including information related to their own biases and personal histories.

### 1.   *Three Jurors Failed to Answer Truthfully Voir Dire Questions Asked of Them*

75.     The misconduct of three jurors, Marilyn Jackson ("M.J."), Timothy Crawford ("T.C."), and William Parker ("W.P."), in failing to answer truthfully questions propounded to them during voir dire, violated Marshall's federal constitutional rights.

76.     Jurors M.J., T.C., and W.P. were asked the following questions:[11]

- "Do any of you have a bias or prejudice that would influence your verdict in this manner in any way?" (TR. 90) (M.J., T.C.)
- "Do any of you have any reason why you could not give both the State of Alabama and the defendant, William Bruce Marshall, a fair and impartial trial?" (TR. 90) (M.J., T.C., W.P.)
- "If anyone has been the victim of a violent crime. . . . Anyone a victim?" (TR. 130) (M.J.)
- "Is there anybody here who feels like for whatever reason, and I won't ask you, you won't be able to render a fair and impartial verdict in this case?  You won't be able to sit as a fair and impartial juror?" (TR. 145) (M.J., T.C., W.P.)

---

[11] After each Question are listed the juror(s) for whom the Question is relevant.

- "Do you feel you might require less proof than a case which did not involve violence?" (TR. 159) (M.J.)
- "Is there any pressing business or personal situation that might cause you not to want to be a member of a jury which will decide this case?" (TR. 161) (W.P.)

(collectively, the "Questions").

77. Jurors M.J., T.C., and W.P. did not respond to any of these questions at all, in direct violation of <u>Williams v. Taylor</u>, 529 U.S. 420, 441–42 (2000).

78. At Marshall's Rule 32 hearing, M.J. presented disturbing details of emotional and physical abuse that occurred during her first marriage. (HR. 21–27, 31–32). M.J. testified that her first husband had a problem with alcohol abuse and emotionally abused her by telling her how lucky she was to have him because no one else would have her. (HR. 21–22). She also testified that her husband repeatedly physically abused her. (HR. 22). She gave one specific example of the physical abuse, describing one night when she woke up and her first husband was standing over her with his hands around her neck. (HR. 22). She stated that she thought her husband was trying to kill her then. (HR. 22). She gave another specific example of when her first husband shot at her. (HR. 31–32). She further testified that she used makeup to hide bruises on her face, neck, and arms received from his physical abuse. (HR. 24). M.J. testified that to this day, she keeps an unlisted phone number because, when she moved back to the Birmingham area after having lived elsewhere with her second husband, her first husband threatened to kill her. (HR. 27).

79. M.J. testified at Marshall's Rule 32 hearing that she considers herself a victim of multiple occasions of violence. (HR. 48). M.J. also testified that the emotional and physical abuse received from her first husband had a serious effect on her. (HR. 24). She stated that she has (obviously) not forgotten the abuse and thinks about it often. (HR. 24-25). She further

testified that in January 2006, more than 30 years later, she thought about the abuse from her first husband.  (HR. 25).

80.     M.J. stated that she thought about the abuse her first husband inflicted upon her during the course of Marshall's trial.  (HR. 25–26).  She stated that she remembered testimony from "an ex-wife and an ex-girlfriend" during the penalty phase that "paralleled some of the experience that [she] had personally."  (HR. 43).

81.     M.J.'s testimony at Marshall's Rule 32 hearing establishes that her failure to answer the Questions during voir dire was deliberate.  She testified that she remembered the Questions but did not respond to them.  (HR. 28–30).  She further testified that the reason she did not respond to the Questions was not because she did not hear them, not because she did not understand them, not because they were ambiguous, and not because she did not remember the prior abuse from her first marriage.  (HR. 30, 32).

82.     The conclusion from M.J.'s testimony at Marshall's Rule 32 hearing that she deliberately chose not to answer the Questions during voir dire is consistent with the circumstances of the voir dire.  During voir dire, a potential juror, in response to the question about prior experiences as a crime victim, disclosed that she had been a victim of spousal abuse.  (TR. 141).  M.J. remained silent.

83.     At Marshall's Rule 32 hearing, T.C. testified that at the time of trial in January 2006 he had an extraordinary amount of involvement with a State of Alabama program for sexually abused children.  From 2002 to 2005, T.C. and his wife had been exploring foster care with the Alabama Department of Human Resources.  (HR. 62).  In 2005, T.C. contacted Mrs. Black-Williams, who was in charge of beginning a foster care program (the "Program") for children who have either been sexually offended or who are sexual offenders.  (HR. 60, 62).

T.C. engaged in communications with Mrs. Black-Williams regarding the experiences of children who were to be placed in the Program and the type of behaviors to expect from the children. (HR. 63, 65–66). T.C. also went through formal training, called "Group Preparation Selection," for being a foster care parent. (HR. 67). This was a ten-week program that occurred prior to Marshall's trial in January 2006. (HR. 66–67). T.C. also attended a self-defense training course for dealing with physical aggression by children. (HR. 68).

84.     In December 2005, T.C. became certified to receive a child in his home through the Program. (HR. 69). As of Marshall's trial in January 2006, T.C. was actively awaiting the placement of a foster child in the Program into his home. (HR. 69).

85.     At Marshall's Rule 32 hearing, T.C. testified that the sexual abuse was a key part of the evidence that was presented during the penalty phase of the trial. (HR. 75).

86.     T.C.'s testimony establishes that he, too, deliberately chose not to answer the Questions. T.C. testified that he remembered the Questions. (HR. 71–72). He also testified that he did not respond to them in any way. (HR. 72). He further testified that the reason he did not respond to the Questions was not because he did not hear them, not because he did not understand them, not because they were ambiguous, and not because he did not remember his recent experiences in training and preparation for the sexually abused children foster care program. (HR. 72–74).

87.     At Marshall's Rule 32 hearing, W.P. described his serious vision problems. W.P. has experienced vision problems since the age of 16. (HR. 90). When he was 25, he could not pass the eyesight exam upon applying for a job at the coalmine and was required to obtain glasses. (HR. 91). At that time, he was experiencing difficulty seeing things far away, such as car tags, faces, road signs, and general objects to read. (HR. 92, 94–95). He went to the Eye

Foundation in Birmingham in the mid-1970s, and the doctor there told W.P. that he could do nothing for him other than prescribe glasses and advise him to use a plain magnifying glass along with his prescription glasses. (HR. 92–93). Beginning then, W.P. used prescription glasses and a magnifying glass. (HR. 93). W.P.'s vision continued to worsen during the 1970s and 1980s. (HR. 93).

88.    In 2005, W.P. was told he was on the borderline of being legally blind. (HR. 93). At the time of Marshall's trial, W.P. used both glasses and a magnifying glass for his vision problems. (HR. 95).

89.    During the trial, W.P. sat at the far end of the jury box, farther away from the witness box and than other juror. (HR. 97). He could not see the witnesses in the witness box or the slides or film presented as evidence well. (HR. 97). When exhibits were passed around, W.P. was able to use his prescription glasses, but he did not have his magnifying glass with him because he was embarrassed to use it. (HR. 97).

90.    W.P.'s testimony at Marshall's Rule 32 hearing establishes that he, too, deliberately chose not to answer the Questions. W.P. testified that he remembered the Questions. (HR. 99–100). He also testified that he did not respond to them in any way. (HR. 101–02). He further testified that the reason he did not respond to the Questions was not because he did not hear them, not because he did not understand them, not because they were ambiguous, and not because he did not remember his vision problems. (HR. 102–03).

91.    The conclusion from W.P.'s testimony at Marshall's Rule 32 hearing that he deliberately chose not to answer the Questions during voir dire is consistent with the circumstances of the voir dire. During voir dire, a potential juror disclosed that he had a hearing problem due to a prior surgery. (TR. 92, 165). W.P. admitted at the Rule 32 hearing that his

omission of his vision problems was not an oversight, explaining that he did not bring his magnifying glass because he was "embarrassed." (HR. 97).

### 2.  *The Jurors' Misconduct Compromised the Jury's Verdict*

92.     The misconduct of each of these three jurors compromises the reliability of the jury's verdict.  Their cumulative effect is substantially greater, and the reality is that the jury's verdict is palpably unreliable.  At Marshall's Rule 32 hearing, defense counsel Mathis testified that, had he known M.J. suffered through a physically and emotionally abusive first marriage, he "absolutely" would have moved to strike her for cause.  (HR. 170–72).  Mathis testified that the reason he would have so moved was because the "whole case" dealt with Marshall having been an "abusive mate's spouse, boyfriend, live-in companion throughout his – at least his last 10 years or so, history" and he "didn't want anybody like [M.J.] on the jury." (HR. 172–73). Indeed, during voir dire, a different potential juror disclosed that she had been a victim of spousal abuse, and Mathis moved to strike her. (TR. 173–76).  Over the objection of the State, the Court granted Mathis's motion to strike.  (TR. 173–76).  These facts make plain the materiality of M.J.'s misconduct.

93.     Similarly, at Marshall's Rule 32 hearing, Mathis also testified that, had he known T.C. had gone through training to serve as a foster parent for sexually abused children and was awaiting placement of a foster child in his home, he "certainly" would have moved to strike T.C. for cause. (HR. 175).  Mathis explained that the case involved an allegation that a child had been sexually abused in conjunction with a murder and that he "just [didn't] think a juror with [the life experience of T.C.] would be as independent and neutral as [he] would like to have [his] jurors." (HR. 175–76).  Yet, because of T.C.'s misconduct, he remained on the jury and its independence was compromised.

94.     Finally, it is common sense that a juror's vote to convict a defendant is unreliable if physical impairments hamper the juror's ability to understand or evaluate the evidence presented to support the conviction.  See, e.g., United States v. L'Hoste, 609 F.2d 796, 802 n.4 (5th Cir. 1980) (explaining circumstances where parties and court agreed that juror who could not hear "was not competent to sit on the jury" and was replaced with an alternate juror upon the court's discovery of the impairment during the proceedings).  Accordingly, W.P.'s failure to alert the trial court to his vision problems gravely compromised W.P.'s participation in jury deliberations and undermined the reliability of his vote to convict Marshall.

> 3.   *One Juror Introduced Extraneous Information During Jury Deliberations, Further Compromising the Jury's Verdict*

95.     In addition to the grave misconduct related to failure to answer truthfully voir dire questions, the introduction of extraneous information during jury deliberations seriously compromised the reliability of the jury's verdict.  More particularly, M.J. violated Marshall's federal constitutional rights by introducing extraneous information during jury deliberations. Turner, 379 U.S. at 472.

96.     At trial, evidence relating to AB's vaginal tear was admitted.  The only evidence of the cause of the vaginal tear was offered by the State, and that evidence was not conclusive. The State called Dr. William Arthur "Art" Shores, who could not opine with certainty as to what may have caused the tear, and who testified that the vaginal tear "could have been created in more ways than just sexual abuse."  (TR. 582–83).

97.     At Marshall's Rule 32 hearing, the Court partially sustained the State's objection to M.J.'s testimony regarding the vaginal tear.  (HR. 36–39).  In the limited testimony allowed, M.J. testified that the vaginal tear introduced at trial was a key part of the evidence presented and

was a key medical issue for her.  (HR. 36–37).  She also testified that how the vaginal tear occurred was a key issue for her.  (HR. 37).

98.    At the end of the Rule 32 hearing, Marshall proffered the evidence that M.J. would have provided had the State's objection been overruled.  Had M.J. been allowed to testify without objection, she would have testified that:

    a.  an elderly male juror asked whether the vaginal tear could have been caused by masturbation;

    b.  M.J. and another female juror replied that the vaginal tear could not have been caused by masturbation; and

    c.  M.J.'s response that the vaginal tear could not have been caused by masturbation was based on her general life experiences.

(HR. 39, 333–34).  M.J. also would have testified that the information regarding masturbation not being a source of a vaginal tear was key information and probably led her to be more in favor of convicting on the capital murder/sexual abuse charge.

99.    M.J.'s commentary (as well as the other female juror's) that the vaginal tear could not have been caused by female masturbation was not evidence presented during trial.  Indeed, the only evidence presented during trial on the issue showed that it could have been caused by anything.  Consequently, M.J.'s statement was extraneous medical information and was improperly shared with the jury.

100.    Marshall's constitutional right to a trial by an impartial jury was violated on multiple occasions due to juror misconduct and the jury's consideration of extraneous information during its deliberations.  McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 55–56 (1984); Turner v. Louisiana, 379 U.S. 466, 472 (1965); Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The state court's determination that Marshall was not entitled to relief on this ground was both an unreasonable determination of the facts and contrary to or an unreasonable

application of clearly established federal law.  Marshall is thus entitled to habeas corpus relief on this ground.  See 28 U.S.C. § 2254(d).

### C.     Alabama's Lethal Injection Protocol Violates the Eighth Amendment

101.     Any decision of the Alabama Courts that the State's lethal injection protocol did not violate the Eight Amendment is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  See Farmer v. Brennan, 511 U.S. 825 (1994), and Helling v. McKinney, 509 U.S. 25 (1993).

102.     The State's lethal injection protocol creates a demonstrated risk of severe pain and that risk is constitutionally unacceptable.  This risk is very likely to cause needless suffering. See Baze v. Rees, 553 U.S. 35, 49-50 (2008).

103.     Moreover, the risk of pain and harm from the State's lethal injection protocol is excessive and substantial when compared to known and available alternative methods of execution.  See Glossip v. Gross, 135 S. Ct. 2726, 2738 (2015).

### IV.  PRAYER FOR RELIEF

For all the above-stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Petitioner William Bruce Marshall respectfully asks this Honorable Court to grant him the following relief:

(a) Grant petitioner's accompanying motion to proceed in this matter *in forma pauperis* and appoint the undersigned as counsel for petitioner;

(b) Afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(c) Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(d) grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases

and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(e) Permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(f) Issue a writ of habeas corpus granting petitioner relief from his unconstitutionally obtained conviction and sentence of death; and

(g) Grant such further and other relief as may be appropriate.

Respectfully submitted,

s/ Anna Manasco
One of the Attorneys for Petitioner
William Bruce Marshall

OF COUNSEL

Glenn E. Glover (gglover@babc.com)
C. Jason Avery (javery@babc.com)
Tiffany deGruy (tdegruy@babc.com)
Leigh Ann Fleming (lfleming@babc.com)
Anna Manasco (amanasco@babc.com)
Taryn Ely Hodinka (thodinka@babc.com)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

**CERTIFICATE OF SERVICE**

I hereby certify on September 26, 2015, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:


    Kevin W. Blackburn, Esq.
    Office of the Attorney General
    501 Washington Avenue
    Montgomery, AL 36130-0152


and I hereby certify that I have mailed by United States Postal Service the document to the

following non-CM/ECF participants:

    NONE


    s/ Anna Manasco
_____
    Of Counsel

**ATTORNEY'S VERIFICATION**

I affirm under penalty of perjury that, upon information and belief, this Petition for Writ of Habeas Corpus is true and correct. Executed on September 26, 2015.


s/ Anna Manasco
_____
Of Counsel
