FILED
2018 Nov-26 PM 12:18
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM BRUCE MARSHALL,
Petitioner,

v.

JEFFERSON S. DUNN,
Commissioner of the Alabama
Department of Corrections,
Respondent.

CASE NO. 2:15-cv-01694-AKK

Abdul K. Kallon
United States District Judge

October 25, 2018
Birmingham, Alabama

**EVIDENTIARY HEARING RE: MOTION FOR DISCOVERY AND TESTIMONY OF NICHOLS AND VOGELSANG**

Proceedings recorded by mechanical stenography, transcript produced by computer.

**SABRINA LEWIS, CCR, RDR, CRR**
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-2065
sabrina_lewis@alnd.uscourts.gov

FOR THE PETITIONER:

Hillary Chinigo Campbell
Tiffany J. deGruy
Anna Marie Manasco
Thomas Lee Oliver III
Davis Shuford Vaughn
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
205-521-5000
hcampbell@bradley.com
tdegruy@bradley.com
amanasco@babc.com
toliver@bradley.com
dvaughn@bradley.com

FOR THE RESPONDENT:

Lauren A. Simpson
Assistant Attorney General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130
334-242-7300
ccramer@ago.state.al.us

## EXAMINATION


| | PAGE |
|---|---|
| **GEORGE R. NICHOLS II, M.D.** | |
| DIRECT EXAMINATION BY MR. OLIVER | 5 |
| CROSS-EXAMINATION BY MS. SIMPSON | 33 |
| **JANET VOGELSANG, MSW** | |
| DIRECT EXAMINATION BY MS. CAMPBELL | 41 |
| CROSS-EXAMINATION BY MS. SIMPSON | 179 |
| REDIRECT EXAMINATION BY MS. CAMPBELL | 220 |
| **TONYA BENTLEY** | |
| DIRECT EXAMINATION BY MS. SIMPSON | 223 |

## PETITIONER'S EXHIBITS

| NO. | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| 2 | Shores's autopsy report | 14 | 14 |
| 13 | Marshall screening notes | 30 | 31 |
| 15 | Shores's trial testimony transcript | 19 | 20 |
| 16 | Records | 25 | 26 |
| 17 | Records | 25 | 26 |
| 18 | Records | 25 | 26 |
| 19 | Records | 25 | 26 |
| 20 | Vogelsang's CV | 41 | 42 |
| 24 | State v. Hugh Wilkins, Sr., records | 81 | 81 |
| 25 | Frederick County Public Schools records | 130 | 132 |
| 26 | Rowan County Public Schools records | 130 | 132 |
| 27 | Wahama High School records | 131 | 132 |
| 28 | 16th District Juvenile and Domestic Relations Court of Virginia record | 112 | 114 |
| 29 | William Bruce Marshall U.S. Army National Guard service records | 139 | 143 |
| 37 | Physicians Associates records | 145 | 149 |
| 40 | Cumberland Medical Center records | 146 | 149 |
| 49 | State of Florida v. Gentile and Marshall court records | 209 | 209 |
| 50 | State of Florida v. William Marshall court records | 210 | 210 |
| 71 | Photo of Charles Marshall | 82 | 82 |
| 78 | Composite records not objected to by the State | 174 | 175 |
| 79 | Composite records objected to by the State | 175 | 177 |
| 80 | Visuals | 172 | 178 |

## RESPONDENT'S EXHIBITS

| NO. | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| 1 | Ackerson forensic evaluation report | 190 | 191 |
| 2 | Ackerson file | 190 | 191 |
| 3 | Bernard's trial testimony | 210 | 211 |
| 4 | Tonya Marshall's trial testimony | 214 | 214 |

THE COURT: The matter before the Court at this time is in the case of William Bruce Marshall against the Commissioner of the Alabama Department of Corrections.

Mr. Marshall is challenging his death penalty sentence in Jefferson County Circuit Court. This is an evidentiary hearing. It's limited in scope.

Who is taking the lead this morning on behalf of Mr. Marshall?

MS. CAMPBELL: Hillary Campbell, Your Honor, on behalf of Mr. Marshall.

THE COURT: Ms. Campbell, good morning. Walk me through what you plan to do today, please.

MS. CAMPBELL: Yes, Your Honor.

First up, we will present Dr. Nichols for his testimony, and my colleague, Trey Oliver, will be examining Dr. Nichols. And then after we finish with him, I will be presenting Ms. Vogelsang, who is our licensed clinical social worker expert, for her testimony.

THE COURT: Okay. Let's begin, then, please with your first witness. Nichols, you're calling?

MR. OLIVER: Yes, Your Honor. This is Trey Oliver for the petitioner. I'd like to call Dr. George Nichols at this time.

THE COURT: Okay. Thank you, Mr. Oliver.

Dr. Nichols, good morning. Thank you for being here.

DR. NICHOLS: Good morning, sir.

(Witness sworn.)

THE COURTROOM DEPUTY: Please state and spell your first and last name for the record.

THE WITNESS: I am George, G-e-o-r-g-e, Riley Nichols, N-i-c-h-o-l-s, the Second.

THE COURTROOM DEPUTY: What city and state do you reside in?

THE WITNESS: I live in Louisville, Kentucky.

THE COURT: Mr. Oliver, your witness, sir.

MR. OLIVER: Thank you, Your Honor.

GEORGE R. NICHOLS II, M.D.,

duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. OLIVER:

*Q.* Dr. Nichols, what is your current profession?

**A.** I'm a physician, a forensic pathologist.

*Q.* Are you also a licensed physician?

**A.** I am.

*Q.* Are you certified?

**A.** I am, by the American Board of Pathology.

*Q.* In what fields are you certified as a physician?

**A.** I'm certified in anatomic pathology. This is the study of the organs, the structures, the tissues, and the cells of the body and how that relates to disease or to health. The anatomic pathologist is the doctor who makes the

diagnosis of a tissue biopsy taken by your surgeon.

Next I'm certified in clinical pathology. This is basically the study of human biologic fluids and how that relates to disease or to health. The clinical pathologist is the doctor in charge of the laboratory where the blood that's taken from your arm is sent and is tested.

And last I'm certified in forensic pathology. The word forensic means law applied. Therefore, theoretically, anything having to do with the law and human disease is the purview of a forensic pathologist, in actuality and in practice. The vast amount of a forensic pathologist's professional time is spent in an attempt to determine, if possible, how a human being goes from alive to dead.

*Q.* Do forensic pathologists also perform autopsies?

**A.** Yes.

*Q.* Now, let's back up a little bit. Where did you get your medical degree?

**A.** University of Louisville School of Medicine, graduated in 1972.

*Q.* Can you go through in detail for the Court your work experience upon graduation from the University of Louisville School of Medicine starting with your residency?

**A.** I did a residency in anatomic and clinical pathology at the University of Louisville affiliated hospitals from '72 to '76. '76 to '77, I did a fellowship in forensic

medicine at the Institute of Forensic Medicine, Toxicology, and Criminalistics. And at that same time, I was a deputy coroner in Hamilton County or Cincinnati, Ohio.

On the 1st of July 1977, I was appointed to become the first chief medical examiner, a position I held for slightly over 20 years at the pleasure of six consecutive governors.

Q. During your employment as a fellow, resident, or deputy coroner, did you ever personally conduct any autopsies?
**A.** Yes.
Q. How many?
**A.** During that period, about a thousand.
Q. You also stated, I believe, that you were the chief medical examiner. As chief medical examiner for the Commonwealth of Kentucky, did you supervise over autopsies?
**A.** I did.
Q. How many?
**A.** Greater than 20,000. Perhaps 40,000.
Q. Do you have any medical experience as a teacher and academic?
**A.** Yes. I held teaching appointments for the faculty at the University of Louisville School of Medicine, Department of Pathology as a resident from 1972 through junior faculty positions to eventually become a clinical professor in the Department of Pathology. That appointment lapsed in 2016.

At one time or another, I was also a part-time member of the departments of pharmacology and toxicology and pediatrics.

Q. Have you conducted any research or made any publications relating to the field of pathology?

A. Yes, sir. I'm coauthor of about 24 peer-reviewed papers.

Q. Have you been awarded or recognized for your work in the medical field especially as it relates to the field of pathology?

A. Yes, sir.

Q. Can you state a couple of those to the Court?

A. From the Kentucky Victims Advocates, an award acknowledging my work toward advocacy for victims of crime; from the Attorney General's Task Force on Domestic Violence; another award, The Wolf Award, named after a forensic anthropologist who tragically died who -- this came from the Kentucky Coroners Association because of work dealing with dead human beings and others.

Q. How many times have you testified before a federal court at trial?

A. Before a federal court?

Q. Yes, sir.

A. Probably about 24, 25 times.

Q. And how many times have you testified through the

course of your career at trial?
A. Thousands.
MR. OLIVER: Your Honor, at this time I would like to ask that Dr. Nichols be qualified as an expert in clinical and forensic pathology.
THE COURT: As I understand, the State does not question his qualifications; it's just that his testimony is irrelevant?
MS. SIMPSON: No, Your Honor. No objection.
THE COURT: Tell me your name, please. I should have asked for the State's lawyers to identify themselves earlier.
MS. SIMPSON: I'm Lauren Simpson, Your Honor.
THE COURT: Ms. Simpson. Who is with you?
MS. CAMPBELL: This is Beth Hughes, Your Honor.
THE COURT: Ms. Hughes, good morning to you as well.
MS. HUGHES: Good morning, Judge.
THE COURT: Thank you both.
We will receive Dr. Nichols based on his qualifications and his extensive experience as an expert in the areas for which he's being tendered for.
MR. OLIVER: Thank you, Your Honor.
Q. Dr. Nichols, were you involved in this case at the time of the trial or in preparation leading up to the trial?
A. I was involved in this case after the trial was

completed, as far as I know.
*Q.* But are you stating to the Court that you were not involved in this case at the time of trial?
**A.** Correct.
*Q.* Were you involved in this case by the time of the Rule 32 hearing in 2010?
**A.** Yes.
*Q.* Can you please let the Court know what you were specifically asked to opine upon and look into?
**A.** I was specifically asked to evaluate Dr. Shores's autopsy report and evidence associated with the autopsy and his subsequent testimony in the trial.
*Q.* As it relates to what you were asked to look upon, were you also asked to look and see specifically as to the time and cause of the occurrence of a small superficial mucosal tear in the vaginal area of the deceased?
**A.** I was.
*Q.* What materials did you rely upon to form any scientific opinions that you may state today?
**A.** I read and studied the following: the autopsy report performed by Dr. Shores that's 05 TU-00653 and accompanying toxicology report, a cause of death letter from Dr. Shores, autopsy photographs.
I also read the trial testimony of Karl Marterer and the trial testimony of Dr. Shores. Eventually, I asked for

and received five tissue slides obtained from the tissues of the body of decedent, and I received notes from Detective O'Connor.

Q. Is there anything else that you're aware of that you reviewed in this case?

A. Some letters concerning a question of other available vaginal tissue that had been retained.

Q. Is it typical for you to rely on the information that you previously just stated that you reviewed in forming your expert opinion?

A. Yes.

Q. And is that the type of information that is reasonably relied upon by other experts in your field?

A. Yes.

Q. Now, when you say you were asked to review the materials in order to give a scientific opinion, what exactly do you mean? Is there a certain standard that is required for you that you hold yourself out to before you are able to reach a scientific opinion?

A. The standard is called reasonable medical probability. This is the standard by which conclusions are reached either in clinical medicine -- by your doctor -- or by a pathologist in postmortem situations.

Q. Now, I believe you said earlier that you didn't learn about this case until before the Rule 32 hearing and after

trial. Were you testifying in cases as a forensic pathologist in October 2005 and when this case went into trial in 2006?
A. Yes.
Q. Were other experts in your field testifying as a forensic pathologist in 2005 and 2006?
A. Yes.
Q. Would you have been willing and able to testify as a forensic pathologist if you had been contacted to testify in this trial?
A. Yes.
Q. While we are on if you'd have been willing and able, I want to go ahead and ask are you being paid for your time, as you sit here today, and for the materials that you previously looked at in preparation of this hearing?
A. Yes.
Q. How much are you being paid per hour?
A. $400 per hour.
Q. Is that your standard rate?
A. Yes. Or pro bono, nothing.
Q. Just to be clear and before I ask you about any expert opinions today, has anyone ever asked you to provide testimony in one particular manner or another that would be or might be helpful to Mr. Marshall's case?
A. No.

*Q.* Now, you stated that you reviewed the autopsy report conducted by Dr. Shores. Before we look or ask you questions about the actual autopsy, can you explain the purpose of conducting an autopsy?

**A.** The autopsy has multiple goals, the first of which is to establish the identity of the decedent. Next is to determine the cause of death and eliminate any other cause of death. The next is to determine the direction, nature, and severity of forces that may have been applied onto and deep into the tissues of the body. Next is to document any underlying natural disease process which may be present. The next is to recover evidentiary materials which may be studied in the toxicology lab and other forensic sciences laboratories. And last is to help determine the manner of death.

*Q.* If these autopsies are performed correctly with the goals that you just stated, what may the autopsy determine?

**A.** May determine all of those. It helps to determine the manner of death, but it can determine the cause of death; eliminate any other cause of death; see if there's any wounds to the exterior of the body and if those wounds are carried by forces deep into the tissues causing tissue injury; obviously document any underlying diseases there and recover materials for other tests to be performed.

MR. OLIVER: Your Honor, may I approach the witness?

THE COURT: You may.

(Petitioner's Exhibit 2 was marked for identification.)

Q. (BY MR. OLIVER:) Dr. Nichols, is this a document that you have previously reviewed?

A. Yes.

Q. All right. Can you state to the Court what you believe this document to be?

A. This is the written report that Dr. Shores completed as a result of his autopsy examination and other tests that were done, and attached to it are multiple body diagrams.

MR. OLIVER: Your Honor, at this time I'd like to request the autopsy which has previously been labeled as Petitioner's Exhibit 2 be admitted into evidence. We previously asked the State if they had any objections to authentication or hearsay, and they did not.

THE COURT: Ms. Simpson?

MS. SIMPSON: No objection, Your Honor.

THE COURT: Thank you.

Petitioner's 2 is received.

(Petitioner's Exhibit 2 was admitted into evidence.)

MR. OLIVER: Kim, can you please pull up Petitioner's Exhibit 2, page 1.

Q. Dr. Nichols, when reviewing this autopsy, what did you see and rely upon as it relates to the first page that may be specific to Dr. Shores's testimony?

**A.** Well, what is the object of the question here is diagnosis number 6, "fresh superficial vaginal mucosal tear (6:00) with unremarkable speculum exam."

*Q.* Now, Dr. Nichols, can you take some time and break that down for me, because there are some medical terms, as to what each of those terms mean?

**A.** Well, I'm not too sure what "fresh" means. "Fresh" is not in the standard medical text anywhere. I didn't look it up in Steadman's Medical Dictionary. But the word we usually use for a brand-new thing is "acute," not "fresh." So I don't know what that word means.

"Superficial" means just what it says. It's on the outer surface of a thing. In this case, it turns out to be the vaginal mucosa in which there is a small "tear." And the medical term for tear is laceration, which means to tear the tissue.

It's located at an anatomic position at 6:00, if we were viewing the perineal body with the woman in the face-up or supine position.

Then "with unremarkable speculum examine." A speculum is a medical tool that is used to open the vaginal tissue so that all of the vaginal epithelial or lining surfaces can be viewed with the eye.

*Q.* Is there anything else that you can denote of importance on this page from the final diagnosis that

states that there was a fresh superficial vaginal mucosal tear at 6:00 with unremarkable speculum exam?

**A.** No, sir.

MR. OLIVER: Kim, can you please turn to the diagram on page 13 of Petitioner's Exhibit 2.

*Q.* Dr. Nichols, have you reviewed this diagram?

**A.** I have.

*Q.* Is there anything in particular about this diagram that you noted when reviewing the materials submitted to you?

**A.** Well, obviously he has drawn an arrow to these "small superficial mucosal tear that is present in the diagram at 6:00."

*Q.* Is there anything different about what you can tell from this notation as it relates to what was concluded on the first page of the autopsy?

**A.** No.

*Q.* Were there any other notations that you looked at on this page that drew your attention?

**A.** No.

MR. OLIVER: Kim, can you please turn to page 6 of Petitioner's Exhibit 2.

*Q.* Dr. Nichols, if you look in the middle of the page here, I think it says that there was a microscopic examination conducted.

**A.** It says that "no microscopic examination was

conducted."

Q. What is a microscopic examination?

A. It is the removal of tissue and treatment of the tissue as what's called a tissue block. So the piece of tissue that's removed and will be studied is about the size of a nickel. It then goes into a tissue processer, and the material is dehydrated and it is made firm. It's analogous to skin becoming leather.

So once it becomes firm enough, then it goes through -- continues through a process where it's sliced into tiny, thin fragments of tissue that you can actually see through they are so skinny. Then it goes into a series of chemicals to impart dyeing to -- selective dyeing to portions of each cell. Then it gets another piece of glass put on it, and that becomes a glass histologic slide.

Q. Now, you mentioned a histologic slide. What does a person or a doctor conducting an autopsy do with a histologic slide?

A. Well, you would look it and study it with the microscope. Then you would retain it. And you would also retain the tissue block with the tissue embedded in a paraffin for at least five years.

Q. Is it normal for doctors conducting autopsies to take these histology slides?

A. Yes.

Q. What happens if the slides aren't initially maintained?
A. Well, if the tissue will be retained in a communal -- a jar of communal-sourced tissue from that same autopsy. So pieces of kidney, liver, et cetera, along with, hopefully, the vaginal tissue in question would be retained in a fixative solution in basically a mason jar.
Q. If this evidence was maintained in a mason jar or the fixative solution that you just mentioned, could it later be made into a slide?
A. It could. It would have to search and try and find the right piece or pieces of tissue that were in the mason jar.
Q. Based on this autopsy, are you aware if any histology slides were looked at or histology test was conducted as part of the autopsy?
A. I know that five slides of retained tissue were made in the histology lab at the Alabama forensic sciences department. I know because they were sent to me after they had been processed. And they were processed appropriately. They were technically adequate to be able to study and see what they showed.
Q. Do you know if those slides were looked at by Dr. Shores?
A. I do not.
Q. You also stated that you have reviewed the testimony of Dr. William Shores at the trial. Based on your

understanding of his testimony, were Dr. Shores's statements and conclusions presented to the jury?
A. Yes.
Q. What conclusions did Dr. Shores make, in your opinion, as to the timing of the mucosal tear specifically?
A. Well, basically that he thought it was less than 24 or maybe more than -- up to 48 hours, was his most frequent testimony. He also stated it could have been a perimortem artifact, meaning around the time of death rather than occurring 24 hours before. And he also stated that it could have -- if in cold surroundings, it could have been longer than 24 hours.
MR. OLIVER: Your Honor, may I approach the witness?
THE COURT: You may.
(Petitioner's Exhibit 15 was marked for identification.)
Q. (BY MR. OLIVER:) Dr. Nichols, have you reviewed the document that I just handed you?
A. Yes, I have.
Q. And based on what you see now, what is this document?
A. This is a copy of the written transcript of his testimony in the trial in chief.
MR. OLIVER: Your Honor, at this time I'd like to request that the transcript of Dr. Shores's testimony be admitted into evidence. The State had no objections previously to authenticity or hearsay regarding it either.

THE COURT: Ms. Simpson?

MS. SIMPSON: No objection, Your Honor.

THE COURT: Thank you.

Petitioner's 15 is received. You may proceed.

(Petitioner's Exhibit 15 was admitted into evidence.)

MR. OLIVER: Kim, can you please pull up Petitioner's Exhibit 15 at page 589-590.

Q. Dr. Nichols, you previously just testified that Dr. Shores stated that the mucosal tear may have occurred less than 24 hours in age and 48 hours at the outset. Do you recognize that statement by him on Petitioner's Exhibit 15?

**A.** Yes. That's on page 590. 589, however, does have other materials that deal with his evaluation.

Q. Is this one of the statements that you were referring to concerning Dr. Shores's testimony as to the timing of the mucosal tear?

**A.** That is part of it, yes. "It's probably less than 24 hours of age. You know, 48 hours at the outset but probably less than 24 hours in a -- I don't know what that I can get much more specific than that."

Q. In your opinion, did Dr. Shores also rely on the appearance of the mucosal tear in his testimony as support for his conclusion that the tear may have occurred 24 to 48 hours out?

A. He did.

MR. OLIVER: Kim, can you please turn back to 589 of Dr. Shores's testimony and pull the answer below the question asking, "How recently was the vaginal tear caused?"

Q. Dr. Nichols, in your medical opinion, does being moist or wet allow for a doctor to determine the recency of a mucosal tear?

A. No.

MR. OLIVER: Kim, can you please now turn to page 587.

Q. On page 587, Dr. Shores appears to be asked several questions. In the middle of the page, Dr. Shores appears to state it occurred before death and then later states if it didn't occur before death, it occurred very perimortem, as you previously testified. What does perimortem mean?

A. Around the time of death.

Q. In your medical opinion, could a doctor testify to the timing of this injury if it occurred around the time of death or after death any better than he could prior to death if a histology test had not been conducted?

A. He cannot.

Q. There's also a line on page 587 where Dr. Shores answers, "They are fresh abrasions. They have the appearance of fresh abrasions." In your opinion, do these statements indicate that Dr. Shores may have testified as

to a time period based on his perception of viewing the mucosal tear?
**A.** That is my opinion; he is testifying about his observation with his eye.
*Q.* In your medical opinion, is that appropriate, for a medical doctor to make a determination based on his observation in this regard?
**A.** No.
*Q.* Now, Dr. Nichols, based on your expert analysis of the numerous different materials you have reviewed and relied upon, have you been able to come to a scientific opinion as to the timing of the mucosal tear before the death occurred yourself?
**A.** No.
*Q.* Have you been able to come to a scientific opinion as to the timing of the mucosal tear after the death occurred?
**A.** No.
*Q.* Why is it that you were unable to come to those conclusions?
**A.** Because Dr. Shores did an incomplete examination.
*Q.* Can you please explain a little bit more what you mean by an incomplete examination.
**A.** Dr. Shores needed to evaluate in more detail the vaginal lesion. I'll use the word lesion, meaning anything other than normal. So he found a lesion, took photographs

of the lesion, made a diagram of the lesion, said a few words about the lesion, and stopped. He didn't see if there was deeper injury to vaginal or perivaginal tissues that could be seen with further dissection. He made no attempt to retain the tissues and study it histologically to make a determination of vital reaction occurring in the tissues, meaning that the heart was beating after the injury and she was alive when it happened. He made no attempt to see if any form of inflammatory response had occurred in the damaged tissues which would occur if she had lived for about six hours or longer after the injury had occurred so you could begin to time when the event happened if she was alive. And he made no attempt to see if the lesion was an artifact occurring after death.

*Q.* So is it your testimony here today that there's no way that a doctor could have determined the timing with a reasonable degree of probability by only looking at the mucosal tear or the lesion?

**A.** Using his naked eyes or corrected eyes like mine, no.

*Q.* You previously stated you looked at some histology slides. What were you able to determine when you looked at those five histology slides that you previously mentioned?

**A.** Only two of the five had tissues that were of the type that could be from the vagina. They also could have been from the mouth. The vagina and the mouth have very similar

microscopic appearances. So there were only two. And those two showed the surface to be intact, that there was no lesion present on the skin surface or deep into the skin surface. So while it may have been vaginal tissue, it was not "the" vaginal tissue that is in question.

*Q.* So let me make sure I got this straight. Is it your testimony that of the slides you reviewed, you did not see any type of damage to the vaginal tissue?

**A.** Correct.

*Q.* Did you look at any other histology slides than the five that you just mentioned?

**A.** I did. There were pieces of tissues of other organs, liver, kidney, gastrointestinal tract, some of which showed autolysis or tissue death in which the outline of the cells was falling apart. It's a form of decomposition.

*Q.* And I apologize if I'm confused, but did you state that you looked at other histology slides than the ones that -- than the two that dealt with the vaginal or just the five histology slides?

**A.** I only looked at those five slides. As far as I know, those were the only five slides that had been made in this case.

*Q.* After looking at those five slides, did you reach out or ask anyone to see if there were any other histology slides that either had been made or could be made for you

to review and come to an expert opinion?
A. I did. I asked your firm to contact the Alabama Division of Forensic Sciences and the Vestavia Hills Police Department to see if either of them had retained any additional tissues from which slides could be made.
Q. What is your understanding of whether the attorneys actually reached out to them or not?
A. There is correspondence in my file that indicates that indeed that was carried out and there were no slides that were made.
MR. OLIVER: Your Honor, may I approach?
THE COURT: You may.
(Petitioner's Exhibits 16-19 marked for identification.)
Q. (BY MR. OLIVER:) Dr. Nichols, can you take a second and look through the documents that I have just handed to you and tell the Court what you are looking at.
A. I'm looking at correspondence from your firm written by Tiffany deGruy in which the director of the -- or, actually, the general counsel of the Alabama Department of Forensic Sciences is asked to look for -- for his people to look for the tissue in question, and the answer is supplied by the director of the forensic sciences lab, Angelo Manna. They don't have anything.
Next is to the Vestavia Hills Police Department, directed to "Dear Sir or Madam," again by the same lawyer

from your firm, and there is no positive response from the police department.

MR. OLIVER: Your Honor, at this time we would like to admit into evidence Petitioner's Exhibits 16 through 19. These exhibits consist, as Dr. Nichols just spoke of, communications between our firm and the Alabama Department of Forensic Science and the Vestavia Hills Police Department requesting all other histologic slides available.

MS. SIMPSON: No objection, Your Honor.

THE COURT: Thank you.

Petitioner's 16 is received.

MR. OLIVER: Your Honor, may we also have those exhibits -- they have previously been labeled as 17 through 19.

THE COURT: They're attached to this stack that you gave me?

MR. OLIVER: Yes, sir.

THE COURT: Petitioner's 16, 17, 18, and 19 are admitted.

(Petitioner's Exhibits 16-19 were admitted into evidence.)

MR. OLIVER: Thank you.

*Q.* Based on your understanding and the letters that are before you today, is it your belief that no other histology slides were available or made available to you to conduct a

review?
A. That's correct.
Q. Why is that?
A. Because there was no additional tissue removed and because there was no tissue slide collected and made of the lesion in question at the time of the autopsy.
Q. What should a doctor who is conducting an autopsy have done as it relates once he identifies a mucosal tear?
A. Should have dissected the tissues to search and see if there was any other trauma anyplace around the lesion, and he should have made a block of tissue containing in its center "the" tear. And then that should have been -- he should have directed that that be made into glass histologic slides, then he could use a microscope to look for the things that I've previously discussed.
Q. Based on the histology slides that were provided to you, are you aware of any other way to conduct a test to determine the timing of which a mucosal tear may have occurred?
A. No.
Q. Dr. Nichols, I'd like to back up a little bit and ask a couple general questions about histology testing. First off, why exactly is it difficult to tell how long a mucosal tear has existed?
A. Things happen in a postmortem status that add artifact

to lesions that are there. They may dry out. They may be actually moistened after death occurs. The activity of bacteria that live in and on us cause changes that occur in the lesions in question, and there is actual melting or lysis of the red blood cells that occurs after death. So many things can change. So you want to stop the clock in terms of decomposition as soon as the tissue goes into the fixative solution so you can know what it looks like at the time that you're doing the autopsy, not necessarily at the time of the death.

*Q.* Is there any other way to determine the timing with a medical degree of probability without conducting histology tests?

**A.** No.

*Q.* Based on your experience, was it the customary practice to conduct histology tests during an autopsy back in 2005?

**A.** Yes.

*Q.* Would it still be considered customary practice to conduct a histology test today?

**A.** Yes.

*Q.* We've previously discussed that you were the chief medical examiner for the Commonwealth of Kentucky for 20 years. And during your time as chief medical examiner, you said you oversaw thousands of autopsies being conducted. If you were overseeing an autopsy in that role as chief

medical examiner in which the histology test was not conducted after a mucosal tear was found, what would you have done?

**A.** I would have picked up the phone and called the pathologist who did the examination and we would have had a long talk.

*Q.* What do you mean by a long talk?

**A.** I would have asked why the examination was not performed, did he or she understand that he was there doing a service for the people and, in so doing, he needed to do his job completely.

*Q.* Now, we've previously discussed the timing of the tear, but you were also asked to look into the cause of the tear. Were you able to make any scientific determinations regarding the cause of the tear?

**A.** No.

*Q.* And why is that?

**A.** Well, number one, it's a nonspecific descriptor that he's used. Number two, we have no microscopic appearance of it. And I can't tell you whether it occurred hours or days before her death. I can't tell you if it didn't occur near the time of her death. I can't tell you that it didn't occur postmortem. So the causation is totally unknown. It's a nonspecific finding.

*Q.* So let me make sure I understand this. Are you stating

that due to the lack of scientific basis to determine the time in which the tear occurred, it would be almost impossible to then determine the cause with any certainty?

**A.** Well, that plus the fact that he didn't examine the surrounding tissues to see if there was hidden damage to other tissues from a more forceful cause.

*Q.* Dr. Nichols, did you come upon any other reports in your review of documents that provided any insight into potential sources of the tear that otherwise bring you to question Dr. Shores's conclusions at trial?

**A.** Yes. There is a narrative written by Detective O'Connor.

MR. OLIVER: Your Honor, may I approach?

THE COURT: You may.

(Petitioner's Exhibit 13 was marked for identification.)

*Q.* (BY MR. OLIVER:) Dr. Nichols, the document that I have just handed you, is this the detective's notes that you were previously speaking upon?

**A.** Yes.

MR. OLIVER: Your Honor, at this time I'd like to request that the Marshall screening notes, which I've labeled as Petitioner's Exhibit 13, be admitted into evidence. The State previously had no objection.

THE COURT: Ms. Simpson?

MS. SIMPSON: No objection, Your Honor.

THE COURT: Thank you.

Petitioner's 13 is received.

(Petitioner's Exhibit 13 was admitted into evidence.)

MR. OLIVER: Kim, can you please pull up page 11 of Petitioner's Exhibit 13.

Q. Dr. Nichols, did you review this statement within the detective's notes in forming your opinion?

**A.** Yes.

Q. What does this statement indicate to you?

**A.** It indicates to me that the investigator thought that Dr. Shores was "not very impressive." He says -- the investigator says that Dr. Shores was not sure how the tear at 6:00 on the vagina happened. He said it might even have come from the body bag. And then after talking to him further, he says that he is not very familiar with trauma related to sexual assault. He would prefer that "we find an expert."

Q. Is it possible that a body bag could have caused the mucosal tear?

**A.** It's possible. Just handling of the body postmortem can cause tears if they're done wrong.

Q. Do you have any medical basis that will allow for you to proffer an opinion as to what the tear is at all other than potentially the medical bag?

**A.** Well, it could be from the surroundings she was dumped

in. She was out in the woods.

*Q.* Now, Dr. Nichols, you've testified today that, in your opinion, Dr. Shores could not provide a timeframe for the tear, the mucosal tear, with any degree of medical probability; is that correct?

**A.** That is correct, sir.

*Q.* You also testified today that because there is no degree of medical certainty as to the time that the tear occurred, it would be improper for you or any other medical professional to attest to a cause; is that correct?

**A.** Yes.

*Q.* Do you believe that Dr. Shores had any more information to offer his opinion at trial as to the timing and the cause of the mucosal tear with any more certain medical degree of probability than you do as you sit here today?

**A.** No.

*Q.* And based on your opinion that Dr. Shores had no medical basis to offer the specific testimony he did at trial as to the timing of the tear, could Dr. Shores's testimony inappropriately have influenced the jury to find that Mr. Marshall was, in fact, guilty of murder in conjunction --

MS. SIMPSON: Objection.

THE COURT: Yeah, I'm going to sustain that.

*Q.* (BY MR. OLIVER:) Dr. Nichols, in your expert opinion,

was it improper for Dr. Shores to offer testimony as to the time period in which the mucosal tear occurred?
A. Yes.
MR. OLIVER: Your Honor, I think that's it at this time.
THE COURT: Thank you.
Ms. Simpson, any cross-exam?
MS. SIMPSON: Yes, Your Honor.
THE COURT: You may.
CROSS-EXAMINATION BY MS. SIMPSON:
Q. Good morning, Dr. Nichols.
A. Good morning.
Q. You ended your career as the chief medical examiner for the Commonwealth of Kentucky in 1997, correct?
A. I did, on September 1, 1997.
Q. And you were a medical consultant for the Commonwealth from '98 until 2004, yes?
A. Yes.
Q. Since that time, have you appeared on behalf of the government, any government, as an expert witness?
A. I have appeared -- I don't know. I would have to pull up the computer records to answer that question. I don't know.
Q. Have you appeared in any other capital case?
A. No.

Q. Okay. Do you currently work for any organization other than Commonwealth Medical Legal Services, Incorporated?
A. No.
Q. And that is your company?
A. That is correct.
Q. How were you employed from December 2004 until January 2006?
A. I ran an anatomic pathology laboratory with another doctor that we founded in 1978 up until 2008 -- we sold it in 2006. Until 2005, I was also the medical director of a series of clinical laboratories that were in operation in the state of Kentucky.
Q. So you did work for Commonwealth Medical Legal Services, Incorporated?
A. I incorporated that in the fall of 1997, as you indicated, put it into business operation on the 1st of March of 1998.
Q. Yes, sir. And you were employed by the University of Louisville School of Medicine in both pathology and pediatrics during that period?
A. I was a member of the department of pediatrics for about five years ending in either 2000 or 2002. I've forgotten which.
Q. Yes, sir. How about the SmithKline Clinical Laboratories as medical director?

**A.** Well, that was -- first it was International Clinical Labs, that became SmithKline Labs, that became SmithKline Beecham Labs, that became Quest Diagnostics. Then Quest Diagnostics moved all of their operations out of the state of Kentucky.

*Q.* Laboratory Physicians, Incorporated, that's the one that you and your partner sold?

**A.** Yes.

*Q.* What about AdminaStar of Kentucky?

**A.** That is the Medicare -- was the Medicare provider in the state of Kentucky, and I was a consultant to the medical director of AdminaStar.

*Q.* And a staff pathologist at the University of Louisville Hospital?

**A.** I was for quite some time, yes.

*Q.* And staff at Kosair Children's Hospital?

**A.** I was for years, yes.

*Q.* You keep yourself fairly busy, do you not, Doctor?

**A.** I do.

*Q.* You stated that you would have been able to testify at Marshall's trial in 2006 had you been contacted by trial counsel, correct?

**A.** Yes.

*Q.* Did you consult your calendars to make that determination?

A. I was practicing on a daily basis in 2006.
Q. Do you know what you were doing in particular around the time of the trial?
A. No, I have no idea. My scheduler schedules -- keeps my schedule open so I won't be in two spots at the same time.
Q. Yes, sir. How many hours have you spent on this case?
A. I have not been asked that question until right now, so the answer is I don't know; I would have to take some time and add it up.
Q. Okay. Can you tell us how many hours you spent on this case prior to the 2010 Rule 32 hearing?
A. I think that was probably about five or six hours.
Q. Okay. And since then ballpark it?
A. It would be speculation at best.
Q. Yes, sir. How much have you billed to this point?
A. I don't know. I wasn't asked that question.
Q. Yes, sir. Do you --
A. I didn't carry the billing records down here with me.
Q. Do you advertise your services in the state of Alabama?
A. No.
Q. Okay.
A. I have a website. That's it.
Q. So you didn't advertise your services in Alabama back in 2005?
A. I never have advertised my services.

Q. And you've never had a practice in the state of Alabama?

A. No.

Q. Okay. Do you know of any other medical professionals with your degree of skill and qualifications in Alabama who would have been available to Marshall's defense counsel in 2005?

A. No. But then I haven't looked at the membership roster. I'd have to look at the membership roster of the American Academy of Forensic Sciences and the National Association of Medical Examiners in 2005-6 to be able to answer that question correctly.

Q. Yes, sir. Now, you stated that Dr. Shores did not have an adequate foundation for opining that Alicia Marshall's vaginal lesion occurred 24 to 48 hours prior to her death, correct?

A. Yes.

Q. But, now, you cannot state conclusively that the lesion did not occur within that timeframe?

A. That's correct. All I can say is there's no grounds to make an assessment of when it occurred.

Q. All right. And you said that you did review Dr. Shores's trial testimony, which is Petitioner's Exhibit 15?

A. I did.

Q. Yes, sir. So on page 582 of that transcript --
A. Let me see if I can find it.
Yes, ma'am.
Q. You saw where Dr. Shores stated concerning the lesion, "To me it raises the question of has there been sexual activity or sexual abuse. That's all it does. I'm not an expert in this area." Correct?
A. Yes.
Q. And you saw that Dr. Shores on that page and the next page readily admitted that the lesion could have been created by something other than sexual abuse?
A. He did.
Q. And you saw on page 583 where he admitted there was no evidence of semen or trauma to the genitalia?
A. True.
Q. Okay.
A. But, again, he did not do a complete examination of the genitalia.
Q. Yes. Dr. Nichols, you cannot state that Marshall did not attempt to have sexual contact with Alicia based on your examination of the evidence available, can you?
A. I cannot.
MS. SIMPSON: Thank you. No further questions.
THE COURT: Redirect?
MR. OLIVER: Your Honor, we have no further questions.

THE COURT: Dr. Nichols, you may step down, sir.
THE WITNESS: Thank you, Your Honor. Am I excused finally?
THE COURT: You don't need him for anything else?
MR. OLIVER: No, Your Honor.
THE COURT: Ms. Simpson?
MS. SIMPSON: No, Your Honor, that's fine.
THE COURT: Dr. Nichols, indeed, you are excused. You may stick around the courtroom or you can travel back to Louisville.
THE WITNESS: I think I'll travel. Thank you, Your Honor.
THE COURT: Safe travels, sir. See you.
(Witness excused.)
MS. CAMPBELL: Your Honor, Mr. Marshall will call Ms. Vogelsang now.
THE COURT: You may.
MS. CAMPBELL: Your Honor, if we may have just a quick five-minute recess or so?
THE COURT: Of course. We're in recess for the next five minutes or so until -- let's just say five after 10:00, please.
MS. CAMPBELL: Thank you, Your Honor.
THE COURT: Thank you.
(Recess.)

THE COURT: Have a seat. Is it Dr. Vogelsang?
MS. VOGELSANG: It's not "Doctor." It's Janet Vogelsang.
THE COURT: Thank you.
Has she been sworn in, or do I need to swear her in?
MS. CAMPBELL: We need to swear her in.
THE COURT: Ms. Vogelsang, will you stand and raise your right hand.
(Witness sworn.)
THE COURT: Would you please state your first and last name and spell your last name, please.
THE WITNESS: Janet Vogelsang. V-o-g-e-l-s-a-n-g.
THE COURT: And what city and state do you live in?
THE WITNESS: Greenville, South Carolina.
THE COURT: Thank you.
MS. CAMPBELL: Your Honor, one housekeeping matter before we get started.
THE COURT: Certainly, Ms. Campbell.
MS. CAMPBELL: In Volume 17 of the evidentiary record that was submitted by the State, there was a slight copying issue with one of the exhibits we'll be using. And so the State will be submitting a corrected copy of Volume 17 and for the purposes of today, we will be using a correct copy of the exhibit.
THE COURT: Okay.

MS. CAMPBELL: Thank you, Your Honor.
THE COURT: Thank you.
JANET VOGELSANG, MSW,
duly sworn, was examined and testified as follows:
DIRECT EXAMINATION BY MS. CAMPBELL:
Q. Ms. Vogelsang, what is your profession?
A. I'm a clinical social worker.
MS. CAMPBELL: Your Honor, may I approach the bench and the witness?
THE COURT: You may.
(Petitioner's Exhibit 20 was marked for identification.)
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've just handed you a copy of what's been marked as Petitioner's Exhibit 20. What is this document?
A. It's my CV.
Q. Is this a true and accurate copy of your CV?
A. Yes.
Q. Does this accurately reflect your education, employment, and experience?
A. Yes.
MS. CAMPBELL: Your Honor, we would move to admit Petitioner's Exhibit 20 into evidence.
THE COURT: Any objections?
MS. SIMPSON: No, Your Honor.
THE COURT: Thank you.

20 is received.

(Petitioner's Exhibit 20 was admitted into evidence.)

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, are you currently employed?

A. Yes.

Q. What is your position?

A. I have a private practice in Greenville, South Carolina, where I diagnose mental, emotional, and behavioral disorders. I conduct biopsychosocial assessments both for my private practice, and I give educational presentations in various areas.

Q. And you said you're a licensed clinical social worker. How long have you been a licensed social worker?

A. I have been practicing since 1980. And at that time, South Carolina was under registration, and we received official licensure in 1988.

Q. And how long have you had your private practice?

A. Since 1986.

Q. What degrees do you hold?

A. I have a master's degree in social work from the University of South Carolina College of Social Work, and I have a bachelors in psychology from Pepperdine University in California.

Q. Can you tell the Court what is a clinical social worker?

A. A clinical social worker is a mental health professional. Their training and education is in the diagnosis and treatment of mental, behavioral, and emotional disorders; and they have to meet certain state requirements, and board certification is optional. They can be found in a number of settings in mental health centers, psychiatric hospitals, in the military, in business, in private practice. And clinical social workers provide about 60 percent of all the mental health treatment in the United States.
Q. Are you licensed and board certified?
A. Yes.
Q. What are your licenses and board certifications that you hold?
A. I'm licensed by the South Carolina Board of Examiners in clinical social work, and I'm board certified by the American Board of Examiners in clinical social work. I'm also licensed in Alabama.
Q. Have you authored any publications?
A. I have written a book called "The Witness Stand." And it's a how-to guide for social workers who are going to inevitably find themselves in the courtroom. And I served as advisory editor on a crime victims advisory handbook. And then I have authored along with others a paper on social work and psychoanalysis.

Q. Have you held any appointments?
A. For eight years I served on the South Carolina Crime Victims Advisory Board. That was an appointment by the governor of South Carolina at that time. And this is a board that was set up to address the needs of crime victims. I served on a panel that decided compensation for crime victims in the areas of medical expenses, burial expenses, lost wages, and counseling. And then we also wrote and proposed legislation on behalf of crime victims.
Q. Are you licensed to diagnose and treat medical disorders?
A. Yes.
Q. Were you asked to diagnose any mental disorders in this case?
A. No.
Q. Can you briefly describe your work experience for the Court.
A. After I completed my internships at the Greenville Area Mental Health Center, at the Veterans Administration Hospital in Salisbury, North Carolina, and at William Hall Institute in Columbia, South Carolina, my first job was with the Los Angeles Department of Public Social Workers as a master's level caseworker. And in that capacity, I worked in the areas of child abuse and neglect. I had to write reports for the court and had to testify about those

kinds of issues: physical, emotional, sexual abuse and neglect of children.

And at that same time, I was part of a group that started a program for teenage boys who had been sexually abused and were prostituting themselves in Hollywood, California, and were very hard to place.

When I returned to South Carolina, I was the maternal child care supervisor at Baptist Medical Center in Columbia, South Carolina, and also their emergency room social worker. So in that capacity, I also was occasionally called to testify in court regarding children especially.

When I returned to Greenville, which is my home, I went to work for United Way, a program called Family Services Greenville. And that was as director of their domestic violence program and so, of course, found myself frequently in the courtroom testifying about family violence.

In 1986, I went into private practice with Behavioral Consultants. And that was a group of clinical social workers, and we brought in additional staff. We brought in psychiatrists, we brought in psychologists, and then some other paraprofessionals so that our practice could have a very broad approach, a multidisciplinary approach.

I became a partner in that practice and, due to my

cases, would be called on to testify in court in various areas regarding mental, emotional, and behavioral problems and conducting biopsychosocial assessment.

In 1992, I got some additional training under Dr. Edna Copeland in Georgia. Her expertise was in neurological problems that affect children and adults who have learning disabilities and other type of neurological impairments. And so I added that to my practice and started a solo practice, and I've been doing that till the present time.

*Q.* What professional organizations do you belong to?

**A.** I'm past president of the South Carolina chapter of the National Association of Social Workers and past president of the South Carolina Society for Clinical Social Workers. I belong to the American Board of Examiners in Clinical Social Work, and I have served on their board and served as editor for the National Organization of Forensic Social Workers.

*Q.* Have you received any awards or recognitions for your work in the field of social work?

**A.** Over the years mostly for leadership in the field from the South Carolina chapter of the National Association of Social Workers, the South Carolina Society for Clinical Social Workers, the House and the Senate of the South Carolina legislature, and recognition from the 13th Circuit

Solicitor's office in South Carolina and Alumnus of the Year at the College of Social Work at the University of South Carolina.

Q. And in your practice do you conduct biopsychosocial assessments?

A. Yes.

Q. Have you created a visual to help explain to the Court what a biopsychosocial assessment is?

A. Yes.

MS. CAMPBELL: May I approach, Your Honor?

THE COURT: You may.

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, is that a copy of the visual that was created?

A. Yes.

Q. Will you explain to the Court what a biopsychosocial assessment is.

A. Well, it's the social work method of gathering extensive information on an individual when you are trying to either arrange for resources and treatment in your private practice or for the court regarding the disposition of a case.

It includes clinical interviews. It includes reviewing numerous records, visiting various communities that would have been relevant to the life of the person being assessed. It is a review of research and literature

and studies that may or may not be relevant to what you're finding in the course of your assessment.

It is looking at an intergenerational history, in other words, the history of prior generations, to see if there are any patterns either of different types of problems that perhaps were passed down through the generations without interruption, and then consultation or the reading of reports of other professionals.

Q. Biopsychosocial assessment, that's a long word. Let's break that down a little. What does the "bio" part of that term mean?

**A.** Well, we're trying to conduct these assessments in our practices in a multidisciplinary fashion. And so we're trained to factor in any sort of medical problems, illnesses. It may be neurological problems. It could be anything that would come under the heading of medical or biological. Not because we are trained or licensed in that area but because we're trained to consult with those professionals to learn from them what they have found in their own assessments and to factor that information into our thinking when we're assessing a client.

Q. What is the "psycho" part of biopsychosocial assessment?

**A.** Well, of course, many of us to some degree do similar things. But psychologists especially focus on testing.

And because they have those skills and can do a lot of higher level testing, again, we refer clients to them. We consult with them. We get their opinions and conclusions from the testing and, again, in the multidisciplinary approach to have a broader view of the person we're assessing.

Q. And what does the "social" part of that word mean?

**A.** The social part has to do with the environment. It has to do with life experiences. It has to do with anything that would impact on an individual in the course of their life. So things like their socioeconomic status, their educational level, gender, race, cultural issues, anything in the environment that would have or possibly have an impact on how they develop and who they become.

Q. And what is the purpose of conducting this assessment?

**A.** Well, it's not the purpose to excuse human behavior or to excuse a person for whatever their circumstances is. It's intended to shed some light on a person's life, on their history, to look at the circumstances that possibly brought them to where they are today.

Q. And you conduct interviews when you're conducting the biopsychosocial assessment?

**A.** Yes.

Q. How does that process work?

**A.** The conducting of interviews? Well, for the purposes

of the court or in this particular type of case, the first step is with an investigator who is called a mitigation specialist. And they more or less go out and meet significant people and lay the groundwork and gather records and do some of that very basic first steps.

And then later in the process, I come in and conduct clinical interviews once the investigator has completed his or her work and good decisions can be made on, you know, who should be seen or spoken with, whether it's in person or by telephone.

*Q.* You also mentioned that you visit the communities the individual lived in. Why do you do that?

**A.** Well, often the last resort for a child is the neighborhood or the community. If a family's failing, it's very important for us to know what is going on outside their door, what kind of services are available, what is the quality or condition of schools, are there programs where they can go after school or be exposed to Scouts or sports or church or any of the other activities that can build their resilience, can help them face adversity if things are not working in the household.

*Q.* You also mentioned gathering and reviewing records. What type of records do you gather?

**A.** There is a large variety of records, but to mention a few, school records, medical records, social services

records, mental health records, law enforcement records, corrections records, and so on.
Q. And why do you look at those records?
**A.** Well, the historical records are contemporaneous. And so they were created in a time or at a time when the current situation was not present. And so the requirements of the biopsychosocial assessment or as many layers as possible of information. And research and studies help give us some theoretical basis for what we're concluding or what our opinions are.
Q. So in addition to gathering records about the individual or his family, you also gather research and literature and review that?
**A.** Yes.
Q. When you're gathering information for your biopsychosocial assessment, do you gather information just about the particular individual?
**A.** No. It's a very expansive process. Of course, parents and siblings are very important. Whenever we can, we try to get records on other family members for the simple reason that there are things that run in families, and sometimes people lived with an aunt or an uncle or a grandparent. And so the information that we gather on extended family is important because those are people that can also have an impact.

And, again, we know, just as doctors want to know who's had heart attacks, who's had strokes, mental health people want to know that as well as are there any mental, emotional, or behavioral issues that are also forming patterns in a family.

*Q.* And do you gather information about individuals in the family that the particular individual you're conducting the biopsychosocial assessment on may not have even known? For instance, that may not have even been alive when this person was --

**A.** Yes, yes. Yes. Because certain types of information that is discovered about them can still be part of a pattern that is not being broken and is coming down through the generations and then can have an impact on the person you're assessing.

*Q.* For instance, why would the background and childhood history of someone's parents matter to your assessment?

**A.** The parents are primary caretakers. In general, they are the people who are going to have the greatest influence on a child, especially through infancy, birth, and the early developmental years. And, of course, we know that by adolescence, peers become important in terms of their influence. But the condition of parents, their own life histories, whether or not they have suffered mental illness or they've suffered trauma or they have any other

conditions that would have affected their ability to be an effective parent is significant in looking at the history of the person being assessed.

Q. You also mentioned that you consult with other professionals. What types of professionals do you consult with?

**A.** It depends. It may be a professional who was involved in the case. I may have questions and I may contact someone that I have worked with over the years who is a specialist in a certain area. I may speak with them and ask them some questions. More typically, I read the reports and the opinions of other people who have been involved with the person that's being assessed.

Q. And in your practice, do those other professionals also rely on licensed clinical social workers like yourself to provide biopsychosocial assessments in their own assessment of the individual?

**A.** Yes. The Diagnostic and Statistical Manuals over the years have, through their field studies and through their categorizing disorders, have said that it's very important for all the professionals to rely on one another, especially when it comes to the biopsychosocial assessment.

Q. You've created some visual aids for us today. When you're testifying before a jury, do you typically create visual aids?

A. Yes.
Q. Why do you do so?
A. Because the assessment includes voluminous information. If I tried to bring in every binder, every box, every jump drive, every piece of paper that I see to go over, I would be up here for a week or more. And so at some point you have to make a decision that you have enough to draw some conclusions and to somehow condense this information in a way that's easily understood.
Q. Can you give the Court an estimate of the number of biopsychosocial assessments you've conducted throughout the course of your career?
A. Well, in capital cases, over a period of 28 years plus, I have conducted approximately 100 of the assessments.
Q. Have you provided testimony in those cases?
A. In about 75.
Q. In which courts have you testified?
A. In state courts and federal courts.
Q. What other types of cases besides capital cases have you testified in?
A. Over the years, I've testified in adoptions cases, in custody cases, termination of parental rights, child endangerment cases, divorce. The type of cases that are typically conducted in a family court.
Q. Have you previously been qualified as an expert in

state and federal courts to conduct this type of assessment and give your opinions?
**A.** Yes.
*Q.* In which states have you been qualified?
**A.** In South Carolina, North Carolina, Georgia, Florida, in Tennessee, Virginia, in Alabama, Mississippi, Texas, California, Alaska, Louisiana, Georgia, and Arizona.
*Q.* Are clinical social workers such as yourself trained to assess both victims and offenders?
**A.** Yes.
*Q.* Do you conduct assessments on behalf of both victims and offenders?
**A.** Yes.
*Q.* Do you ever turn cases down?
**A.** Yes.
*Q.* Give me an example of why you would turn a case down.
**A.** There have been cases where I've conducted the assessment and simply, even with an adequate amount of information, I've simply not been able to draw any conclusions or form any opinions. There have been cases that there simply was not enough time to complete a biopsychosocial assessment.
*Q.* Have you been retained on behalf of Mr. Marshall in this case?
**A.** Yes.

Q. What have you been asked to do?
A. I was asked to conduct a biopsychosocial assessment of Mr. Marshall.
MS. CAMPBELL: Your Honor, at this time we would ask that Mrs. Vogelsang be qualified as a licensed clinical social worker with expertise in conducting biopsychosocial assessments and giving her opinions based on that assessment.
THE COURT: Ms. Simpson?
MS. SIMPSON: No, objection, Your Honor.
THE COURT: Thank you both.
The request is granted. This witness is tendered as an expert in her areas of expertise including biopsychosocial assessments.
MS. CAMPBELL: Thank you, Your Honor.
Q. Ms. Vogelsang, are you being paid for your time here today?
A. Yes.
Q. How much are you being paid for your time?
A. My fee is $150 an hour plus expenses.
Q. Are you being paid to give a particular opinion?
A. No. Absolutely not.
Q. And have you been paid for your work leading up to this hearing and then throughout the course of this case?
A. Yes.

Q. Can you give an estimate of how many hours you've put in since you've been retained in this case?
A. Up until the time I began preparation and came here today, I was close to 300 hours. And I'm approximating that in the end, it will be 350 to 400.
Q. Did you conduct a biopsychosocial assessment on Mr. Marshall?
A. Yes.
Q. Have you met with Mr. Marshall?
A. I have.
Q. How many times?
A. I have met with him three times.
Q. Did you meet with any other individuals other than Mr. Marshall?
A. I met with family and nonfamily in his case.
Q. Have you prepared a visual to show the Court which individuals you have met with?
A. I have.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, is this a copy of that visual that you created?
A. Yes.
Q. Who all have you met with in this case?
A. The family members that I have met with are his

paternal aunt, Barbara Carlton; his mother, Beverly Charlton; his paternal uncle, Ronald Johnson; another paternal uncle, Steven Marshall. I've met with Bruce Marshall on three occasions. I met with his sister, Berguittia Marshall; his paternal uncle, Thomas Marshall; a paternal aunt, Audrey O'Dell; his foster parents, Gerald and Marlene Scott; his brother, Charles Allen Wilkins; and his former wife, Tonya Wyatt.

Q. Generally, will you tell the Court what you did when you met with those individuals?

A. I conducted interviews and, in most cases, it was one interview. With several family members, it was more than one. And I think with Bruce -- yes, I had three with Mr. Marshall. And those interviews on average were a minimum of two hours. They typically have run three hours or more.

Q. And in conducting your assessment, did you rely on the information that was provided to you during those interviews?

A. Yes.

Q. Do you typically rely on the information provided to you during your interviews?

A. Yes.

Q. And do other clinical social workers and experts in your field reasonably rely on this type of information

that's provided?
A. They do.
Q. Generally, of the individuals you talked to, were those people available to testify in 2005 and 2006?
A. During the course of the interviews, most of them mentioned that they would have been available. I didn't specifically ask them that question. But when the mitigation specialist was with me to make introductions, when she would come back or at the end of the interview, she would ask them if they would have spoken with someone like myself at that time.
Q. Did you visit the communities that Mr. Marshall lived in?
A. I did.
Q. And have you created a visual to show the Court which communities you visited?
A. Yes.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, is what I've just handed you, is that a copy of the visual you created?
A. Yes.
Q. What communities have you visited?
A. I'm sorry. Could you repeat that?
Q. What communities have you visited?

**A.** As you can see on the list, I visited Edgewater in Volusia County, Florida; New Smyrna Beach in Volusia County; Eustis, which is a town in Lake County, Florida; Ocala in Marion County Florida; Apopka in Orange County, Florida; Sanford in Seminole County, Florida; Salisbury in Rowan County, North Carolina; Statesville in Iredell County, North Carolina; Cleveland in Rowan County, North Carolina; Crossville in Cumberland County, Tennessee; and New Haven in Mason County, West Virginia.

*Q.* Would you tell the Court what you did generally when you visited those communities?

**A.** Well, in addition to interviews that I conducted there, these were also communities where Mr. Marshall had lived at one time or another. I think most all of them. Maybe all but one. And so in visiting those communities, even though it's now many years later and I am sure those communities have changed, it is still important to talk to people who live there, who grew up there, who can recall what life was like there, what services were available when you were a child, were there programs available, were there services and resources for your family. So I thought it was important to take a look at those.

*Q.* Did you also gather and review records in connection with your assessment of Mr. Marshall?

**A.** Yes.

Q. Did you create a visual to show the Court what types of records you relied upon?
A. Yes.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, is what I've just handed you a copy of that visual?
A. Yes.
Q. What types of records did you gather and review in connection with your assessment?
A. School records, medical and mental health records, military records, civil and criminal court records, vital records, social services records, probation and parole records, correctional records, and law enforcement records.
Q. Do these categories of records that you gathered, do they relate only to Mr. Marshall?
A. No. They relate to other family members as well and to some nonfamily members.
Q. Did you rely on the information contained within those records in conducting your assessment?
A. I did.
Q. Do you typically rely on the information contained in these types of records?
A. Yes.
Q. And do other clinical social workers with similar

expertise to yourself reasonably rely on these types of records in their assessments?
A. They do.
Q. Ms. Vogelsang, you've gathered and reviewed many types of records. Are you able to find a record to corroborate every fact you learned about Mr. Marshall or his family?
A. No.
Q. What else did you review in this case?
A. I looked at testimony that was in the Rule 32 hearing. I saw a couple of depositions -- actually, more than two, I think -- with family members, a proffer by a family member, and the testimony of Dr. Carol Walker and the evaluation by Dr. Kimberly Ackerson.
Q. Do you recall a proffer by Louise Hostetler that you --
A. Yes.
Q. And did you also review the transcript from the penalty phase of the trial?
A. Yes.
Q. Did you review portions of the trial itself as well?
A. Yes.
Q. Is this the type of information that's reasonably relied upon by other experts in your field?
A. Yes.
Q. And did you rely on that information in providing your opinions here today?

A. I did.
Q. Were you testifying as an expert providing biopsychosocial assessments in 2005 and 2006?
A. Yes.
Q. And were there other clinical social workers conducting biopsychosocial assessments in capital conviction cases in 2005 and 2006?
A. Yes.
Q. Were they testifying as to their conclusions?
A. Yes.
Q. Were you asked by Mr. Marshall or anyone on his legal team to provide any testimony at the trial?
A. No.
Q. Were you engaged prior to the Rule 32 hearing?
A. Yes.
Q. Did you testify at the Rule 32 hearing?
A. No, I did not. I wasn't allowed to testify, as I recall.
Q. Did you provide an affidavit?
A. Yes.
Q. Did that affidavit contain a full biopsychosocial assessment?
A. No, it did not.
Q. Why not?
A. There was not time to do a complete and thorough

biopsychosocial assessment. So that's why I referred to it as modified.

Q. Can you tell the Court what you have been able to do to inform your biopsychosocial assessment since the Rule 32 hearing.

A. Well, I asked the legal team first to follow the process, which was to hire a mitigation specialist and to have her do the kind of work that includes locating family members and other significant people, doing court searches, gathering other types of records, forming relationships with the people she meets so that they can become comfortable speaking with her and to work with the legal team on various issues that tend to rise.

During the time the mitigation specialist is doing that, if they have decided that they do, in fact, need a clinical social worker, I am typically on the phone with the mitigation specialist talking about the case, discussing the case, advising, listening to the information that that person's gathering. And then I start receiving records as they come in, and I begin reading the records and assessing those and deciding if in this sort of looping process that then the investigator needs to go back and find even more people or clarify information or locate more records.

Also in the process of doing the investigation, I am

consulting with other professionals if it looks necessary or reading their reports and as issues arise and patterns begin to emerge, looking for consistencies and inconsistencies and just more or less following the mandates of the biopsychosocial assessment.

And this typically goes on for a minimum of eight months. In many of my cases, it's a year, even two years. I have had it go on for various reasons for in excess of three or four years.

So that's the basic process that was followed in this case.

Q. Since the Rule 32 hearing in this case, have you been able to gather additional records that you were able to review?

**A.** Yes.

Q. Have you been able to conduct any additional research?

**A.** Yes.

Q. Have you been able to conduct additional interviews with witnesses?

**A.** Yes.

Q. Have you been able to develop the multigenerational family history?

**A.** Yes.

Q. And would that include both the paternal family history and the maternal family history?

A. It does.
Q. Have you been able to obtain a history on other individuals who may have played a part in Mr. Marshall's life?
A. Yes.
Q. And have you had a chance since the Rule 32 hearing to visit additional communities that Mr. Marshall lived in?
A. Yes.
Q. At this point, have you now gathered enough information to provide a full biopsychosocial assessment on Mr. Marshall?
A. I have.
Q. I want to talk a little bit about what you learned about Mr. Marshall's family. But before we do that, did you prepare any type of visual aids to assist the Court in understanding that testimony today?
A. I did.
Q. What did you prepare?
A. Well, in order to just have a sense of the family, I prepared a family tree, just a very general sort of barebones type family tree. And then I prepared two genograms that show through symbols and colors some of the relevant patterns that I found on both sides of the family that I thought were significant.
MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may. Thank you.
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've handed you three documents. Are those the visuals you were referring to?
A. They are.
MS. CAMPBELL: Your Honor, may I step over here to use the easel?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) Is this a copy of the family tree?
A. It is.
Q. Do licensed clinical social workers who are conducting biopsychosocial assessments typically rely on family trees such as this?
A. Yes, they do.
Q. And is the family tree you created in this case consistent with licensed clinical social work standards?
A. It is.
Q. Will you give us a brief overview of the family tree.
A. Yes. Of course, it looks overwhelming. And this is more of a way of showing where the significant people are to Bruce's story.
So the left side of the tree is the paternal side of his family. The right side is the maternal side. And I just want to point out certain people.
You can see William Bruce Marshall -- down one.

Right there -- who is the defendant in this case. And his parents are William Charles Marshall, and his mother is Beverly to the right. And the circles represent the women in the family. The squares represent the men.

Then Beverly's parents are over to the right, Hugh William Wilkins, Helen Louise Wagner Wilkins. And the paternal side of Mr. Marshall's family, his father's parents are Vasco Marshall and Cleo Brown. And those are Mr. Marshall's grandparents.

And these people and their families are the ones that I was able to see the most of to interview, to talk with. Not everyone on this tree, but these are other family members that I learned about. So it just gives a broad view, I think, of how far the assessment goes in trying to learn as much as possible.

*Q.* I'd also like you to take a look at the maternal family genogram you created. Can you start by explaining to the Court what a genogram is.

**A.** It is a family tree. And it was created years ago for the mental health profession. This was before ancestry.com and those kind of things. This program was created to assist mostly mental health professionals, particularly social workers, in figuring out what was going on in families, what were the major issues, what were the things that most likely impacted the person you're assessing, how

did that happen.

And so with the maternal side of Mr. Marshall's family, you see over to the left a legend that shows family members who were victims of trauma and abuse. And that includes the ones who also were perpetrators of trauma and abuse.

The second legend, the yellow squares, represent any mental, emotional, or behavioral impairments that were learned in the process of conducting the assessment.

And then the green circle and squares represent anything I learned about any neurological impairments that were present in the family that, of course, could affect behavior.

And so that is representative of his mother's side of the family, Beverly Charlton.

*Q.* Did you also create a genogram of the paternal side of the family?

**A.** Yes.

*Q.* And can you give us a brief overview of the paternal family genogram.

**A.** Yes. And so it's the same. There are symbols in the left-hand corner to explain what the colors represent, what the squares and circles represent. And you see in that earlier generation, at the top, that there's not -- there's very little color there. And that's for a specific reason

that I'll discuss later. But, again, once you get down to Mr. Marshall's grandparents and his own generation, his parents' generation and then his generation, you see the types of issues and impairments that had an impact on family members and ultimately had an impact on Mr. Marshall.

*Q.* Ms. Vogelsang, do licensed social workers such as yourself typically reasonably rely on genograms such as this that you have created?

**A.** They do. It's a very helpful tool when you're trying to look at family history and understand family history.

*Q.* And are the genograms you've created in this case consistent with the clinical social work standards?

**A.** Yes, they are.

*Q.* Why is it important to look at intergenerational family histories?

**A.** Well, again, we don't grow up in a vacuum. We are significantly shaped by the people in our lives. And just as I said earlier, there's a reason doctors want to know what certain conditions are that have run in your family. And mental health people do the same thing.

There are mental health disorders that are genetic, in fact, and can be passed down, which doesn't mean that they will affect every member of the family. But there are also patterns of behavior that are not necessarily medical

or genetic that can also be passed to various family members. And so you see these behaviors repeating themselves.

MS. CAMPBELL: Your Honor, if I may I approach again?

THE COURT: You may.

Q. (BY MS. CAMPBELL:) Can you give the Court a brief overview of what you learned about the maternal family history?

A. And so with the maternal family, there were family members who suffered from neurological impairments, things like seizures, cognitive disorders, and --

MS. SIMPSON: Your Honor, I'd like to object at this point. We're talking about facts not in evidence.

Although Ms. Vogelsang is an expert witness and, under federal rule of evidence 703, she would be allowed to use these sorts of hearsay statements, had this been presented at the Rule 32 hearing in 2010, she would have been bound by Alabama rule of evidence 703, which prohibits hearsay statements. I have case law to that effect, including cases involving Ms. Vogelsang, where this sort of testimony was prohibited.

THE COURT: Okay. She's been doing it all morning.

MS. CAMPBELL: Your Honor, if I may briefly respond?

THE COURT: Ms. Campbell, you may.

MS. CAMPBELL: At the sentencing phase of the trial,

under Alabama law, experts such as Ms. Vogelsang are allowed to testify about hearsay testimony and hearsay evidence. In fact, rules of evidence don't even apply at the sentencing phase. And what Ms. Vogelsang is here to do today is to testify about what she would have or a clinical social worker in her field would have and could have testified about at the sentencing phase.

She's also here to testify, to explain the facts in the investigation that should have been conducted by counsel, which is essential to Mr. Marshall's ineffective assistance of counsel claim.

MS. SIMPSON: Your Honor, if I may respond to that?

THE COURT: I'm not sure. For now, let me allow the testimony to go forward. Ms. Simpson, do you want to preserve the record on anything?

MS. SIMPSON: Yes, sir. We would object to this testimony. It would have been inadmissible under Alabama rule of evidence 703 as it existed at the time of the Rule 32 hearing in 2010. While the rules of evidence more or less do not apply to sentencing, Alabama case law at the time was very clear that those rules did apply at Rule 32, including to experts like Ms. Vogelsang, testifying at Rule 32, brought in by postconviction counsel, doing this sort of biopsychosocial testimony.

THE COURT: Okay. Ms. Campbell, you may continue.

MS. CAMPBELL: Thank you, Your Honor.

Q. Ms. Vogelsang, if you can continue giving the broad overview of the maternal family history to the Court.

A. So the types of things that stood out to me as represented by that legend in the left-hand corner of the genogram was the physical abuse, the emotional abuse, the family violence. And as I mentioned, there were indications of mental illness in the family and seizure activity on the mother's side of the family. And that's just, again, a broad overview of the kind of things that were happening with them.

Q. And Ms. Vogelsang, if you could also give a general overview of the paternal family history.

A. This side of the family also had seizure activity and other neurological type disorders. There were thyroid disorders on this side of the family. Four members of the family suffered from albinoism. And then on this side of the family, there were also behavioral impairments with family violence, physical abuse, sexual abuse, and then on both sides mood lability with many types of behaviors that reflect different types of moods.

Q. And what did you learn, if anything, about where the paternal family grew up and lived?

A. So the paternal family were from Browntown, Tennessee. And this was a part of southern Appalachia that was

extremely poor. And the reason it was called Browntown is that the family members on Mr. Marshall's paternal side of the family were all Browns, and the intermarriage in Browntown accounts for the name. And that is borne out by research on that town.

So the family grew up there. It was an area of poverty and deprivation -- actually, severe poverty and deprivation, with incomes falling far below the national average. There was a great deal of intermarriage.

The family lived on a 35-acre farm that was so isolated and remote it was difficult to get to by road. You had to cross a creek to get onto the property. And they had no electricity, heat, running water, or any of those kinds of basics. And they were engaging at that time in subsistence farming.

*Q.* Did you conduct any research to confirm the accounts that you learned about Browntown?

**A.** Well, the one article that made reference to Browntown was part of a study done by James Montgomery that looked at the conditions in three southern Appalachian communities, and Browntown happened to be one of the ones that was selected.

MS. SIMPSON: Your Honor, we would object to this article as well. I believe it was published in 1949. Please correct me if I'm wrong. This would have been 15

years prior to --

THE COURT: Yeah, we're straying into stuff that I don't believe is helpful.

Ms. Campbell, you represent a client who obviously has been given the ultimate penalty that we give as a society. But I guess ultimately your point is all of this is information that would have been available to Mr. Mathis and Ms. Hall back in 2005 if they did the relevant analysis or investigation from your point of view.

MS. CAMPBELL: That's correct, Your Honor, and that this is just one more basis of Ms. Vogelsang's opinion and the facts on which it's based, and it's a learned treatise --

THE COURT: Does that article say that everyone from Browntown or Appalachia is more prone to murder and/or violent crimes?

MS. CAMPBELL: It does not, Your Honor.

THE COURT: Okay.

Ms. Vogelsang, one question, and then I'll turn to Ms. Campbell. The family members that you spoke to or at least indicated they would have been willing to testify in 2005, did you make any inquiries with any of them, in particular, the sister, I think Berguitta Campbell, as to why they purportedly told -- it's Berguitta Marshall, excuse me -- as to why she told Mr. Mathis that she was not

willing to testify in 2005?

THE WITNESS: When I interviewed her, she said that, like other members of her family, she was, you know, very nervous, very anxious. She didn't really understand who was who. She didn't grasp all of the details of what was happening or when it was happening. And that is consistent with what we hear from a lot of family members in all the cases, that those first contacts are so sensitive, there has to be a process and a training to understand how to make those contacts. So I think her response was typical. And I can't account for why she did not contact other family members.

THE COURT: All right. Now, the other family members were not in the courtroom. But I want to make sure that as to Ms. Marshall, Berguitta, who was in the courtroom and knew the different players in the courtroom, she still represented to you that the reason why she told Mr. Mathis that she was not willing to testify in part is because she did not know the relevant players in the courtroom?

THE WITNESS: I'm sorry. I didn't quite under -- because she didn't have the relevant players in the --

THE COURT: Yeah, if I understand your testimony correctly, some family members, and perhaps Berguitta Marshall included, represented to you that they did not come forward in 2005 or indicated that they didn't want to

get involved because they did not know the relevant players that made contact with them.

Ms. Marshall, Berguitta that is, was purportedly in the courtroom for the trial and allegedly told Mr. Mathis that she was not willing to testify for the defendant and that if she was going to testify at all, she would testify for the government. Allegedly. That's the information that was represented at the Rule 32 hearing, I believe.

Did that come up at all in your conversations with Ms. Berguitta Marshall?

THE WITNESS: Yes, it did.

THE COURT: Okay.

Ms. Campbell, why don't you pick up and continue with your exam. But I will sustain the objection as to the treatise from the study that you were about to get into.

MS. CAMPBELL: Yes, Your Honor.

Q. Ms. Vogelsang, following up on Judge Kallon's questions just a little bit, do you find it's necessary to spend time with witnesses when you're trying to get these interviews and conduct your biopsychosocial assessment?

**A.** Well, it's critical. I don't think you can call or go to their home and expect to delve right into the family history.

Family members and friends and others have been shocked by what has happened. They're confused. They're

very anxious. Sometimes they don't know for sure if the person they're speaking with can be trusted. They want some time to make phone calls, find out who the investigator is.

And so there is a good bit of time spent just providing information, just listening, just giving them a chance to be heard so that all of these concerns and these anxieties can hopefully be laid to rest so that they're comfortable enough to speak with you. And that's typically what happens when that process is followed.

*Q.* In your experience, do laypeople always understand what types of information might be helpful in your assessment?

**A.** They have no idea. I mean, contrary to popular opinion, they are not eager or enthusiastic about speaking with you because they're just so unsure of what the process is. And so they don't understand if what they are telling you is going to hurt the defendant or help the defendant.

And, you know, we're very open with them that it really does not matter. If there are bad things that need to be discussed, that is fine. That is just as important as positive things.

So there's just a number of things that have to be laid out in the beginning over time so that they can become comfortable and confident that they're doing the right thing by talking to you.

Q. You've gone over generally the maternal and paternal family history. I'd like to talk a little bit more specifically about Mr. Marshall's mother. But first can you tell us specifically why the mother and father's childhood and adolescence matters?
A. Well, again, looking at these different types of issues, things such as family violence or physical abuse or any other kind of traumas or conditions or situations, it's important to know if the family members received treatment, if they had intervention, what the impact has been on them, what their own reactions and responses have been to the things that have happened to them and how that is going to affect their own skills to be an effective parent with their own children.
Q. And what did you learn about Beverly, Mr. Marshall's mother's developmental years?
A. Well, Beverly's own background was transient as the family moved down from Ohio, and the family moved around a great deal. So she grew up in a family that was never stable or in the same place.
They came down to Florida from Ohio, and Beverly was 14 years old when she got to Seminole County, Florida. She was in the eighth grade, and she dropped out.
She came from a family that had a pattern of behavior that resulted in one psychiatric admission. Her father was

accused of incest and was committed to a psychiatric hospital after his arrest. Her grandfather shot and killed himself in the family home during a family occasion.

Not only Beverly but four other females in her family were molested by her father and her grandfather. And Beverly never received any kind of intervention or counseling before becoming a parent.

*Q.* In your investigation, did you find any records that confirmed the account that Beverly had been molested by her father?

**A.** Actually, the record reflects that he was -- she reported her father to the police after running from him, and he was arrested. The records reflect that he was arrested for intercourse with a near relative where the consanguinity was relevant. And then he committed him to a psych hospital where he received treatment for incest. The records don't list which relative.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

*Q.* (BY MS. CAMPBELL:) Ms. Vogelsang, are those a copy of the records to which you were just referring?

**A.** Yes.

MS. SIMPSON: Your Honor, at this time we'd object to this also on relevance grounds.

THE COURT: I'll sustain the objection.

MS. SIMPSON: Thank you.
Q. (BY MS. CAMPBELL:) I want to talk a little bit about Bruce's father's developmental years. Were you able to locate any photographs of Mr. Charles Marshall?
A. Yes.
MS. CAMPBELL: Your Honor, as a housekeeping matter, for the record, can we proffer Petitioner's Exhibit 24, which was the records we just discussed that the State objected to and you've sustained the objection on?
THE COURT: It will be part of the record. This is the lawsuit -- my mind is on civil cases. But the records related to, I guess, the defendant's maternal grandfather, the State against Hugh Wilkins, Sr., criminal case, Petitioner's Exhibit 24. The objection is sustained, but it will be part of the record.
(Petitioner's Exhibit 24 was marked for identification and admitted into evidence.)
THE COURT: Anything else you want to do with respect to your offer?
MS. CAMPBELL: We would say that Ms. Vogelsang has testified as to why the maternal family history is important, and that's why these records are evidence and they further corroborate her investigation that she completed.
THE COURT: Okay.

MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
(Petitioner's Exhibit 71 was marked for identification.)
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've just handed you what's been marked as Petitioner's Exhibit 71. Is that a copy of the photograph that you were referring to?
**A.** Yes.
Q. Who is this a photograph of?
**A.** This is a photograph of Mr. Marshall's father, Charles Marshall.
Q. And is this a true and accurate copy of that photograph?
**A.** Yes.
MS. CAMPBELL: Your Honor, we would move to enter Petitioner's Exhibit 71 into evidence.
MS. SIMPSON: No objection, Your Honor.
THE COURT: Thank you.
71 is received.
(Petitioner's Exhibit 71 was admitted into evidence.)
Q. (BY MS. CAMPBELL:) What did you learn about Mr. Charles Marshall's upbringing?
**A.** Well, he started out, of course, in Browntown. And his parents as well. His father wanted to move the family out of there because of the conditions there. And so he grew up with a mother and father who were very harsh in their

discipline. Vasco punished with a razor strap, and his mother, Cleo, was very physically abusive of the children using anything she could get her hands on and would literally beat until she just grew tired. She was also an unstable woman who would become so angry she would pass out. And so he grew up seeing this type of violent behavior.

He was the oldest of the children in his family. There were eight. And his father, Vasco, suffered from severe epilepsy. And so Charles was left to be responsible for the younger kids. And his mother had to go to work because the father, who ultimately died of a brain tumor, was unable to support the family.

What I learned about Charles was that he was very different from the other siblings. He was a very temperamental, enraged young man. He was very unfriendly to everyone. And what family members remember was him being very cruel to animals, breaking the leg of his dog, smashing out the windows of his car, and just having a violent temper that left them feeling intimidated and afraid of him. And, of course, he was left in a parental role at a very young age.

MS. CAMPBELL: Your Honor, if I may approach the easel again?

THE COURT: You may.

MS. CAMPBELL: Just for the Court's reference, throughout Ms. Vogelsang's testimony, I'll leave the family tree up here.

Q. Ms. Vogelsang, you've told the Court a little bit about Mr. Marshall's mother and his biological father. Did you learn about the childhood and developmental years of any other adults that were significant in Mr. Marshall's life?

**A.** Well, the other most significant parental figure in Mr. Marshall's life was his stepfather, who was present in his life from the age of one until around 16 years old. And because he was there with Mr. Marshall during all of those critical developmental years, I thought that an assessment of his behavior, what he was like as a stepfather, and what kind of impact he had on Mr. Marshall would be significant.

Q. And what did you learn, if anything, about his childhood?

**A.** He had run away from home when he was around 13 years old and had just made his way completely on his own during his teenage years.

He had been viciously beaten by his own father, who was an orphan, who had been adopted through the orphan trains. And so he had grown up until age of 13 with this harsh physical abuse.

He ended up at some point joining the Army and

serving in the military. And it was during that time that he met his wife, Pat Johnson.

And so he's a person who also exhibited all kinds of emotional behavioral disorders. He grew up in ongoing conflict and brought that with him. There was never any kind of intervention for him. And it becomes important because later, he singled Mr. Marshall out for the same kind of punishment that he had received as a child.

*Q.* Did you draw any opinions based on the intergenerational history you learned about?

**A.** So the opinion I came to, just looking at these family histories, is by the time we get to Bruce, Mr. Marshall, there is no adult present in his life who has the skills to be an effective parent. Not his mother, not his father, not his stepfather.

*Q.* What was your opinion with regard to the health effects and the health disorders that you've mentioned?

**A.** I'm sorry. I couldn't hear you.

*Q.* What was your opinion or did you draw an opinion with regard to the various health issues you've identified in the intergenerational family history?

**A.** Well, I think on both sides of this family, especially in the early years, they did not have the access to healthcare in the older generations. And especially in the more remote areas, they practiced home remedies. So a lot

of these health problems were either untreated or poorly treated until we get into, like, the '50s and '60s.

*Q.* I want to move now to talking a little bit more specifically about Beverly and Charles and then on into Mr. Marshall's life.

When did Beverly and Charles meet?

**A.** Beverly was 15 years old when she met Charles. They were living in the same area of Florida. And she was pregnant by him fairly quickly after they met. And because Charles's mother did not believe that she was pregnant with Charles's child, she kept them separated, and she stayed with her own mother until that time when her father tried for the last time to assault her. He had her in the truck. He was driving through an orange grove. She jumped out and ran to Charles's house. And that is when the arrest was made, and then Beverly was not having to live with her father anymore.

However, she was pregnant by Charles Marshall. And his mother came to change her mind. Originally she thought the child was by Beverly's father. But when she saw the baby, she realized that it was her grandson.

And at the same time that Beverly was pregnant by Charles Marshall, her sister Nancy was also pregnant by Charles Marshall. So these are the kind of things that were going on during her adolescence.

Q. Did Beverly and Charles eventually get married?
A. They did get married in July of '63.
Q. What did you learn about what their marriage was like?
A. It was never a good marriage. It was never a happy marriage. They were both very immature. Neither one of them had the skills to be in a relationship, much less to parent a child.
Charles was a very controlling husband. He wanted to control what she wore, what she cooked. He would not allow her to get a driver's license. He did not even want her to see her mother. So her life was pretty isolated with him while he either worked or engaged in other relationships with other women.
Q. I want to talk a little bit more specifically about Bruce's life. Are clinical social workers trained to examine child development?
A. Yes.
Q. What is child development?
A. Well, in simple terms, child development refers to the stages that children go through from birth to -- now 25 has become the cutoff for development. But it has to do with the kind of tasks that children need to master at certain stages that only roughly approximate certain ages. And so there is a window open during those times when a child's brain is developed to an extent where it can absorb this

information and practice and learn the tasks that they need to learn.

And parents do not need to have degrees in childhood education to do a good job guiding their children through the developmental stages, but they certainly need some skills, especially in what the researchers now say is from zero to three as the most critical years. And after all those basic elementary types of skills have been learned, it's very important for parents to be present to guide through the ages when children are learning how to reason, how to form an identity, how to be responsible, how to make good decisions, and especially how to form healthy relationships, how to get them and how to maintain and manage them, and what to do when they end.

So these are some of the basic stages that I would say the average parent does a pretty good job with, either through TV shows or tapes or talking to their friends, learning from their own parents, that sort of thing.

Q. When was Mr. Marshall born?
**A.** He was born in December, on the 13th, in 1964.
Q. Where was he born?
**A.** He was born in Eustis, Florida.
Q. How old was his mother Beverly when he was born?
**A.** She was 17.
Q. And what was the pregnancy like for Beverly?

**A.** Beverly had a difficult pregnancy. She reports that it was the most difficult of all four of her children.

MS. SIMPSON: Objection. How is this relevant? She had a difficult pregnancy. He was a 40-year-old man when he murdered Alicia Bentley.

MS. CAMPBELL: Your Honor, this is --

THE COURT: I like to give leeway. Again, the defendant has received the utmost penalty we give in our criminal justice system. He believes that his lawyers failed to present certain mitigation evidence and allegedly this type of information may have made a difference. Before I rule, let me hear from the defendant and his witnesses as to why he believes certain events in his life -- including the pregnancy for a 40-plus-year-old man, as Ms. Simpson pointed out. But you may continue, Ms. Campbell.

*Q.* (BY MS. CAMPBELL:) Did the difficulty in the pregnancy affect Beverly and Charles's marriage?

**A.** Well, she still -- she had a number of stressful events going on during the pregnancy that certainly affected the pregnancy. And one, of course, was the marriage. She also, as I said earlier, had no intervention or counseling for the things she had experienced.

Charles's father, Vasco, died right before Mr. Marshall was born. So there was a lot of stress in the

family over his loss.

Her sister Nancy, who had been pregnant at the same time she was, was sent off to a home for unwed mothers, and Beverly never saw her again ever even to this day and does not know what happened to her.

So there were so many stressful events, the marriage being one of them.

Q. And why does any of that matter to your assessment if these things happened before Mr. Marshall was even born?

**A.** Well, the condition of a mother during her pregnancy can have an impact on how she subsequently bonds with her child, on how she's able to handle nurturing a new baby. It can affect her ability to know how to do certain things at certain times or to recognize the needs of her infant.

Beverly had gone from being a very neat housekeeper and by the time Mr. Marshall was born, everything in her household had kind of fallen apart. So she does report deterioration in her ability to function because she now has an 18-month-old. He was nine months old when she got pregnant with Mr. Marshall. She now has an 18-month-old and a brand new baby.

Q. And is the 18-month-old that you're referring to, is that Mr. Marshall's brother Charles?

**A.** Yes.

Q. So he has a father named Charles Marshall, and his

brother is also named Charles Marshall?
**A.** Yes. Actually, legally his name is Charles Wilkins, but he goes by Charles Marshall.
*Q.* Thank you.
What was the delivery of Bruce like for Beverly?
**A.** Well, again, she said it was very difficult. It was a long and hard labor. He was delivered by forceps. And all she can remember is that he had a blue mark across the top of his nose on his face.
And then when she got him home, he was a very fussy baby. He was having trouble breastfeeding. She had to find a formula that would work. And it was finally discovered by the doctors that he had vitamin and protein deficiencies and was not being able to absorb his food. And so she had to get all of that resolved as well.
*Q.* Did Beverly become pregnant with a third child?
**A.** She did. She became pregnant with her daughter when she was 18 years old. And I believe Mr. Marshall was at 14 months when Berguitta was born, and so at around five months when Beverly conceived Berguitta.
*Q.* Berguitta is Mr. Marshall's sister?
**A.** Yes.
*Q.* What was the marriage like at this point?
**A.** Well, it was during the second trimester of her pregnancy with Berguitta that Mr. Marshall left Beverly and

abandoned the family. And he had been involved in a relationship with a couple who was their friends, and so he moved in with Pat Johnson and Pat and her husband separated. So Beverly was left at home to give birth to a third infant. She had no resources. She had to stay with Cleo, Mr. Marshall's mother, who, as she was able to provide food and whatever help and resources she could give her because she had her own financial struggles. But basically Beverly was now left alone with three infant to toddlers, young toddlers.

Q. Did Beverly start dating anybody shortly thereafter?

**A.** She started dating Dean Johnson, the other half of this couple. And they went out together for a while. Dean was living in an apartment that wouldn't allow children. And so Beverly left her children with Cleo, and she went to live with Dean. And I don't know the period of time she was with him. But at some point, they got an apartment -- I'm sorry. They got a house in Sanford. And the whole family moved in together.

Q. When you said Dean was the other half of this couple, what did you mean by that?

**A.** Well, he had been married to Pat Johnson. It was Dean and Pat Johnson. And they were friends of Charles and Beverly Marshall. And so they just more or less switched partners after Charles left the family.

Q. Did Dean and Pat have any children?
A. They had one son named Gregory. Pat had a daughter from another relationship named Gidget. And she was living with Pat. But Dean and Pat had a son named Gregory.

And she and Charles could not agree on what was going to happen to Gregory, and he insisted that she give Gregory to Beverly. He said that he was not going to raise Dean Johnson's child.

And so when Beverly came home from the hospital with Berguitta, Cleo showed up at the door with Gregory. And she now had a fourth child there with her and Dean and the other three children. So at this point now she has four children, three biological and one step.
Q. About how old was Bruce at this point?
A. Let's see. When Berguitta was born -- let's see if I've got that.
Q. Did you create a visual to help the Court see the various ages?
A. Yeah. Yes, I did.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

Just for your benefit but also for everyone else's benefit, I'm going to stop you at 11:55. I need to go cover some pleas for Judge Bowdre. And then we will pick back up around 1:15 this afternoon. Okay.

MS. CAMPBELL: Thank you, Your Honor.
Q. Is the document I've just handed you the visual you created showing the various ages of the children and when they were born?
A. Yes.
Q. Just explain to me what this document is and why you created this.
A. Well, it demonstrates the closeness of the births of the children. By the time Beverly has her fourth biological child with Dean Johnson -- her son Shawn, who she named Shawn Marshall -- there are now five children in her home. And in doing the math and not counting Greg, she had four biological children in four or less years and then had the fifth child added to her family during that time.
Q. So let's just start from the top so it's clear. We talked about a few different people and when they were born. Charles Wilkins, Mr. Marshall's brother, was born in 1963 when Beverly was 15?
A. Yes.
Q. And then Mr. Marshall was born in 1964 when she was 17?
A. Yes.
Q. And then Berguitta, his sister, is born in 1966 when she's 18?
A. Yes.
Q. And Gregory Johnson comes and lives with Beverly when

she's 19?
A. Yes.
Q. And I know it says Beverly's age at birth here, but does that age actually refer to when she started to raise Gregory?
A. No. She was 18 when she got him.
Q. Okay. But 19 -- whether she was 18 or 19, that doesn't refer to his birth date?
A. Right.
Q. And then when she was 19, Shawn Marshall, Mr. Marshall's other biological brother, was born; is that right?
A. Yes. And Gregory was born between Charles and Bruce Marshall.
Q. But didn't come to live with Beverly until 1966?
A. But didn't come till later. Right.
Q. Why does this matter to your opinion?
A. Well, the literature and the studies indicate that multiple births close together like this can produce extra stress on a mother and that when children are born this close together, there can be some health effects on the mother in terms of the toll it takes on her body. And in fact, not long after the birth of her last child, Beverly ended up in the hospital. She was having convulsions and had to stay in the hospital for a month even though she had

these five very young babies, basically, at home.
Q. When Beverly was in the hospital for the month, who was Mr. Marshall living with?
A. Cleo, the grandmother, Charles Marshall's grandmother, helped out. And other family members helped out as well.
Q. Once Charles Marshall, Mr. Marshall's father, abandoned the family, what was Bruce's relationship with him like?
A. Well, he basically did not have a relationship. Even though Charles Marshall lived very close or in close proximity to the family, to Dean and Beverly, he did not have a relationship with him.

In the beginning, when he and Beverly first split up, Charles Marshall would threaten to take the children. He would come by and pick them up and take them without Beverly knowing about it. So they had a lot of conflict in the beginning over that. But it wasn't because he wanted the children. It's because he was in conflict with Beverly over their relationship.

And then at one point, even if he saw Mr. Marshall, he did not typically stop or tend to him as a father or talk to him or, "How are you doing?" There virtually was no relationship.

And Mr. Marshall's mother does recall one incident where Mr. Marshall was in a car and saw Bruce on his bike and bumped him with his car and knocked him into a ditch.

So behavior that was in keeping with the way Charles Marshall was described even as a young man.

Q. So after this initial period, even though they were living in the same town, Mr. Marshall and his father had no relationship?

A. No.

Q. Did Dean, Beverly, and the children remain in Florida?

A. They were in Florida approximately three to four years. And then the family left Florida and moved to Wisconsin. Dean had grown up in Wisconsin, and he wanted to take the family up there and resume dairy farming. And so --

Q. About how old was Bruce at this point?

A. Bruce was around five years old when they left Florida and went to Wisconsin.

Q. And what was life like for the family in Wisconsin?

A. Well, by this point, Bruce's stepfather, Dean Johnson, had become a violent alcoholic, severe and chronic alcoholic. He was physically abusive to the family. He would beat Beverly. He would beat the children.

And his attention was particularly focused on Bruce because Bruce reminded him of Charles and he believed that Charles had broken up his marriage with Pat Johnson. And so Bruce came in for particularly harsh treatment and, according to his brother and sister, didn't seem to know how to avoid it like the other kids were like, "Run away.

We'll hide. We'll get under the house. We'll go out to the barn," but that Bruce just would sort of stand there and that he would be angry. You know, he felt angry over what was happening. But, of course, he was powerless to do anything about it. But Dean interpreted his just standing there as rebellion, and so he came in for even more harsh punishment.

*Q.* Did you hear any particular stories where Dean was particularly out of control or that were particularly surprising to you during this time?

**A.** Well, he -- when he was drunk, he would get so out of control that Beverly would go to family for help. And the kinds of things that he would do that are, in my opinion, even beyond the typical kinds of child abuse you hear about is that he would beat animals or shoot or beat animals in front of the children. He would use metal pipes to beat the cows. He slammed Charles's kitten into a tree and killed it.

And these are methods that more than abusive parents use. These fall into an area far different than just being abusive. You are really saying to this child, "Watch this," or "I could do this to you ."

*Q.* Did you come to an opinion about how this abuse affected Bruce?

**A.** Bruce already was feeling rejected. He would do his

chores. He wasn't reported to be a violent child. He obeyed the rules at home. He wasn't giving the parents any problems. He did whatever he was asked to do. But he was feeling very singled out, feeling very different, very lonely and very helpless and powerless, especially to protect his mother when Dean would protect her, and he would go to her and beg her to please leave Dean Johnson. And she would pat him on the back and say, "Oh, don't worry. It will get better." So just a feeling of being out of control and having no way of rescuing himself or anyone else in the family.

*Q.* Did he ever seek out love or comfort from Dean Johnson?

**A.** He wanted Mr. Johnson's attention. He wanted to love him. All of the kids were in a confusing situation because Mr. Johnson did provide for them. He never told any of the kids that he loved them or cared about them or showed them any affection until he was sick and dying in his old age. But like the other kids, Bruce, you know, also wanted to please him and to have his approval.

*Q.* Did Bruce have any physical effects from this violence beyond, you know, he would have a bruise or something like that?

**A.** I would say that while certainly the abuse left marks, that the greater impact was the constant threat of harm, the unpredictability of when the next shoe was going to

drop, what was going to happen to his mother. Just the threat of harm, which is very powerful. And some professionals believe the threat of harm is just as powerful as physical or sexual abuse.

MS. CAMPBELL: Your Honor, I'm happy to keep going for another couple minutes. We're kind of transitioning into a next small topic.

THE COURT: All right. Thank you. We'll stop here. Let's resume at 1:15, please.

MS. CAMPBELL: Thank you, Your Honor.

(Lunch recess.)

THE COURT: You may continue with your examination.

*Q.* (BY MS. CAMPBELL:) You ready, Ms. Vogelsang?

**A.** Yes.

*Q.* Going back real quickly to Mr. Marshall's childhood, do you recall a story where Mr. Marshall was found drunk at his parents' home as a child?

**A.** Yes. When Beverly and Dean got together, they would go out a good bit drinking together and leave the children there at home. And Bruce's grandmother, Cleo, had heard from a neighbor or someone that the children were there by themselves. And she went to the house, and she found Bruce drunk. And when she confronted Beverly about it, Beverly just showed no concern, did not think it was that important.

Q. Now, I want to go back. We were talking about Bruce's relationship with Dean. Was Dean Johnson physically abusive to Bruce?
A. Yes.
Q. Can you give me an example of some of the ways? You know, did he beat him? Did he hit him with objects?
A. Of course, just like with other kids, he used various things that he could get his hands on. But he liked to slap and hit and punch. He liked to pull hair. But with Bruce, he would use his fist to the back of his head, to the side of his head, and even backhand him across the face. And so over time, Bruce was taking some of these hits to the head from Dean.
Q. And did Mr. Marshall witness Mr. Johnson beat his mother and his brothers and sisters?
A. Yes.
Q. Do you recall a story where Bruce was in the car and Mr. Johnson was driving drunk chasing after Mr. Marshall's mother?
A. Yes.
Q. Can you tell me that story?
A. She had, again, decided to run to her father-in-law and get him and try to get help. It was during the winter. It was snowing and she was running down the road. So Dean got all the children into the car, and he was drunk. And he

drove down the road trying to find her and run her off the road. She was on foot. And, of course, all the children were in the car with him to witness that happening.

Q. Amidst all this physical violence, did Beverly ever try to leave Mr. Johnson?

A. She did. She had an incident with him again where he had become physically violent, and she had gone to get her father-in-law. And while she was gone, he split Charles's lip. When Beverly got back, she was told by Berguitta what Dean had done, and she got very upset and pushed Dean down the stairs after he grabbed Berguitta and started beating on her.

So he waited the next day until -- she waited the next day until Dean went to work, and she packed up the car and then she went around and picked up all the kids at school and they left.

Q. And before she left, did -- would Dean ever wave around any type of weapons or use any type of weapons in the physical violence?

A. The use of a weapon was the -- I guess the straw that broke the camel's back for Beverly. She could not take the chance that he was going to shoot her or shoot one of the children. According to her, the gun was loaded. And so that's why she left him.

Q. So there was a use of a gun in the incident you were

just talking about?
A. Yes.
Q. When Beverly first left Dean, where did she go?
A. She returned to North Carolina, and she and the children lived in various places. Again, she had no money or resources, and so they just would live with a relative or whoever would take them in.
Q. How did Dean react to Beverly leaving with the children?
A. He was devastated by her leaving, and he kept calling and begging her to come back or to let him come to North, Carolina. And eventually she agreed that he could come to North Carolina if he would quit drinking. And so he did go back to the family, but he did not quit drinking.
Q. What was life like once he got to North Carolina?
A. Sort of picked up where they left off. It was very transient. They moved around a lot. Dean was again working on the dairy farms. But then he was doing other types of odd jobs and he broke his leg and he was not able to work for about a year. And the family really had a difficult time surviving.
There were times when the kids clearly remember going hungry, not having enough food. If they did have food, it was beans. And, you know, not having enough heat in the winter. And so it was a very, very difficult time, a time

that stands out in the minds of all the children.
Q. Would Bruce and the children have to do anything to try to make money for the family at this time?
A. They would go pick up cans and bottles on the side of the road and turn them in to try to get change so that they could buy whatever food they could.
Q. Were they on any type of government assistance?
A. I don't recall that they were. They may have been, but I don't remember that they were.
Q. And during this time, you know, if they didn't have money, did Dean continue drinking or spending money on that?
A. Yes. Wherever the money came from, he was still drinking.
Q. And was he still physically abusive to Bruce at this time?
A. Yes. That did not stop.
Q. Would he call Bruce names as well?
A. Very degrading, demeaning names. He would call him bastard, and you're not worth anything. You're just like your good-for-nothing father. So mostly negative and degrading type remarks.
Q. And by this point, is Bruce about in middle school or sixth or seventh grade?
A. Let's see. This is still in North Carolina. I think

Bruce actually at this point was around eight years old. During the time that Dean was injured, I think he was eight when they went back to North Carolina. So right in that age range.

*Q.* And how did Bruce do in school during this time in North Carolina, generally speaking?

**A.** Well, generally speaking, in his first three grades of school, Bruce did pretty well. There are no notes in the school files to indicate that he was a problem or that he had any problems, that he was disruptive in the classroom or was having to be sent to the principal's office. And that continued to the third grade where you don't -- again, you don't see complaints about him, but you do see his grades starting to decline in the third grade.

*Q.* And up until this point while they're living in North Carolina, to your knowledge, did any child protective services or state entity ever intervene?

**A.** No.

*Q.* So at this point, did they remain in North Carolina?

**A.** They did not. Dean wanted to take the family to West Virginia and to work up there. And by this point, this family was moving around so much that it was very hard to keep up with exactly where they were, to pinpoint where Bruce was at any given time. Even though they gave an address to the school, they weren't always living at that

address and they really can't remember most of the addresses. So from that point on, including West Virginia, they were pretty much bouncing around.

Q. But based on the records you've reviewed and the interviews you've done -- I know you might not be able to give me exact dates or addresses. Are you able to give generally as we walk through these questions where the family may have been at certain points?

**A.** They -- well, they were in West Virginia about the time Bruce was 12 or 13 years old.

Q. And what was life like for them in West Virginia?

**A.** Well, again, it was struggle. Dean was abusive to Beverly. He was abusive to the family. They were moving to different places and -- within West Virginia. And so it was a very transient lifestyle at that point.

Q. And how was Beverly coping with this type of lifestyle and abuse?

**A.** Well, she, again, was not doing very well at all, and she ended up leaving Dean after she had an admission to the hospital. Beverly learned in the hospital that she was suffering from ulcers, and the staff during the time she was there told her that this marriage was taking its toll on her and she needed to get out. So when she got out of the hospital, she took Berguitta and Shawn and she moved back to North Carolina. She left Bruce and Charles and

Gregory with Dean in West Virginia.
Q. So she took two of the children with her to North Carolina but left Bruce and two of his brothers back behind with Dean?
A. Yes.
Q. How did Bruce react to this?
A. Well, this is the time that he recalls beginning to have explosive headaches that were very, very painful, and, you know, he connects that to the loss of his mother. And he began skipping school. In fact, he and Charles and Greg all started skipping school. And Dean was not keeping a close eye on him. So, again, you see him starting to slip, yet it's not reflected in the records at -- any of the school records at 13, again, that he was disruptive or violent toward other kids or aggressive toward teachers. He appeared up to this point to have been going to school fairly regularly.
Q. And I know Beverly, Berguitta, and Shawn were leaving in North Carolina. Who were they living with at this point?
A. When they first went back, they lived with Ron Johnson, Dean's brother. And sooner or later, Dean returned to North Carolina as well. But during this time, they stayed with Ron Johnson or any family members, again, that would take them in. But it was also during this time that

Beverly met a man named Jerry Aires who would have an impact on the family.
Q. Before we talk about Jerry -- so at this point, Bruce is still in West Virginia. Did he stay in West Virginia?
A. He did not. He ultimately came down to North Carolina and rejoined his mother.
Q. And before he rejoined his mother -- did he go straight from West Virginia to North Carolina to rejoin his mother? Did he live with anybody in between that time?
A. He may have. I don't recall him living with anyone else at that time.
Q. Did he ever live with an uncle, Ron Johnson?
A. Well, in my timeframe in my head, that was actually in North Carolina.
Q. Okay.
A. Not in West Virginia.
Q. So he leaves West Virginia and goes to North Carolina to live with Ron Johnson?
A. Yes.
Q. And then actually goes back in North Carolina and lives with his mother?
A. Yes.
Q. You mentioned Jerry Aires. Can you tell me about him?
A. So Beverly had at some point begun to have a number of relationships with men. And along the way, she met a man

named Jerry Aires. And she knew that he had been in prison, and she knew the family would not accept him down in North Carolina. And she was concerned about how to introduce him to Berguitta and Shawn. And so they had a plan where Jerry would stand out on the side of the road hitchhiking, and Beverly would get Shawn and Berguitta into the car and drive by Jerry Aires and pick him up on the side of the road hitchhiking. And this is how she introduced him to two of her children. And then, of course, when Bruce returned to North Carolina, he met Jerry as well.

Q. And did Bruce start living with Jerry and Beverly and his siblings?

**A.** He did.

Q. How did Jerry treat Bruce and his siblings?

**A.** Well, as bad as Dean was in terms of being abusive, Jerry Aires was even rougher. He was much tougher on the kids. He was, in their words, vicious. And he was also a severe chronic drinker. He was not providing for Beverly or providing for the kids. His expectation was that Bruce and Berguitta would steal for him to bring in cigarettes, money for alcohol, and food.

Q. And I think this is implied from your testimony, but just so it's clear for the Court, was Jerry physically abusive to Bruce and his siblings?

**A.** Yes. The kids took a lot of beatings from him. And with Jerry, it was mostly his fists. And he would also, in particular, pick Bruce up and throw him across the room.
*Q.* You mentioned that Bruce was forced to steal. How was the family doing financially?
**A.** Well, they were not doing well at all at this point. During one period when Beverly was with Jerry during the winter, she had to call Ron Johnson and ask him to please come and bring firewood. And he would also come and -- at times and bring food to them as well. Bruce and Berguitta were climbing into dumpsters to get food for the family and bring it home as well.
So when Ron arrived at where they were living at that time, he found Beverly and Jerry at a table drinking, smoking cigarettes, yet they had no firewood, they had no food. And he described to me that this was frequently the case while they were in that area.
*Q.* And Ron is Dean Johnson's brother, right?
**A.** Yes.
*Q.* Did the family stay together in North Carolina, the family now being Jerry, Beverly, Bruce and his siblings?
**A.** They stayed in North Carolina, but Beverly took off to Florida with Jerry Aires and they took Berguitta. And so they were down there, not for a real long period of time. Maybe a month or two. And, of course, Berguitta was very

unhappy and she kept begging her mother to go home. And so after staying in hotels, motels, and frequently being evicted, Beverly packed Berguitta up and they literally hitchhiked back to North Carolina.

*Q.* So at this point, Beverly had abandoned Bruce again. Where was he living in North Carolina?

**A.** He was again with Dean and Ron.

*Q.* Did you come to any sort of opinion about what effect living with Jerry had on Bruce?

**A.** Well, when you consider that up to this point, Bruce had no type of juvenile offenses, he had no assessments or evaluations, he had not been arrested at this point or put in a juvenile facility, yet he was learning from Jerry, who told him you either go steal food from the grocery store, you go get it out of the dumpsters, you go pick up bottles on the side of the road, whatever you have to do, or I will beat your mother. So he held that hammer over Bruce's head that if he and Berguitta did not steal -- and out of this grew another habit that he picked up, which was starting to lie. So stealing and lying became part of Bruce's life after Jerry Aires.

*Q.* Now that Beverly and Berguitta have returned to Florida, did Beverly stay with Jerry, or did she meet somebody else?

**A.** She met a man named Mike Charlton. And in consistent

fashion, Mike was also an alcoholic who was physically violent but toward her. He did not beat the children.

She and Mike worked together at Waffle House until Mike decided that he wanted to move up to Virginia. So he took Beverly and Berguitta and Bruce and, I believe, Charles and they moved up to Virginia to stay with Mike's mother.

When they got there, Mike's mother refused to let Bruce stay. She had heard that he had a problem with stealing. And at times, she wouldn't let the rest of them stay either, but mostly it was Bruce. And so Bruce was made to sleep in the car outside her house during the period of time they were up there.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

Thank you.

(Petitioner's Exhibit 28 was marked for identification.)

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I have just handed you what's been marked as Petitioner's Exhibit 28, which is Exhibit 11 to the Rule 32 transcript, and it's in Volume 16 and 17 of the habeas record in this case. Will you turn to page 14, and can you tell me what this document is.

**A.** It's a document produced by the 16th District Juvenile and Domestic Relations Court. And this is in Virginia.

Q. When is it dated?

A. Sorry. I couldn't hear you.
Q. When is it dated?
A. Oh. 12/1/81.
Q. And if you'll turn to page 15 of this document and look at the third paragraph. And if you'll read the first three sentences for me.
A. "Mr. Charlton was unemployed. Therefore, the family moved in with his mother. According to Mrs. Charlton, her mother-in-law would not allow Bruce in the house since she knew he had a reputation for stealing."
Q. So do these records corroborate what you learned in your assessment?
A. Yes.
Q. Do you know how long this arrangement persisted that Bruce was forced to live in a car?
A. I actually don't know the length of time. It was long enough that he finally gave up and went and stayed at a friend's house. They were the Riggleman family, and they informed the court that they couldn't keep him.
Q. Why is it important to your testimony that Bruce was forced to live in a car while his family lived inside?
A. Well, in addition to the fact that it was just one more example of being abandoned, an example of being rejected, it was not a safe or healthy situation for a teenage boy to be in. It's an invitation for a juvenile to get into

trouble. And as far as I can determine, in the beginning he was not, but ultimately, that is what happened.

MS. CAMPBELL: Your Honor, we would move to admit Petitioner's Exhibit 28.

THE COURT: Any objections?

MS. SIMPSON: No objection, Your Honor.

THE COURT: Thank you.

28 is received.

(Petitioner's Exhibit 28 was admitted into evidence.)

MS. CAMPBELL: Thank you, Your Honor.

*Q.* You mentioned that Mike was physically abusive to Beverly. Did Bruce ever witness this?

**A.** Yes.

*Q.* Where was Bruce's brother Charles around this time?

**A.** Charles had finally grown tired of feeling homeless or transient, and so he joined the Army and refers to that as his escape. And he remained in the Army for a number of years.

He recalls when he was getting on the bus to leave for basic training that Bruce went to the bus with him, Bruce and Berguitta, and that Bruce was standing there crying when the bus pulled off.

*Q.* And where was Bruce's sister Berguitta?

**A.** She was still in North Carolina. No. I'm sorry. She was in Virginia with Beverly and Mike.

Q. And at some point did she leave the family?
A. Yes. She, too, had grown tired of the lifestyle, the multiple moves, and had complained to her mother that she couldn't bear to live that way anymore. So her mother first gave her to her mother, her grandparents. And then she ended up living with her aunt and uncle.
Q. Are Beverly and Mike Charlton still together today?
A. They are.
Q. You talked about several male figures in Mr. Marshall's life. What had those male figures shown Mr. Marshall up until this point?
A. The last part of that question?
Q. What had the male figures that we've talked about -- Charles Marshall, Dean Johnson, Jerry Aires, and Mike Charlton -- what had they shown or taught Bruce up until this point?
A. Well, that he grew up learning that aggression toward women was acceptable. He had seen the males in his life be physically aggressive toward women. He received messages from Jerry that when women say no, they really mean yes and that you had to beat a woman to control her. And he had seen all of this, of course, combined and exacerbated by alcohol.
And so the male role models in his life -- he was not with Ron Johnson long enough to benefit from Mr. Johnson's

better behavior than Dean. And I did not see throughout his life where there was any other male who was parenting him in any kind of effective way.
Q. Why is this important to your testimony and your opinion today?
A. Well, you know, children watch, they see, they hear. The importance of the developmental stages is to imbue them with skills, some of which is to help them know how to overcome adversity. And so this simply did not happen for Bruce. At 16, he is, for all intents and purposes, homeless. So the impact was quite serious for him.
Q. We've also heard about a number of separations Bruce had from various family members: his mother leaving him, being separated from his sister and his brother, various male figures leaving his life. How had those separations affected Mr. Marshall?
A. Well, Bruce developed a real desire for family in any shape or form. He wanted a stable place to live. He wanted to be part of a family. And he just, you know, simply could not bear rejection. Anytime he was abandoned, it just got harder and harder for him. And it didn't harden him as much as it just affected his self-esteem. It affected his lack of confidence in himself. He felt stupid. He felt that there was something wrong with him.
Q. Did he ever start to act out in certain ways?

A. Well, he did. I mean, of course, he was hanging out in the streets because he really did not have a stable home to belong to. And he started getting in trouble with stealing, and he got caught for stealing a gym bag.
Q. And what happened as a result of him being caught stealing that gym bag?
A. This is when his case was picked up by Rockingham County.
Q. And what happened then?
A. They did an investigation. They assessed what the situation was. And they placed him in a facility called Braddock House. And this was a facility that was designed for nonviolent children who were in need of services and were just in a situation where they were kind of at loose ends and had no place to go.
Q. And how did the Braddock House try and help Mr. Marshall?
A. They provided structure. He was in a home with a number of other boys. And this was a homelike facility. I've forgotten how many boys were there. But it was a homelike setting. They had school classes they had to go to. They had rules they had to follow. They had to attend counseling and therapy. And the staff attempted to involve families and parents, which was a significant part of their program.

Q. So when Bruce entered the Braddock House, did they have a full and comprehensive history of his past?
A. No, they did not. They had very little history.
Q. Did they know anything about the fact that Bruce had been forced to steal, for instance, by one of the men he lived with?
A. No, they did not know about any of the things that had happened to Bruce when he was with Jerry Aires.
Q. If you'll turn back on Petitioner's Exhibit 28 to page 15. And if you'll look at that top paragraph, starting with the fourth line down, "He could not agree." Will you read those next few sentences for me, for the Court.
A. "That he could not agree to having Bruce come back to live with him in the state of North Carolina..." --
Q. And let me just interrupt you really quick. I'm sorry. Who is "he" could not agree?
A. That's Dean Johnson.
Q. Keep going.
A. "Mr. Johnson states that Bruce's mother has never taken care of the children and that they have had a difficult life. Mrs. Charlton alleges that Mr. Johnson has been an alcoholic in the past and that he mistreated the family and often beat Bruce when the family was living together."
Q. Now, if you'll look at the fourth paragraph, the last line. If you'll read that for the Court. Starts

"However, Mrs. Charlton."
A. "However, Mrs. Charlton states that her husband Michael absolutely will not let Bruce live with them."
Q. So at this point, is it clear from these records that neither Mr. Johnson nor Beverly will allow Bruce to live with them?
A. Yes.
Q. And what does the line right below that say?
A. "As can be seen, Bruce is simply a child without a home."
Q. Why were these facts in this record important to your opinions?
A. Well, they're contemporaneous records. They were created at the time that Bruce was an adolescent. The notes are being entered by professionals who assess children and assess their situation. It's being done for the Court. And so they hold credibility.
Q. And are the facts contained within this record important as well, the fact that he was, as they described, a child without a home?
A. They were consistent with what I learned.
Q. And those are important to your assessment, these types of facts --
A. Yes.
Q. -- and the fact that he was without a home?

A. Yes.
Q. What was Bruce's attitude about going to the Braddock House?
A. Well, his attitude was really unusual in that he was eager to go. He was described as having a very good attitude about being placed in a group home, which is relatively unusual among juveniles. And I think due to the uncertainty of his life and the instability of his life that he was just glad to have a place to go to.
Q. If you'll turn to page 16 of Petitioner's Exhibit 28. If you'll look at the last paragraph and read the first two sentences of that paragraph.
A. "Bruce is a large attractive young man and has been very receptive to the Court's effort in finding him a permanent residence. He is very agreeable to going to Braddock House and seemed relieved that this is a possibility. Bruce is a young person who has had an unstable home."
Q. So he was admitted to the Braddock House then?
A. Yes.
Q. You mentioned that one of the things the Braddock House tries to do is involve parents. Did Beverly, Bruce's mother, have any relationship with Bruce while he was at the Braddock House?
A. No.

Q. Turn to page 17, please, of Petitioner's Exhibit 28. And this document is a few pages. Can you tell me what this document is?
A. It is a foster care service plan that was filled out and noted with a summary of Bruce's situation.
Q. When is it dated?
A. January 6, 1982.
Q. If you'll turn to the next page, page 18. Will you read the first entry under "parents, prior custodians."
A. "Father's whereabouts are unknown. Mother refuses to have Bruce in her home. She has no interest in him."
Q. If you'll turn to page 29 of Petitioner's Exhibit 28. Once you get there, will you just explain to the Court what this document is. Again, this is, I think, a two-page document.
A. Again, this is from the Braddock House. And it is a progress report on Bruce. And these progress reports were produced the entire time he was there. This one was dated December 1981.
Q. I'm going to focus you on the next page, page 30, on the December 29-January 4 progress report. On that last sentence, if you'll please read that to the Court.
A. "The Braddock House family counselor is not seeing Butch's mother in counseling."
Q. And then one more. If you'll turn to page 19. And

once you get there, if you'll tell the Court what this document is again. It's a couple of pages altogether.
**A.** This is the foster care section. And it is -- it contains notes for foster care.
*Q.* And when is it dated?
**A.** Sorry. The date?
*Q.* I think if you look on page 23.
**A.** June 15, 1982.
*Q.* And if you'll look at page 22, will you read the answer or the note that's made here on this record.
**A.** "The mother is not interested in working towards Bruce's return. All agency can do and is doing is providing a therapeutic environment in which Bruce can work on his many problems."
*Q.* And was there anything else on this document on this page that stuck out to you?
**A.** Well, when I was reading the document, it was just interesting to me under "parents" that it just had "not applicable" in big letters regarding the parents. And I just noted to myself that I didn't think I had ever seen that before.
*Q.* Why is Bruce's mother's lack of involvement with him at this time important and significant to your testimony?
**A.** Well, it just adds to the sense of loss, of abandonment, of rejection, "I'm not wanted, I'm not worthy,

I'm not even good enough to be part of a family." And so, again, he is desperate for a place to be, a place to stay, because it is certainly not working out with them.

And I would also note that in the scheme of things, when I think about almost 40 years altogether now in social work, as juveniles go, up to this point, I could not discover anything that Bruce had done that was so bad that he would be this completely and totally rejected.

Q. How did Bruce initially do at the Braddock House?

**A.** He had some bumpy times. When kids go into these facilities, they have to go through an adjustment period. They are often learning brand new skills. And as I said, talking about child development, if a child has missed some of these skills during the proper stage, it's very hard for them to go back and pick those up. So Braddock House had their work cut out for him. They were working with him on stealing, on lying. He was not violent to the other kids, but he was bigger, and so he could be intimidating to the other kids. And they were trying to teach him something about relationships, about how to solve problems, how to resolve conflict without trying to be a big guy.

Q. After he got over those initial issues, how did he do overall?

**A.** Overall, my view of this record is that it was a successful stay for the short period of time. Six months

is certainly not long enough to effect the kind of changes you want to see to overcome the childhood he had. But I would say that, overall, the stay was successful.

*Q.* You said he stayed there a short time. Where did he go after the Braddock House?

**A.** The Braddock House placed him into foster care, which is part of their goal in the beginning. They want to work with a child in a structured setting, in a residential situation where they can keep a tighter rein on them while they assess and kind of see what the child's needs are. And then after that, if the kid is doing well, then Braddock House would put them in what they call FOGH, a family-oriented group home. And this would be an actual family in a neighborhood, in a residence, that is operating like a family because they are a family.

*Q.* And how was Bruce's time while he was at the Scotts's or with this family?

**A.** Can you say that again.

*Q.* How was Bruce's time when he was with this family?

**A.** According to his foster parents, it went very well. They were initially shocked and surprised years ago when they learned about Bruce being in this kind of trouble. They said of all the boys they had had, he was one of the least they would have suspected to end up in this kind of trouble.

They have cards and letters from Bruce. They remember that he called them Mom and Dad. He seemed very happy there with them.

There were four other boys in the home, and the Scotts had the basement set up like a large bedroom so the boys had to share. They had to take care of their clothes. They had chores.

The Scotts had seven dogs, and they felt that the dogs were very safe around Bruce. He helped take care of them.

They had a severely disabled son who had to be diapered. He could not chew. He was in a wheelchair. And they were struck and always remembered Bruce's kindness to this boy who was 23 but -- even he was nonverbal. And the one time they remember Bruce really getting upset was someone in the neighborhood made a comment in Bruce's presence that that kid should have just died. And this was a very emotional event for Bruce, and he came home and talked to the Scotts about it. And they explained to him that it was okay, that some people feel this way and that he did not have to be upset about it.

So, overall, their memories of the time he was there, it was quite good. The Braddock House staff would come to meet with them. Other families, other boys had their families come. Bruce was the only one at the Scotts's who

never had family for the staff meetings with the foster parents.

Q. And the Scotts, is this Marlene and Gerald Scott that you interviewed in conjunction with your biopsychosocial assessment?

A. Yes.

Q. If you'll also on Petitioner's Exhibit 28 turn to page 50. If you can tell the Court what this document is.

A. This is an advisory report from James Wood High School. And this is in Virginia, Frederick County public schools.

Q. Is this once Bruce is living with the Scotts?

A. Yes.

Q. If you will just read the teacher comment. We can see the grades, but if you'll read the actual comment to the Court.

A. "Obviously, Bruce is doing excellent work. He is very courteous and cooperative."

Q. If you'll turn to page 51 of Petitioner's Exhibit 28. If you can tell the Court what this document is.

A. Another Braddock House record. And, again, this is a September 1982 summary of Bruce's progress. And it was by the probation officer and a caseworker. It was an outreach report for the month of September.

Q. So this is when he's living with the Scotts as well?

A. Yes.

*Q.* If you'll read on that third paragraph the first two sentences.

**A.** "It appears possible that the greatest reason for a very positive month for Butch would be his school experience. His two LD teachers have done a beautiful job with Butch, and he received positive progress reports from both of them in their three classes."

*Q.* And then if you'll also read about midway through, the sentence that starts with "his self-esteem."

**A.** "His self-esteem in the academic area has done a complete turnaround, and he says that he no longer feels stupid and also that he doesn't feel the need to come across with the big man image that he had held on to so diligently while he was in the Braddock House."

*Q.* Why are these records along with what you've learned about Bruce's time at the Scotts's and the Braddock House, why are they significant to your opinion?

**A.** Well, prior to going into the Braddock House, the last school that Bruce had attended had noticed that his grades were not good, that he obviously was having some kind of problems. And so they did the first evaluation on him ever where he received some testing. And even though he got that and recommendations were made for him for further psychological counseling in addition to academic help, nothing was done. So it wasn't until he was in the

Braddock House that he was exposed to trained LD teachers. He got one-on-one attention. They spent time with him. And it made a real difference in his ability.
Q. Bruce is doing well at the Scotts's. Did he get to stay there?
A. No. He -- when he turned 18, in spite of the fact that he was in high school. He was 17 years old in the ninth grade. He was doing well in that school. He was going to be allowed to be on the wrestling team. But the policy there was the kids had to leave at 18. And so Braddock House had to find a place for him to go in spite of the successes that he had had especially during the previous six months.
Q. So where did they find for him to go?
A. They worked at finding someone in Bruce's family who was willing to take him. And they finally contacted Charles Marshall, and he said that Bruce could come there down in Florida.
Q. How did Bruce feel about this opportunity?
A. Well, he was very excited about it. You know, I'm going to get to have a real father. I'm going to get to have a relationship with my dad that I've never known. This is going to be wonderful.
Q. And how did that go?
A. It did not go well at all. Of course, they did not

know each other. Mr. Marshall had not been involved in any of this work at Braddock House. His wife and he had had an agreement from years ago, you know, I can't have my children. You're not going to be around yours. She was very unhappy with him being in her home. So it lasted for a very short period of time, approximately a couple of months. And Bruce was working and paying them some money to stay there in the house. And he was not happy there.

*Q.* Where did he go after he left there?

**A.** He first went and stayed with his grandmother Cleo and was with her briefly, and then he sort of moved around between paternal relatives during that time. He occasionally stayed with one of his uncles. His aunt's husband took him to work and helped him get some work. And most of his jobs were manual labor and obtained through these uncles. But as far as they reported, they thought during this time that he did fine. He was courteous, respectful, and was not giving them any problems.

*Q.* In your opinion, what was the effect and the impact on Bruce of having to leave the Scotts?

**A.** Well, he had done so well there, and he had had the first success in his life. And I think it was a critical moment in his life when something really went terribly wrong because the success he was having there from Braddock House and from the foster parents had made such a

difference. But a year is not enough time. And now he's thrown back into this transient situation. Even though he is with the paternal family, even though he's staying with various ones, again, there's not the stability of a home.
Q. You talked a little bit about Mr. Marshall's schooling and the number of moves. Did you collect any school records, gather any school records?
A. Yes.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may. Thank you.
(Petitioner's Exhibit 25 was marked for identification.)
Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've handed you three sets of records, and I just want to walk through them one by one at first.
One of those sets of documents is Petitioner's Exhibit 25. It was previously admitted at the Rule 32 hearing as Exhibit 13, entered at Volume 17 of the habeas record. What are those records?
A. These -- this is the certificate of the -- hold on a second.
These are school records from Frederick County Public Schools.
(Petitioner's Exhibit 26 was marked for identification.)
Q. And if you'll look at Petitioner's Exhibit 26, which was previously admitted as Exhibit 15 to the Rule 32

hearing and is also at Volume 17 of the habeas evidentiary record. What are these records?

**A.** Okay. These are -- I think these are the Rowan County --

*Q.* I think that's right. If you look at --

**A.** -- schools --

*Q.* -- the first page.

**A.** Yes.

(Petitioner's Exhibit 27 was marked for identification.)

*Q.* And then Petitioner's Exhibit 27, which was previously admitted as Exhibit 16 to the Rule 32 hearing and is also found at Volume 17 of the habeas record. What are those records?

**A.** Can you give me the page number again?

*Q.* If you'll look at Petitioner's Exhibit 27. And I think if you look at the first page, it will tell you what they are on that second line.

**A.** These are the Wahama High School records.

*Q.* And are those from when Bruce was in West Virginia?

**A.** Yes.

MS. CAMPBELL: Your Honor, we would move to admit Petitioner's Exhibits 25, 26, and 27.

THE COURT: Any objections?

MS. SIMPSON: No, Your Honor.

THE COURT: 25, 26, and 27 are received.

(Petitioner's Exhibits 25-27 were admitted into evidence.)
MS. CAMPBELL: Thank you, Your Honor.
Q. And, of course, you also have Petitioner's Exhibit 28 which are the records from the Braddock House.
A. Yes.
Q. In reviewing these records, did you make any kind of opinions about Bruce's life growing up with regard to his moving around or his schooling?
A. Well, I think the records support the information that the family was moving around a great deal. And they all added to that that there were so many addresses, they could not remember all of them.
I think Bruce told someone on the staff at Braddock House he thought he had been in 15 schools. And I think I counted maybe 10 or 11. But it was certainly support for the fact that they were rarely in one place.
Q. Did you create a visual to help show the Court how often Bruce was moving and how many schools he was in?
A. Yes.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) Is the set of documents I have just handed you, is that that visual?
A. Yes.
Q. If you would, we can start with the first page which

looks to be elementary schools, and can you just walk the Court through what this shows.
**A.** Well, the first year indicates that whatever school he was in was unknown. And in the second grade, he was in Woodleaf Elementary in Woodleaf, North Carolina. In one of the only stable periods just in terms of the school, he was in the third, fourth, and fifth grade at Mount Ulla.
*Q.* And then if you'll go to the next page, looks to start with sixth grade. What does this show?
**A.** This also shows starting at Mount Ulla and then moving to Hartford Elementary in West Virginia.
*Q.* So Bruce went to two schools during sixth grade?
**A.** Yes.
*Q.* And then what about for seventh grade?
**A.** In the seventh grade, he went to three schools, East Iredell in Statesville, D. Matt Thompson in Statesville, and West Rowan Junior High in Cleveland, North Carolina.
*Q.* So two schools in sixth grade and then three more different schools in seventh grade?
**A.** Yes.
*Q.* Where did he go in eighth grade?
**A.** In the eighth grade, he attended Wahama High School in Mason, West Virginia.
*Q.* So that's yet another school?
**A.** Yes. And then the eighth grade, it was difficult for

me to determine in the records if grades were being repeated, but he went to two schools in the eighth grade, Wahama High and West Rowan Junior High.

*Q.* So that's six different schools from sixth to eighth grade?

**A.** Yes.

*Q.* If you'll turn to the next page. Looks like he went to two more different schools in ninth grade?

**A.** Yes.

*Q.* And then another school again the next year also in ninth grade?

**A.** Yes.

*Q.* Do you have an opinion about what kind of effect this transiency had on Bruce?

**A.** Well, going by how this culminated at Braddock House and his eagerness just to have a stable place to stay, I think that this transiency left him with the kind of dynamics you see in children who have grown up in what is known as the unsettled home.

And that research and those studies come from work done by Dr. John Bowlby on abandonment loss. But those studies have been repeated many times. The results have proven to be the same; that it makes it very difficult for children to make friends. It can be very isolating. It makes it hard for them to settle into an organization and

be part of that organization, to form relationships, to find adults who maybe can make a difference in their lives.

So, you know, the unsettled home does have an impact. It's even been shown more recently to have an impact on military children who are having to move around a lot, that they are also demonstrating some depression and anxiety over those kinds of moves and never being in one place.

*Q.* I noticed on this chart it says that Mr. Marshall was 17 or 18 in 1982 when he was in ninth grade. Is that accurate?

**A.** Yes.

*Q.* And there's nothing listed after ninth grade. Did Mr. Marshall finish school?

**A.** No.

*Q.* How did Mr. Marshall do in school? I know you noted that he did well in the first few grades.

**A.** Well, these records were a little difficult to follow in some ways. But as I said, you see things starting to change for him in the third grade. And then by the seventh grade, sixth or seventh grade, you see things starting to spiral downward again.

And the significance of that is it is consistent with some children who have learning disabilities that the third grade is a watermark year. It is -- they can keep up till the third grade, and then the third grade is when their

abilities to keep up start to show themselves. And so they notice that all the kids around them are doing the work, and they can't do the work. And it's a classic time to do some testing.

And then by the seventh grade, sixth or seventh grade, with a lot of the kids, their self-esteem is low. They've been taunted and teased. The teachers are harder on them. And so you just see this downward spiral continue and see the grades.

Bruce did fairly well in things like sports. There was one other subject that he did fairly well in. But his testing showed that his reading comprehension was on a relatively low level. And his math was fourth grade when he was in the eighth grade, I think.

*Q.* And if you will, Ms. Vogelsang, if you'll turn to Petitioner's Exhibit 27, page 5. Or -- I'm sorry. I think it's page 9.

**A.** Yes.

*Q.* Is this the testing you were just referring to?

**A.** Yes.

*Q.* And what does this show us?

**A.** That he was in the eighth grade when this evaluation was done at the Mason County Special Education Department. The test was given January 28 of 1980. And in eighth grade, he had a mental age of 9 years and 10 months. He

had a chronological age of 15 years and 2 months. And they got an intelligence quotient of 65.

And then going farther down, they show the chronological age versus the age equivalents and the grade equivalents in various subjects. And so at 15 years, 2 months, his reading comprehension is 11 years and 2 months -- about four years' difference. And then the diagnostician goes on to say that there needs to be further testing; that she is not sure that the intelligence quotient is accurate.

*Q.* And at this point in 1980, Bruce was not living at the Braddock House; is that right?

**A.** That's correct.

*Q.* If you'll turn in Petitioner's Exhibit 25 to page 19.

**A.** Page 19?

*Q.* Yes. Can you explain to the Court the significance of this record?

**A.** This is an IEP for Bruce in the Frederick County Public Schools. And this is in the ninth grade. And in the ninth grade, he is 17 years and 9 months old. So he's three months short of 18 in the ninth grade.

He is categorized, over to the right, as having learning disabilities. And then under section two, the least restrictive environment, he is in three LD resource classes. And then going on down -- for a total of 15

hours.

Going on down, the evaluators have noted that his reading recognition is at or above appropriate grade level. However, reading comprehension is deficient, a lag of about three years. And then in math, low level. His math was on the level of a fourth-grader.

Q. Based on these records we just looked at as well as all the records you've looked at regarding Mr. Marshall's schooling, did you reach any opinions related to his schooling?

**A.** Well, I think the categorization of Bruce as learning disabled is probably accurate and an example of one of his cognitive problems. The fact that it was identified so late contributed to him not experiencing that much success in school and feeling stupid until he gets with LD teachers who can give him the kind of attention that he needs and the kind of help and support that he needs.

And this is, you know, it's a serious -- it's a serious thing to be learning disabled to the extent that even -- that now, even tech schools, community colleges, and other colleges, even advanced education offers special tracks for learning disabled students. Unfortunately, Bruce's was discovered pretty late.

Q. As Bruce entered adulthood, how had all these experiences affected him?

A. Well, I think that Bruce went into adulthood still immature, not having age-appropriate skills to manage his life, to begin thinking about how to live independently.

When a lot of kids are going off to college, Bruce is with his grandmother and with other family members doing manual labor jobs and sort of guessing about life, guessing a lot of the things that we would like 18-year-old boys to know.

Q. What did Bruce do after he entered adulthood and left Charles Marshall's house after he had been living with some family members?

A. Well, he signed up with the U.S. Army National Guard and was in the National Guard for about two years.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

Thank you.

(Petitioner's Exhibit 29 was marked for identification.)

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've handed you what's been labeled Petitioner's Exhibit 29, which was Exhibit 12 to the Rule 32 hearing and it's found at Volume 41 of the habeas evidentiary submission. What are these documents generally?

A. These are his service records from the U.S. Army National Guard as they're archived at the National Personnel Records Center.

Q. And are these records you reviewed and relied upon in conducting your biopsychosocial assessment?
A. Yes.
Q. Did anything significant happen with Bruce during this timeframe in his life?
A. Bruce started dating a young woman during this time. And they dated for about two years -- so pretty much throughout the time he was in the National Guard. And when she broke off with him, he became very agitated, very upset. And so he got into some trouble when he tried to break in to where she was staying, which I believe was at a friend's house, and was assaultive toward the friend's father.
Q. And when you say got into some trouble, you mean criminal trouble?
A. Yes. Yes.
Q. And was that woman Sharon Bernard?
A. Yes.
Q. Did Bruce then leave the National Guard?
A. Well, he was discharged for excessive leave which had to do with him having to go to jail for a year.
Q. And was that an honorable discharge?
A. But it was characterized as an honorable discharge.
Q. Where did he become employed after that? Was he still in Florida at that time?

**A.** He was. Actually, when he came out of jail, he was again with his paternal family, some of the uncles, and he was working for a furniture company. And the furniture company required him at times to go up to Crossville, Tennessee. And so that's what he was doing at the time he met Tonya Wyatt.

*Q.* And who is Tonya Wyatt?

**A.** Tonya Wyatt is his first wife. While he was in Tennessee, they met and started dating, and he asked that his probation be moved up there, and they married. They then moved back down to Florida together, but Tonya really did not like Florida. And so they ended up back in Tennessee, and they were married for 10 years from 1990 to 2000.

*Q.* What did Bruce do for employment in Tennessee?

**A.** A lot of what Bruce did had to do with being a driver for various companies. He did some odd jobs, some construction along the way, but mostly he was driving.

*Q.* Through that job, was he able to provide for his family?

**A.** Yes. They certainly had their financial struggles, but he was working and providing.

*Q.* Can you tell me just very generally about Bruce and Tonya Wyatt's marriage.

**A.** Well, as I said, the marriage lasted for 10 years. And

they did have their happy times, but the relationship had a number of problems. And these problems reflected, again, Bruce's lack of understanding of marriage, of how to be a husband, the kind of things that you need to do in order to run a family.

He loved his children very much. He bought things for them. He loved Tonya very much. But over time, he would come home from work. He would be very tired. He would sit down in the chair. He wouldn't talk or speak. And this became very difficult for her. She started feeling neglected. They certainly had their aggressive moments with each other as well. But, you know, the marriage over time began to deteriorate.

Q. Did they eventually divorce?

A. They divorced after 2000, yes.

MS. CAMPBELL: Your Honor, we're moving into another section if the Court would like to take a quick break or anything. Or I can move on, whatever the Court would like.

THE COURT: That's okay. The witness has been in the box for an hour and 15 minutes, so a break is appropriate.

Let's take a 15-minute break, please. Come back at 2:47. Thanks, everyone.

MS. CAMPBELL: Thank you, Your Honor.

(Recess.)

MS. CAMPBELL: One thing I forgot to do, Your Honor, is

I forgot to move to admit Petitioner's Exhibit 29, which were the records related to the National Guard, and Petitioner would move to enter those into evidence at this point.

THE COURT: The most important person was not in the room. I apologize.

Mr. Marshall, the only thing that you have missed is me asking the witness and the lawyer if they were ready.

Does the State have an objection to Number 29?

MS. SIMPSON: No, Your Honor.

THE COURT: That's received as well.

(Petitioner's Exhibit 29 was admitted into evidence.)

THE COURT: Now that everyone is here, Ms. Campbell, you may move on.

*Q.* (BY MS. CAMPBELL:) Ms. Vogelsang, throughout Bruce's life, was he ever taught boundaries and appropriate behavior?

**A.** Not that I could determine and certainly not on a -- any kind of long-term consistent basis where those kinds of lessons can stick and then be used effectively.

*Q.* We talked briefly about Tonya Wyatt and the fact that Mr. Marshall and Tonya Wyatt divorced. Was there ever a criminal action brought against Bruce as a result of his relationship with Tonya Wyatt or arising out of that relationship, rather?

A. There was. After they divorced, Mr. Marshall again became extremely agitated and upset over the loss of his marriage. He wanted her to come back. He wanted her to let him come back home. He would call her and have these conversations in which he would, you know, beg her to let him come back. And when that didn't happen, he went to her residence and he broke in and assaulted her.
Q. After Tonya Wyatt and Mr. Marshall divorced, did Mr. Marshall subsequently remarry?
A. He did, yes.
Q. Who did he remarry?
A. He married Tonya Bentley, who was his first cousin.
Q. How did they come to reunite with each other?
A. As I recall, they were at some family gathering, possibly a funeral, and Bruce attended the funeral of that family member, and they saw each other again.
Q. When did they get married?
A. I think it was in 2001.
Q. And where did they live?
A. And they -- initially, they lived in Crossville and then ultimately moved to Birmingham.
Q. Did Ms. Bentley have any children at this time?
A. She did. She had a daughter named Alicia Bentley, and then she and Mr. Marshall had a child named Devon, a son.
Q. Was Mr. Marshall employed during this time?

A. Yes. Again, driving.

Q. Ms. Vogelsang, how was Bruce's health as an adult?

A. Well, in '95, Bruce had collapsed while he and Tonya were at a county fair and went to the hospital, and it was discovered that he had -- ultimately discovered that he had thyroid disease or what is known as hyper -- Graves' disease. It's hyperthyroidism.

The other thing that Bruce was diagnosed with, again, at some point after this was with -- no, I think he was diagnosed with this when he was still married to Tonya Wyatt. He had severe obstructive sleep apnea.

Q. And did he suffer from any stress and anxiety?

A. Could you repeat that?

Q. Did he suffer from any stress and anxiety that you saw documented in his medical records?

A. Yes, he did. In addition to the reactions he was having to the loss of his marriage, he also -- it was noted in the medical record that he was being given medication that would hopefully help with his stress and anxiety. And those medications, if I recall, were antidepressants.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

Thanks again.

(Petitioner's Exhibit 37 was marked for identification.)

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I've handed you two

sets of records. The first is Petitioner's Exhibit 37, which was Exhibit 17 to the Rule 32 hearing and is contained in Volume 17 and 18 of the habeas evidentiary submission. Can you tell me what these records are.

**A.** These are records from Physicians Associates. And that's a medical facility in Tennessee.

*Q.* And did you rely on these records in conducting your biopsychosocial assessment?

**A.** Yes.

*Q.* Do experts such as yourself reasonably rely on medical records in conducting biopsychosocial assessments?

**A.** We do.

(Petitioner's Exhibit 40 was marked for identification.)

*Q.* If you'll look at Petitioner's Exhibit 40, which is the other set of documents I gave you -- the other set, Ms. Vogelsang.

**A.** Right.

*Q.* No, no, that's okay. I know I've given you a lot of records today.

**A.** Okay.

*Q.* What are these records?

**A.** These are medical records from the Cumberland Medical Center. And, again, that is in Tennessee.

*Q.* Did you rely on these records in conducting your biopsychosocial assessment?

A. Yes.
Q. You noted that Mr. Marshall had been diagnosed with a thyroid disorder, hyperthyroidism, Graves' disease, sleep apnea, stress and anxiety. If you were treating this patient in private practice, what would you do if you found that a patient had these health issues?
A. I would consult with experts in that area.
Q. And why would you do that?
A. Because I'm not a medical doctor. I do know from education, reading, research that those are things that can affect emotions and can affect cognitive functioning, and so it would be critical to make sure that they were seeing the right person to be treated for those things.
Q. What types of effects on behavior could these health conditions have?
A. Bruce was switching back and forth until they got him regulated between hyperthyroidism -- I am so sorry.
MS. CAMPBELL: That's okay. Take your time.
THE COURT: Do you have any water there? You do.
THE WITNESS: I do. Thank you.
A. Hyperthyroidism and hypothyroidism. So one can cause memory problems, problems with concentration, and great fatigue. And this is something anyone can look up online. Hyperthyroidism can cause agitation, irritability. And both can cause cognitive problems. And, of course, with

Bruce already being diagnosed with a cognitive problem and then combined with the effects of sleep apnea, where his oxygen levels were dropping during the night to 69 percent -- I think anybody that's ever had their oxygen tested, the ideal is 100 percent. And so these things could, in fact, have an effect. And when I see those kind of red flags, those kind of signs and symptoms, then I am immediately going to consult with their family doctor or a specialist to have it better defined and distinguished from anything else that might be going on.

*Q.* (BY MS. CAMPBELL:) So family doctor, specialist. What other kinds of -- other types of professions might you consult with if you saw these conditions? Perhaps a neuropsychiatrist?

**A.** Well, one of the challenges, of course, is to be able to differentiate in terms of what is causing something. There are many things that can cause irritability. There are many things that can cause fatigue or cause cognitive problems.

Children who have been traumatized can exhibit any number of cognitive problems and cause them to be misdiagnosed. So it's so important -- I can't do a blood test, and I can't determine whether or not someone has thyroid disease without having a trained and skilled professional do that. I can't tell if there's brain damage

unless a neurologist shows me a record or shows me an X-ray or tells me about it. But the signs and symptoms I can identify from experience lead me to think about and choose and consult with and then refer.

*Q.* And do social workers typically reasonably rely on other types of professionals like you just discussed?

**A.** Yes.

*Q.* Are you aware of any medical professionals or neuropsychiatrists that have testified about these issues you have identified in this case?

**A.** Dr. Carol Walker is a neuropsychologist who testified.

*Q.* Did you review and rely on her testimony?

**A.** I did.

MS. CAMPBELL: Your Honor, we would move to admit Petitioner's Exhibit 37 and 40.

THE COURT: Any objections?

MS. SIMPSON: No, Your Honor.

THE COURT: 37 and 40 are received.

(Petitioner's Exhibits 37 and 40 admitted into evidence.)

MS. CAMPBELL: Thank you, Your Honor.

*Q.* Ms. Vogelsang, based on the work you have done in this case, were you able to reach any ultimate opinions?

**A.** I was.

*Q.* I'd like to discuss those opinions with you. Did you create some demonstrative and visuals to help the Court

with those opinions?
A. Yes.
MS. CAMPBELL: Your Honor, may I approach?
THE COURT: You may.
Q. (BY MS. CAMPBELL:) I've handed you a set of those visuals, and we can go through them one by one.
Now, Ms. Vogelsang, there are thousands of children in the country and the world that have had bad things happen to them in their childhood. How do you account for the fact that some children are able to cope with these types of things and some children can't?
A. Well, the general conventional wisdom among mental health people and among researchers who, of course, have been asking themselves this question for years is currently that there are degrees of resilience that children are maybe born with, maybe not born with, but certainly can typically be taught during the developmental stages.
And so we know that life is filled with adversity; that no one escapes; that at some point throughout your life, you're going to have a number of bad things happen. So why is it some people can cope and seem to just be able to bounce back from almost anything, including children, and then there are others whose resilience just simply breaks down.
Q. And did you come to an opinion about how Mr. Marshall's

childhood prepared him for his adulthood?

**A.** Well, I think that definitely his resilience was impacted and that he was at high risk for it to break down.

There's an accumulation of risk factors that can place a person at higher risk to end up in serious circumstances.

Based on research, the number of risk factors that accumulate over the lifespan of a child can, again, place them in very serious circumstances; can affect their judgment, their insight, their choices, their decisionmaking, and their impulse control.

So that along with the impact of things such as psychological battering, all of which were present in Bruce's life, in my opinion, did affect his ability to exercise judgment and to exercise insight and to make good decisions.

And along with his loss of skills for managing relationships, along with his, just, ongoing, almost unrelenting loss of family, I think all of these things came together to make him completely unable to handle rejection or abandonment or whatever he perceived as rejection.

*Q.* I think there's two visuals up there that deal with resiliency. Did you create those?

**A.** Yes.

Q. To help the Court understand your opinions?

MS. CAMPBELL: Your Honor, may I approach the easel?

THE COURT: You may.

Q. (BY MS. CAMPBELL:) I believe the first is entitled "Development of Resilient Children"?

A. "Development of Resilience in Childhood." Is that the one? Or --

Q. Yes, that's correct.

A. Okay. So just by way of background, this particular study, which is one of many, was conducted and her results published by Dr. Edith Grotberg, who is no longer living, but up until just a few years ago had a position at the University of Alabama and was conducting studies there on the resilience of children in an effort to explain, you know, what kind of differences does this make in how children handle adversity. And so among her volumes of work, she talked about the development of resilience in childhood and then also homes that failed to produce resilient children.

Q. Would you walk the Court through the development of resilience in children in childhood and how that intertwines with your opinion about Mr. Marshall.

A. So this list looks at the things that either did or did not happen when Mr. Marshall was developing. Did he have "unconditional physical and emotional love and verbal

affection"? No.

Did he belong to a family that "used soothing words to calm and comfort and teach a child to calm himself"? I will briefly say that in regard to that one that it's one of the most important because families that teach their children how to calm themselves down, how to regulate their emotions, have a lot more success in producing resilient children.

And, in fact, in Bruce's family, during this assessment, I was able to witness for myself the inability of many families -- of his family members not to calm and soothe themselves.

"Enforcing rules without belittling, harming" --

Q. That was one of the factors --

A. That was -- yes.

"Enforcing rules without belittling, harming, or rejecting." No, that did not happen in his family.

Did the family "model behavior that communicates confidence, optimism, and results"? No, he did not have those kind of role models.

Was there "praise for his accomplishments"? The first time I know of Bruce having anything positive was from the Braddock House and the LD teachers. But in his home, no.

"Encouraged to be independent"? This was one of the

greatest losses for Bruce. Up until he married Tonya Wyatt, he did not live independently. He always lived with someone else. They had a home that belonged to her family, and so Bruce did not have those independent skills that you want to see children develop.

"Label feelings and help a child to recognize their feelings." That did not happen in his home.

"Use language that helps a child face adversity." As I mentioned earlier, teaching children that life will not always be perfect and that there will be bad times and you have to be able to bounce back.

Q. That --

**A.** That did not happen.

"Preparation for adverse situations." No, that did not happen in his family.

"Teach how to problem-solve and to reconcile." This is another major item in resilience that went with learning how to solve problems. How to reconcile, how to resolve conflicts with family, with friends, with your spouse is critical. That did not happen.

"Provide comfort and encouragement in stressful situations." I think that his mother loved him. I think there were times when she would pet him and tell him everything was going to be okay. But in general, to receive comfort and to receive encouragement, that was not

happening in his family.

To "provide a stable environment." Of course, as I've testified, the environment was not stable.

And "help to manage feelings and impulses." Again, if feelings and impulses are out of control, if you can't put on the brakes, if you are not wired to be able to restrain your emotions or you have not learned how to do that, it places you at very high risk, and it can cause a breakdown in resilience. That was not present as well.

*Q.* You also mentioned there was a second part to this model; is that right?

**A.** Yes. The second part that was looked at in terms of the most important issues that need to be present in a home. And there are situations outside the home that can help as well, but these are restricted to the home. And these are homes that failed to produce resilient children, what are the dynamics and elements in those homes.

"Lack of guidance and mental health intervention." That was certainly present in Bruce's home.

"Divorce and separation" was present in his home.

"Multiple moves," as I've testified to earlier, that the family was often transient.

"Abuse." And it's just presented in a very general way. It's not distinguishing physical or sexual. But certainly abuse was present in Bruce's home.

"Abandonment." He had multiple losses. Really never had his father who abandoned the family. At some point, he really lost his mother even when she was there. Her choices were usually to stay with the males even if they were physically abusive. When his brother left, when his sister left -- and then when he lost his wife and when he thought that his girlfriend was breaking up at anytime, we see how later these multiple losses affected him, and those were certainly in his home.

"Homelessness," I think I've described in detail.

"Disabled family member." Any family member who is a drunk, who is violent, who cannot function and raise their children because of alcohol or drugs. And he certainly had that with his stepfather from the ages of 1 to 16.

The one that does not apply to his home is "immigrant status." So that one stays blank.

I talked earlier about the "lack of role models," especially males. And so that was certainly a failure on the part of the family.

"Growing up witnessing violence." That was definitely present in the home.

The "lack of a constant caregiver." And one could argue that he was with his mother and with Dean Johnson for a number of years. But they were not effective caregivers. So in my mind, there was an absence of the kind of care

that you want a child to receive.

The "inability to trust." You can witness that even now on the paternal side of his family. There's a great deal of paranoia, a lot of accusations, and inability to trust that comes out with these older adults even today.

"Worry about violence in the home which affects learning in school." Children who are experiencing violence at home often have trouble concentrating at school -- in school. And so they're in the classroom worrying about their mother: "Is my mother safe? Will everything be okay when I get home?" And that certainly was a dynamic in this family.

"Impaired cognitive functioning." We have both a learning disability -- and learning disabilities are -- can be genetic. And then we have cognitive functioning affected by thyroid disease. We have cognitive functioning affected by trauma. And all these things were present in Bruce's home.

"Inability to deal with aggressive feelings." I think that that is one of the most important in Bruce's life history. No one in that family was taught how to handle or deal with aggressive feelings.

"Sense of helplessness." Children who get the Pavlovian shock over and over again every time they try to face adversity, to exercise some power, to jump on that man

who's beating up your mother, and they fail, the shock of that failure creates a sense of helplessness and hopelessness and powerlessness.

And "poor problem-solving skills," and I discussed that as well, those last two get a check.

So usually when I use Dr. Grotberg's model, I don't typically have all these filled out. It might be half. It might be three-fourths. But I think that this is very consistent with Bruce's family. So you look at the other children. Where was the hand out, the hand up for them, the ones that didn't have learning disabilities, the ones that didn't have health problems or thyroid disease, the ones that did not have sleep apnea, the ones who went on finally to live and stay in a stable home until they were able to get on their feet? The U.S. Army was a rescue for Charles -- which often happens.

So we see all of these events in a child's life where they do get that hand up and that hand out. And what is impressive to me is that Bruce was able to function as well as he did for as long as he did given the kinds of events that were -- adverse events that were going on in his home.

*Q.* So in Bruce's case, we can see that each of the factors for development of resilience in childhood were absent in his life and, with regard to the homes that fail to produce resilient children, each of those factors with the

exception of one was present?
**A.** Yes.
*Q.* Ms. Vogelsang, what did you conclude about the emotional abuse of Bruce?
**A.** Well, figuring out and learning about emotional abuse is one of the more difficult challenges of conducting the assessment. But not just in conducting this assessment. It is especially hard for caseworkers, social workers, and other mental health people to describe exactly what emotional abuse is in a way that it's easily understood. So there are even guidelines that have been drawn up in family courts to assist judges in knowing what to look for because with physical abuse, you can have marks and bruises, cigarette burns. With sexual abuse, you can have medical information from a hospital. But the psychological battering of children is especially hard to describe. And it's best done by example.

And so Dr. James Garbarino, who is a child development specialist -- I believe he's still at Cornell -- developed a model a few years ago based on his book, "The Psychological Battering of Children." And in that model, he uses that to help us understand what are the kind of events that cause a child to suffer emotional abuse. So I used that model and looked at some examples from my assessment of Bruce and created a visual aid.

Q. And is that visual aid that you have created for the Court the one that's a few pages -- I think it's five pages, entitled "Psychological Battering of Children"?

A. Yes.

Q. If you will, walk the Court through this model.

A. So under "rejection," Dr. Garbarino talks about the events in a child's life that robs them of feeling worthy, robs them of self-worth or self-esteem. And certainly if the most important people in your life -- your mother and your father -- are not present at critical times and available to be with you and guide you through, that can certainly affect a child's self-esteem and self-worth and to question even where they belong in the world.

And so some of the examples I gave from Bruce's life were these losses and abandonments by father, by mother. And then, of course, as we've discussed today, there were others as well.

He was singled out for more harsh abuse by his stepfather, which also causes a child to question what they've done wrong, why are they so bad, "Why me? Why was I picked out?"

Q. And does that refer to Dean Johnson?

A. Yes. And then "mother fails to protect from violent men." When a mother chooses all of these violent relationships and she chooses men with substance abuse

problems and allows her children to witness -- and I don't want to be judging his mother. She certainly had her own tragic life with no intervention herself. So I understand how this has happened. But to see your mother with these different men who abuse her and abuse her children, again, affects self-worth and self-esteem. And when this goes on for years, as it did in Bruce's life, it can certainly have a critical impact.

The second part of the model has to do with ignoring. And by that, Dr. Garbarino is talking about the ignoring of various needs and opportunities that children need to have in order to feel good about themselves to come out with certain kinds of skills. And so if their basic developmental needs are missed --

A good example is that when Bruce reached the age where little boys, around five years old, are starting to gravitate toward males -- they're kind of pushing away from mom, losing interest in mom. This is a very important stage. Bruce was five years old. He was moving with Dean up to Wisconsin. And this is where all this violence began. So this first male that had the opportunity to be a role model for him, to be by his side, to help him and his brothers was not present for that.

"Emotional needs neglected." As we talked about dealing with children's dealings and explaining them to

them and helping them to understand what they mean and telling them how to express them.

"Opportunities to develop life skills ignored." I think that Bruce and his brothers were having a lot of responsibilities on the dairy farms. I think they were getting up early to feed the animals and to do those sort of things. But the other kind of life skills that have to do with forming an identity or learning reason or having a parent model good choices or learning about relationships, that was not there. Nor were they having the opportunity to be in places, except school, but to be in other places where they could learn these things or pick up these skills.

"Needs for intervention for learning disabilities neglected." And so when you see your child failing in school or you see their grades going down or you see they're struggling or not doing well or that they're feeling stupid. It is true that sometimes professionals fail to train parents or to educate them or to intervene for them and help them to understand learning disabilities. And I am positive Beverly did not. But to get to the ninth grade and be almost 18 years old in the ninth grade is pretty startling.

Under "terrorism," these are physical acts that present a threat of harm. It's not actual beating or

whipping or abusing but things that children see in the home that are terrifying and make them think that, "If this is happening to my brother, my mother, then these things could happen to me."

So the mother's boyfriend threatened to and did beat the mother. The stepfather abused animals in front of the kids. He was -- Bruce was in the car when his stepfather was drunk and tried to run over his mother. He witnessed his stepfather waving a gun around that his mother says was a loaded gun. So it's like, "Could this go off? Could this shoot me? Could it shoot my brother and sister?" Witnessing the stepfather beat the mother. So the succession of males who were violent to others, that threat of harm can be just as powerful as the actual physical abuse.

With the isolation, I think the frequent moves made it very difficult for Bruce to learn about relationships, to make friends, to have any kind of stability in terms of play or finding out who you are or how other people respond to you, frequent moves that affected the development of new skills.

When people are moving around frequently, it is very easy to ignore and not pay attention to what your kids need. And so they're learning these things in isolation. They're learning them in the streets. They're learning

them from the wrong kids at school.

But it's very isolating to sleep in a car. When you're sleeping in a car, it goes not only to rejection and not being worthy but, you know, "How do I handle this? Who do I get -- where do I go for help? Are there any resources? Is there anyplace I can go?" And even at his age, you know, the ability to pack a little bag and go get on an airplane just simply wasn't there.

The "lack of understanding or help with sexual issues" is very isolating for kids. Other kids will know things that Bruce might not know. And certainly it's clear even today when I talk with Bruce, there are many things about relationships that he just never learned and is puzzled by.

And then the "loss of siblings" can be very isolating. And he not only was sleeping in a car or staying at a friend's house, but then his brother goes to the Army, his sister goes and stays with other family, and he's just kind of out there on his own with no guidance or help at all.

And then finally, and one of the ones that I think is the most significant is "corruption." And corruption is the missocialization of children: How does the behavior of adults teach a child the wrong things. And so in Bruce's family, Jerry Aires forcing him to steal or he would beat

his mother. And this was in order to get food and other necessities and to provide cigarettes and alcohol for his mother and her boyfriend.

"Mother's boyfriend threatens to beat the mother in order to force Bruce to steal." I just explained that. But, again, this is missocializing. What is this teaching a young boy about how you treat women?

"Confusing behaviors and messages about sexual relationships in the family." The lack of sexual boundaries on both sides of Bruce's family, the stories about sexual behaviors that were not hidden from the children with them growing up, having this information and knowing this, with the intermarriage, especially on the father's side of the family, and just confusion about relationships can certainly give a young person the wrong ideas about what is sexually acceptable, and then witnessing violent and aggressive relationships, which pretty much defines his developing years.

*Q.* Based on this model that you've just explained to the Court, did you reach any opinions that the emotional abuse of Bruce played a role in his adult behavior?

**A.** Yes. I think it left him psychologically impaired, emotionally impaired. And so aside from the other things that were going on, this lack of understanding, what to do with feelings, what to do with emotions even now is very

confusing to him.
Q. And what, in your opinion, was the role of the family violence and neglect on Bruce in his life?
**A.** Well, some of the best information we have on family violence and neglect has been produced by the United States Department of Justice. And they have conducted these studies or caused these studies to be conducted over and over again and typically with the same results. So over time, we've been able to assess what the impact of family violence and neglect is. And neglect has been found to pretty much hold an equal role as family violence in its impact on children and is one of the risk factors that place kids at higher risk to end up in juvenile incarceration and adult incarceration.
Q. So taking all of these factors that you've discussed into consideration and based on the assessment that you have conducted, do you have any other conclusion that you have drawn regarding Bruce Marshall?
**A.** Well, my final conclusion, in summary, is it's very difficult to ever point to one thing in a person's life, one event, and claim that that is responsible for them being the way they are or being in the trouble that they are in.
And research confirms that it is typically an accumulation of factors that pile up over time that are

more likely to place a person at risk to end up in very serious circumstances. And this is based on some of the work by Dr. Arnold Sameroff, by Dr. Garbarino, and many others who have studied risk factors.

And so the general thinking is that almost anyone, whether they've had a lot of adversity or not in their life, almost anyone when they get between the third and fourth serious stressor, serious risk factor in their daily life -- it could be the loss of a job, the loss of income, the death of a child; it could -- you know, just the things we know about that are awful life events, that between the first and second stressor, most people function pretty well. But when they get between the third and the fourth, you start to see a breakdown, no matter their education, no matter their socioeconomic level, their gender, their race; that the third and fourth adverse event starts to make certain things noticeable, a lack of concentration, impaired memory, the inability to focus, not doing as well at your job, not being able to manage.

So on and on, we know that as these build, they have an effect on almost anyone. But when we look at a childhood history and we list this accumulation of factors over time that are affecting children who have not yet developed the skills they need to deal with them, then those can affect -- place at high risk and affect judgment,

choices, decisions, the ability to have insight to control impulses.

So I have prepared on Bruce from his life history just some examples of the factors I believe have accumulated over his history from birth.

Q. Is that the demonstrative that's "Accumulation of Risk Factors For Bruce Marshall"?

**A.** Yes.

Q. What did you base that on?

**A.** Again, I based it on the research that's been done on risk factors. And it's important to note that in the process of doing the life history and looking at this accumulation, it's important to note positive factors in a person's life as well to count and see was there enough or a powerful enough positive factor in this life to compensate for the major risk factors.

Q. And if you could briefly walk the Court through this demonstrative.

**A.** So born into an unstable home. And, again, we've talked about the spacing between the births in that home. His parents switch partners when he is still very small.

He is ultimately abandoned by his father. He's physically abused by his stepfather. He's singled out for abuse because of his resemblance to his father.

The loss of consistent guidance with development, the

lack of assistance with learning disabilities, an unsettled home with frequent moves, ultimately abandoned by mother. Periods of hunger, witnessing violence to loved ones, physically abused by mother's violent boyfriend, forced to steal to support mother and her boyfriends, male role models abused alcohol, witnessed stepfather attempt to run over mother. And I didn't add waving the gun around.

Fear of mother's boyfriend's violence, forced to tolerate abuse to protect his sister, brought up in an environment of fear and violence, long-term intervention interrupted by family, inappropriate family sexual behavior.

And so I probably could have an even longer list. But I think that accumulation was certainly sufficient to be able to say that there has been a credible amount of adversity in his life and that until the Braddock House, Bruce did not get that hand up from Braddock House and from the Scotts until he was 16 or 17 years old. And unfortunately, it was not long term enough and it wasn't -- you know, enough treatment for a long enough period of time to overcome the many things that he had basically survived over 17 years.

*Q.* Bruce's brothers and sisters were raised in the same environment or with some of the similar conditions at least. How do you explain the fact that they have not

engaged in the violent act that Mr. Marshall is accused of?
A. Well, you know, first of all, acts such as these are rare even though when you watch television, read the news, you don't think that's the case. So I think it's safe to say that most people do not engage in these kind of acts.

But what we know about those who do is that there are a number of factors present that under circumstances, certain circumstances come together and cause a person to end up in a very, very serious situation that they absolutely cannot handle.

And so Charles, again, as far as I could learn in talking to him, did not have some of the health problems that Bruce had. Berguitta went to live with grandparents.

But it's important to note that these children are not unscathed by this background. Charles has had four marriages that have been troubled and that have caused him to struggle with relationships. Berguitta married a man that molested her children and went to jail for molesting her children. Shawn has had about 30 drug convictions.

And so it's critical to note that, for whatever reasons, most of the ones we've explained here today, Bruce's resilience, whether it was due to his health problems, a combination with trauma, a combination with abandonment combined with witnessing violence, having absolutely no idea what to do when a relationship breaks

down or how to manage it or put it together ended up being at very high risk to end up in this kind of situation.

Q. Thank you, Ms. Vogelsang.

Before we finish, I want to take you back to something that Judge Kallon asked you about earlier today about Berguitta Marshall and her -- and talk about her testimony at the Rule 32 hearing.

Do you know when Berguitta was first asked to testify at the penalty phase of the trial?

**A.** I don't recall.

Q. In conducting your biopsychosocial assessment, did you review Ms. Berguitta's Rule 32 testimony?

**A.** I did.

MS. CAMPBELL: Your Honor, may I approach?

THE COURT: You may.

Thank you.

Q. (BY MS. CAMPBELL:) Ms. Vogelsang, I'll represent to you that this is a portion of the Rule 32 transcript which starts at page 289. Will you read starting at line 4 through line 19.

**A.** Line 4?

Q. Yes. Start at 289, please.

THE COURT: Basically, just to speed this up, the sister testified that the lawyers did not get in touch with her and never asked her to testify.

MS. CAMPBELL: That's correct, Your Honor. And then on page 290, she goes on to say that she wasn't prepared to testify and then she was not even aware she would be able to testify. Then if Your Honor will look at page 291, lines 6 through 9, she's asked, "If you would have been prepared or contacted before the day of the trial, would you have been willing to give your testimony at the trial?" And Berguitta responds, "Yes, I would."

THE COURT: Okay. Thank you.

*Q.* (BY MS. CAMPBELL:) And just one last question for you, Ms. Vogelsang. Is this why it's important to approach a witness prior to the day of trial or the day of the penalty phase in order to allow the witness to have an opportunity to prepare and be prepared to testify?

**A.** The day before?

*Q.* Is this why it's important to do so, to talk to the witness more than the day before or the day of trial?

**A.** Yes.

MS. CAMPBELL: Your Honor, we would like to put in our visuals as a composite exhibit. I can mark them as Petitioner's Exhibit 80.

THE COURT: You can. I don't think you need them, but if you believe that's necessary, you may.

MS. CAMPBELL: Thank you, Your Honor.

(Petitioner's Exhibit 80 was marked for identification.)

THE COURT: Ms. Vogelsang, before you are passed to the State, I know this is not your model, but what exactly is the author or the researcher of these resilient models saying about immigrant status? Which does not apply to Mr. Marshall, obviously.

THE WITNESS: They are saying that the loss of a home, depending on the circumstances, the efforts to adjust and adapt, what used to be called assimilation to a new culture, that it is very difficult for immigrant families in a new culture trying to adapt to have the knowledge or ability to work with their children regarding resilience and that these children are facing problems both in housing and in the community.

THE COURT: Was she, the author, saying that kids, I guess, who grow up in households where the parents are immigrants -- I don't know if this is what the model is saying -- but they're less resilient and more likely to commit or more prone to commit acts of violence in real life -- in their adult lives?

THE WITNESS: No, I don't think they're saying more likely. I don't think Dr. Grotberg was saying that the homes that failed to produce resilient children mean those children will be more likely to kill or take a life. It's just that they will have a far more difficult time facing life's usual typical adversities.

THE COURT: Okay.

Any follow-up as to my questions before you pass the witness?

MS. CAMPBELL: No, Your Honor.

Just two more housekeeping matters, Your Honor. We have a composite exhibit, which will actually be two different exhibits, of the records that Ms. Vogelsang relied on. And we've split it up into two exhibits because we've given an index to the State, and we have Petitioner's Exhibit 78, which will be a composite of records, and those are the records that the State has not objected to.

(Petitioner's Exhibit 78 was marked for identification.)

THE COURT: The records admitted today? I think there was only one objection from the State, if I recall correctly.

MS. CAMPBELL: These are not just records admitted today. These are additional records. And Mr. Vaughn and Ms. Ferguson are getting those together. But we've provided the State with copies prior to the hearing. And those are records that were relied upon by Ms. Vogelsang.

There was also a second exhibit, Petitioner's Exhibit 79. And that contains a group of exhibits that Ms. Vogelsang relied upon that the State objects to, and we would like to put those into evidence as well. And we've separated them out for ease so that we can deal with them.

(Petitioner's Exhibit 79 was marked for identification.)

THE COURT: The documents that the witness relies on that were objected to, I think the only one that I sustained is criminal records, I think the defendant's maternal grandfather maybe?

MS. CAMPBELL: Yes. I have a list, Your Honor, that may clarify it a little bit.

THE COURT: Okay. May I see it, please?

MS. CAMPBELL: If I could approach, Your Honor?

THE COURT: Thank you.

MS. CAMPBELL: So as Your Honor can see, Petitioner's Exhibit 78 is a list of a number of records, not all of which we discussed specifically today, not all of which we put in front of Your Honor, but which Ms. Vogelsang used to inform her testimony and base her opinions on. And Petitioner's Exhibit 78 represents those exhibits that, to my understanding, the State has no objection to.

MS. SIMPSON: That's correct.

THE COURT: Okay.

MS. CAMPBELL: So we would like to put that in as a composite exhibit, move that into evidence.

THE COURT: You may.

(Petitioner's Exhibit 78 was admitted into evidence.)

MS. CAMPBELL: And then Petitioner's Exhibit 79 is a group of exhibits that Ms. Vogelsang also relied upon that

she based her opinions upon and which informed and based her opinions in this case. And these are a group of records that the State does have objections to. And, again, not all of these were discussed today or put in front of Your Honor today.

THE COURT: Okay.

Ms. Simpson, you obviously have stated your grounds as to some of these exhibits, but let me give you an opportunity to build a record with respect to your objection to the exhibits that are listed in composite 79, please.

MS. SIMPSON: Thank you, Your Honor.

On all these grounds, we would argue relevance.

Petitioner's 23 and 24 are the incest files from Hugh Wilkins, Jr., and Hugh Wilkins, Sr.

31 and 32 are criminal charges from Sharon Bernard, who was Mr. Marshall's fiancée that he abused in 1985. She testified at both that proceeding and in his trial in 2006.

Petitioner's 23, his mother's medical records from Carolinas Health System. We don't believe this is relevant to his mitigation.

52 and 53 are battery and careless driving charges for his father, William Charles Marshall. Again, we don't believe these are relevant particularly because Bruce Marshall did not live with his father as a child.

54, an indecent exposure for Danny Floyd Marshall, a relative.

55, an assault on a minor for Lance Marshall, a relative, a distant relative.

85, a disorderly conduct from Shawn Marshall, his half-brother. Again, this was a disorderly conduct citation in 1985.

And, finally, his grandfather's Army discharge record. We don't believe this has any real relevance to his mitigation case.

THE COURT: Okay.

MS. SIMPSON: And so we would object.

THE COURT: I will sustain the objection but will receive composite 79 as part of the appellate record. For the record on appeal, composite 79 will include Petitioner's 24, which the petitioner sought to introduce earlier this afternoon and which the Court sustained the objection.

But composite 79, those exhibits are received and will be made part of the record. They are received to be part of the record. The objection to their relevance is sustained.

(Petitioner's Exhibit 79 was admitted into evidence.)

MS. SIMPSON: Thank you, Your Honor.

MS. CAMPBELL: And then one last thing, Your Honor.

With regard to the visuals, it may just be simpler to -- I've got a group of them all right here with an index, and we can mark these as Petitioner's Exhibit 80.

THE COURT: You may.

(Petitioner's Exhibit 80 was admitted into evidence.)

MS. CAMPBELL: Thank you, Your Honor.

Also one last thing, Your Honor. We would like to at some point address our request for post-hearing briefing, and my colleague Mr. Davis Vaughn would like to do that at some point. We're happy to do it now or after we are done with Ms. Vogelsang's testimony, whenever you would prefer.

THE COURT: Let's cross-exam at this point, Ms. Simpson, if you're so inclined.

MS. SIMPSON: Thank you, Your Honor.

THE COURT: Okay.

Ms. Vogelsang, do you need a break? If you don't take one now, my --

THE WITNESS: That would be great.

THE COURT: Okay. Let's do that. Otherwise, we were going to go until 5:00.

Let's take a break until 4:00, and then we will resume at 4:00 sharp. Thanks, everyone.

(Recess.)

THE COURT: Everyone is back. Ms. Simpson, you may begin with your examination.

MS. SIMPSON: Thank you, Your Honor.

CROSS-EXAMINATION BY MS. SIMPSON:

Q. Ms. Vogelsang, my name is Lauren Simpson. I represent the State of Alabama in this matter.

Just as a preliminary matter, Bruce Marshall was 40 years old when he sexually abused or attempted to sexually abuse and murder Alicia Bentley, correct?

A. Yes.

Q. And none of his siblings have murdered anyone, correct?

A. No. No, they have not.

Q. Okay. You're not licensed to diagnose in the State of Alabama, correct?

A. Correct.

Q. Okay. You say that you have testified on behalf of a criminal defendant at a capital murder or a murder trial?

A. Yes.

Q. Was that in Alabama?

A. No. That was in South Carolina.

Q. Can you recall the defendant's name?

A. I can't. It was many, many years ago.

Q. Any idea? No one -- nothing?

A. I'm sorry. I just don't recall.

Q. Okay. So you have not testified in the penalty phase of a capital case in the State of Alabama?

A. In the penalty phase of a capital -- in the State of

Alabama?
Q. Yes, ma'am.
A. At a trial?
Q. Yes, ma'am.
A. No.
Q. Okay. How many times have you testified on the trial level overall? Just the once in South Carolina?
A. No. Many times in -- I would say in capital cases, it's about 50-50 between trials and PCRs.
Q. Okay. So how many times have you testified in a capital trial in the last year?
A. I have not in the last year.
Q. Okay. How about the last five years?
A. I have. I don't have a list with me. Let me just think a second.
Ahmad Falad may be in the last five years. I'm not sure. That was in Virginia.
Q. Okay.
A. Ashley Buckman in Arizona. That's not complete. I can provide that. I'll be happy to. I just don't -- can't recall.
Q. Sure. And sorry to put you on the spot about this, but ballparking, how many times have you testified on behalf of a defendant in a capital murder trial over the course of your career?

A. About 75 times.
Q. And in how many states have you done so?
A. What did I do with that list? About 15 maybe. Approximately 15 states. 14.
Q. 14 states? Okay. And how many times have you testified postconviction on behalf of a person who has been convicted of murder?
A. Out of the 75, like I said, it's about 50-50. So half of 75.
Q. 37, 38? Okay.
How many times have you testified on behalf of the State in a postconviction case challenging a capital murder conviction?
A. I haven't.
Q. Okay. What percentage of your income last year came from being retained by defendants in criminal proceedings either trial or postconviction?
A. Last year, approximately maybe 50 percent.
Q. And the other part of your income would come from your private practice?
A. Yes.
Q. Now, you've said today that you were charging $150 per hour for your services, correct?
A. Yes.
Q. Plus expenses?

A. Yes.
Q. Does that fee include the mitigation expert's fees as well?
A. No.
Q. So that is a separate fee?
A. Yes.
Q. Who is your mitigation expert?
A. Her name is Rebecca Kendig.
Q. Could you spell that last name, please.
A. K-E-N-D-I-G.
Q. Thank you. And what's her fee?
A. I don't know.
Q. Do you know how many hours she's worked in this case?
A. A lot. But I don't know the amount.
Q. Can you ballpark for us?
A. Well, at least 300.
Q. Okay. So you said that including your time here today, you have logged approximately 300 hours in this case so far? Or was that 350?
A. I said around -- I think I said around 300 but not including today.
Q. Okay. And that overall, you expect to spend between 350 and 400 hours on this case?
A. Approximately, yeah.
Q. All right. Is that typical for a case like Marshall's?

A. This case took a few more hours because Bruce is not from Alabama, this is not where most of his family members are, so I had to travel to a number of states, and those hours include the travel hours.
Q. In your experience, how long does it typically take to conduct a biopsychosocial assessment in a capital case for a postconviction proceeding like this?
A. In postconviction?
Q. Yes, ma'am.
A. The rule of thumb is a couple hundred hours. 150 to 200 hours.
Q. And you said that you have not done a biopsychosocial assessment at the trial level in Alabama, correct?
A. I don't think I've ever worked on a trial in Alabama.
Q. Okay. Do you do biopsychosocial assessments in your private practice?
A. Yes.
Q. And how long do those take?
A. Typically they occur over the course of eight months to a year. That's about the average that I see my clients. Sometimes it takes more. Sometimes it takes less. And, you know, the methods, of course, are a little different. You're not doing the travel. You're sending for records based on their releases. Sometimes clients help you to gather records and to set you up with other family members.

So it doesn't take quite as long as doing one of these cases.
Q. So we're not talking 150 to 200 hours for a private client?
A. Not typically.
Q. How many hours?
A. 50 to 100.
Q. So $15,000?
A. Yes.
Q. Okay. Now, you said that you would have been available to help the defense prior to trial, correct?
A. Yes.
Q. Okay. In the period between December 29, 2004, and January 9, 2006, what other cases were you working on?
A. I have no idea.
Q. Were you working on other cases?
A. Most likely, because I'm -- at any given time, I typically have one or two at least.
Q. How many patients were you seeing in 2005?
A. I have no idea.
Q. Okay. Do you know any other professional responsibilities you may have had that year?
A. I have no idea.
Q. Do you advertise your services in Alabama?
A. No.

Q. Have you ever had a practice in Alabama?
A. No.
Q. And what other social workers with your qualifications in Alabama would have been available to defense counsel in 2005?
A. I don't know.
Q. So let's break down a bit of what you did in this case. When were you actually retained for the first time in this case?
A. It was in 2017. I want to say I maybe was first contacted maybe around April of 2017.
Q. You weren't retained before December 14, 2009, for the work --
A. Oh, yeah, for the -- yes. The first time, yes.
Q. Do you remember when in two thousand -- was it '08? '09?
A. It was -- I believe it was in '09, and it was about -- I think it was about three months before the hearing took place.
Q. So approximately September, October 2009?
A. I don't recall for sure, but....
Q. Okay. You rendered a proffer of testimony on January 26, 2010; is that correct?
A. Yes.
Q. How many hours did you spend on this case between the

time you were retained and the proffer?
A. I do not know. I conducted three interviews in various parts of North Carolina and read records. So other than that, I don't know how much time I spent at that time.
Q. So the time you spent in that prior Rule 32 period does not count toward the 300 or 400 hours you've spent right now; is that correct?
A. That's correct.
Q. Okay. So you have met with Bruce Marshall three times in preparation for this hearing, correct?
A. Yes.
Q. How many times did you meet with him prior to the Rule 32?
A. I did not meet with him prior to the Rule 32.
Q. Who did you meet with prior to the Rule 32?
A. His mother, Beverly; his brother, Charles Marshall; and his sister, Berguitta.
Q. How many hours have you spent talking to other people about this case? I believe you said you spoke with 11 people including Bruce Marshall, correct?
A. Yes.
Q. For approximately two to three hours each time?
A. At least.
Q. All right. So approximately somewhere between 33 and 40 hours?

A. Including Bruce or excluding Bruce?
Q. Including Bruce.
A. I'm sorry. Did you say including 2009?
Q. Yes, ma'am.
A. About 51 hours.
Q. 51 hours? Thank you.
Now, you watched the video depositions of Marshall's grandmother and his aunts and Marlene and Gerald Scott, correct?
A. Yes.
Q. And you talked with Tonya Wyatt?
A. Yes.
Q. You did not speak with Tonya Bentley, did you?
A. No.
Q. And you didn't speak with Sharon Bernard?
A. No.
Q. Okay. What other professionals, mental health professionals or social workers, did you speak with in preparation for this hearing?
A. I read the report of Dr. -- the testimony of Dr. Carol Walker. I reviewed the evaluation of Dr. Kimberly Ackerson. I talked to Dr. Brook in Greenville, who is an endocrinologist. I asked that information be gathered for me from Dr. Agharkar in Atlanta and Dr. Woods in Oakland, California.

Q. And who are those two professionals?
A. They are neuropsychiatrists.
Q. Did you speak with Dr. Ackerson?
A. I did not. I have met her before and spoken with her on another case, but I did not meet with her on this case.
Q. Okay. You said that you visited 11 communities to do interviews and see the communities as part of your assessment, correct?
A. Yes.
Q. Most of those communities have changed since Marshall lived in them in the '60s, '70s, and '80s, have they not?
A. Yes, they have. I did take that into consideration.
Q. Who in these communities besides the 11 people you identified did you speak with in preparation for this hearing?
A. In the communities?
Q. Yes.
A. No one.
Q. No one? Okay.
Overall, ballparking, how many hours did you spend reviewing documents in this case?
A. Considerable number. I would guess at a hundred plus.
Q. Okay. So you are basing your findings in your biopsychosocial assessment on the documents you reviewed and what Marshall and the other 10 witnesses told you; is

that correct?
A. Yes. And then on the research I reviewed, certain things I looked up, read, examined to see how they relate to what I was learning about Bruce.
Q. Did you find all of the witnesses trustworthy?
A. I have no way of measuring whether anyone is trustworthy or not.
Q. Did you consider that members of the family might engage in hyperbole to benefit a family member on death row?
A. Of course. However, as I said earlier, that is not generally my experience. Family members do not tend to know what helps or what doesn't help. And we are very forthcoming with them. We don't care if it's bad. We don't care if it's good. We just want them to tell us what they remember as best they can. Certainly they have different perspectives. Memories are not always accurate.
Q. And concerning Berguitta Marshall, it's your testimony that she was -- the only reason she didn't testify is because she was unprepared to do so?
A. Well, that's what -- yeah, because she was unprepared. And when I interviewed her, yes, she said that no one had met with her to tell her what to expect or what she was expected to testify to and that she was very nervous about that. And she also felt like she was in a bad position

because of this being a family member.
Q. Did she not say that she had come to the hearing to support Tonya Bentley?
A. No. I remember her saying that she did support Ms. Bentley, yes. I don't know if it was in regard to coming to the hearing, but she felt very supportive of Ms. Bentley.
Q. So you have spoken with Dr. Ackerson in the past, correct?
A. Yes.
Q. Okay. And in your work for this case, did you review her 2006 forensic evaluation report and her file?
A. Yes.
MS. SIMPSON: Your Honor, may I approach?
THE COURT: You may.
(Respondent's Exhibits 1 and 2 were marked for identification.)
Q. (BY MS. SIMPSON:) Ms. Vogelsang, I'm showing you what's been premarked as Respondent's Exhibits 1 and 2. Do you recognize these documents?
A. Yes.
Q. And what are these documents?
A. This is the forensic evaluation report of Dr. Kimberly Ackerson, and this is her file.
Q. Considering document 1, the forensic evaluation

report -- excuse me.

MS. SIMPSON: First, Your Honor, the Respondent moves to admit documents 1 and 2.

THE COURT: Any objections?

MS. CAMPBELL: No objection, Your Honor.

THE COURT: Thank you. Respondent's 1 and 2 are received.

(Respondent's Exhibits 1 and 2 admitted into evidence.)

MS. SIMPSON: Thank you, Your Honor.

*Q.* Ms. Vogelsang, considering document 1 there, you're aware, on page 1254, that Dr. Ackerson found that Bruce Marshall was probably not completely honest with her during her evaluation?

**A.** Yes.

*Q.* And again on page 1254, you're aware that she wrote "His history is remarkable for antisocial behaviors, substance abuse, and narcissistic personality traits"?

**A.** Yes.

*Q.* And that she opined, bottom of that page and the beginning of page 1255, "Most critically, Mr. Marshall also has a significant history of violence against women including sexual aggression"?

**A.** Yes.

*Q.* Also, page 1255, that she wrote, "Within relationships, he has been domineering, aggressive, and has essentially

denigrated the rights and welfare of his previous female partners." Is that accurate?

A. Yes.

Q. You're aware that Dr. Ackerson concluded on page 1255 that "Marshall's animosity toward women coupled with his narcissism best explains his actions towards Alicia in this case"?

A. Yes.

Q. Did you read the jail letter in Dr. Ackerson's file, that's document 2, written to both of his ex-wives and his children? It's on pages 1289 through 1297.

A. Yes.

Q. On page 1294 and -95, do you recall when he stated "My situation is ridiculously beyond the boundaries of human civilization. I will awaken to this living hell 365 days of the year. It's polluting my mental image of tranquility and serenity. I'm not gutter material, nor do I appreciate being subjected to the harsh conditions of scum buckets. I come from a loving and caring family. I don't enjoy the company of snakes, cowards, maggots, and rejects."

A. Yes.

Q. Marshall did say he comes from a loving and caring family, correct?

A. Yes.

Q. So Marshall on some level believes that he comes from a

loving and caring family, does he not?
A. Yes.
Q. Okay. How about on page 1296 when Marshall writes to both of his ex-wives to "Break the mold and strive for perfection. Take what I've done as a source of knowledge, wisdom, and understanding. Build yourself into the supreme being that I tried to be and be what my son needs you to be. You are stronger and better because of what you're going through." Is that accurate?
A. Yes.
Q. Does that sound like narcissism to you based on your work as a social worker?
A. Well, it is a very complex personality disorder, and I have never treated anyone with that personality disorder that wrote in this style or this manner.
Q. It's a rather grandiloquent style, is it not?
A. Yes.
Q. Does that sound to you like the writing of a person with severe learning disability?
A. It could be. Learning disabilities don't mean unintelligent or untrainable. So, yes, it could be.
Q. Do you disagree with Dr. Ackerson's finding that Marshall is a narcissist?
A. I do.
Q. Do you disagree that he has a history of sexual

violence?
**A.** No.
*Q.* Turning to some of your earlier testimony in this case, who in particular told you about the history of Browntown, its naming, and the family intermarriage?
**A.** Aside from the article, all of the brothers and sisters on the paternal side of the family talked about Browntown.
*Q.* So that would have been William Charles Marshall's brothers and sisters?
**A.** Yes.
*Q.* Okay. And who told you about the poverty and deprivation in Browntown? Again, would that be the William Charles Marshall siblings?
**A.** Yes.
*Q.* Okay. Let's see. Now, you've mentioned that his mother's family has a pattern of behavioral problems, correct?
**A.** Yes.
*Q.* Okay. As far as you know, nobody in his mother's family has murdered anyone, correct?
**A.** That's correct.
*Q.* Now, William Charles Marshall was not a part of his son's life from about the age of 1 to about the age of 17, correct?
**A.** Yes.

Q. As far as you know, his father has never killed anyone, has he?
A. No.
Q. As far as you know, nobody in his father's family has ever murdered anyone, correct?
A. No.
Q. You didn't speak with William Charles Marshall, did you?
A. No. Attempts were made, and he was not willing to be interviewed.
Q. All right. So who in particular told you that his parents were harsh disciplinarians?
A. The brothers and the sisters on his side of the family.
Q. And who told you that his father used a razor strap and his mother would beat until she got tired?
A. The brothers and sisters on that side of the family.
Q. When were these interviews held?
A. Sorry?
Q. When were these interviews held?
A. In June of '18. One second. One, two, three -- four of the interviews were held down in Florida in June of '18.
Q. Okay. Just to reiterate, you did not speak with any of William Charles Marshall's siblings prior to the Rule 32, correct?
A. His siblings? Prior to 32? No.

Q. Okay. Ms. Vogelsang, in the mid-century American South and Appalachia, physical discipline of children was not uncommon, was it?
A. No, it wasn't.
Q. Even physical discipline with something like a belt or a switch?
A. That's correct.
Q. Or an open hand?
A. Yes.
Q. I know that Dean Johnson has since died. Do you know when Dean Johnson died?
A. I don't recall the year.
Q. So you did not speak to him at any point in these proceedings?
A. No.
Q. Who told you about his family history?
A. About his -- his brother, Ronald Johnson.
Q. You said that he had emotional and behavioral disorders. What did you mean by that?
A. About who?
Q. Dean Johnson.
A. Well, I don't recall saying that. I think it was -- I can't remember if it was on the family tree.

The descriptions of his behaviors were consistent with emotional and behavioral disorders. His substance

abuse certainly qualifies. His violence certainly qualifies. So the descriptions came from the children, from Bruce's brothers, from his sister, from Beverly.
Q. But you don't have any firm diagnosis in the record, do you?
A. No. No.
Q. Now, you said that I believe with the Browntown family in particular that it was difficult to access healthcare in remote areas until about the '50s or '60s; is that accurate?
A. Yes.
Q. Was that uncommon for Appalachia?
A. No.
Q. Who discussed Nancy Wilkerson with you? Was that Beverly?
A. Beverly. I was trying to think if there was anyone else other than Beverly. I think it was just Beverly.
Q. Was the paternity of her child ever satisfactorily established?
A. I don't know that any of that was established medically or through testing. This was strictly from the interviews.
Q. Okay. So obviously, you have not spoken with Nancy?
A. No. No one knows where she is.
Q. You've said in talking about Bruce Marshall and his birth that his mother had a difficult labor, correct?

**A.** Yes.
*Q.* It's not uncommon for newborns to have a vitamin deficiency or to need to take formula, correct?
**A.** No, not always. It is -- it can be normal, yes.
*Q.* That, in fact, newborns can have all kinds of issues, require different sorts of milk or formula, that breast milk isn't always possible?
**A.** That's correct.
*Q.* And, in fact, in this case, his mother did procure the correct formulas for him, did she not?
**A.** Yes.
*Q.* So even with her difficult labor and the stressors at home, she still provided nourishment for her son, correct?
**A.** Yes.
*Q.* You said that the stressors of a mother can have an effect on her bonding with her newborn child, correct?
**A.** Yes.
*Q.* All right. In this case, are you saying that Beverly never bonded with Bruce?
**A.** I do not believe, based on her descriptions, that the bonding was what it could have been. She was very unhappy. She was deteriorating emotionally. And even she describes, you know, just her problems with picking the babies up and holding them and having the facial connections with them. So that does not mean that they weren't attached to each

other. In fact, sometimes in those situations, the attachment can be even greater even though not particularly healthy. But from what I listened to from her regarding these births, how close together they were, that sort of thing, she had a very difficult time with that bonding.
Q. Is there any diagnosis of postpartum depression in the record?
A. There is not.
Q. You said there was a deterioration in this case and especially in terms of her housekeeping and whatnot. But with a woman with three or possibly four children under 4 underfoot and no one helping out with the house, would it surprise you that the housework sort of went off to the side?
A. Not at all.
Q. And, of course, William Charles Marshall and Dean Johnson, I'm assuming, were not helping with the housework, correct?
A. Correct.
Q. This being 1960s? Okay.
You said that Bruce was about 5 years old when the family moved to Wisconsin?
A. Yes.
Q. Who told you that Dean became a chronic alcoholic?
A. All the family described his drinking as severe, as

ongoing, which is what chronic means. So I heard it from Beverly, I heard it from Charles Marshall, I heard it from Berguitta and from Bruce.
Q. Did they all agree that he singled out Marshall for punishment?
A. They did.
Q. Who told you that he killed Charles Allen's kitten?
A. Charles Allen described his treatment of the animals, the way he abused them, and him slamming his kitten against the tree and killing it.
Q. Did he give any rationale for killing the kitten?
A. No.
Q. So he lived in Wisconsin till he was approximately 8 years old, correct?
A. Yes.
Q. And then he moved to North Carolina?
A. Yes.
Q. The children began picking up cans and bottles to make spare money during this period?
A. This was -- there were two moves back to North Carolina, and I sometimes get them confused. But during one of those moves back when Dean was injured and couldn't work, that's when the kids went along the side of the road, picked up bottles, did what they could to help their mother.

Q. Okay. And, again, how would old Bruce have been during this period when he was picking up bottles and cans?
A. I think around 9 or 10 by that second time back down there.
Q. And he never stole during this period?
A. Not that I know of.
I think, actually -- let me think a second. There was one earlier complaint by a family member about him stealing something. But it was not at that time -- it was more like a child steals, but it wasn't an ongoing pattern at that time.
Q. Okay. You said that once they moved to West Virginia and that Beverly took Berguitta and Shawn and left, that Bruce Marshall began to have explosive headaches, correct?
A. Yes.
Q. Was there ever any formal diagnosis made concerning those headaches?
A. No.
Q. Does he still have explosive headaches?
A. I don't think he is having them at the current time. He has had them off and on through the years.
Q. Did you ever speak with Jerry Aires as any part of this proceeding?
A. No.
Q. And Mike Charlton, did you speak with him?

A. I met him.
Q. You said, considering Jerry Aires -- you'd used the word "vicious" in describing him. Who used that word in particular?
A. Beverly used it. Charles Marshall used it. Berguitta used it. They were describing that as bad as Dean was how much worse Jerry was.
Q. Okay. And you said that during this period with Jerry, that that's when Bruce Marshall learned to steal and started to lie, correct?
A. Yes.
Q. So he never lied prior to living with Jerry Aires?
A. I'm sure he did.
Q. All right. So you said in total that Bruce Marshall learned that aggression toward women was acceptable because of the male role models in his life; is that accurate?
A. Yes.
Q. What about Charles Allen? Has he ever had any issues of domestic violence?
A. Not that I can recall. He's had issues, but I don't recall there being domestic violence.
Q. And how about Greg Johnson?
A. No. From what I understand, Greg also went to the military, got away from the family, and has actually done quite well. But he does have a different mother.

Q. Okay. And I know you said that Shawn Marshall has had a drug problem, but do we have any domestic violence charges against him?
A. I don't know that he does. He has the convictions for drugs.
Q. You said that Bruce Marshall developed a desire for family in any form, correct?
A. I'm sorry. Could you repeat that.
Q. I'm sorry. You said that Bruce Marshall developed a desire for a family in any form; is that accurate?
A. I don't know if that was my exact words. May have been. But yes, he pretty desperately wanted a family.
Q. And who told you that?
A. Well, he told me that. And when I interviewed his former wife, she talked to me at length about how desperate he felt about losing them, the begging he did for her to come back, you know. And she had no doubt that he loved his family very much.
Q. Okay. Let's turn to his Braddock House records for a second. And this would have been what was introduced in the composite exhibit 78 -- I'm sorry. As Plaintiff's 28. You may have actually received 28 separately.
A. Here it is. Sorry.
Q. Sorry to make you go digging.
A. That's okay.

Q. Now, Ms. Vogelsang, you did say that you reviewed his criminal history in Virginia as part of your work in this case, correct?
A. Yes.
Q. So you're aware that shortly before December 1981, he stole a gym bag and that's what landed him in the Rockingham County system, correct?
A. Yes.
Q. And looking on page 1386 of that -- and I apologize. I have the record numbers and not the individual page numbers.
A. Okay.
Q. So you're aware that at the time in December of 1981 when he was adjudicated delinquent, he had already been convicted of unauthorized use of a motor vehicle in North Carolina?
A. Yes.
Q. And that he at that point had a six months suspended sentence?
A. Yes.
Q. And was not actually supposed to leave the State of North Carolina without permission?
A. Yes.
Q. Now, Marshall lived at the Braddock House home from December of '81 until late June of '82; is that accurate?

A. Yes.
Q. So you said that he had some bumpy times when he first moved in; is that correct?
A. Yes.
Q. So looking, I guess, all told, pages 1403 through 1426, you're aware that his counselor wrote at different instances during that period that he stole from other residents on multiple occasions?
A. Yes.
Q. That he had problems following rules?
A. Yes.
Q. That he disobeyed staff and became belligerent?
A. Yes.
Q. In fact, they used the word "belligerent" on multiple occasions, correct?
A. Yes, they did.
Q. That he sneaked alcohol twice?
A. Yes.
Q. That he sneaked speed once?
A. Yes.
Q. And that he used physical violence or intimidation to get his way with other residents?
A. Yes.
Q. So Marshall lived then in the Scotts' group home from July of '82 until he aged out in December of that year,

correct?
A. Yes.
Q. You're aware that one set of potential foster parents, the Shileys, considered taking him in during that period?
A. Yes.
Q. And that they ultimately decided not to because he could not follow rules, intimidated their son, played too roughly with toddlers, and invited other teenagers over without permission during his visit?
A. Yes.
Q. That's all accurate?
A. Yes.
Q. You're aware that his counselor from Braddock House wrote that Mrs. Scott and Mrs. Shiley agreed that Marshall should not be placed in a home with small children or animals?
A. Yes.
Q. And you were aware that the Braddock House program director concluded that Marshall's progress had been minimal and that he had numerous behavioral problems including stealing, lying, and intimidation?
A. Yes.
Q. All right. You said that his stay at Braddock House was successful?
A. And I think that it was successful. When you think of

all of the things that he had been exposed to, these behaviors were not shocking or unacceptable or -- well, they were unacceptable -- but not unexpected given his history. And he was put in that program because it was a program for nonviolent kids. And I didn't see anywhere in here where he harmed or hurt another child.

*Q.* But he did threaten violence or use intimidation, did he not?

**A.** Yes. And I testified to that earlier. Yes, he did. And one of the things they were dealing with was trying to help him understand that he did not have to be that way; he didn't have to carry that big man type attitude. And saw some of that change once he got into the LD classes and started doing better and had a little more insight into his behavior.

The Scotts, when I interviewed them and proposed these things to them that they supposedly claimed, said that they did not remember having anything but a good experience with Bruce and that the Shileys felt like their home was not as structured as the Braddock House or as the Scott home, and they were afraid he wouldn't do as well with them.

*Q.* Sure. But going to the Scotts, I believe he sent them letters or Christmas cards on several instances after leaving their house in 1982?

A. Yes.
Q. When did they last have contact with Bruce Marshall?
A. It's been many years. But my understanding was that they have had phone calls. But since they moved and have gotten older, they have not had the same contact with him.
Q. So they didn't have close contact with him during the mid to late '80s or the '90s or the time of this murder?
A. I don't recall that. I thought that they did have occasional contact with him along the way. I know there were times when they would send him money or put some money on his account.
They expressed a desire to reconnect; that they were, you know, wanting to remain supportive of him and wanting him to know that he had people that were supportive. They really felt like he adapted well to their family and to the other boys.
Q. Well, Mr. Scott is a minister, is he not?
A. Yes.
Q. He's actually Reverend Scott?
A. Yes.
Q. Did you interview them in 2017 or 2018?
A. 2018.
Q. 2018. So from 1982 until 2018, that's quite a few years, is it not?
A. It is.

Q. Okay. I'd like to turn to Marshall's criminal history in Florida. The exhibits, I believe, that you relied upon were introduced as the cumulative Exhibit 78.

I guess if we have particular questions, you can pull those files out if this doesn't sound familiar to you.

A. Are you saying that I don't have those up here?

(Petitioner's Exhibit 49, previously admitted into evidence, was referenced.)

Q. Ms. Vogelsang, I'm showing you what has been admitted already. This is Plaintiff's 49. Do you recognize this document?

A. Yes.

Q. And what is that document?

A. This is in the Circuit Court of the 18th Judicial Circuit in Seminole County, Florida. And it is the State of Florida v. James Everett Gentile and William Bruce Marshall.

Q. So you did read this case file out of Seminole County which concerned the aggravated battery of Jeff Farmer, correct?

A. Yes.

Q. And that case occurred in 1985?

A. Yes.

Q. Marshall was allowed to plead to a lesser charge of aggravated assault and was sentenced to five years'

probation, 360 days to serve in county jail; is that accurate?
A. Yes.
Q. Did you read the file concerning the attack against Sharon Bernard and John Gentile?
A. I did.
(Petitioner's Exhibit 50, previously admitted into evidence, was referenced.)
Q. I'm going to show you that as well. I'm showing you what has been premarked as Plaintiff's Exhibit 50 and introduced. Do you recognize that document?
A. Yes.
Q. And what is that document?
A. It's the State of Florida v. William Marshall.
Q. Did you review Sharon Bernard's statements from that case and her 2006 trial testimony?
A. Yes.
MS. SIMPSON: Your Honor, may I approach?
THE COURT: You may.
(Respondent's Exhibit 3 was marked for identification.)
Q. (BY MS. SIMPSON:) I'm showing you what has been marked as Respondent's Exhibit 3. Do you recognize that document?
A. Yes.
Q. And what is this document?
A. This is her testimony in the -- let's see. Was this

her testimony at the Rule 32? Or in trial?
Q. The trial.
A. Trial.
MS. SIMPSON: Your Honor, at this time, the State moves to admit Respondent's 3 taken from the trial testimony.
THE COURT: Any objections?
MS. CAMPBELL: No objection, Your Honor.
THE COURT: Thank you.
Respondent's 3 is received.
(Respondent's Exhibit 3 was admitted into evidence.)
MS. SIMPSON: Thank you.
Q. Ms. Vogelsang, Marshall and Sharon Bernard began dating in December of 1983; is that accurate?
A. Yes.
Q. And Sharon broke up with him in approximately August of 1985; is that accurate?
A. Yes.
Q. Now, on September 16, 1985, Marshall was arrested for kidnapping and sexual battery of Sharon and of home burglary and battery of John Gentile, correct?
A. Yes.
Q. So you're aware, then, according to these records that Marshall stalked Sharon at the Gentile house?
A. Yes.
Q. That he broke into the house and carried Sharon out in

the middle of the night as she screamed?
A. Yes, I read this in the testimony.
Q. Are you aware, according to her trial testimony on page 754, that he said that if he couldn't have Sharon, no one could?
A. Yes.
Q. That he stabbed John Gentile with a butter knife?
A. Yes.
Q. And, of course, you're aware then that he was convicted of burglary and the lesser charge of battery and was sentenced to 30 years split 3 to serve, correct?
A. Yes.
Q. Now, are you aware that Sharon Bernard moved to have the charges against him dropped concerning her?
A. Yes.
Q. In a domestic violence situation, it's not uncommon for a female victim to move to have charges against her partner/perpetrator dropped, is it?
A. No.
Q. In Exhibit 50 there, the sentencing transcript, at page 11 -- it's near the very back -- are you aware that the sentencing judge referred to Marshall as "a good con artist"?
A. Where is this?
Q. It's in the sentencing transcript, at the very back of

Plaintiff's 50, page 11 of the sentencing transcript.
A. Okay. I might need some help here. I'm starting to get confused.
Q. I'm sorry.
MS. SIMPSON: I'm showing the witness from Plaintiff's 50, page 11 of the sentencing transcript.
A. Yes, that's what it says.
MS. CAMPBELL: Would you mind just showing me where you are?
MS. SIMPSON: Sentencing transcript. Exhibit 50.
Q. You're aware that Marshall's probation was revoked in 1990 and he was placed on two years in community corrections? Is that accurate?
A. Yes.
Q. Let's turn to his Tennessee cases. Did you review his criminal history in Tennessee as part of your work in this case?
A. Yes.
Q. Now, you said that Marshall married Tonya Wyatt in 1990?
A. Yes.
Q. Did you read Tonya Wyatt's trial testimony from the capital trial?
A. Yes.
MS. SIMPSON: Your Honor, may I approach?

THE COURT: You may.
MS. SIMPSON: Thank you.
THE COURT: Thank you.
(Respondent's Exhibit 4 was marked for identification.)
Q. Ms. Vogelsang, I'm showing you what's been marked as Respondent's 4. Do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is the testimony of Tonya Marshall.
Q. From the trial?
A. Yes.
MS. SIMPSON: Your Honor, the State moves to admit Respondent's 4 taken from the trial testimony.
THE COURT: Any objections?
MS. CAMPBELL: No objection, Your Honor.
THE COURT: Thank you.
Respondent's 4 is received.
(Respondent's Exhibit 4 was admitted into evidence.)
MS. SIMPSON: Thank you, Your Honor.
Q. Ms. Vogelsang, you're aware that Marshall was arrested for assault in June of 1993 in Cumberland County?
A. Yes.
Q. And you're aware that he was arrested in November of 1994 for spousal rape?
A. Yes.

Q. I'm going to show you here -- excuse me. If you would look at page 1279 and 1280 in Respondent's 2.
A. The problem I'm having is I don't see numbers on these. Is this 2?
Q. Here's 2.
A. Oh. Sorry.
Q. Ms. Vogelsang, is it accurate to say that Tonya Wyatt stated that during the 1994 incident, Marshall jumped into her car, forced her to go to a remote area, broke parts of her car when she refused to have sex with him and tried to fight him off and run away, and then he said, "If you just come home to me, I will let you live"?
A. Yes.
Q. Are you aware that Marshall was arrested in 1995 for sexual battery?
A. Yes.
Q. Are you aware that after they were divorced in 2000, Marshall continued to follow Tonya to work, come by her house, and call her?
A. Yes.
Q. And in September 2000, after their divorce, are you aware that Tonya claimed that Marshall ran her off the road, took her to an isolated area, and assaulted her?
A. Yes.
Q. And that at that time, according to Tonya, he claimed

that he would kill her if he couldn't have her?
**A.** Yes.
*Q.* This shows a bit of a pattern, does it not, Mrs. Vogelsang?
**A.** Yes, it does.
*Q.* You're aware of Tonya's statement about the night of October 19, 2000, correct?
**A.** Yes.
*Q.* Okay. At that time, she claimed that Marshall cut her phone line, kicked in her door, made her strip, threatened to kill her and himself, and forced her to have sex with him multiple times?
**A.** Yes.
*Q.* Correct? All of that is accurate?
**A.** Yes.
*Q.* And that as a result of those actions, he was allowed to plead guilty to aggravated burglary, vandalism, and assault and received 3 years suspended to 5 years probation?
**A.** Yes.
*Q.* And that he was subsequently arrested for violating the order of protection that Tonya Wyatt had gotten against him?
**A.** Yes.
*Q.* Are you aware that according to Tonya Wyatt, Marshall

wanted her to have sex with other people so that he could watch and wanted to prostitute her?
**A.** Yes.
*Q.* Turning for a moment to Tonya Bentley. When did Marshall and Tonya Bentley marry?
**A.** They were married in 2000. I don't recall the month.
*Q.* You said that you did review Dr. Ackerson's file. That's Respondent's 2, correct?
**A.** Yes.
*Q.* Okay. On page C-1273 of that, you're aware that Tonya Bentley told police that she caught Marshall peeping on Alicia while Alicia was showering in January of 2004?
**A.** I think I'm not thinking of the correct record. You asked me when they married, and I think I said 2000. They married -- oh, you're talking about Tonya Bentley?
*Q.* Tonya Bentley.
**A.** I'm so sorry.
*Q.* That's all right.
**A.** Yes.
*Q.* So you are aware, then, that Tonya Bentley told police that Marshall had peeped in on Alicia while she was showering in January of 2004, correct?
**A.** Yes.
*Q.* And you are aware that Tonya claimed that when she confronted Marshall, he struck and raped her?

A. Yes.
Q. And that Tonya found pictures of Alicia taken at the pool in Marshall's nightstand despite the fact that Marshall never went to the pool with Alicia?
A. Yes.
Q. Backing up a little bit, I know you said that Marshall attended many schools over the course of his academic career. His siblings had a similar situation, did they not?
A. Can you repeat that question.
Q. Sure. Marshall's siblings also went to many schools over the course of their academic career, didn't they?
A. Yes.
Q. Okay. You said that a learning disability is one of Marshall's cognitive problems, correct?
A. Yes.
Q. Are you considering his Graves' disease, his hyperthyroidism, another cognitive problem?
A. It's possible, yes.
Q. When was he diagnosed with Graves' disease?
A. I think in '95.
Q. How about his sleep apnea? Are you considering that a cognitive problem?
A. It can be.
Q. When was he diagnosed with sleep apnea?

A. I don't recall. It's in the record, but I don't recall the exact date.
Q. That's all right.
You haven't personally tested or had him tested for any sort of cognitive functioning deficits, correct?
A. No.
Q. Okay. The marriage of first cousins is legal in the State of Alabama, isn't it?
A. I don't know the answer to that, but I know it is legal in some states.
Q. In fact, approximately half of all states, correct?
A. I don't know that statistic.
Q. Is a person who has been diagnosed with a thyroid deficit or sleep apnea more likely than the average person to murder someone?
A. No.
Q. I know you've said that his siblings had sometimes fewer risk factors, but Marshall's siblings did have quite a few risk factors that he shared, did they not?
A. They did.
MS. SIMPSON: Thank you. Nothing further.
THE COURT: Okay. How long is your cross?
MS. CAMPBELL: I think I'll have --
THE COURT: Redirect, I should say.
MS. CAMPBELL: Just one question, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION BY MS. CAMPBELL:

Q. Ms. Vogelsang, the State talked about Dr. Ackerson's report that was done on Mr. Marshall. Can you briefly explain to the Court what the difference is between what you did and what Dr. Ackerson did?

A. Dr. Ackerson did not have the kind of background or life history. And so she did not have the benefit of a mitigation specialist to gather more information for her. She did not have a paternal history. She did not have an intergenerational history. She did not have the volumes of corroborating materials that went into this biopsychosocial assessment. She did not have information on the stepfather, the moves, or the meaning of those moves. I don't recall that she knew anything about Beverly's breakdowns and hospitalizations.

The maternal family history at that point was incomplete and, in fact, was incomplete in 2009. That had not been finished yet, either.

I don't believe she knew about Jerry Aires. I don't know how much she knew about Braddock House or the Scotts. Certainly she had never interviewed them or heard their perspectives about Mr. Marshall. She only had one interview with the defendant.

And so I feel like the work and the documents and the

interviews that went into this assessment provided more information. And I don't remember when I worked with Ms. Ackerson, but I know that this was the process that was taking place during that case, which was a good many years ago. I would say certainly 2000 to 2005.

So I don't know what else to say other than this looks to me more like a mental status exam or a competency exam than what I guess is being called a forensic evaluation.

MS. CAMPBELL: That's all, Your Honor.

Thank you, Ms. Vogelsang.

THE COURT: Ms. Simpson.

MS. SIMPSON: Your Honor, I realize this was not part of the schedule. If it would be possible for the State to present one brief witness in rebuttal to some of the testimony we've had today. We'd like to call Tonya Bentley.

THE COURT: How long is -- well, it's Ms. Bentley. I'll make time for that. Let's do it today instead of tomorrow.

MS. SIMPSON: Thank you, Your Honor.

MS. CAMPBELL: Your Honor, we would just move that we would object to that. We'd asked the State if they planned to call any witnesses. They told us they did not plan to call any witnesses and are now just telling us at this

point that they are planning to call her.

THE COURT: Well, Ms. Simpson is saying she has decided to call Ms. Bentley to rebut what transpired today. I guess, Ms. Simpson, you would say you were not planning on calling her and that you've only made that decision based on what has been presented here today.

MS. SIMPSON: That's correct, Your Honor.

THE COURT: Okay.

MS. SIMPSON: Very briefly.

THE COURT: I will allow you and then -- to do that. And, Ms. Campbell, if you need some time to prepare cross, I will give you that opportunity as well.

MS. CAMPBELL: Thank you, Your Honor.

THE COURT: Ms. Vogelsang, you may step down. I'm sure you are quite relieved. But thank you for being here today. Important case, obviously.

(Witness excused.)

MS. SIMPSON: Your Honor, may Ms. Bentley approach?

THE COURT: She may.

Good evening, ma'am.

(Witness sworn.)

THE COURTROOM DEPUTY: Please state and spell your first and last name for the record.

THE WITNESS: Tonya Bentley. T-o-n-y-a B-e-n-t-l-e-y.

THE COURTROOM DEPUTY: What city and state do you

reside in?
THE WITNESS: Alabaster, Alabama.
TONYA BENTLEY,
duly sworn, was examined and testified as follows:
DIRECT EXAMINATION BY MS. SIMPSON:
Q. Ms. Bentley, I'll keep this brief.
Did you attend Bruce Marshall's 2006 capital murder trial?
A. Yes, ma'am.
Q. During those proceedings, did you sit near Berguitta Marshall?
A. Yes.
Q. Did Berguitta Marshall ever --
MS. CAMPBELL: Objection, Your Honor. Hearsay.
THE COURT: Well, it goes back to the same argument that you made earlier. In my fact-gathering role, I'm not really trying to ascertain the truth of all the hearsay type testimony. I'm just trying to gather information. But this may be different.
Ms. Marshall has not testified in this case, so the normal analysis to allow hearsay type testimony to come in may not apply. But before I, I guess, sustain the objection, let me hear from you, Ms. Simpson, as to why you think this testimony should be allowed.
MS. SIMPSON: Your Honor, Berguitta Marshall testified

at the Rule 32 hearing and gave a vastly different reason for why she did not testify in mitigation on her brother's behalf than that given by trial counsel. Ms. Bentley was not allowed to testify at that proceeding. To this point, we've heard conflicting stories about why Berguitta did or did not. The question before this Court is what counsel should or should not have done in mitigation. Trial counsel's perspective was that Berguitta Marshall flat-out refused to testify.

THE COURT: I think Dr. Vogelsang's testimony on cross may be consistent with what Mr. Mathis testified to. Let me find the exact exchange that you had with her on this point.

I think she said one of the reasons that Ms. Berguitta Marshall provided to her for not testifying or willing to testify was that she was in a bad position because the death was of a family member, which I think is consistent with what Mr. Mathis said is she just was not willing to testify and said, if anything, purportedly, she would testify for the State.

MS. SIMPSON: Yes, Your Honor.

THE COURT: Okay. I'll sustain the objection as to that line of questioning for this witness.

MS. CAMPBELL: Thank you, Your Honor.

MS. SIMPSON: May I ask one more question?

THE COURT: Yeah, you may.
MS. SIMPSON: Thank you.
*Q.* Do you know anyone else from the family aside from Berguitta Marshall who was present during the capital sentencing phase?
**A.** Her daughter Stephanie.
*Q.* No one else?
**A.** Off the top of my head, I cannot remember.
THE COURT REPORTER: I'm sorry?
**A.** I'm sorry. Berguitta's daughter Stephanie was there. And the only other family member that I can think of off of the top of my head was my mother.
MS. SIMPSON: Thank you very much. No further questions.
THE COURT: Ms. Bentley, were you present at all when Mr. Mathis may have approached Ms. Berguitta Marshall about testifying?
THE WITNESS: I do not remember him coming to where we were sitting in -- in the --
THE COURT: In the courtroom?
THE WITNESS: Yes, sir.
THE COURT: But Ms. Marshall sat with you during the trial; is that correct?
THE WITNESS: Yes, sir.
THE COURT: Okay. Thank you, ma'am.

Before you step down, let me see if there are any questions for you from Ms. Campbell.

MS. CAMPBELL: No, Your Honor.

THE COURT: Okay. Thank you.

You may step down, ma'am.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: Anything else as far as testimony?

MS. CAMPBELL: Nothing as far as testimony, Your Honor.

MS. SIMPSON: Nothing, Your Honor.

THE COURT: Thank you. All right.

Ms. Campbell, you said you wanted to be heard as to post-hearing briefing?

MS. CAMPBELL: Yes, Your Honor. And my colleague, Mr. Davis Vaughn, is going to address that if that's all right with Your Honor.

THE COURT: That's fine.

MR. VAUGHN: Yes, Your Honor. My name is Davis Vaughn. I represent the petitioner, Mr. Marshall, as well.

We had mentioned in our original habeas the opportunity to have post-hearing briefing, and we've discussed with the State and the State has agreed not to oppose our request for briefing. In fact, we actually mentioned to the State a proposed briefing schedule that we would like to suggest to Your Honor as well.

We would ask for 60 days to submit Petitioner's post-hearing brief after receipt of the transcript. And then, in turn, we'd like to give the State 60 days as well for them to reply and then 30 days for Petitioner to respond as well. That was, again, discussed with the State.

THE COURT: All right. So far, no objections. The part where we may disagree on is the length of the submissions. But let me hear from you as to how many pages you want the initial briefs to be.

MR. VAUGHN: 25, Your Honor, is our suggestion.

THE COURT: Okay. And then what about the reply briefs? Well, your reply brief, I should say.

MR. VAUGHN: 10, Your Honor.

THE COURT: Okay.

Ms. Simpson, any commentary with respect to the page limits?

MS. SIMPSON: Your Honor, that's fine by us.

THE COURT: All right. I was thinking 15, but this is not a civil case. Mr. Marshall, again, is facing the utmost form of punishment we give in society. I'm okay with 25 pages for the initial briefs.

MR. VAUGHN: Thank you.

THE COURT: And then 10 pages for the reply brief.

The briefing schedule will be entered in the form of

a text order that Ms. Humphrey will enter now or at the end of the day. The initial brief of the Petitioner will be due 60 days after the transcript is ready. The State's response will be due 60 days thereafter. And then the Petitioner's reply brief will be due in 15 days after that instead of the full month that the Petitioner has requested.

Page limits for initial briefs will be 25 pages, and the Petitioner's reply brief will be due -- did you say 15 or 10? What did you want?

THE COURTROOM DEPUTY: 10. He said 10.

MR. VAUGHN: 10, Your Honor, is what we said, yes, sir.

THE COURT: Okay. It will be 10 pages for your reply brief.

You can have the full 30 days to reply. So Karen, let's do it 60, 60, 30.

THE COURTROOM DEPUTY: 60, 60, 30?

THE COURT: Yes, please. Thank you.

Anything else, folks?

MR. VAUGHN: Yes, Your Honor. One more issue we'd like to address is, obviously, our client Mr. Marshall does have sleep apnea. And, unfortunately, a piece of his machine was left back at Holman Correctional Facility. So we just ask for Your Honor's as well as the marshal's consideration to try to get Mr. Marshall back to Holman as quickly as

possible. He has had difficulty sleeping without this machine. So we just want to ensure his health and safety and see whatever the Court can do or the marshals can do to ensure that Mr. Bruce Marshall is returned to Holman as quickly as possible.

THE COURT: Who transported? I think the State did, right? You guys are responsible --

STATE TRANSPORT OFFICER: Yes, sir.

THE COURT: -- for taking him back, and you will.

I don't think the marshals have anything to do with that. We are done for this hearing. I know Mr. Marshall is being housed, I think, at Donaldsonville, which is where you typically have people --

STATE TRANSPORT OFFICER: Kilby. He's at Kilby, Your Honor.

THE COURT: Okay. Obviously, to the extent that you can take him back tomorrow or maybe even today. But I defer to the trained officers that are responsible for Mr. Marshall. So thank you, gentlemen.

MR. VAUGHN: Thank you, Your Honor.

THE COURT: Thank you all.

(The proceedings were concluded.)

C E R T I F I C A T E

I, Sabrina Lewis, RDR, CRR, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Dated: November 25, 2018

Sabrina Lewis

SABRINA LEWIS, FEDERAL OFFICIAL COURT REPORTER