FILED

2020 Oct-23  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM BRUCE MARSHALL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action Number** |
| **vs.** | ) | **2:15-CV-1694-AKK** |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner of the Alabama** | ) | |
| **Department of Corrections** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

William Bruce Marshall, an Alabama death row inmate, has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. Doc. 7.  Marshall challenges his 2005 capital murder conviction and death sentence, contending that a variety of constitutional violations require reversal of his conviction and/or sentence. The court held an evidentiary hearing regarding two of Marshall's claims related to alleged ineffective assistance of trial counsel, specifically the introduction of mitigation evidence and forensic testing of a tissue sample. Docs. 23; 45.

Marshall's guilt is not in dispute – he confessed to the murder and led law enforcement to the victim's body. And his allegations of alleged error at the guilt phase of his trial are without merit and do not warrant any relief from the underlying conviction. However, he is entitled to relief on his allegations related to the failure

1

of his trial counsel to present mitigation evidence at the penalty phase of the trial. As the state trial judge noted during the Rule 32 proceedings, "trial counsel presented no mitigation evidence during the penalty phase [and] mitigation evidence is presented during the penalty phase of most capital murder trials." Vol. 15 at 1004. Certainly, as the state trial judge noted, trial counsel are not "per se ineffective for not presenting mitigation evidence." *Id.* After all, "no absolute duty exists to introduce mitigating or character evidence." *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000). But, where, as here, the failure to do so was based on an inadequate investigation and trial counsel overlooked potential mitigation evidence in their files, their performance rises to the level of unconstitutional ineffectiveness.

An attorney representing a capital defendant has an "obligation to conduct a thorough investigation of the defendant's background," *Williams v. Taylor*, 529 U.S. 362, 396 (2000), "or to make a reasonable decision that makes particular investigations unnecessary," *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quotation and citation omitted). And when counsel fails to "conduct an adequate background investigation," *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011), or declines to pursue "all reasonably available mitigating evidence," their assistance may be deemed ineffective, *see Wiggins v. Smith*, 539 U.S. at 524 (emphasis and citation omitted). Therefore, after careful consideration of the record,

the pleadings, and the applicable provisions of 28 U.S.C. § 2254, the court grants Marshall's petition for a writ of habeas corpus, doc. 7, solely as to his claim related to trial counsel's failure to adequately investigate and present mitigating evidence at the penalty phase of his trial.  In all other respects, the petition is due to be denied.

## I.

On April 22, 2005, a grand jury in Jefferson County, Alabama indicted Marshall on three counts of murder in the death of Alicia Nicole Bentley: (1) Ala. Code § 13A-5-40(a)(4)—murder in conjunction with an unlawful entry into a dwelling with the intent to cause assault (Count I); (2) Ala. Code § 13A-5-40(a)(3)— murder in conjunction with an attempt to engage in forcible sexual intercourse (Count II); and (3) Ala. Code § 13A-5-40(a)(8)—murder in conjunction with an attempt to sexually assault a minor (Count III).  Vol. 1, Tab 1 at 17-18.[1]  Erskine Mathis and Linda Hall represented Marshall at trial. *Id.* at 7, 54. The jury convicted Marshall on two counts of capital murder (Counts I and III), and one count of murder (Count II). Vol. 6, Tab 14 at 735-738. The jury subsequently voted 11 to 1 during the penalty phase to recommend a sentence of death. Vol. 7, Tab 24 at 808-809. The

---

[1] References to the record are designated "(Vol. _ )." The court will list any page number associated with the court record by reference to the number in the upper right-hand corner of the page, if available. Otherwise, the page number will correspond with the number at the bottom of the page. Additionally, citations to the record will include an easily identifiable tab number close to the cited material where available. And "ACCA," which is used throughout this opinion, refers to the Alabama Court of Criminal Appeals.

trial court followed the recommendation and sentenced Marshall to death, and the ACCA affirmed. *See Marshall v. State*, 992 So. 2d 762 (Ala. Crim. App. 2007). The Supreme Court of Alabama denied Marshall's application for *certiorari* on April 25, 2008, and the United States Supreme Court also denied review. *See Marshall v. Alabama*, 555 U.S. 918 (2008).

On April 23, 2009, Marshall, through new counsel,[2] filed a timely Rule 32 petition for post-conviction relief pursuant to the Alabama Rules of Criminal Procedure.  Vol. 10, Tab 41. Marshall filed an amended petition on July 10, 2009, Vol. 10, Tab 42, and the State moved to dismiss thereafter, Vol. 11, Tabs 43-44. Although the trial court summarily dismissed the majority of Marshall's claims at a hearing that September, Vol. 12, Tab 46 at 495; Vol. 35, Tab 58, the court also allowed Marshall to amend some of the claims he raised in his petition. Vol. 10, Tabs 39 and 40.  Thereafter, the court dismissed Marshall's ineffective assistance claims related to appellate counsel. Vol. 10, Tab 40 at 29.

On February 16 and 17, 2010, the circuit court held an evidentiary hearing on trial counsel's failure to secure a forensic pathologist to challenge the forcible sexual intercourse charge (Count 1),[3] and to investigate mitigation evidence during the

---

[2] Glenn E. Glover, C. Jason Avery, and Tiffany DeGruy filed the Rule 32 petition on behalf of Marshall. Vol. 10 at 1-2.

[3] "Dr. Art Shores, a forensic pathologist with the Alabama Department of Forensic Sciences, testified that he performed an autopsy on the body, which revealed that Alicia had been strangled to death. Dr. Shores also testified that Alicia had a small vaginal mucosal tear. The tear

penalty phase of the trial. Vol. 35-38. Two of Marshall's expert witnesses were unable to attend the hearing, and the court refused to continue the hearing or allow counsel to offer the experts' deposition testimony in evidence. Vol. 35-38. The court also denied Marshall's request for his forensic pathologist to examine the wet tissue samples collected from the victim. Vol. 37 at 391-92. Ultimately, the court denied the Rule 32 petition, holding, in relevant part, that Marshall had failed to establish that trial counsel's failure to hire a forensic pathologist rose to a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984), or that counsel's investigation into a mitigation case was deficient and prejudicial. Vol. 14, Tab 56. The ACCA affirmed, *Marshall v. State*, 182 So. 3d 573 (Ala. Crim. App. 2014), and the Alabama Supreme Court denied *certiorari*, Vol. 46, Tab 67.

Marshall filed this petition for writ of *habeas corpus* on September 28, 2015, doc. 1, and an amended petition thereafter.  The Respondent filed an answer and brief, docs. 11 and 12, and Marshall filed a reply, doc. 17. Marshall then moved for an evidentiary hearing pursuant to 28 U.S.C. §2254(e)(1)-(2),[4] arguing that he did

---

probably occurred within 24 to 48 hours of Dr. Shores's examination of the body, which was conducted on December 30, 2004." *Marshall v. State*, 992 So. 2d 762, 767 (Ala. Crim. App. 2007). Marshall contends that "based on [Dr. Nichol's] review of the trial testimony, the autopsy report, and his 'education, experience, knowledge, background, training and skills, in the field of forensic pathology, it is [his] opinion that Dr. Shores did not have an adequate foundation for opining that the genital lesion on [Alicia] occurred 24–48 prior to his examination of [Alicia], because he did not perform a histological examination of the tissue samples of the lesion.'" *Marshall v. State*, 182 So. 3d 573, 585 (Ala. Crim. App. 2014).

[4] 28 U.S.C. §2254(e)(2):

not receive a full, fair, and complete hearing in state court and that the records of those proceedings are insufficient to determine the issues in his 2254 habeas petition. Doc. 16. In support of the motion, Marshall filed an affidavit from Dr. George R. Nichols, II (forensic pathologist licensed in Kentucky) and testimony from Janet Vogelslang (clinical social worker and mitigation expert licensed in South Carolina).

This court granted the motion for a discovery and evidentiary hearing with respect to two claims. *See* doc. 23. Using the Section 2254(e)(2) framework, the court found that Marshall had established that (1) his claims relied on facts previously unavailable to him despite an exercise of due diligence and (2) the proffered evidence, if true, would entitle him to habeas relief. *Id.* (citing 28 U.S.C. 2254(e)(2)). The court subsequently held an evidentiary hearing, and the parties filed post-hearing briefs, docs. 46; 48; 50.

---

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

## II.

For general background, the court turns to the ACCA, which explained the

offense, proceedings, and sentence as follows:

> In 2005, Marshall was convicted of two counts of capital murder for the killing of his stepdaughter, Alicia Nicole Bentley—one count of murder made capital because it occurred during a burglary, *see* § 13A–5–40(a)(4), Ala.Code 1975, and one count of murder made capital because it occurred while Marshall, who was over the age of 19 years, sexually abused or attempted to sexually abuse Alicia, who was between the ages of 12 and 16 years, *see* § 13A–5–40(a)(8), Ala.Code 1975.1 This Court, on direct appeal, summarized the facts underlying Marshall's convictions as follows:
>
>> Marshall did not deny that he killed 15–year–old Alicia. Indeed, while in police custody he confessed to the killing and eventually led police to Alicia's body. His attorneys, however, presented a defense in which Marshall attempted to call into question the allegation that he had had any kind of sexual contact with Alicia.
>>
>>> The evidence adduced at trial tended to show the following facts. On December 28, 2004, Tonya Bentley called the Vestavia Hills Police Department to report that her daughter, Alicia, was missing from their apartment. Tonya Bentley and Marshall had separated in early December 2004. Tonya, Alicia, and Tonya's newborn son had moved from the apartment they had shared with Marshall into an apartment in a different complex. Tonya still had personal belongings at Marshall's, and her name was on the lease for that apartment.
>>> Tonya told police that she believed that Marshall may have known of Alicia's whereabouts. She based her belief on the fact that she had discovered a videocassette recorder, or VCR, that Alicia had left at the old apartment in a chair in the new apartment when she got home. Tonya was positive that the VCR had not been in the apartment when she left for work that morning. When Tonya called Marshall to ask whether he had seen Alicia that day, however, he denied having come to the apartment.

Further, Tonya and Marshall had spoken earlier that day about the possibility of Marshall bringing Tonya the washer and dryer. Tonya said that Marshall asked her when she would be home so that he could bring the appliances over. He also said he was going to rent an appliance dolly to make the move easier.

After speaking with Tonya, police alerted other law-enforcement agencies to be on the lookout for Alicia. Police went to Marshall's apartment, where they could hear the dryer running inside, but no one answered the door when they knocked. Marshall's truck was parked outside the apartment, and neighbors said that they had seen him go into the apartment but had not seen him come back out. Police attempted to call Marshall and have neighbors call Marshall, but no one answered the telephone inside the apartment.

Tonya attempted to open the front door with her key, but the lock had been changed. The manager of the apartment complex also attempted to open the lock with the master key, but that key did not work, either. After receiving permission from Tonya to enter the apartment, police simultaneously broke down the front and back doors to the apartment and found Marshall inside.

Detective Mike O'Connor of the Vestavia Hills Police Department testified that, as police searched the apartment, Marshall was handcuffed both for his safety and for the safety of the police. Alicia was not found in Marshall's apartment, and O'Connor asked Marshall to come to city hall with him. Marshall agreed and the police took him to city hall. O'Connor said that he told Marshall that he was not under arrest at that time and removed the handcuffs from him before he got into the car.

O'Connor said that even though Marshall had not been arrested at that point, he was advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), while they were still at the apartment. O'Connor said that he advised Marshall of his rights again once they reached his office. Marshall signed a waiver-of-rights form and initially denied knowing anything about Alicia's whereabouts. O'Connor said that he explained to Marshall that he was not under arrest and that he was free to leave, but because the doors were broken at the apartment, Marshall chose to stay at city hall. O'Connor testified that the only place he had for Marshall to stay was in a

8

cell, but that Marshall only had to ask to leave and he would have been free to go that night.

Police continued to investigate Alicia's disappearance throughout the night of December 28 and into the morning hours of December 29, 2004. During their investigation, they discovered clothes, shoes, a purse, and a comforter identified as Alicia's in a dumpster at an apartment complex next to the apartment complex where Marshall lived. Their investigation also showed that Marshall left work and was unaccounted for during several hours the afternoon of December 28.

On the morning of December 29, after finding the comforter, clothes, and purse, police got an arrest warrant for Marshall based on kidnapping. In addition, law-enforcement officials discovered Alicia's driver's license and her library card in a dumpster at Marshall's job site. Once police obtained the kidnapping warrant, O'Connor said, Marshall was arrested, and he was no longer free to leave. Marshall was not questioned again until about 1:00 p.m. on the afternoon of December 29.

Agents from the Federal Bureau of Investigation ('FBI') assisted the Vestavia Hills Police Department in questioning Marshall. When FBI agents interrogated Marshall, they also advised him of his *Miranda* rights. Marshall signed a form indicating that he understood his rights. While the agents were questioning Marshall the evening of December 29, one day after Alicia had been reported missing, Marshall admitted that he 'had done a terrible thing.' (R. 444.) Agent Scott Keeler of the FBI said that Marshall told him he 'had gotten into a verbal argument with Alicia that had become violent and he had struck her in the head with his fist.' (R. 444.) He said he was not sure whether she was okay and that he had taken her out in the country and dropped her off.

Marshall rode with law-enforcement officials to an area outside Columbiana. After searching off various side roads, Marshall was finally able to lead authorities to Alicia's body. She was nude, except for a pair of white socks.

Dr. Art Shores, a forensic pathologist with the Alabama Department of Forensic Sciences, testified that he performed an autopsy on the body, which revealed that Alicia had been strangled to death. Dr. Shores also testified that Alicia had a small vaginal mucosal tear. The tear probably occurred within 24

to 48 hours of Dr. Shores's examination of the body, which was conducted on December 30, 2004.

*Marshall v. State,* 992 So. 2d 762, 765–67 (Ala. Crim. App. 2007). The jury, by a vote of 11 to 1, recommended that Marshall be sentenced to death. The trial court followed the jury's recommendation and sentenced Marshall to death, finding

> the existence of the following statutory aggravating circumstances: (1) that the capital offense was committed while Marshall was under sentence of imprisonment; (2) that Marshall had previously been convicted of a felony involving the use or threat of violence to the person; and (3) that Marshall was engaged in the commission of a burglary at the time the capital offense was committed.
> The trial court found no statutory mitigating circumstances existed. It further found that there were no nonstatutory mitigating circumstances.

*Marshall,* 992 So. 2d at 779 (alterations in original).

## III.

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). As such, this court's review is limited to questions of federal constitutional and statutory law. Claims that turn solely upon state law principles – e.g. a state court's "interpretation of its own law or rules" or "an alleged defect in a collateral proceeding" – fall outside the ambit of this court's authority to provide relief under § 2254. *See Alston v. Department of Corrections*, 610 F.3d 1318, 1326 (11th Cir. 2010) (citations omitted).

## A.

A habeas petitioner "can seek federal habeas relief only on claims that have been exhausted in state court." *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). In other words, he is required to present his federal claims to the state court and to exhaust all of the procedures available in the state court system before seeking relief in federal court. 28 U.S.C. § 2254(b)(1). That requirement ensures that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights. As the Eleventh Circuit has explained:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. . . .
>
> Exhaustion of state remedies requires that the state prisoner "fairly presen[t][5] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:
>
> > [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

---

[5] The phrases "fairly presented" and "properly exhausted" are synonymous. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts") (emphasis in original).

> *Picard*, 404 U.S. at 275. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").
>
> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first and third alterations and redactions in original) (footnote added).

## B.

The next condition precedent to federal review is the procedural default doctrine. This requires that Marshall show that he has not procedurally defaulted his claims by failing to properly raise them for review in the state courts.

## 1.

It is well established that if a habeas petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009). The Supreme Court explained the so-called "procedural default" doctrine as follows:

In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. *See Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid*., but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, and that procedural bar provides an adequate and independent state ground for denying relief,[6] then federal review of the claim also is precluded by procedural default principles. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991). As the Eleventh Circuit put it,

The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a

---

[6] *See Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See Id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).[7]

Federal deference to a state court's clear finding of procedural default under its own rules is strong:

"[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack

---

[7] When the last state court rendering judgment affirms without an explanation, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale," and "should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state can "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in original).

The Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is *independent* of the federal question and adequate to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (emphasis in *Lee*). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "is itself a federal question." *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Stated differently, if "the state court must rule, either explicitly

15

or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is not independent of federal law. *Id*.

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "firmly established and regularly followed." *Lee v. Kemna*, 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as adequate. *James*, 466 U.S. at 346. That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule inadequate. "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009). Rather, the adequacy requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd*, 250 F.3d at 1313.

Thus, in summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered adequate, and the state court decision based upon such a rule can be reviewed by a federal court. *Card*, 911 F.2d at 1517. Conversely, if the rule is deemed adequate, the decision will not be reviewed by this court.

16

**2.**

Generally, there are three circumstances in which an otherwise valid state-law ground will *not* bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, and, that he was actually "prejudiced" by the alleged constitutional violation; (2) where the state procedural rule was not "firmly established and regularly followed"; or (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring).[8]

**a.**

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir.

---

[8] *See, e.g., Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray*, 477 U.S. at 496)).

2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). This so-called "cause and prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both parts.

To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488.

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . [on direct review] is cause." Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (citations omitted) (first alteration in original, all other alterations added).

Generally, the constitutional ineffectiveness of post-conviction counsel on collateral review will not support a finding of cause and prejudice to overcome a procedural default. *Coleman*, 501 U.S. at 754. After all, "[t]here is no right to counsel in state post-conviction proceedings." *Id*. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)). But, in two recent landmark cases, the Supreme Court extended its prior decision in *Coleman* by deciding that, as a matter of equity, and, under specific, limited circumstances, errors by counsel on post-conviction collateral review could establish the necessary

18

"cause" to overcome a procedurally defaulted claim. In the first such case, *Maples v. Thomas*, 565 U.S. 266 (2012), the Court found that post-conviction counsel's gross professional misconduct (e.g., abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id*. at 281. And, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process. *Id*. at 11-12.

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must show actual prejudice. He must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added). If the "cause" is of the type described in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at

12-15 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

### b.

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default if *either*: (a) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38 (quoting *Carrier*, 477 U.S. at 496); or (b) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323-27 & n.44 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

### C.

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials."

*Id*. (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963).

"Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634. That is due to the fact that, under our federal system of government,

> [t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982). "The reason most frequently advanced in [Supreme Court] cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992).

Congress legislated these principles in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In several provisions, AEDPA requires federal courts to give even greater deference to state court determinations of federal

constitutional claims than before. AEDPA governs Marshall's petition since he filed it after AEDPA became law.[9]

## 1.

Section 2254(e)(1) requires district courts to presume that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). This provision provides "a highly deferential standard of review for factual determinations made by a state court." *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001). Put simply, Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, federal courts must afford a presumption of correctness to a state court's factual findings,

---

[9] *See, e.g., McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254). *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

even when examining the habeas claim *de novo*. *See Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012). And, the presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court. Therefore, those claims are subject to the standards of review set out in § 2254(d)(1) or (d)(2), which the court addresses next.

### 2.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim or is a summary ruling "unaccompanied by explanation." *Id.* Further, the "backward-looking language" of AEDPA requires an examination of the state court decision on the date rendered. *Cullen v. Pinholster*, 563 U.S. 170 (2011). That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id*. at 182 (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)). Also, "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 181. Therefore, a federal habeas court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de novo*." *Id*. at 182.

A closer look at the separate provisions of § 2254(d)(1) and (d)(2) reveals that when a state court has ruled on a petitioner's constitutional claim, the petitioner is entitled to habeas relief only if the court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[10] Moreover, the "contrary to" and "unreasonable application" clauses are "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[11] Therefore, when considering a state court's adjudication of a petitioner's claim, the court must not conflate the two.

---

[10] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted to reference only "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis added); *see also, e.g., Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

[11] *See also Williams*, 529 U.S. at 404 ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) '*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis added).

**a.**

A state court determination can be "contrary to" clearly established Supreme

Court precedent in at least two ways:

> First, a state-court decision is contrary to this Court's precedent if the
> state court arrives at a conclusion opposite to that reached by this Court
> on a question of law. Second, a state-court decision is also contrary to
> this Court's precedent if the state court confronts facts that are
> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405. But, *Williams* does not limit the construction of §

2254(d)(1)'s "contrary to" clause to these two examples. Instead, the statutory

language "simply implies that 'the state court's decision must be substantially

different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d

at 791 (quoting *Williams*, 529 U.S. at 405).

And, a state court's determination of a federal constitutional claim can result

in an "unreasonable application" of clearly established Supreme Court precedent in

either of two ways:

> First, a state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing legal
> rule from this Court's cases but unreasonably applies it to the facts of
> the particular state prisoner's case. Second, a state-court decision also
> involves an unreasonable application of this Court's precedent if the
> state court either unreasonably extends a legal principle from our
> precedent to a new context where it should not apply or unreasonably
> refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407.

It is important to note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In other words, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.[12]

---

[12] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409).

26

To demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Stated another way, if the state-court's resolution of a claim is debatable among fairminded jurists, it is not objectively unreasonable.

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted). Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

**b.**

Section 2254(d)(2) "imposes a 'daunting standard – one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 565 U.S. 1138 (2012) (Sotomayor, J., respecting denial of certiorari) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010)). As the Supreme Court has noted,

> in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L.

27

> Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual
> determination is not unreasonable merely because the federal habeas
> court would have reached a different conclusion in the first instance.
> *Cf. Id.*, at 411, 120 S. Ct. 1495.

*Wood v. Allen*, 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)) (alteration in original). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*)) (alterations in original).

Section 2254(d)(2) limits the availability of federal habeas relief on any claims by a state prisoner that are grounded in a state court's factual findings. To obtain relief, the petitioner must show that the state court's findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, § 2254(e)(1) provides that factual determinations made by a state court are "presumed to be correct," and that the habeas petitioner bears "the burden of rebutting the presumption of

correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Ward*, 592 F.3d at 1155 (holding that the presumption of correctness attending a state court's findings of fact can be overcome only by clear and convincing evidence).

"[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard." *Cave v. Sec'y, Dep't of Corr.*, 638 F.3d 739, 744-45 (11th Cir. 2011) (quoting *Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)). Even so, in *Ward v. Hall*, the Eleventh Circuit clearly held that federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." 592 F.3d at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). *Ward* also observed that § 2254(e)(1) "commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in original).

## D.

Federal habeas "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a). Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality

and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from those fundamental propositions.

First, "[t]he burden of proof in a habeas proceeding is always on the petitioner." *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)). Stated differently, the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. § 2254(d) and (e)(1).[13] And, second, the habeas petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*. Rule 2(c) requires a state prisoner to "specify all the grounds for relief available to the

---

[13] As discussed previously, § 2254(d) provides that the state courts' adjudication of a habeas petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

petitioner," and to "state the facts supporting each ground." Rule 2(c)(1) and (2),

*Rules Governing Section 2254 Cases in the United States District Courts*. *See also*

28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege

the facts concerning the applicant's commitment or detention").

In short, a habeas petitioner must include in his statement of each claim

sufficient supporting facts to justify a decision for the petitioner if the alleged facts

are proven true. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977)

(observing that a habeas petition must "state facts that point to a 'real possibility of

constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules*

*Governing Section 2254 Cases in the United States District Courts*). And, "[c]itation

of the controlling constitutional, statutory, or other bases for relief for each claim

also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus*

*Practice and Procedure* § 11.6, at 654 (5th ed. 2005). As another district court has

held:

> It is not the duty of federal courts to try to second guess the meanings
> of statements and intentions of petitioners. Rather the duty is upon the
> individual who asserts a denial of his constitutional rights to come forth
> with a statement of sufficient clarity and sufficient supporting facts to
> enable a court to understand his argument and to render a decision on
> the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

## E.

The court will discuss ineffective assistance of counsel claims here because of the relationship between these types of claims, which are governed by a highly deferential standard of constitutional law, and Section 2254(d), which is itself an extremely deferential standard of habeas review.

The "benchmark" standard for determining ineffective assistance is well-established.[14] The question is whether a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions. In other words, the court asks, "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that question is "yes," then counsel was constitutionally ineffective.

*Strickland* requires a two-step approach:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the

---

[14]"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). And, federal ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial, or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i).

> defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687. The petitioner must satisfy both parts of the *Strickland* standard: that is, he bears the burden of proving, by "a preponderance of competent evidence," that (1) the performance of his trial or appellate attorney was deficient; and (2) that such deficient performance prejudiced his defense. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, "[b]ecause both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

## 1.

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong, a defendant must prove that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id.* at 688.

"The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). Furthermore, courts must "recognize that 'omissions are inevitable, but, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). In fact, the Sixth Amendment does not guarantee the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [Courts] ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances.[15] And

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized,

---

[15] *See, e.g., Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> "[a]bsolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration added, second alteration in original). Judicial scrutiny of counsel's performance must be "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. After all,

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* (citations and internal quotation marks omitted).

"When reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). And, "[b]ased on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386.

## 2.

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). The habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (quoting *Strickland*, 466 U.S. at 693) (alteration in original). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "[t]he likelihood of a different result must be

substantial, not just conceivable." *Harrington*, 562 U.S. at 111-112 (citing *Strickland*, 466 U.S. at 693).

To prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When that standard is applied in the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer [i.e., in Alabama, the trial court judge] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

To satisfy this high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted).

37

**3.**

State court findings of historical fact made in the course of evaluating a claim of ineffective assistance of counsel are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See, e.g., Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state-court finding of fact, the petitioner bears the burden of proving contrary facts by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Additionally, under AEDPA, a federal habeas court may grant relief on a claim of ineffective assistance of counsel only if the state-court determination involved an "unreasonable application" of the *Strickland* standard to the facts of the case. *Strickland* also requires an assessment of whether counsel's conduct was professionally unreasonable. Those two assessments cannot be conflated into one. *See Harrington*, 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts only if the habeas court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable." As the *Harrington* Court explained:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371-372], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very

adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at [125], 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

562 U.S. at 105 (alterations added); *see also Premo v. Moore*, 562 U.S. 115, 121-23 (2011). However, "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced [so long as] the state court's application [was]

objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520-21 (citations and quotation marks omitted).

## IV.

With these general principles in mind, the court turns now to Marshall's claims, A–F, which he maintains entitle him to relief. The court will address the claims in alphabetical order.

## A.

Marshall contends in Claim A that his trial counsel's performance at both the guilt and penalty phases of his trial fell below "an objective standard of reasonableness" and "was deficient by any measure." Doc. 7 at 9.  The court agrees in part.

## 1.

The court begins with the penalty phase claims. Marshall argues that counsel failed to investigate his family history, present as mitigation an expert report from a clinical psychologist, hire a neuropsychologist, properly use expert investigators, or to present any mitigation evidence during his penalty phase. Doc. 7 at 10-15, 27-38. Allegedly, "it is probable that additional jurors would have voted to spare Marshall's life" had his defense counsel presented mitigation evidence. *Id.* Because all of these alleged failures culminate in Marshall's ultimate argument—that his counsel offered

the jury no mitigating evidence that could have persuaded them to spare his life—the court considers these claims together.

### a.

The court declines to adopt the Respondent's position that Marshall failed to exhaust several of his ineffective assistance claims by briefing them as penalty phase rather than guilt phase issues. Docs. 11 at 10, 12, 15, 17, 18; 12 at 31, 32, 35, 36. All of these claims relate to alleged ineffective assistance for the failure to develop and present mitigating evidence at both the guilt and penalty phases of trial. *Id.* Marshall fairly presented this claim to the state courts. *See* Vol. 10, Tab 42 at 150; Vol. 44, Tab 61 at 41-48, 50-51, 54-58; Vol. 45, Tab 65, at 43-44. Also, because a habeas claim is exhausted if the petitioner presented the substance of the claim to the courts "despite variations in the … factual allegations urged in its support,"[16] the court disagrees with the Respondent's contention that Marshall failed to exhaust specific factual allegations in his mitigation claims. *See* docs. 11 at 3-7; 12 at 18-19.

### b.

Turning now to the merits of Marshall's specific claim, "no absolute duty exists to introduce mitigating or character evidence." *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000). But, an attorney representing a capital defendant has an "obligation to conduct a thorough investigation of the defendant's

---

[16] *Picard v. Connor*, 404 U.S. 270, 277–78 (1971).

background." *Williams v. Taylor*, 529 U.S. at 396. Thus, the principal concern is not whether counsel should have presented mitigation evidence; rather it is whether "the investigation supporting counsel's decision not to introduce mitigating evidence of [Marshall's] background was itself reasonable." *Johnson v. Secretary, DOC*, 643 F.3d 907, 931 (11th Cir. 2011).

The Eleventh Circuit has found ineffective assistance in instances where attorneys failed to present sufficient mitigating evidence at sentencing.[17] The Circuit has rarely had to address the *complete* failure to present any mitigation evidence,[18] with the most analogous case being *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d

---

[17] *See, e.g., Maples v. Comm'r, Alabama Dep't of Corr.*, 729 F. App'x 817 (11th Cir. 2018) (finding petitioner stated facts that, if true, would entitle him to habeas relief where counsel failed to contact willing family members or investigate records); *Daniel v. Commissioner, Alabama Dept. of Corrections*, 822 F.3d 1248 (11th Cir. 2016) (counsel's failure to investigate or present mitigation was deficient and prejudicial where mitigating evidence was available); *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) (counsel's failure to follow up on red flags in files counsel already possessed resulted in mitigating evidence going undiscovered); *Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) (counsel failed to investigate or present mitigating evidence at the penalty phase regarding petitioner's mental health, alcohol, drug abuse, erratic behavior, dysfunctional family life, mental and physical abuse, and suicide attempts); *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995) (counsel failed to present evidence related to petitioner's upbringing at sentencing phase); *Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992) (counsel failed to prepare for penalty phase or offer willing family member character witnesses); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1989) (counsel ineffective for failure to seek out or present mitigating evidence of mental illness and childhood abuse).

[18] *See Wilson v. Warden, Georgia Diagnostic Prison*, 898 F.3d 1314, 1322-23 (11th Cir. 2018) (ineffective assistance claim denied where new mitigation evidence petitioner argued should have been presented at trial was cumulative and a "double-edged sword" that would have hurt his as much as it helped); *Tharpe v. Warden*, 834 F.3d 1323, 1335 (11th Cir. 2016) (finding counsel who interviewed multiple friends and family members but found no evidence of a "troubled or deprived background . . . undertook a meaningful investigation and thereafter developed a mitigation strategy in line with what they discovered").

541 (11th Cir. 2015). In that trial, despite "having ample information signaling the existence of potential significant mitigation evidence," 803 F.3d at 554, the attorneys (1) failed to obtain any school, medical, mental health, or juvenile justice records, or any social service records about Hardwick's foster home placements and abuse;  (2) did not ask their expert or anyone else to investigate or evaluate mitigation evidence relative to the sentencing phase; and (3) failed "to present any mitigating evidence to the jury, let alone the powerful mitigating evidence, including Hardwick's deprived and abusive upbringing," *id.* at 547. In finding counsel's failure to present "even the least bit of . . . mitigating evidence" deficient, *id.* at 559, the Circuit reasoned that Hardwick's defense counsel "appeared to have given up on defending Hardwick and seemingly expended no effort, either in presentation of mitigating evidence or in understanding mitigation law," *id.* at 547.

In *Ferrell v. Hall*, the Circuit held that counsel's performance was deficient where they "conducted a profoundly incomplete investigation, and [his] judgment to . . . sharply limit [his] inquiry fell far outside the wide range of professional competence." 640 F.3d at 1227. The Circuit found that counsel's failure to "speak with any penalty-phase witnesses, or potential witnesses, aside from the parents, until immediately following the guilt-innocence phase" constituted an unreasonable investigation, despite evidence that counsel's investigator interviewed between 40-45 witnesses about the defendant's character. *Id.* at 1228, 1230-31. And, in *Williams*

*v. Allen*, the Circuit found counsel's investigation unreasonable when they relied entirely on an account from the petitioner's mother, leaving them with "an incomplete and misleading understanding of [his] life history." 542 F.3d 1326, 1340 (11th Cir. 2008). The Circuit concluded "trial counsel abandoned their investigation at an unreasonable point, particularly in light of the information about [the defendant's] background that the investigation revealed." *Id.* at 1341.

Generally, "thorough investigations are virtually unchallengeable." *Wiggins*, 539 U.S. at 522. But when counsel fails to "conduct an adequate background investigation," *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011), or declines to pursue "all reasonably available mitigating evidence," their assistance may be deemed ineffective, *see Wiggins v. Smith*, 539 U.S. at 524. Notably, the Supreme Court has held that "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91. Furthermore, counsel "must not overlook evidence of abuse that was documented extensively in available records." *Morrow v. Warden*, 886 F.3d 1138, 1147 (11th Cir. 2018). Such evidence showing the defendant's background and character "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable" and such evidence "might well . . . influence[] the jury's

appraisal of [a defendant's] moral culpability." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (citations and quotation marks omitted).

### c.

Even the Rule 32 trial court noted that Marshall's trial was unusual in that "trial counsel presented no mitigation evidence during the penalty phase [and] mitigation evidence is presented during the penalty phase of most capital murder trials." Vol. 15 at 1004. And while the trial court correctly stated that trial counsel are not "per se ineffective for not presenting mitigation evidence,"[19] *id.*, the relevant inquiry is whether counsel made their rare choice to forego mitigating evidence at the penalty phase based on an inadequate investigation. As this court stated in its order granting the evidentiary hearing, though attorneys need not investigate every evidentiary lead, the decision to limit an investigation "must flow from an informed judgment." Doc. 23 at 9 (quoting *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989)).

To "determine whether trial counsel should have done something more in their investigation, [the court] first look[s] at what the lawyer[s] did in fact." *Raulerson v. Warden*, 928 F.3d 987, 997 (11th Cir. 2019) (citations and quotation marks omitted). Marshall's counsel's investigation consisted entirely of hiring two individuals: Alfred Armour, a private investigator charged with finding family

---

[19] *See Chandler*, 218 F.3d at 1319.

members who might testify on Marshall's behalf, and Dr. Kimberly Ackerson, a

clinical psychologist who prepared a mitigation report. For her part, Dr. Ackerson

prepared her mitigation report,[20] Vol. 36 at 124-26, based on "(1) information

provided by defense counsel including a summary report dated January 6, 2005 and

prepared by defense counsel; [a] letter from Office of District Attorney addressed to

Seminole County (Florida) dated March 23, 2005; copies of Affidavit of Complaint;

copies of summaries prepared by law enforcement officials; [] Interview of

defendant at the Jefferson County Jail on December 15, 2005" as well as Personality

Assessment Inventory completed by Marshall. Vol. 16 at 1248. Her sole interview

with Marshall lasted for four hours. *Id.* at 1251.

---

[20] The court does not address whether counsel acted ineffectively when they decided not to use Dr. Ackerson's report as mitigation for two reasons. First, as the Respondent notes, Marshall failed to exhaust this claim when he did not raise it before the Rule 32 court. *See* doc. 11 at 14. Alternatively, even if Marshall had exhausted the claim, he could not successfully argue that counsel's decision met the deficiency prong of *Strickland*. Though Dr. Ackerson was Marshall's sole source of mitigation and her report contained some information that may have proved helpful to Marshall at sentencing, her report contained several negative conclusions about Marshall, including that Marshall was "remarkable for antisocial behaviors, substance abuse and narcissistic personality traits . . . [as well as] a significant history of violence against women, including sexual aggression." As the ACCA found:

Although Dr. Ackerson's report contained information that may have been used in mitigation—*e.g.,* information regarding Marshall's childhood and his history of abuse— trial counsel determined that they could not use Dr. Ackerson's information as mitigation evidence because "the report could not be submitted a piece at a time. It had to be submitted, the whole hog. The whole hog would have killed us. It would have put him in the electric chair." (R2. 131–32.)

*Marshall v. State*, 182 So. 3d 573, 603 (Ala. Crim. App. 2014). The ACCA reasonably determined that the decision not to present Ackerson's report to the jury was a strategic one, and therefore not deficient under *Strickland.*

Despite the professional trend at the time to include collateral information such as school, social service, and medical records in a mitigation report, Vol. 37 at 357-58, counsel did not direct Armour to retrieve school records or social services records, Vol. 36 at 134, or provide Dr. Ackerson with medical records he had in his file, *id.* at 150-51; *see* Vol. 16 at 1248 (statement from Dr. Ackerson that she did not base her report on any records). Dr. Ackerson reported:

> [Marshall] described a chaotic and periodically abusive childhood. He was approximately five years of age when his biological parents divorced and . . . prior to that time there was a great deal of marital strife. A short time later [Marshall's mother] married Dean Johnson . . . [who] began drinking heavily and became physically and mentally abusive towards family members. [Marshall] specifically recalled having been hit by Mr. Johnson on all areas of his body, including the face with an assortment of objects including belts and switches. He noted further, "It seemed like we were getting whippings all the time" and he also acknowledged taking the blame for his younger sister at times to prevent her from being "hurt." Most notable, [Marshall] explained that he had been "hit" so many times by his stepfather that "it got to the point where I didn't cry." He affirmed having runaway [sic] from the home at times to avoid the abuse . . .
>
> [Marshall's] mother and [stepfather] eventually separated and [she] was left financially destitute and with poor prospects for employment, the family "moved around a lot." . . . [Marshall] was approximately fourteen years of age when the couple's divorce was final. At the same time of the . . . divorce[,] [Marshall] . . . began displaying problem behaviors including truancy, disobedience, destruction of property, and physical aggression. It appears around this same time he left the family home and moved in with a school friend. According to [Marshall] he left home "because [he] was tired of not feeling loved." A month or two later he was "picked up" by a child welfare agency official and was transported to a juvenile detention center. He remained in the detention center for two to three weeks before being placed in a "boy's home" in Virginia. Until age eighteen he remained at this facility, spending some time with a foster family as well . . .

Following completion of the ninth grade, [Marshall] ceased attending school. He claimed to have been enrolled in at lease [sic] fifteen different schools during his academic career secondary to numerous relocations . . .

[Marshall] was enlisted in the Army National Guard for approximately two years . . .

He [is] prescribed an antidepressant medication at this time for "sleep."

Vol. 16 at 1248-51.

### i.

Lead trial counsel admitted at the Rule 32 hearing that he read Dr. Ackerson's report and appreciated the mitigating potential of the background information. Vol. 36 at 131. Still, despite having evidence in the report of potential mitigation information, including Marshall's violent and unstable upbringing, counsel declined to do any further investigation. *Id.* at 134-35. Basically, he did not seek medical records, school records, or social services records from Marshall's childhood, *see id.*, – records that he admitted he knew may have had some mitigation potential. The failure to do so is unreasonable because, as the Supreme Court held long before Marshall's trial, lawyers representing capital defendants have an "obligation to conduct a thorough investigation of the defendant's background."[21] *Williams v. Taylor*, 529 U.S. at 396.

---

[21] And recently in *Andrus v. Texas,* 590 U.S. __ , 140 S. Ct. 1875 (2020), the Court granted relief in part because

Over and over during the habeas hearing, counsel acknowledged that he did not look into or present the myriad tragic circumstances that marked Andrus' life. . . . Counsel uncovered none of that evidence. Instead, he "abandoned [his]

Moreover, the facts outlined by Dr. Ackerson mirrored those the Eleventh Circuit has consistently held warranted further investigation. For example, in *Jackson v. Herring,* 42 F.3d 1350 (11th Cir. 1995), the Circuit found counsel acted deficiently where he "had a small amount of information regarding possible mitigating evidence regarding [the defendant's] history, but he inexplicably failed to follow up with further interviews and investigation." 42 F.3d at 1367. And in *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987), the Circuit found that counsel performed deficiently when, despite being informed by the defendant about his abusive background, counsel "did not even interrogate [the defendant's] family members to ascertain the veracity of the account or their willingness to testify." 823 F.2d at 1145.[22] In short, under the prevailing law at the time, counsel provided ineffective

_____

investigation of [Andrus'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S., at 524.

On top of that, counsel "ignored pertinent avenues for investigation of which he should have been aware," and indeed was aware. *Porter*, 558 U.S., at 40. At trial, counsel averred that his review did not reveal that Andrus had any mental-health issues. But materials prepared by a mitigation expert well before trial had pointed out that Andrus had been "diagnosed with affective psychosis," a mental health condition marked by symptoms such as depression, mood lability, and emotional dysregulation . . .

140 S. Ct. at 1882-83 (alterations in original).

[22] And, albeit after Marshall's conviction, the Circuit again held that facts similar to those in Dr. Ackerson's report were exactly the types of "red flags" that should have prompted counsel to investigate further. Specifically, in *Williams v. Allen*, the Circuit found counsel provided ineffective assistance when they knew the defendant was abused as a child and suffered from mental health issues, including depression and suicide risk, and yet failed to present this evidence at the mitigation phase. 542 F.3d 1326, 1340 (11th Cir. 2008). The court noted also that "nothing in [counsel's] limited inquiry into Williams' background . . . suggest[ed] that further investigation

assistance when they failed to investigate further after receiving Dr. Ackerson's report.

**ii.**

Counsel's performance fared no better with the investigator they engaged to find useful people and information for Marshall's mitigation case. Vol. 36 at 134-36. Armour testified at the Rule 32 hearing that he had never previously investigated family members for a death penalty case. *Id.* at 211. Marshall's attorneys instructed Armour to focus on finding immediate family members that might speak on Marshall's behalf. *Id.* at 213. Though at the time of the Rule 32 hearing Armour could not recall his efforts in Marshall's case, the defense file showed that Armour began by collecting from Marshall a list of names, addresses, and telephone numbers of family members to contact. Vol. 36 at 209-210. From that list, the only person with whom Armour made contact was Marshall's father, who made clear he was not interested in helping Marshall and that he believed Marshall should face punishment for the crime. *Id.* at 211-28. Still, based on Armour's notes, Marshall's father provided Armour the names of other family members and their places of residence.[23]

---

would have been fruitless." *Id*. And, the Circuit instructed that "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further . . . *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Id.* at 527.

[23] Armour's notes from his conversations with Marshall Sr. include several family members' names and useful information for locating them. He lists:

50

*Id.* Despite admitting that he remembered receiving a list of names, *id.* at 216-28, Armour testified that he never called any of them because he was "not . . . able to contact" them, *id.* at 228, purportedly due to Marshall, Sr.'s failure to provide specific contact information for other family members. But Armour's notes, which show that Marshall, Sr. provided phone numbers for Tonya Marshall, belie his contention. Moreover, Armour's notes reveal that although he managed to locate Marshall's brother, Charles Allan Wilkins, *id.* at 218-19, he failed to contact Wilkins, Vol. 37 at 259-60. And yet, although he spoke to no one other than Marshall Sr., Armour stated at the end of his report, "[i]t is the humble opinion of this agent that Mr. William Marshall, Sr., nor any family member of his family, would provide any positive input which would help Mr. Marshall during the case." Vol. 36 at 227. Critically, Armour admitted at the Rule 32 hearing that Marshall, Sr. did not share an opinion regarding whether other family members were willing to testify, and that

---

- "Charles Allan-Marshall Wilkins, Brother, Salisbury, North Carolina." Vol. 36 at 216.

- "Beverly Wilkins, Charleston (mom)," along with a note that she had moved near Winchester, Virginia. *Id.* at 219-20.

- "Bergeta [sic], sister" *Id.* at 220-23.

- "Tonya Marshall (ex-wife) 68 Wideway, Crossfield, Tennessee 38572," along with a home and cell phone number. *Id.* at 223.

Armour attributed his inability to locate Marshall's sister, Berguitta Marshall, to his misspelling of her name. *Id.* at 220-23. Although trial counsel had documents containing the correct spelling of Berguitta's name and more information on several other family members, Armour testified that he never saw those documents. *Id.* at 220-28.

he based his opinion that no member would help Marshall on his inability to reach them. *Id.* at 227-28.

For his part, Mathis testified at the Rule 32 hearing that Armour's investigation "didn't get anything that was worthwhile at all . . . that [he] could use." *Id.* at 136. When asked why he never reviewed Armour's list or did his own follow up even though he knew Armour had in his file a list of family members and potential witnesses, Mathis stated simply, "I did not ask for it. I don't know why." *Id.* at 138. And Mathis testified that he failed to take any further action even though he had read a supportive letter that Marshall's brother, Charles Allan Wilkins, sent to Marshall a month before trial with the brother's correct address, as well as letters from Marshall's ex-wife naming family members available to help in his case.[24] *Id.* at 138-46. As Mathis acknowledged at the Rule 32 hearing, "I knew there was family out there . . . We did not track them down." *Id.*

### iii.

The ACCA found that Mathis's reliance on Armour's investigation was reasonable, stating:

> Investigator Armour attempted to contact . . . family members for
> purposes of discovery of mitigation evidence, but they were either

---

[24] Marshall's brother testified at the Rule 32 hearing that he was willing and able to testify on Marshall's behalf, and had contact information for multiple members who were similarly willing to aid Marshall through either deposition or trial testimony. Vol. 37 at 259-70. These family members included Marshall's niece, Vol. 39 at 111-16, aunt, Vol. 34 at 4987-91, and his grandmother, *id*. at 4972-79.

unwilling to assist in Marshall's defense, did not return telephone calls, or were unable to be located . . .

At the evidentiary hearing, Mathis testified that Investigator Armour was tasked with locating family members for mitigation. Mathis stated that Investigator Armour provided him with a letter, which was introduced by Marshall during the evidentiary hearing and admitted as "Petitioner's Exhibit 3," and provides:

"During my initial interview with [Marshall], he provided me with a list of names of family members and friends that might wish to speak on his behalf at his sentencing hearing. The list of names included several members of his family that reside outside the State of Alabama. Many of the addresses and telephone numbers were old and had change[d] from the time [Marshall] obtained them."

"I have placed numerous calls to relatives thought to be residing in Crossville, Tennessee, but was unable to get in contact with any of his siblings that were listed. After a number of attempts, I was able to contact Mr. William Marshall, Sr. [, Marshall's father,] by telephone on at least three occasions during the course of the investigation. [Marshall's father] stated to me during each conversation that he was aware of the case involving [Marshall. He] also stated to me that it is an unfortunate circumstance in which [Marshall] was involved in, but believes that if he did the crime, he needs to do the time."

"I informed [Marshall's father] that his son could possible be facing the death penalty in the State of Alabama. [Marshall's father] replied that he loves his son and wish that the events leading up to this point had not taken place, but believes that if he has to pay for his crime with his life, that is what he will have to do. [Marshall's father] stated that he did not intend to be present at the sentencing hearing for [Marshall,] but asked that he be kept informed of the status of the disposition of the case."

"When asked about the biological mother of [Marshall, Marshall's father] stated that they had been divorced for many years and that he has lost contact with her, but believes that she is located in the State of Florida. [Marshall's father] stated that his son was raised by his biological mother and he felt that the mother did not do a sufficient job raising him. He could not provide a name the biological mother might be listed under, and attempts to locate her using the last name Marshall were unsuccessful."

"[Marshall's father] informed me that he does not even know how to contact the biological brothers and sister of [Marshall] or a step-sister

[Marshall] has. He stated that one of his brothers was believed to be home at Fort Bragg, North Carolina from military duty in Iraq. A search of the Fort Bragg post locator was unable to confirm any member of the Fort Bragg community as being a relative of [Marshall.]

"[Marshall's father] did mention that [Marshall] ... appeared to have had some mental stability issues during his childhood which might have contributed to the case involving him in Birmingham. [Marshall's father] provided me with the name an[d] telephone number of the physician for [Marshall,] which I contacted and requested a copy of the medical records for [Marshall] be sent to your office."

"It is the humble opinion of this agent that [Marshall's father], nor any member of his family would provide any positive input to a judge or jury that would cause them to see any reason why [Marshall] should receive any relief in this case."

*Marshall v. State,* 182 So. 3d at 598–99.

In determining that Marshall's counsel's investigation was adequate, the

ACCA stated:

Initially, we note—just as the circuit court did in its order denying Marshall's Rule 32 petition—that "[t]he circumstances of this case are extraordinary. Marshall murdered Alicia Bentley, who was his step-daughter. However, because Marshall married his first cousin, Tonya Bentley, Alicia was not only Marshall's step-daughter but also his first cousin once removed. Therefore, trial counsel were tasked with convincing Marshall's family members to testify for Marshall during the penalty phase, where, to do so, would mean testifying in favor of the murderer of another one of their family members.

Trial counsel retained two experts in an effort to obtain mitigation evidence, trial counsel spoke with the experts, reviewed their reports, determined that family members did not want to participate in the presentation of mitigation evidence, and determined that it would be detrimental to Marshall to call Dr. Ackerson as a witness during the penalty phase of Marshall's trial. Thus, like Hall, Marshall's trial counsel was not ineffective for relying on Dr. Ackerson and Investigator Armour to investigate mitigation evidence. Investigator Armour attempted to contact those family members for purposes of

discovery of mitigation evidence, but they were either unwilling to assist in Marshall's defense, did not return telephone calls, or were unable to be located. Although Mathis testified that he believed that Investigator Armour's assessment that the family members would be unwilling to assist during trial was correct, Mathis attempted, during trial, to persuade Marshall's sister, Berguitta Marshall, to testify on Marshall's behalf, but—just as Investigator Armour concluded— Berguitta was unwilling to help. Additionally, Mathis testified that he spoke with Marshall about his family's unwillingness to assist in the proceedings, and no evidence was presented indicating that Marshall provided trial counsel with any further information about people he wanted trial counsel to contact to assist in his defense.

*Id.* at 600-603.

This assessment, however, is based on a set of facts that is at best incomplete. To begin, only one family member, Marshall, Sr. – rather than multiple family members – refused to help. Other than Marshall, Sr., no other family members received notice from counsel or from Armour that they could testify on Marshall's behalf. And, while Armour stated in his letter to counsel that he could not reach the persons Marshall gave him due to incorrect contact information, he neglected to point out that Marshall, Sr. also gave him names and contact information and that he failed to contact this second set of individuals. Vols. 36 at 216-28; 37 at 259-60.  The court recognizes that lawyers generally cannot and should not try to do everything on their own. Indeed, counsel should in fact rely on other professionals on their team to help them provide adequate representation for their clients. But, counsel must not blindly rely on their team. And where, as here, counsel knew that at least one person, Marshall's brother, had reached out to Marshall and was willing to help, *see* Vol. 36

at 143, this fact should have provided counsel good cause to doubt Armour's contention and to do their own follow up.

Similarly, while Berguitta Marshall indeed expressed an unwillingness to testify, the ACCA overlooked that counsel approached her for the first time during the trial at the courthouse. Vol. 37 at 289-91. Berguitta testified at the Rule 32 hearing that counsel never contacted her before that day at the trial. *Id.* And she added that when she traveled to Alabama for the trial, she had no idea that she was even allowed to testify, and she refused to get on the stand when asked because she "wasn't prepared," and "hadn't had any phone calls from [her brother's] attorney to prepare [her] for anything [she] needed to say, or what was going to go on in the courtroom." *Id.* at 290. Berguitta testified that "if [she] had been prepared or contacted before the day of trial, . . . [she] would . . . have been willing" to testify at the trial. *Id.* at 291. Put simply, her decision not to testify was not made out of malice, and proper efforts undertaken by counsel prior to the trial may have yielded a different response.

And Berguitta was not the only one. At the Rule 32 hearing, five other members of Marshall's immediate and extended family provided testimony or depositions for Marshall, including his brother, who had written him before the trial, Vol. 37 at 259-60, and his mother, Beverley Charlton, *id.* at 315-18. *See also* vol. 34 at 4972-91; vol. 39 at 111-16. Marshall also presented affidavits and depositions

from his foster parents, Marlene Scott, Vol. 34 at 4998-5000, and Gerald Scott, Vol. 35 at 5008-5011, and the director of the children's home where he lived as an adolescent, Louise Huffstuttler, Vol. 39 at 106-10. These individuals testified or attested that neither Marshall's counsel nor investigator Armour contacted them about testifying on Marshall's behalf. Each claimed they would have testified for Marshall if asked.[25]

### iv.

Foundational to the ACCA's assessment of Marshall's counsel's investigation and the purported unwillingness of Marshall's family to help was the intermingled family relationships between Marshall's family and the victim's. Missing from the ACCA's assessment however is the failure to analyze whether Marshall's counsel made a reasonable effort to engage these family members before trial and if they

---

[25] The Respondent argues that even Marshall saw little value in continuing to contact family, stating in their brief that when Mathis informed Marshall of his difficulties in contacting his family, "*Marshall* 'figured if [his family] didn't care anymore about their son than to contact his lawyer when he's charged with capital murder, he sure as hell didn't need to contact them.'" Doc. 12 at 20-21 (citing Vol 45, Tab. 65 at 24) (emphasis added). But it was *counsel,* rather than Marshall, who "figured . . . he sure as hell didn't need to contact" Marshall's family. Vol. 36 at 130 ("I recall talking to Bruce about the fact that his family didn't want to have anything to do with him. That they knew what was going on and they knew where he was. *I* figured if they didn't care anymore about their son than to contact his lawyer when he's charged with capital murder, I sure as hell didn't need to contact them"). The Supreme Court has held that a clear instruction from a capital defendant to his counsel not to present mitigating evidence can relieve the attorneys of ineffective assistance charges. *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007) (reasoning that the client would likely obstruct any efforts by the attorneys to admit such evidence). However, the statement here by counsel does not rise to the clear instruction from the defendant contemplated in *Schriro*.

repeatedly rebuffed him. If the facts showed this, this relationship may be more relevant to the inquiry of ineffective assistance. But Marshall's counsel did not engage in an adequate investigation, and unreasonably relied on his investigator even though counsel had facts that questioned the veracity of the investigator's report. Therefore, the ACCA was unreasonable in their assumption "that the trial counsel's investigation was adequate . . . without considering the reasonableness of counsel's decision to limit the scope of their inquiry." *Daniel v. Commissioner, Alabama Dept. of Corrections*, 822 F.3d 1248, 1272 (11th Cir. 2016).

In the end, "counsel chose to abandon their investigation at an unreasonable junction, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins,* 539 U.S. at 527. And by adopting counsel's post-hoc rationalization of why they were unable to turn up mitigating evidence without considering the other evidence presented at the Rule 32 hearing, the ACCA engaged in an unreasonable application of clearly established law to the facts in this case. Once a federal court determines that a state court decision is unreasonable under § 2254(d), it is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF,* 710 F.3d 1241, 1255 (11th Cir. 2013) (quotation omitted).

**v.**

Marshall's counsel also failed to uncover any documentation of Marshall's adult life, including military records, probation records, and medical records. Vol 36 at 150-54. The Constitution requires that the trial court and the jury consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604 (1978).  Any reasonable attorney would have obtained complete and accurate records regarding Marshall's medical, education, employment, and family history.  *Borden v. Allen*, 646 F.3d 785, 801–02 (11th Cir. 2011) (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976)). In fact, here, counsel's investigator actually provided the medical records to counsel. Vol. 36 at 150-54. And, had Marshall's counsel reviewed the medical records secured by Armour and performed even a cursory investigation into Marshall's physical conditions, counsel would have discovered that Marshall suffered from two medical conditions, sleep apnea and a thyroid condition, *id.*, both of which purportedly have cognitive and emotional effects, Vol. 37 at 343-350,[26] and which may have supported Marshall's contention for a sentence less than death.

---

[26] At the Rule 32 hearing, Dr. Carol Walker, an expert in the field of neuropsychology, testified that Marshall's thyroid condition, Graves' disease, causes emotional and cognitive symptoms including agitation, executive dysfunction, and significant anxiety, as well as negative impacts on judgment and impulse control. Vol. 37 at 336, 344-48. Dr. Walker explained that Marshall's severe obstructive sleep apnea could also cause psychological and emotional problems.

Perhaps recognizing trial counsel's failures, the Respondent asserts that these medical and psychological challenges did not "support an insanity defense." Doc. 12 at 36. True, indeed. But, Marshall never alleged an insanity defense. And, the Respondent overlooks that the Supreme Court has noted, "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Porter*, 558 U.S. at 42 (citation omitted). Consequently, in *Porter*, the Court found that the Florida Supreme Court was "not reasonable to discount entirely the effect [mental health evidence] might had had on the jury or the sentencing judge" simply because it did not "rise to the level of establishing a statutory mitigative circumstance." *Id*. at 42-43 The same is true here—Marshall's trial counsel should have presented the evidence to the jury for the jury to consider its mitigating effect, if any.

## vi.

There are additional reasons to support a finding of ineffective assistance by counsel. Beyond hiring these two experts, counsel performed no other investigation into potential mitigating evidence for the penalty phase. This is not a case where counsel had already "gleaned a portrait of [Marshall's] life." *Raulerson v. Warden*, 928 F.3d at 997. For example, in *Raulerson*, the court found counsel's investigation reasonable because counsel engaged multiple experts, interviewed several family

---

*Id.* at 348-50, 354-58. What weight, if any, this type of evidence is entitled to is a matter that Marshall's jury should have had the opportunity to decide.

members, and reviewed extensive records. *Id.* at 997. In Marshall's case, the investigation's inadequacy is further underscored by counsel's notes, which show that counsel had "evidence that would lead a reasonable attorney to investigate further." *Id.* at 998. More specifically, as noted previously, Armour had names and contact information of family members who were willing to testify on Marshall's behalf, Vol. 36 at 136-46, 209-28, counsel knew that Marshall's brother had written Marshall and offered to help, *id.* at 138-46, and Dr. Ackerson's report showed that Marshall suffered a "chaotic and periodically abusive childhood," Vol. 16 at 1248-51. "In light of what counsel actually discovered" in Dr. Ackerson's report and Armour's investigation, Marshall's counsel should have continued looking into leads. *See Wiggins*, 539 U.S. at 525. After all, as the Supreme Court has held, counsel's knowledge, for example, that "Petitioner's mother was a chronic alcoholic; [he] was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food" was sufficient to alert any reasonably competent attorney to the need for further investigation. *Id.*

### vii.

The Respondent asserts that trial counsel simply made a strategic decision against hiring a mitigation expert. The ACCA agreed with this point:

> [T]rial counsel did not hire a "mitigation expert" to assist in investigating and presenting mitigation evidence. Trial counsel instead retained both a private investigator and a clinical psychologist to assist in the mitigation phase of Marshall's trial—which was a reasonable decision. Simply because trial counsel did not retain the same type of expert to assist in the mitigation phase that Rule 32 counsel would have retained does not render Marshall's trial counsel ineffective. Accordingly, the circuit court did not err when it denied these claims,

*Marshall v. State*, 182 So. 3d 573, 605 (Ala. Crim. App. 2014). This court agrees that Marshall's counsel certainly reasonably made the strategic decision to rely only on the investigator and the psychologist. But, having done so, counsel were not relieved of their obligation to actually look at the reports their professionals prepared. Dr. Ackerson's report is replete with red flags that courts have held warrant further investigation. Again, this is not to suggest that counsel should have offered the report at the trial or call Dr. Ackerson as a witness. To the contrary, opting not to admit Dr. Ackerson's report at the penalty stage was a strategic decision for counsel to make based on their professional expertise. *See, e.g.,* n. 20 *supra.* However, counsel unreasonably chose not to follow up on the information contained in that report. Under then prevailing standards, knowing of Marshall's abusive, neglected childhood, any reasonable attorney would have engaged in a more thorough investigation, by either talking to family members (at least one of whom counsel knew had written Marshall) or revisiting the decision whether to hire a mitigation expert. The failure to use the information provided by the two individuals counsel hired is the error rather than counsel's failure to hire a mitigation expert.

### viii.

To close, given what counsel describes as "overwhelming" evidence of guilt, Vol. 7, Tab 24 at 770-72, any reasonable attorney would have known that the sentencing phase presented the only realistic opportunity for Marshall to obtain a "favorable" result.[27] And yet, despite "potentially powerful mitigating evidence star[ing] [them] in the face," i.e. Dr. Ackerson's report and Armour's investigation, Marshall's counsel "unreasonably decided to end [their] investigation after only talking to" Marshall's father. *Maples v. Comm'r, Alabama Dep't of Corr.*, 729 F. App'x 817, 824 (11th Cir. 2018). They made this decision despite acknowledging they had no mitigation strategy to offer at sentencing. Vol. 36 at 117.[28] And, this is not an example of a reasonable decision made after counsel gathered a substantial amount of information about their client.[29] To the contrary, counsel made the decision to stand down even though they had pertinent information that may have

---

[27]In *Johnson*, the Eleventh Circuit held "[n]o reasonable attorney who has every expectation that his client will be convicted and will be facing a death sentence would wait until the guilt stage ended before beginning to investigate the existence of non-statutory mitigating circumstances. No reasonable attorney, after being told by his client that he had an abusive upbringing, would fail to interview members of his client's family who were readily available and could corroborate or refute the allegations of abuse. No reasonable attorney told by his client that he had an alcoholic and abusive father would fail to pursue those non-statutory mitigating circumstances simply because the father denied it." 643 F.3d at 932-33.

[28] *Compare Jenkins v. Commissioner, Alabama Department of Corrections*, 936 F.3d 1252, 1269-70 (finding counsel's failure to investigate defendant's background was strategic where counsel prioritized raising a residual doubt mitigation theory at sentencing).

[29] *Compare Bobby v. Van Hook*, 558 U.S. 4, 9-12 (2009) (finding lawyers who spoke with multiple family members "early and often" and employed multiple expert witnesses months before trial were reasonable in deciding not to pursue more evidence).

proved useful, such as evidence that Marshall had an abusive upbringing and an alcoholic father. In short, trial counsel failed to pursue leads on family members who could "corroborate or refute [these] allegations." *Johnson*, 643 F.3d at 932.

The failure of counsel is not in dispute. The state trial judge noted that it was unusual that trial counsel presented no mitigation evidence. Vo. 15 at 1004. Also, Marshall's counsel basically conceded their shortcomings. Lead trial counsel admitted at the Rule 32 hearing that he "d[idn]'t know that [he] had" a theory of mitigation for the penalty phase. Vol. 36 at 117. And in a sad indictment of the process, he added further that he did not have a sense of how long his investigator would have needed to investigate mitigation for the case because "[w]e, in Jefferson County, Alabama, don't know a whole lot about mitigation, because we don't get any money to hire anybody to do mitigation." Vol. 36 at 183.  The lack of resources is not an excuse here, however, where counsel actually had information that should have caused them to inquire further, i.e. multiple red flags indicating readily available and compelling mitigation evidence, as well as leads on where to find that evidence. No reasonable attorney would have failed to investigate Marshall's background further. In light of this unreasonable investigation, counsel's failure to develop or present mitigating evidence at the sentencing stage was deficient.

**d.**

In addition to showing that counsel acted deficiently, Marshall must also show prejudice. *Strickland*'s prejudice prong requires that Marshall show that "but for [this] deficient performance, there is a reasonable probability that the result of his penalty phase proceeding would have been different." *Johnson*, 643 F.3d at 928 (citations omitted). This requires that the court "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding [and] reweigh it against the evidence in aggravation." *Maples v. Comm'r, Alabama Dep't of Corr.*, 729 F. App'x 817, 823 (11th Cir. 2018). If this reweighing shows "a breakdown in the adversarial process that our system counts on to produce just results, such that the proceeding was fundamentally unfair," then the court must vacate the death sentence. *Id.*

However, a court may not consider "undiscovered and unpresented mitigating evidence . . . in isolation." *Maples*, 729 F. App'x at 823. Rather, the court must address "what would be the combined effect of all mitigating evidence in producing a different outcome at sentencing." *Daniel v. Commissioner, Ala. Dept. of Corrections*, 822 F.3d 1248, 1278 (11th Cir. 2016). In doing so, the court must recognize that sentences at the penalty phase must be "individualized by focusing on the particularized characteristics of the individual." *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987). For that reason, "[i]t is unreasonable to discount

to irrelevance the evidence of [a defendant's] abusive childhood, . . ." *Porter*, 558

U.S. at 43. Moreover, a petitioner's background that includes "severe privation,"

"abuse," "physical torment," and an "alcoholic, absentee [parent]" is the kind of

troubled history that the Supreme Court has "declared relevant to assessing a

defendant's moral culpability." *Wiggins*, 539 U.S. at 535. A defendant's life history

is "a part of the process of inflicting the penalty of death." *Id.* at 535.[30]

Here, Marshall's jury heard nothing about him at the penalty phase. Had

Marshall's counsel investigated the red flags before them in their records, they

would have had the following mitigating testimony, drawn from deposition and Rule

32 hearing testimony of family members who claimed trial counsel never contacted

them:

> From age two to fifteen, Marshall's father figure was his mother's second
> husband, Dean Johnson. At the Rule 32 hearing, the Marshall family
> described Dean as "violent," "a heavy drinker," and a father who taught right
> from wrong "with a belt," often leaving physical evidence of beatings on his
> victims, including Marshall.
>
> As revealed at the Rule 32 Hearing, Dean even threatened Marshall's mother
> with a gun in front of Marshall when he was only 5 years old. Perhaps the

---

[30]*See also Collier v. Turpin,* 177 F.3d 1184 (11th Cir. 1999) (failure to present the available
evidence of defendant's upbringing, compassion, his poverty, and gentle disposition rendered
performance ineffective); *Harris v. Dugger,* 874 F.2d 756 (11th Cir. 1989) (because the jury knew
little about defendant including that family members described him as a devoted father, husband,
and brother, counsel was ineffective); *Armstrong,* 833 F.2d at 1434 (finding the "demonstrated
availability of undiscovered mitigating evidence clearly met the prejudice requirement"
under *Strickland* ); *Blanco v. Singletary,* 943 F.2d 1477, 1505 (11th Cir. 1991) (finding a
"reasonable probability" that "jury might have recommended a life sentence" had counsel
presented the mitigating evidence that would have been available "had they more thoroughly
investigated").

most shocking episode of drunken violence witnessed by Marshall involved a drunken Dean trying to run over Marshall's mother with a car in which the children were all riding.

Marshall often got the worst, and the most repeated beatings, from Dean. It was not uncommon for Marshall to be hit, slapped, and punched in the face or head. Beverley testified that Dean "hit Bruce upside his head with his fists. He would use a belt or something. It didn't make any difference where it hit, a leg, an arm. It didn't matter." She testified that these "beatings" occurred weekly. Dean would leave physical marks on Marshall during these beatings. In fact, Marshall's mother testified that she eventually stopped trying to get Dean to quit beating Marshall or the other kids because, when she did try, the beatings just got worse.

Despite knowing the violence towards Marshall, his mother voluntarily left Marshall in the care of the very man perpetrating the violence. Mrs. Charlton also gave up emotionally on Marshall, resulting in abandonment and extreme emotional abuse towards Marshall. Once Mrs. Charlton's marriage to Dean ended, the family split up, with Marshall and his brother remaining in Dean's household, while Berguitta continued to live with their mother. For years thereafter, Marshall had only limited contact with his mother.

The physical abandonment of Marshall came on the heels of severe neglect. Specifically, Cleo testified regarding a time when Marshall was four or five years old, and she was called over to his house by a neighbor because something was wrong. When Ms. Brasted arrived, she found a little four or five year-old at home while his mother was in bed with a random man and "Bruce was drunk." Based on this event, Ms. Brasted testified that after that incident she contacted a lawyer and considered keeping the children since they were not "taken care of."

The violence and emotional and physical abuse did not end when Marshall eventually returned to live with his mother. Rather, they continued at the hands of Mrs. Charlton's subsequent romantic partner, Jerry Aires. Berguitta testified that Aires was "abusive and evil" to Marshall. She said he was "very, very mean when he would drink. He would just hit for no reason." He would hit Marshall in the face and in the head. He would leave physical marks on Marshall and would hit him with things other than his hands, including a belt with metal rings. Ms. Marshall further testified that fear ruled the household with Jerry, eventually leading Marshall to run away from home. She said that

she and Marshall "were always scared." Marshall was not just the subject of abuse, but he was a witness to the violence and abuse inflicted on his loved ones, including his mother and sister, whom he oftentimes tried to protect.

Marshall, by the time he was a teenager, had lived in four states and somewhere between ten and fifteen cities. In addition to his constant moves, during Ms. Charlton's time with Dean, the family went from place to place within a city desperately looking for shelter. In the words of Marshall's brother, "we didn't have a place to live."

As a teenager, Marshall was sent to live at the Braddock House. Ms. Louise Hostetler is the "former director of Braddock House, a state facility for children who were designated as either CINS ("Child In Need of Services") cases or juvenile delinquents" . . . Hostetler's affidavit was filed in open court during the Rule 32 Hearing. Had Ms. Hostetler been asked to testify on Marshall's behalf, she would have testified that the Braddock House was not a facility for children who had committed violent crimes, but rather a facility for "basically good kids who needed structure to learn socially acceptable ways to live." Ms. Hostetler would have explained to the jury that in this structured environment, Marshall "did not exhibit any really bad behavior" and in fact counseled another boy into staying at the Braddock House instead of running away.

Additionally, Ms. Hostetler could have told the jury of how Marshall's mother essentially abandoned him to the home. Although the Braddock House encouraged family visits, Ms. Hostetler does "not recall Bruce's mother or any other family member visiting Marshall during the time he lived at Braddock House." After leaving the Braddock House, Marshall went to live with his foster parents, the Reverend Gerald and Marlene Scott. Reverend Scott has testified that Marshall lived with him and his wife in 1982 as a part of a "Family Oriented Group Home" as a "family model home" after Marshall completed his stay at the Braddock House in order for him to be better equipped when he returned "into the family life." Reverend Scott stated that his role was to be "the father figure" and that the boys called him "dad."

Had Reverend Scott been contacted for mitigation evidence, he would have testified that in this structured environment with a family who loved and cared for him, Marshall "was fabulous." Reverend Scott would have testified that they had "no difficulties with him" and that he cannot "remember any

situation that [he] even had to correct him" and noted that "he was super." Reverend Scott could have explained to the jury that Marshall would help look after his mentally challenged son, Mikey, and that his daughter considered Marshall another brother in the family. (C. 5009). Further, Reverend Scott testified that he absolutely never saw any violent tendencies in Marshall. Id. Reverend Scott would have told the jury that he does not recall Marshall ever receiving a visit, telephone call, or single piece of mail from Beverley. (C. 5010). In fact, Reverend Scott explained that it was like there "was no home for him to go to."

Reverend Scott's wife, Marlene Scott, testified that Marshall called her "Mom." Mrs. Scott would have explained that her role was to help boys such as Marshall "see how an ordinary home functioned, how husband and wife reacted and how they reacted with the children and how discipline came about, and how there was much love, that love was something that could be expressed." Mrs. Scott would have testified that while Marshall lived with her he did his chores and was always willing to do anything she asked. Mrs. Scott could have explained to the jury that in such a structured environment surrounded by a loving family, she did not recall any problems with Marshall and that "[o]ut of the 44 boys" that she acted as a foster parent to, that "if you would have ever asked me which ones would be in trouble, he would have never made that list. He was just – he was what you wished all of them would be."

Doc. 7 at 12-15 (citing Vol. 34 at 4972-5000; Vol. 35 at 5008-11; Vol. 37 at 237-334; Vol. 39 at 106-16).

### i.

During his Rule 32 proceedings, Marshall wanted to call Jan Vogelsang, a social worker and mitigation specialist, to testify about his background and the impact it had on him. However, Vogelsang advised Marshall's counsel that the three-month window available for her assessment was too short, and counsel requested a continuance to allow Vogelsang to complete her report. Vol. 39 at 128. The court

denied the continuance and foreclosed Vogelsang's testimony as cumulative, Vol.

37 at 394-403, but allowed Marshall to proffer an affidavit from Vogelsang,[31] vol.

39 at 117-66. And, because she did not have time to perform a full biopsychosocial

assessment, Vogelsang submitted instead a "modified" report that provided an

incomplete assessment of Marshall.[32] Doc. 45 at 63-64.

---

[31] The Respondent argued that Vogelsang's testimony at the Rule 32 hearing was irrelevant to the ineffective assistance claim, stating Marshall's counsel could not have hired her during the trial. Doc. 48 at 3-6, 23-24. But, the point is not whether Vogelsang *herself* could have testified during the trial, but rather that Marshall's counsel were deficient for failing to find the evidence that Vogelsang found or hire a mitigation expert who could have done the same work, and that had counsel presented this evidence to the jury, there existed a reasonable probability of a life sentence instead of death. Furthermore, the court rejects the Respondent's contention that the trial court would have excluded Vogelsang's testimony as hearsay. *Id.* at 21-22. Under Alabama law, "[t]he trial court may properly consider hearsay at the penalty phase of trial if the defendant has an opportunity to rebut the evidence." *Ex Parte McGahee*, 632 So. 2d 981, 982-83 (Ala. 1993)); Ala. Code §§ 13A-5-51–52 (stating that a defendant at sentencing may offer evidence of any aspect of a defendant's character or record and any other relevant mitigating circumstance); Ala. R. Evid. 1101 (establishing that the Rules of Evidence do ***not*** apply in sentencing proceedings).

[32] This court granted an evidentiary hearing in part to allow the full testimony of Vogelsang. The undersigned reasoned that "because Dr. Vogelsang's proffer is consistent with the testimony from Marshall's family members during the Rule 32 hearing and is replete with potential mitigating evidence that trial counsel purportedly erred in either not discovering or failing to present at the penalty phase, Marshall has established that his trial counsel's investigation into potential mitigating evidence was so deficient that, if true, would entitle him to habeas relief." Doc. 23. And consistent with Marshall's contention about the affidavit, at the hearing, Vogelsang testified that due to time constraints and the denial of a continuance, the affidavit proffered at the Rule 32 hearing provided only a truncated assessment of Marshall. Doc. 45 at 63-64. In any event, between the Rule 32 hearing and this court's evidentiary hearing, she gathered new records, conducted additional research, interviewed additional witnesses, and performed multi-generational histories of Marshall's family and assessments of communities where he lived. *Id.* Because the potency of the mitigation contained in Vogelsang's report depended on its presentation as a whole, and because none of the state courts had the opportunity to review this report, this court reviews the mitigation evidence contained therein *de novo. See Johnson v. Williams*, 568 U.S. 289, 303 (2013) ("AEDPA permits *de novo* review in those rare cases when a state court decides a federal claim in a way that is 'contrary to' clearly established Supreme Court precedent. When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before

Through her assessment, Vogelsang identified five types of "psychological battering" Marshall experienced as a child, as well as twenty risk factors in Marshall's life that impacted his psychological and emotional development. *See* Doc. 47-11. Vogelsang testified that, taken together, certain features of Marshall's life accumulated to leave him with poor judgment, poor insight, a lack of resilience, and a "complete[] [inability] to handle rejection or abandonment."[33] Doc. 45 at 151. Had Marshall's counsel engaged in a reasonable investigation, the jury would have heard from Marshall's family and/or from someone like Vogelsang about Marshall's violent, deprived, and perilous childhood, and the impact it likely had on his development.[34] But trial counsel presented no such evidence, and instead offered to the jury that "the only way [he] c[ould] see that [the jury] might come back with a

---

a federal judge."). *See also Berghuis v. Thompkins*, 560 U.S. 370 (2010); *Pittman v. Sec'y, Fla Dept. of Corr.*, 871 F.3d 1231, 1245 (11th Cir. 2017).

[33] The features Vogelsang identified included: "Accumulation of Risk Factors," including being "[b]orn into an unstable home," "[a]bandoned by father," "[p]hysically abused by stepfather," "[a]bandoned by mother," "[p]eriods of hunger," "[w]itnessing violence to loved ones," "[p]hysically abused by mother's violent boyfriend," "[f]orced to steal to support mother and her boyfriends," "[w]itnessed stepfather attempt to run over mother," and "[i]nappropriate family sexual behavior." Doc. 47-11 at 20-22.

[34] None of this evidence presented the "double-edged-sword dilemma" contemplated by the Eleventh Circuit in *Peede v. Attorney General*, 715 F. Appx. 923, 931 (11th Cir. 2017) (finding new mitigation evidence was insufficient to grant habeas relief where it "could have hurt as much as it helped"). *See also Evans v. Sec'y, Fla. Dep't of Corrs.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (deferring to state court's rejection of relief where new evidence was a double-edged sword because evidence can be more harmful than helpful); *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 650 (11th Cir. 2016) ("And there is a real danger that additional mitigation evidence, particularly if presented by testifying family members, would have been a 'double-edged sword,' which argues against a showing of prejudice." (citing cases)).

life without parole recommendation would be just out of compassion," and apologized that he had nothing else to give the jury. Vol. 7, Tab 24 at 770-72. Counsel's sincere apology does not excuse his failure to present available mitigation evidence.[35]

### ii.

To restate, Marshall's jury heard no evidence that would "humanize [him] or allow them to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41. Had Marshall's counsel performed a reasonable investigation, they would have had the "kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535. Instead, the picture the jury received of Marshall's life was nonexistent. This meant that the jury lacked "so many important data points about [Marshall's] background and character" that it completely foreclosed their ability to "accurately gauge [his] moral culpability." *Maples*, 729 F. App'x at 827. The failure is not necessarily a non-factor or non-

---

[35] The failure to present any mitigation evidence distinguishes this case from others in which a habeas petitioner is seeking to introduce evidence that is cumulative to that presented in his trial. *Compare Cullen v. Pinholster*, 563 U.S. 170, 200-01 (2011) (finding "no reasonable probability that . . . additional evidence . . . would have changed the jury's verdict" when the evidence "largely duplicated the mitigation evidence at trial" and was "of questionable mitigating value"); *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) (finding new evidence could not show prejudice because it merely recapitulated evidence heard at trial).

prejudicial because the evidence in question may well have convinced a few more jurors to recommend a sentence other than death.[36]

Moreover, "the weight of the evidence in aggravation is not as substantial as the sentencing judge thought." *Daniel*, 822 F.3d at 1277 (citing *Porter*, 558 U.S. at 41). One of the aggravating circumstances the State presented to the jury was incorrect: Marshall was not "under a sentence of imprisonment" when he committed the murder, a fact the ACCA acknowledged in their opinion.[37] *Marshall v. State*, 182 So. 3d 573 at 607, n.9 (Ala. Crim. App. 2014). This correction "reduce[s] the ballast on the aggravating side of the scale." *Porter*, 558 U.S. at 41. Reweighing the two proper aggravating circumstances—that Marshall had a prior conviction for a violent felony and was engaged in a burglary when he committed the murder—against a

---

[36] In Alabama, a jury verdict for life without parole "must be based on a vote of a majority of the jurors," but a jury verdict for death "must be based on a vote of at least 10 jurors." Ala.Code § 13A–5–46(f). If the jury is unable to reach a verdict as to sentence, the trial court is authorized to declare a mistrial. *Id.* § 13A–5–46(g).

[37] Marshall raised this point as a separate contention of alleged ineffective assistance – counsel's "fail[ure] to correct the trial court's reliance on a critical aggravating factor," namely, that he was on probation at the time of the murder. Doc. 7 at 18. The trial court found that two aggravating factors weighed against Marshall, in addition to his (ultimately erroneous) probationary status. *Marshall,* 992 So. 2d at 779. As the ACCA found, the jury recommended death "based on the weight given to the other two aggravating circumstances: (1) the Alabama Code Section 13A–5–49(2) aggravating circumstance that Marshall had previously been convicted of a felony involving the use or threat of violence to the person on two prior occasions and (2) the Alabama Code Section 13A–5–49(4) aggravating circumstance that Marshall was engaged in the commission of a burglary at the time of the commission of the capital offense." *Marshall v. State,* 182 So. 3d 573, 594 (Ala. Crim. App. 2014). Therefore, because two other aggravating circumstances existed, the ACCA dismissal of this claim on its merits was not "contrary to, or . . . an unreasonable application of, clearly established federal law," nor was it an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

competent closing statement and testimony from his family, foster parents, children's home director, as well as from medical records and a competent mitigation specialist detailing his painful life history, this court finds that the wealth of mitigating evidence Marshall's counsel failed to find or present was both powerful and significant, creating a "substantial likelihood of a different sentence." *Cullen*, 563 U.S. at 202.

Based on both the amount and the kind of mitigation that counsel could have presented at the penalty phase, this court cannot conclude that no reasonable possibility existed that Marshall's jury would not have recommended life in prison instead of death. Accordingly, Marshall has also established the prejudice prong and is entitled to relief on this claim.

## 2.

Also, in relation to the penalty phase, Marshall contends that his counsel "improperly emphasized . . . the inculpatory evidence against [him]" in closing statements. Doc. 7 at 19. At issue is the following portion of counsel's closing:

> The only thing I can say is . . . none of us know what the future is going to bring . . . I don't know if [Marshall] may somehow someday be able to see the error of his ways and do right . . . In this situation the evidence is overwhelming. The only way I can see that you might come back with a life without parole recommendation would be just out of compassion . . . I'm sorry I didn't have anything else to say or give you.

Vol. 7, Tab 24 at 770-72.

**a.**

The Respondent contends that Marshall defaulted this claim when he failed to properly raise it under Alabama Rule of Appellate Procedure 28(a)(10).[38] Docs. 11 at 10; 12 at 28. Indeed, the ACCA dismissed this claim along with several others, on procedural grounds:

> Marshall, in raising these arguments, cites no authority supporting his claims.  It is well settled that "[i]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."' *Borden*, 60 So.3d at 943 (quoting *Butler*, 871 So. 2d at 20, quoting in turn *Dykes*, 652 So. 2d at 251). Consequently, these arguments do not satisfy Rule 28(a)(10), Ala. R.App. P., and are deemed abandoned.

*Marshall v. State,* 182 So. 3d 573, 623 (Ala. Crim. App. 2014).

Marshall counters that the ACCA "did not clearly indicate its reliance on state procedural grounds for its decision to reject [his] argument," doc. 17 at 32, and inaccurately found he insufficiently pleaded his claim under Rule 28(a)(10), *id.* at 33-34. But, as the ACCA noted, the burden is not on the court to make or flesh out arguments for the parties. Rather, "[t]o obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error

---

[38]Rule 28(a)(10) requires that an argument contain "the contentions of the appellant/ petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied upon."

occurred and that the alleged error should result in reversal." *Alonso v. State,* 228 So. 3d 1093, 1108 (Ala. Crim. App. 2016) (citations omitted). Still, courts must not liberally or gratuitously apply Rule 28(a)(10) for convenience or expedience as a way to whittle down a voluminous appeal. Instead, "waiver of an argument for failure to comply with Rule 28(a)(10) . . . has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions." *Borden*, 60 So. 3d at 944.

A review of the relevant brief indicates that Marshall relied solely upon ABA Guideline 10.11 to support his argument that "defense counsel should be an ardent advocate for their client, especially when that client faces death."  Vol. 44 at 152–53.  Marshall then cites to the allegedly prejudicial closing argument and deems it "devaluing to the client." *Id.* at 152. Marshall cites no case law or statute supporting his claim, and provided only the ABA guidelines and a vague, conclusory argument, in clear violation of Rule 28(a)(10). *See* Vol. 44, Tab 61. "[P]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable, but they are only guides." *Strickland*, 466 U.S. at 688-89. By "explicitly invoking a state procedural bar rule as a separate basis for decision," the ACCA's application of Rule 28(a)(10) to Marshall's claim presents an adequate and independent state procedural ground for dismissal. *Harris v. Reed*,

76

489 U.S. 255, 264 n.10 (1989). Accordingly, the court is unable to determine the merits of this unexhausted (and now procedurally barred) claim.[39]

### b.

Alternatively, the claim fails for two additional reasons. First, Marshall procedurally defaulted this claim by failing to raise it in his application for rehearing to the ACCA. *See generally* Vol. 45, Tab. 64. The only mention of the claim is a brief reference to counsel's allegedly prejudicial closing argument in the Statement of the Case.  A federal court cannot grant habeas relief to a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). This exhaustion requires the petitioner to "invoke[] one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). And in Alabama, this complete round involves an application for rehearing following an ACCA denial of a Rule 32 appeal, as well

---

[39] Marshall's petition contains both exhausted and nonexhausted claims. Ordinarily, "a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." *Rose v. Lundy*, 455 U.S. 509, 510 (1982).  However, "[d]ismissing a mixed petition is of little utility . . . when the claims raised for the first time at the federal level can no longer be litigated on the merits in state court because they are procedurally barred. In such a case, requiring the petitioner to return to state court only to make a futile application for relief simply delays the federal courts' adjudication of his petition." *Kelley v. Secretary for Dep't of Corrections*, 377 F.3d 1317, 1351 (11th Cir. 2004).

as a petition for certiorari to the Alabama Supreme Court. *Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001). In each step, the petitioner must present the federal claim so that "a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley*, 377 F.3d at 1344-45. Here, Marshall failed to exhaust this claim by leaving it out of his application for rehearing.

Second, while the damning remarks made by counsel arguably run afoul of the deficiency prong of *Strickland*, Marshall cannot show prejudice. Based on the case Marshall's counsel presented, the defense had little fodder for a closing statement. As lead counsel admitted in his closing, "I didn't have any witnesses to call . . . I didn't have anything else to say or give you." Vol. 7, Tab 24 at 772. In that respect, even if counsel had refrained from his more objectionable comments,[40] his closing would still have lacked any substantive references that would have made a difference. And, consequently, Marshall has not presented any specific evidence that he would have received a different sentence but for the improper closing argument. Therefore, he fails to satisfy the *Strickland* prejudice standard.

---

[40]Counsel stated to the jury, "In this situation the evidence is overwhelming. The only way I can see that you might come back with a life without parole recommendation would be just out of compassion." Vol 7, Tab 24 at 772. The court notes that in the context of counsel's deficient and prejudicial failure to develop and present mitigating evidence, counsel's statement drawing attention to the lack of evidence in his closing argument is even more egregious. Though this argument does not rise to the level of ineffective assistance on its own, when taken in combination with the counsel's other failures, it adds to the picture of a set of attorneys who "g[ave] up" on their client. *Hardwick*, 803 F.3d at 547. However, the court does not include this argument in its assessment of Marshall's successful ineffective assistance claim because it was defaulted and therefore outside this court's proper review.

**3.**

Turning next to Marshall's contentions of alleged ineffective assistance at the guilt phase claims, Marshall challenges counsel's failure to hire a forensic expert to rebut the State expert's trial testimony regarding a vaginal lesion found on the victim. Doc. 7 at 30-33. Marshall contends that the failure to offer a forensic witness precluded counsel from "conduct[ing] even a minimally effective cross-examination of the State's witness, Dr. William Shores." *Id.* at 30. Allegedly, Dr. Shores' testimony that the vaginal lesion likely occurred within 24-48 hours before the victim's death, *id.*, allowed the jury to infer that Marshall caused the lesion, *id.* at 33. The ACCA agreed with the State that counsel made a strategic choice on this issue, noting Mathis' testimony at the Rule 32 hearing that he had no reason to doubt the State's expert, did not believe the defense would benefit from delving into the victim's sexual history, and did not think hiring a forensic expert was "pertinent." *Marshall v. State*, 182 So. 3d 573, 586 (Ala. Crim. App. 2014) (citing Vol. 36 at 164-65). The court agrees.

**a.**

In his petition to this court, Marshall asserted that because the Rule 32 court refused to allow his forensic rebuttal witness, Dr. George R. Nichols, to review tissue samples from the victim or testify at the hearing, Vol. 37 at 390-92, he proffered an affidavit from Dr. Nichols, *id.* at 393. And in that affidavit, Dr. Nichols stated that

Dr. Shores could not have had "any basis for concluding that the genital lesion . . . occurred 24-48 [hours] prior to his examination" because he did not perform the microscopic histological examination required to make such an assessment. Vol. 43 at 352. Dr. Nichols further stated that, had Marshall's defense team contacted him and put him up to testify at the 2006 trial, he would have "provided testimony consistent with . . . [his] affidavit." *Id*. at 352-53.

After finding that Marshall presented facts which, if proven true, would demonstrate prejudice from his counsel's failure to hire a forensic expert, this court ordered an evidentiary hearing to allow Dr. Nichols to analyze wet tissue samples from the victim and provide testimony. *See* Doc. 23 at 8-9. At the evidentiary hearing, the court received Dr. Nichols as an expert witness in the area of clinical and forensic pathology. Doc. 45 at 9. In his testimony, Dr. Nichols elaborated on the statements in his affidavit, explained the process of a microscopic histological examination, and opined that Dr. Shores could not have determined the timing of the lesion because Dr. Shores "did an incomplete examination."[41] *Id.* at 22-23.

---

[41] Dr. Nichols explained, "Dr. Shores needed to evaluate in more detail the vaginal lesion. I'll use the word lesion, meaning anything other than normal. So he found a lesion, took photographs of the lesion, made a diagram of the lesion, said a few words about the lesion, and stopped. He didn't see if there was deeper injury to vaginal or perivaginal tissues that could be seen with further dissection. He made no attempt to retain the tissues and study it histologically to make a determination of vital reaction occurring in the tissues, meaning that the heart was beating after the injury and she was alive when it happened. He made no attempt to see if any form of inflammatory response had occurred in the damaged tissues which would occur if she had lived for about six hours or longer after the injury had occurred so you could begin to time when the

According to Dr. Nichols, his examination of the wet tissue samples provided no clarity on the timing of the lesion, doc. 45 at 22-29, that Dr. Shores could not have known from his examination whether the lesion occurred before or after the victim's death or the age of the lesion, *id.* at 31-32, and that the lesion could have resulted from mishandling of the victim's body after death, *id.* at 31.[42]

### b.

Dr. Nichols' testimony at the evidentiary hearing largely tracked his affidavit to the Rule 32 court. In light of this, the court finds that Marshall failed to present any new evidence to this court that was not before the state courts. Therefore, the court reviews the evidence with the deference required by § 2254, considering only whether any reasonable jurist could have reached the same decision as the ACCA. The answer is yes.  To begin, as to the *Strickland* deficiency prong, counsel likely made a strategic error by failing to call a forensics expert in light of counsel's opening statement in which counsel promised that the defense would prove "through

---

event happened if she was alive. And he made no attempt to see if the lesion was an artifact occurring after death."

[42]The court notes that during this line of question, Marshall's counsel referenced Petitioner's Exhibit 13, which contains a narrative written by an investigator in the original trial. The investigator stated the following regarding Dr. Shores: "He found out that no semen was found on the victim and now says he is not sure how the tear . . . happened. He says that might even have come from the body bag . . . [H]e says that he is not very familiar with trauma related to sexual assault. He would prefer we find an expert." Doc. 47-2 at 11. Marshall contends in his post-evidentiary hearing brief, doc. 46, that "no evidence was ever presented at . . . trial that the body bag could have been a possible cause of the mucosal tear." *Id.* at 6. To the extent that Marshall is attempting to raise a *Brady* claim that the State failed to divulge this potentially favorable evidence to the defense, the court finds Marshall fails to allege sufficient facts to state the claim.

a forensics examiner who does DNA testing" that Marshall had no sexual contact

with the victim. Vol. 4, Tab 8 at 252. Moreover, lead counsel admitted at the Rule

32 hearing that testimony from a forensic expert would have improved the defense's

chances to successfully introduce sexually explicit letters from the victim to her

boyfriend. Vol. 36 at 205-07. These letters were the only evidence suggesting an

alternative source of the vaginal lesion, and their exclusion meant the defense had

no credible basis to raise the argument of an alternative source or to challenge the

State's contention that Marshall sexually abused or assaulted the victim. In

discussing his decision not to hire a forensic expert, lead trial counsel further

admitted that "if [he] had it to do again, [he] would do just that, but [he] didn't do

it," commenting, "[i]t was not done. I can't give an explanation as to why . . . I may

have just missed it. I don't know." *Id.* at 166-67.

However, despite counsel's hindsight reflection and admission, a reasonable

jurist could still find that the decision not to hire a rebuttal expert was strategic, and

therefore outside the *Strickland* purview of deficiency. As the ACCA discussed:

> Mathis testified at the evidentiary hearing that, 'had [he] thought it was
> pertinent, [he] would have hired [a forensic pathologist for the trial].' (EH.
> 164–65.) Mathis's testimony indicated that he did not think that a forensic
> pathologist was necessary because he had no reason to doubt the State expert's
> conclusions regarding the timing of the vaginal tear and that he thought it was
> not in Marshall's best interest to impugn the reputation of the 15–year–old
> victim by suggesting that she was sexually active without presenting
> compelling evidence of that fact, which trial counsel did not have. (EH. 189–
> 92.) 'I did not want to be cast in the mold of somebody who comes up here
> speaking ill of a dead child,' said Mathis. (EH. 192.) Mathis testified that, with

regard to challenging the State's forensic evidence by suggesting that the victim might have had sex with her boyfriend around the time of the murder, he 'felt the negatives outweighed the positives and [he therefore] left it alone.'

*Marshall v. State*, 182 So. 3d 573, 586 (Ala. Crim. App. 2014). *Strickland* permits counsel to "make reasonable decision[s] that make[] particular investigations unnecessary." 466 U.S. at 691. And, defense attorneys have "wide latitude [when] making tactical decisions." *Id*. at 689. Here, counsel indicated that they did not pursue a rebuttal forensic expert because they believed an argument centering around the victim's sexual activity would impede their ability to advocate for Marshall. Vol. 36 at 189-92. They instead cross-examined Dr. Shores to highlight his uncertainty as to the timing of the lesion and show the lack of a direct link to Marshall. Vol. 6 at 582-95. Accordingly, the ACCA could reasonably "conclude that defense counsel could follow a strategy that did not require the use of experts." *Harrington v. Richter*, 562 U.S. 86, 106-07 (2011). Strategic decisions, even if hindsight proves them in error, do not rise to a deficiency under *Strickland*.

### c.

Alternatively, Marshall cannot demonstrate prejudice under *Strickland* for two independent reasons. To begin, the jury heard evidence that Dr. Shores' testimony regarding the source of the tear was inconclusive, and rebuttal testimony on this point would not have meaningfully changed the evidence already before the jury. The Rule 32 record demonstrates the evidence at trial showed that the forensic

report regarding the vaginal tear was inconclusive. Indeed, Dr. Shores testified at trial that his findings did not prove sexual assault, that he found no trauma to the vagina or semen therein, and that while the lesion "raise[d] the question of . . . sexual activity or sexual abuse[,] [t]hat's all it [did]." Vol 6. at 582-83. He further admitted, "I'm not an expert in that area." *Id.* at 583. And, in discussing the timing of the lesion during both direct and cross examination, Dr. Shores expressed uncertainty. *See generally id.* at 582-96.[43] Moreover, the State presented other evidence, albeit circumstantial, that Marshall sexually abused or assaulted the victim, including testimony that Marshall had spied on the victim while she showered, Vol. 8, Tab at 12, that he kept photographs of her clad in a swimsuit stored in his dresser drawer, *id.* at 10, and that the victim's body was found naked except for her socks and her jewelry, *id*. Finally, as Marshall concedes, the jury deliberated about the cause of the vaginal tear,[44] suggesting that trial counsel succeeded in creating doubt as to Dr. Shores' contention. While one reasonable jurist could find that these deliberations show the jury considered the lesion important to their decision, another could find

---

[43] Dr. Shores testified "I [d]efer to those people that are much more of an expert in that area than I am," Vol. 6 at 582, "I think it's probably less than 24 hours in age . . . I guess before the time of examination . . . Who knows, basically, how much any changes are going to be retarded by refrigeration and that type of stuff . . . It could potentially be older if it were very cold," *id.* at 589-90.

[44] Doc. 17 at 47-48 (One juror, M.J., mentioned "that when [a] male juror asked whether the vaginal tear could have been caused by masturbation, she and another female juror informed the rest of the jury that the vaginal tear could not have been caused by masturbation.").

that the jury properly viewed the State expert's testimony as inconclusive as to the source of the tear. Indeed, ultimately, the jury did not find Marshall guilty of murder while committing rape in the first degree and convicted him instead of the lesser included offense of murder. Vol. 6, Tab 14 at 735.

For all these reasons, the ACCA reasonably held that Marshall was not prejudiced by his counsel's failure to hire a rebuttal forensic expert. Therefore, this ineffective assistance claim is due to be denied.

**4.**

Marshall also alleges ineffective assistance at the guilt phase based on the failure to "seek out and produce the lease to [his] apartment." Doc. 7 at 37-38. Marshall alleges that his arrest and ultimate confession resulted from police officers unlawfully entering his home on the improper consent of his ex-wife, Tonya Bentley. *Id.* Although Bentley had moved out of the apartment two weeks prior to the search, she told law enforcement that she remained on the lease, that she still had belongings in the apartment, and that she retained a key. *Marshall v. State*, 992 So. 2d at 765-67. When Bentley's key and the landlord's key failed to open the door, the officers requested and received Bentley's permission to forcibly enter, at which point they found and detained Marshall. *Id.* Marshall contends that this entry led to his confession, and that his trial counsel acted deficiently in failing to secure the lease and suppress the confession. Doc. 7 at 37-29. The court disagrees.

Habeas relief is generally unavailable on Fourth Amendment claims, but petitioners may bring a Sixth Amendment ineffective assistance of counsel claim based on an alleged failure to adequately litigate a Fourth Amendment violation. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). The petitioner must satisfy the deficiency prong of *Strickland* and demonstrate actual prejudice by "prov[ing] that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Id.* As the ACCA noted:

> [C]laims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result. Because Marshall failed to produce the purported "new" lease, or any other evidence that it ever existed, this issue would have had no affect on the outcome of his trial. Hence, this sub-claim is denied.

*Marshall v. State*, 182 So. 3d 573, 587–88 (Ala. Crim. App. 2014).

To show that his claim has merit, Marshall would need to demonstrate the officers conducted an unlawful search. The "determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief' that the consenting party had authority over the premise?" *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). If the officer answers this question in the negative, "then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid." *Id.* (emphasis added).

86

This creates a two-part inquiry into the lawfulness of the forcible entry into Marshall's apartment: (1) did the facts before the officers create a reasonable belief that Bentley had the authority to consent and, if not, (2) did Bentley actually have the authority to consent. An affirmative answer to either question is sufficient.

No relief is warranted because reasonable jurists could differ on both of these questions.[45] To begin, there is no proof that the lease would have supported Marshall's contentions. As the ACCA held, "Marshall . . . did not produce the

--------

[45] "Common authority [to consent to search] rest[s] on mutual use of the property by persons generally having joint access or control for most purposes." *Rodriquez*, 497 U.S. at 181. In *Rodriguez*, the consenting party lacked common authority because she "had moved out . . . almost a month before the search at issue [and] took her and her children's clothing with her, though leaving behind some furniture and household effects . . . [S]he sometimes spent the night at [the] apartment, but never invited her friends there, and never went there herself when [the resident] was not there. Her name was not on the lease nor did she contribute to the rent. She had a key to the apartment." *Id.* The search in *Rodriguez* bears substantial similarities to the search of Marshall's apartment. Bentley had moved out of the apartment two weeks prior to the search, taking her children and many of her belongings with her. *Marshall*, 992 So.2d at 765-67. She represented to the officers that she was on the lease, but the officers did not independently verify this claim. *Id.* Though she had a key to the apartment, her key did not work when she arrived. *Id.* Assuming her name was not on the lease, based on *Rodriguez*, Bentley may not have had actual authority to consent to search. However, courts differ on whether these facts would present apparent authority to consent to search such that an officer would reasonably believe the search was lawful. *Compare Koch v. Town of Brattleboro, Vermont*, 287 F.3d 167, 167 n.4 (2d Cir. 2002) (finding no apparent authority in a case with facts similar to *Rodriguez* but where officers knew the consenting party did not live at the residence); *United States v. Clay*, 630 F. App'x 377, 383 (6th Cir. 2015) ("Factors we consider in determining whether a girlfriend had apparent authority include whether she had a key . . . whether she provided a detailed description of the premises . . . whether her name was on the lease . . . whether the police independently knew that she lived with the defendant . . . [even when] the defendant changed the locks on the exterior doors of the searched house [or] had expressly asked the police to bar the consenting girlfriend from the searched house") (citations and quotation marks omitted); *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir.1988) (estranged wife had authority to consent to a search of her former husband's apartment two weeks after she moved out, where she still had a key and collected personal belongings during the search).

alleged lease purporting to remove Tonya as a tenant of the property—or any other evidence demonstrating that Tonya was not longer a tenant on the lease[,]" and, consequently, "Marshall failed to show that had his trial counsel obtained the lease it would have, in fact, established that Tonya was no longer listed as a tenant on the lease." *Marshall v. State*, 182 So. 3d at 587. Moreover, even with the lease or evidence of it, suppression of the confession is not automatic. Generally, "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor v. Alabama*, 457 U.S. 687, 690 (1982). Stated differently, suppression of Marshall's confession as "fruit of the poisonous tree . . . [would] depend[] on whether the subsequent evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Cordova*, 829 F. Supp. 2d 1342, 1348–49 (N.D. Ga. 2011) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).  Courts examine a variety of factors to assess whether evidence is obtained by exploitation, including *Miranda* warnings, "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* Finally, "[i]n determining whether there is a nexus between the

evidence in question and the police conduct, [the] inquiry is essentially a common sense evaluation of the facts and circumstances of the particular case." *United States v. Kapperman,* 764 F.2d 786, 793 (11th Cir. 1985).

Here again, Marshall would necessarily fail to establish prejudice because he cannot show that suppressing the search would necessarily have excluded the introduction of his confession. As the ACCA noted:

> Here, if we were to consider Marshall to have been arrested from the time police entered his apartment and handcuffed him on the evening of December 28, 2004, then his confession was given some 30 hours later—the night of December 29 or the earliest morning hours of December 30. Several crucial intervening circumstances took place in that time. Marshall was advised of his Miranda rights before leaving the apartment. He spoke with Detective O'Connor at O'Connor's office after once again being advised of his rights and executing a waiver of those rights. It was undisputed that O'Connor offered to drive Marshall back to his apartment. Detective O'Connor also gave Marshall the option of staying at the Vestavia City Hall that night, because the doors to Marshall's apartment had been broken when the police entered the apartment. Police continued an independent investigation into Alicia's disappearance and discovered her clothing, her purse and the comforter from her bed, which had been discarded near Marshall's apartment. From the evidence, police were able to obtain a kidnapping warrant for Marshall's arrest the morning of December 29. When FBI agents questioned Marshall, they, too, advised him of his rights and had him sign an acknowledgment that he understood those rights. All of these facts, taken together, provide sufficient intervening circumstances that would have broken the causal connection between the allegedly illegal arrest and Marshall's confession.

*Marshall v. State*, 992 So. 2d 762, 769–70 (Ala. Crim. App. 2007).

Put simply, Marshall cannot establish the merits of his Fourth Amendment claim or satisfy the prejudice prong of *Strickland.* The ACCA reasonably applied the law on this matter, and Marshall's claim is due to be dismissed.

To close, the alleged ineffective assistance claims are due to be denied except for the claim related to the failure to present available mitigation evidence at the penalty phase.

### B.

Marshall contends in Claim B that four alleged instances of juror misconduct compromised his right to a fair trial, citing to three jurors' alleged dishonesty during voir dire and that some jurors introduced extraneous information to the deliberations. Doc. 7 at 39-51. No relief is warranted based on these contentions.

### 1.

As it relates to juror dishonesty during voir dire, "to obtain a new trial . . . a party must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). The first prong requires a determination of whether the juror answered honestly or was aware of the falsity of his or her answers. *Id.* The second prong asks whether a correct response would provide a valid basis for a cause challenge and a showing of actual bias because of the juror's nondisclosure. *United*

*States v. Burke*, 724 F. App'x 837, 839 (11th Cir. 2018). "Bias may be shown either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *Id.* (citing *United States v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001). In determining whether a defendant was prejudiced, Alabama courts have looked at the following factors: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." *Ex parte Dobyne,* 805 So. 2d 763, 772 (Ala. 2001).

### a.

Marshall contends that Juror M.J. failed to truthfully answer a question about being a victim of violence and that, if she had, his counsel would have struck her for cause. Doc. 7 at 42-44.[46] The ACCA rejected this claim based on the ambiguity of the question and M.J.'s honest belief that it did not apply to her situation:

> Juror M.J. testified that she remembered being asked the above-listed questions and that she did not respond to them. With regard to the question about being the victim of a crime, juror M.J. explained that when she "thought of a crime[, she] thought of being burglarized, or having something stolen from [her] car. [She] just didn't equate the

---

[46] Marshall alleges M.J. deliberately failed to answer the following questions: "Do any of the you have a bias or prejudice that would influence your verdict . . . in any way? . . . Do you have any reason why you could not give both the State of Alabama and the defendant . . . a fair and impartial trial? . . . If anyone has been the victim of a violent crime . . . Anyone a victim? . . . Is there anybody here who feels like for whatever reason . . . you won't be able to render a fair and impartial verdict in this case? You won't be able to sit as a fair and impartial juror? . . . Do you feel you might require less proof than a case which did not involve violence?"

term 'crime' with the domestic situation." (R2. 30–31.) Juror M.J. further stated that she believed that the "closest" thing to a crime involving her first husband was when she believed that he had discharged a firearm after an altercation with her. Juror M.J. explained that she did not answer the question because she did not believe that her first husband had committed a crime. Juror M.J. further explained that if an attorney had asked "if [she] had been in an abusive relationship, [she] certainly would have said yes." (R2. 33.)

On cross-examination, juror M.J. testified that she did not have any bias against Marshall and that she had made her decision based on the facts and the evidence that she heard at trial.

Although juror M.J. failed to respond to the above-listed questions, the matter inquired about during voir dire—i.e., whether juror M.J. was a victim of a crime—occurred approximately 35 years before Marshall's trial; juror M.J. did not consider what happened to her to, in fact, be a crime; and juror M.J. stated that had she been asked whether she had been subject to spousal abuse she would have responded to the question. In other words, the matter inquired about was remote, the question propounded was, in juror M.J.'s mind, ambiguous, and juror M.J. did not willfully fail to answer the question.

*Marshall v. State,* 182 So. 3d at 610–11.

Marshall argues that the ACCA should have inferred that M.J. deliberately chose not to disclose the matter for two reasons: (1) her admission at the Rule 32 hearing that she recalled the abuse she had experienced often during Marshall's trial and (2) that M.J. was present when another member of the panel stated she was a victim of crime due to her experience with spousal abuse. Doc. 7 at 42-44. While a reasonable jurist could have found that M.J. deliberately declined to disclose her status as a victim of crime, and further that this disclosure would have likely resulted in her exclusion for cause, *see McDonough*, 464 U.S. at 554, Marshall's evidence and proposed inferences are not so persuasive that no reasonable jurist could have

92

found otherwise. The *McDonough* bar is high and not easily met by a mere failure to answer voir dire questions. *See, e.g. United States v. Perkins*, 748 F.2d 1519, 1532-33 (11th Cir. 1984). The ACCA considered the temporal remoteness of M.J.'s victimhood and her own attestations of her unbiased approach to the case to find that Marshall did not pass the first bar of proving dishonesty, thereby properly applying the *Dobyne* factors. Accordingly, because fairminded jurists can disagree on this issue, Marshall cannot succeed on this claim.

**b.**

Marshall contends that Juror T.C. failed to disclose his involvement in a program supporting and fostering sexually abused children. Doc. 7 at 42.[47] Marshall argues that his counsel would have "certainly" stricken T.C. for cause if T.C. had disclosed this information. *Id*. at 48. In contrast to Marshall's description, the Rule 32 court offered a more nuanced version of T.C.'s involvement with the program:

> Juror T.C. testified that he recalled being asked the above-listed questions, that he understood the questions, that the questions were not ambiguous, and that he did not respond to the questions because, he said, he "didn't see any connection with those questions . . . and [his] experience with the foster care program." (Vol. 36 at 73.) . . . On cross-examination, juror T.C. testified that he based his decision in both the guilt phase and penalty

---

[47] The questions Marshall alleges T.C. deliberately declined to answer were: "Do any of the you have a bias or prejudice that would influence your verdict . . . in any way? . . . Do you have any reason why you could not give both the State of Alabama and the defendant . . . a fair and impartial trial? . . . Is there anybody here who feels like for whatever reason . . . you won't be able to render a fair and impartial verdict in this case? You won't be able to sit as a fair and impartial juror?"

> phase of trial on the evidence presented and the instructions
> given by the trial court. Juror T.C. also testified that he did not
> have any bias against Marshall; specifically, juror T.C. stated that
> he "did not know Mr. Marshall before this, or did not have
> anything against him." [Vol. 36 at 85.] Although juror T.C. failed
> to respond to the question inquiring about whether potential
> jurors had children, at the time of trial juror T.C. had no children
> living in his home. That question, therefore, did not apply to him,
> and he did not engage in misconduct when he did not respond.
> Additionally, with regard to the questions asked about general
> bias, juror T.C. testified that he did not believe that his
> participation in foster-care classes had any connection with the
> above-listed questions. Thus, juror T.C. did not willfully fail to
> answer the above-listed questions.

*Marshall v. State,* 182 So. 3d at 612.

No relief is warranted on this claim. The voir dire questions at issue did not

directly relate to T.C.'s work with foster children. The questions asked him instead

to make a subjective assessment about whether he could be fair and unbiased. *See*

doc. 7 at 42. The ACCA reasonably found that T.C. was not dishonest in failing to

respond to the questions, and simply believed instead that his experience was not

relevant to the questions. Moreover, even if Marshall could demonstrate T.C.

engaged in misconduct, the ACCA reasonably found that T.C.'s foster work

experience did not prejudice the verdict. T.C. testified at the Rule 32 hearing that he

based his decision "on the evidence that was presented in court," Vol. 36 at 84,  and

that he "followed the evidence of what was being presented here … where it was

found that [Marshall] had admitted, you know, the death, and you know, had taken

the sheriffs or the authorities to Shelby County where the body was found," *id.* at

84-85. There is nothing in the record to dispute this testimony. Accordingly, the ACCA acted reasonably in denying Marshall's claim that T.C. engaged in prejudicial juror misconduct.

c.

Marshall challenges next Juror W.P.'s failure to disclose that he was legally blind. Doc. 7 at 46-47. W.P. wears strong magnifying glasses and is unable to drive because he cannot see red lights or stop signs with his glasses.  Vol. 36 at 90-95. And, at the time of the trial, W.P. routinely used a round magnifying glass to read items at hands length. *Id.* at 97. During voir dire, counsel asked the panel if any of them had personal or other reasons that might cause them not to render a fair and impartial verdict. Doc. 7 at 42. W.P. did not volunteer his visual impairments in response, and during the trial, W.P. sat the furthest from the witness box and could not see the witnesses, facial expressions, or the evidence presented. Vol. 36 at 97. W.P. also did not use his magnifying glass to review exhibits because he was embarrassed, opting to use his glasses alone. *Id.*

To support his contention that W.P. deliberately chose to hide his vision impairments, Marshall argues another member of the panel disclosed a hearing issue in response to a question about reasons to doubt his qualifications as a juror. Doc. 7 at 46. Marshall asks the court to infer that this juxtaposition with a similarly situated juror shows that W.P. deliberately chose to stay silent. But, again, the questions

Marshall claims W.P. evaded were vague in their connection to W.P.'s vision problems. *See* doc. 7 at 42. Counsel asked the panel whether they had any reasons they believed would compromise their ability to be fair and impartial or if they had any personal circumstances that caused them to not want to serve as a juror. *Id.* At Marshall's Rule 32 hearing, W.P. stated that he did not view his vision problems as a "big problem." Vol. 45, Tab 65 at 37-38. When asked if he would have responded affirmatively to a question specifically asking the panel whether they "ha[d] a physical disability or infirmity which would affect [their] review of the evidence," W.P. responded that he believed he would have "spoken up about [his] vision." Vol. 36 at 104. Based on these responses, the ACCA found that W.P.'s failure to respond was not "willful," and that he "simply believed that he could serve as a juror." Vol. 45, Tab 65 at 50. The record supports the ACCA's finding.

But even assuming W.P. acted dishonesty, "not every failure to respond properly to questions on voir dire automatically entitles the defendant to a new trial . . . [Rather,] the proper standard to apply in determining whether a party is entitled to a new trial . . . is whether the defendant might have been prejudiced." Vol. 45, Tab 65 at 46 (citations and quotation marks omitted). Marshall must demonstrate "proof of actual bias" which "may be shown either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *United States v. Burke,* 724 F. App'x 837, 839 (11th Cir.

2018) (citing *Bank Atlantic v. Blythe Eastman Paine Webber, Inc*., 955 F.2d 1467, 1473 (11th Cir. 1992)). Ultimately, district courts are not obligated to investigate allegations of juror misconduct absent "clear, strong, substantial and incontrovertible evidence" that the jury committed an impropriety that might undermine the verdict. *United States v. Cuthel,* 903 F.2d 1381, 1383 (11th Cir. 1990) (internal quotation marks omitted).

The record belies contention that W.P.'s "physical impairment . . . impeded his ability to evaluate the evidence." Doc. 17 at 45. To begin, W.P. claimed that he made his decision in both the guilt and penalty phases of the trial based "on the facts and the evidence and the law that the judge explained," that his vision problems did not "cause him to be biased against [Marshall] in any way," and that "[t]he guilty part was not in question . . .  the sentencing was what [he] was concerned about." Vol. 36 at 107. And W.P. testified that he "voted to give [Marshall] life," *id.*, meaning he was the sole juror who voted to spare Marshall's life, and Marshall offered nothing to rebut this testimony. Moreover, even if W.P. had disclosed his vision impairment, Marshall's trial counsel would not have removed W.P. from the jury. "Marshall's trial counsel testified that if he knew a potential juror had a vision problem he 'would leave them on' the jury because, he said, 'most of the evidence is going to be coming from the State. Hell, if the juror can't see it, he can't use it against [Marshall]. Leave them on there. I'd like for them to be deaf, too.'" *Marshall*

*v. State,* 182 So. 3d at 613 (quoting Vol. 36 at 187). Put simply, Marshall cannot demonstrate that W.P. intentionally failed to disclose his disability, that the failure caused prejudice, or would have resulted in a cause challenge.

To close, Marshall's alleged juror misconduct claim related to the voir dire fails. The ACCA accurately applied the law and found a reasonable basis for denying Marshall's claims: (1) counsel did not directly ask M.J. a question to elicit her experience with domestic violence; (2) counsel would have kept W.P. on the jury despite his vision disability; and (3) T.C. did not find his experience with Alabama foster care programs relevant to his ability to view the evidence impartially. Moreover, "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." *Greenwood,* 464 U.S. at 555. Therefore, relief is denied on these issues.

## 2.

Marshall's final claim related to the jury is based on his contention that the jury relied on extraneous information in their deliberations. Doc. 7 at 50. In particular, Marshall cites to M.J.'s contention that she and another female juror

explained to a male juror that, based on their own life experiences, masturbation could not have caused the vaginal tear found on the victim. *Id.*[48]

Though "[p]ost-verdict inquiries into the existence of impermissible extraneous influences on a jury's deliberations are allowed under appropriate circumstances, . . . inquiries that seek to probe mental processes of jurors are impermissible." *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1051 (11th Cir.), *cert. denied,* 484 U.S. 969 (1987) (citations omitted). Consequently, courts are required to "disregard the portions of the affidavits dealing with forbidden testimony under Federal Rule of Evidence 606(b)."[49] *United States v. Siegelman,* 467 F. Supp. 2d 1253, 1272 (M.D. Ala. 2006). Relevant here, the Rule 32 court noted that

---

[48] The Rule 32 court did not allow M.J. to testify about the deliberations, Marshall contends M.J. would have testified "(i) an elderly male juror asked whether the vaginal tear could have been caused by masturbation; (ii) M.J. and another female juror replied that the vaginal tear could not have been caused by masturbation; and (iii) M.J.'s response that the vaginal tear could not have been caused by masturbation was based on her general life experiences." Vol. 36 at 39, 333–34.

[49] Rule 606(b) states that:

(a) At the Trial. A juror may not testify as a witness before the other jurors at the trial. If a juror is called to testify, the court must give a party an opportunity to object outside the jury's presence.

(b) During an Inquiry into the Validity of a Verdict or Indictment.

(1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form.

Alabama courts have found that jurors relied on extraneous information only in a

limited number of cases, citing a

> distinction, under Alabama law, between "extraneous facts," the
> consideration of which by a jury or jurors may be sufficient to impeach
> a verdict, and the "debates and discussions of the jury," which are
> protected from inquiry. This Court's cases provide examples of
> extraneous facts. This Court has determined that it is impermissible for
> jurors to define terms, particularly legal terms, by using a dictionary or
> encyclopedia. *See Fulton v. Callahan*, 621 So. 2d 1235 (Ala.1993);
> *Pearson v. Fomby*, 688 So. 2d 239 (Ala.1997). Another example of
> juror misconduct leading to the introduction of extraneous facts
> sufficient to impeach a jury verdict is an unauthorized visit by jurors to
> the scene of an automobile accident, *Whitten v. Allstate Ins. Co.*, 447
> So. 2d 655 (Ala.1984), or to the scene of a crime, *Dawson v. State*, 710
> So. 2d 472 (Ala.1997).
>
> The problem characteristic in each of these cases is the extraneous
> nature of the fact introduced to or considered by the jury. The improper
> matter someone argues the jury considered must have been obtained by
> the jury or introduced to it by some process outside the scope of the
> trial. Otherwise, matters that the jurors bring up in their deliberations
> are simply not improper under Alabama law, because the law protects
> debates and discussions of jurors and statements they make while
> deliberating their decision. *CSX Transp. v. Dansby*, 659 So. 2d 35
> (Ala.1995). This Court has also noted that the debates and discussions
> of the jury . . . are not extraneous facts that would provide an exception
> to the general rule of exclusion of juror affidavits to impeach the
> verdict. *Weekley v. Horn*, 263 Ala. 364, 82 So. 2d 341 (1955) . . . [I]n
> order for information to come within the extraneous-information
> exception to Rule 606(b), the information must come to the jurors from
> some external authority or through some process outside the scope of
> the trial, either (1) during the trial or the jury's deliberations or (2)
> before the trial but for the purpose of influencing the particular trial . .
> . personal experience[] . . . is not extraneous information under the
> exception to Rule 606(b).

*Marshall v. State*, 182 So. 3d 573, 617-18 (Ala. Crim. App. 2014). The ACCA

reasonably found that M.J.'s statements reflect the debate and discussions of the

jurors for deliberation rather than extraneous information not presented in the trial. And, the court did not err in excluding the testimony and rejecting the contention of juror misconduct. *Id.* at 615–16.[50]

### C.

Marshall alleges in Claim C that Alabama's lethal injection protocol "creates a demonstrated risk of severe pain [that is] constitutionally unacceptable [and] excessive and substantial when compared to known and available alternative methods of execution." Doc. 7 at 50-51. The Respondent contends that Marshall failed to exhaust this claim because he first raised it in his 2014 petition for certiorari. Docs. 11 at 23; 12 at 41-42. Marshall replies that the claim is not defaulted because the lethal injection protocol changed in September 2014, and his claim "did not accrue until after [his] Rule 32 hearing and the proceedings in the Court of Criminal Appeals . . ." Doc. 17 at 49. But Marshall provides no further explanation for his contention, and it is unclear to the court which procedural default exception he is

---

[50] At the Rule 32 evidentiary hearing, the court engaged in the following discussion with Marshall's counsel:

 [The Court]: I don't see that as extraneous in the sense of somebody going out and looking in a medical book and bringing it back.

[Marshall's Rule 32 Counsel]: Or calling your doctor friend.

[The Court]: Exactly. If you had testimony of that, that's different . . . You know, I tried 20 years worth of sexual assault cases as a prosecutor and talked to jurors after the fact, and those kind of things do come up. I disagree with you and I will sustain your objection.

Vol. 45, Tab 65 at 52.

invoking. *See Edwards*, 529 U.S. at 455. In light of Marshall's failure to adequately argue his procedural default position, this court finds he failed to exhaust this claim.

Alternatively, this claim fails on the merits. "Federal habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release," *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1267 (11th Cir. 2011). When a death row inmate challenges a state's execution protocol, he attacks "the means by which the state intends to execute him, which is a circumstance of his confinement." *McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013) (citing *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006)). "Issues sounding in habeas are mutually exclusive from those sounding in a § 1983 action." *Id.* Therefore, "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." *Id.* (citing *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009)). Because Claim C "does not attack the validity of [his] conviction or death sentence," *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015), it is due to be denied.

### D.

Marshall asserts in Claim D that Alabama's lethal injection protocol is unconstitutional because "his sentence to die is based on an advisory jury verdict that was not unanimous." Doc. 7 at 51. As Marshall puts it, allowing a death sentence

102

based on a non-unanimous jury recommendation violates his Sixth Amendment right to a trial by jury. *Id.* at 52. In support of his proposition, Marshall cites *Ring v. Arizona*, 536 U.S. 584, 588-89 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). However, Marshall fails to provide any analysis as to how these cases support his position. *Id.* at 51. Instead, Marshall only quotes Justice Scalia's concurrence in *Ring* bemoaning the decline of the right of trial by jury and the practice of "*a judge* [finding] that an aggravating factor existed." *Id.* at 52 (citing *Ring*, 536 U.S. at 612) (emphasis in original). The concurrence is not helpful.

### 1.

Marshall raised this issue for the first time in his Rule 32 proceedings,[51] doc. 13, Vol. 10, Tab 41 at 133-34; Vol. 44, Tab 61 at 145-47, citing *Ring* and *Apprendi* to argue that because the jury's recommendation of death was not unanimous and because "it is impossible to determine whether the jury found [any aggravating circumstance] beyond a reasonable doubt," doc. 13, Vol. 10, Tab 41 at 133, the "procedural safeguards were absent [and] Marshall's death sentence violat[ed] the

---

[51] On direct appeal, Marshall did not address the constitutionality of the State's capital sentence structure in his brief to the ACCA. Doc. 13, Vol. 8, Tab 29 at 2-50. Instead, his first attack with any relation to the sentencing scheme arises in his petition for certiorari to the Alabama Supreme Court, in which he challenges the then-extant judicial override provision: "the statutory scheme for capital murder prosecutions in Alabama provides for judicial override of the verdict of a trial jury [which] adversely affected the jury's role in the sentencing process and . . . denied [Marshall's] constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments." Doc. 13, Vol. 9, Tab 34 at 13-14. The Court denied Marshall's petition and did not reach the merits of his arguments. Doc. 13, Vol. 9, Tab 35 at 66.

Fifth, Sixth, Eighth, and Fourteenth Amendments," *id*. at 134. While declining to address specifically the merits of the unanimity argument, the ACCA denied Marshall's broader claim that Alabama's capital sentencing scheme violated the United States Constitution. Doc. 13, Vol. 45, Tab 65 at 40 (citing *Ex parte Waldrop*, 859 So. 2d 1181, 1190 (Ala. 2002) ("*Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.")). The court held that the Rule 32 trial court properly dismissed Marshall's claim because "Marshall could have, but did not, challenge the constitutionality of Alabama's capital sentencing scheme on [direct] appeal." Doc. 13, Vol. 45, Tab 65 at 40. Indeed, because Marshall failed to raise his claim in his direct appeal, the ACCA reasonably found that it is preempted, and it is due to be denied.

### 2.

Alternatively, the claim fails on the merits. The holdings in *Apprendi* and *Ring* are more limiting than Marshall contends. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. And *Ring* applied *Apprendi* to the death penalty context, holding that because aggravating circumstances are used to justify increasing a defendant's maximum punishment from life imprisonment without parole to death, these circumstances are "the functional equivalent of an

element of a greater offense," and must be found by a jury rather than a judge. *Ring*, 536 U.S. at 609. Thereafter, the Court applied *Ring* to find Florida's capital sentencing scheme violated the Sixth Amendment right to an impartial jury by "requir[ing] the judge alone to find the existence of an aggravating circumstance." *Hurst v. Florida*, 136 S. Ct. 616, 624 (2016).[52]

Alabama's capital sentencing scheme at the time of Marshall's direct appeal mirrored Florida's pre-*Hurst* scheme: the sentencing phase required the jury to "hear the evidence and arguments of both parties, deliberate, and return an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating

---

[52] Under Florida's pre-*Hurst* capital sentencing scheme, the sentencing judge held an evidentiary hearing, after which the jury would propose by majority vote an "advisory sentence" without divulging the factual basis for their recommendation. 136 S. Ct. at 620 (citations and quotation marks omitted). The sentencing judge would then independently weigh the aggravating and mitigating circumstances and impose a sentence "notwithstanding the recommendation of the jury." *Id.* (citations and quotation marks omitted). Though the scheme required that the judge give "great weight" to the jury's recommendation, the sentence was "the trial judge's independent judgment." *Id.* (citations and quotation marks omitted). The Supreme Court held that the Sixth Amendment right to an impartial jury requires that a "death sentence [be based] on a jury's verdict, not a judge's factfinding" and that by allowing "the judge alone to find the existence of an aggravating circumstance," the Florida scheme was unconstitutional. *Id.* at 624.

Because the Supreme Court decided *Hurst* after Marshall's conviction became final on direct appeal, the court considers *Hurst* "only to the extent it reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x 900, 923 n.6 (11th Cir. 2017).

circumstances)." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x at 922 (citing the pre-2017 version of Ala. Code § 13A-5-46(e)).[53] The trial judge would then "independently determine the appropriate sentence." *Id.* (citing the pre-2017 § 13A-5-47(e)). The trial court could impose the death sentence "notwithstanding a contrary jury recommendation" so long as "the court found that at least one aggravating circumstance existed, and that they outweighed any mitigating circumstances." *Id.* (citing the pre-2017 § 13A-5-47(e)).

A death sentence in Alabama required that "at least one aggravating circumstance as defined in 13A-5-49 [must] exist[]."[54] Ala. Code § 13A-5-45(f). When a defendant is convicted of a capital offense for which one of the enumerated aggravating circumstances is an element, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the

---

[53] Alabama amended its capital sentencing scheme in 2017, *see* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017), making the jury's sentencing recommendation binding on the court. *See* Ala. Code § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

[54] These aggravating circumstances include the two capital offenses of which Marshall was convicted:

(1) The capital offense was committed by a person under sentence of imprisonment.

(2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person . . .

(4) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping.

Ala. Code § 13A-5-49.

sentencing hearing." Ala. Code § 13A-5-45(e); *see Ex Parte McNabb*, 887 So. 2d 998, 1006 (Ala. 2004) (holding that even a nonunanimous recommendation of death proved the jury had unanimously found an aggravating factor, and this finding "is sufficient to satisfy *Ring*."). And, "[t]he decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors." Ala. Code § 13A-5-46(f).

Marshall contends that *Ring* and *Apprendi* required a unanimous recommendation of death by a jury. Doc. 7 at 51. The ACCA disagreed and denied Marshall's broader contention that Alabama's capital sentencing scheme violated the United States Constitution. Doc. 13, Vol. 45, Tab 65 at 40 (citing *Ex parte Waldrop*, 859 So. 2d 1181, 1190 (Ala. 2002) ("*Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.")).[55] This conclusion is not "so unreasonable that no 'fairminded jurist' could agree with the conclusion." *Waldrop*, 711 F. App'x at 923 (citing

_____

[55] Alabama courts have upheld the Alabama scheme after *Hurst. See Ex Parte Bohannon*, 222 So. 3d 525, 533 (Ala. 2016) ("Our reading of *Apprendi*, *Ring*, and *Hurst* leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment."); *see also Creque v. State*, 272 So. 3d 659, 730 (Ala. Crim. App. 2018) (rejecting a defendant's constitutional challenge to Alabama's allowance of juries to recommend death based on a non-unanimous verdict); *Gobble v. State*, 104 So. 3d 920, 977 (Ala. Crim. App. 2010) ("*Ring* does not require a unanimous recommendation for the death penalty before a defendant may be sentenced to death"). And, in *Waldrop*, the Eleventh Circuit indicated the Alabama Supreme Court's holding was consistent with *Hurst* because the jury, not the judge, found the aggravating circumstance. *Waldrop*, 711 F. App'x at 924 ("the Sixth Amendment does not allow the trial court to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty") (citations and quotation marks omitted).

*Harrington v. Richter*, 562 U.S. 86, 101 (2011)). In fact, the same concurrence from Justice Scalia that Marshall cites supports the ACCA's holding: "the jury must find . . . that an aggravating factor existed. Those [s]tates that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase." *Ring*, 536 U.S. at 612-13. And "[n]othing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict." *Lee v. Comm'r, Alabama Dept. of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013).

Marshall's jury unanimously found him guilty of two capital offenses, murder while committing burglary in the first degree and murder while committing sexual abuse in the second degree, during the guilt-phase of the trial. Doc. 13, Vol. 6, Tab 15 at 734-36. Both of these offenses contain an aggravating circumstance as defined by Alabama Code § 13A-5-49.[56] Therefore, Marshall's jury unanimously found the facts that made him death-eligible beyond a reasonable doubt. At the conclusion of the sentencing hearing, eleven members of the jury recommended death and one recommended life imprisonment without the possibility of parole. Doc. 13, Vol. 7, Tab 23 at 799. The ACCA's rejection of Marshall's *Ring* and *Apprendi* claims was

--------

[56] *See* n. 54 *supra*.

not an unreasonable application of either case. Thus, Marshall is not entitled to relief on Claim D.

## E.

Marshall asserts in Claim E that Alabama's lethal injection protocol is unconstitutional because "the death penalty itself is cruel and unusual punishment," based on its purported "serious unreliability, . . . arbitrariness . . ., and . . . unconscionably long delays[.]" Doc. 7 at 52-53 (citations omitted). But, the Supreme Court has held that "capital punishment is constitutional." *Baze v. Rees*, 553 U.S. 35, 47 (2008) (citing *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.")). Therefore, Claim E is due to be denied.

## F.

Finally, Marshall asserts in Claim F that the prosecution violated his Due Process rights under the Fourteenth Amendment by withholding favorable material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Allegedly, the State withheld DNA testing from the victim and failed to disclose that fur-lined handcuffs were found in Marshall's nightstand before trial. Doc. 7 at 53-54. Marshall reasons that "none of [the victim's DNA] evidence could be linked to Marshall or the State

would have talked about it at trial." *Id.* He further states that had his counsel known about the fur-lined handcuffs before trial, they could have developed an alternative narrative to explain why Marshall had the cuffs in his possession.[57]

### 1.

Before turning to the merits of these claims, the court considers whether Marshall properly exhausted and presented these claims on direct appeal. The ACCA found that the Rule 32 court properly deemed the *Brady* claims abandoned under Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. Vol. 46, Tab 45 at 57-58. Indeed, Marshall did not raise *Brady* claims in his direct appeal. *See* Vol. 8, Tab 29, 31, 32; Vol. 9, Tab 34. And, in his First Amended Rule 32 Petition and his "Amendment"[58] to that petition, while Marshall outlines the legal framework applicable to a *Brady* claim and alleges some related facts in his case, he failed to apply the law to the facts to support his contention of a *Brady* violation. *See* Vol. 10, Tab 42 at 197-99; Vol. 12, Tab 47 at 577-79. Moreover, a review of Marshall's appeal of the denial of his Rule 32 petition indicates that, like in his petition to this

---

[57] Marshall claims his trial counsel would have argued Marshall had confiscated the cuffs from the victim by linking the cuffs to a letter found in Marshall's wallet from the victim to her boyfriend in which she "refers to handcuffing her boyfriend." Doc. 7 at 54

[58] Marshall filed his original Rule 32 petition on April 23, 2009 and his First Amended Rule 32 Petition on July 10, 2009. Vol. 14, Tab 56 at 982-83. The circuit court summarily dismissed several claims in Marshall's First Amended Petition and granted him leave to amend. *Id.* Marshall filed an "Amendment" to his First Amended Petition on October 2, 2009. *Id.* The circuit court and ACCA considered this "Amendment" in conjunction with Marshall's First Amended Petition. *See generally id.*; Vol. 45, Tab 65.

court, he only cited to *Brady* in the argument heading but offered no explanation of how the State purportedly withheld DNA testing of samples taken from the victim's body, results from the rape kit, and fur lined handcuffs found in Marshall's nightstand. Vol. 44, Tab 61, 153-54. "In order to satisfy Rule 28(a)(10) as to that particular issue, [Marshall] was obliged to include in his appellate brief an adequate recitation of facts relied on, citations to relevant legal authorities, and an analysis of why those authorities support an argument of reversible error." *Taylor v. Dunn,* 2018 WL 575670, at *17 (S.D. Ala. Jan. 25, 2018). Merely citing to *Brady* is not the same thing as providing analysis as to why *Brady* supports his argument. Therefore, in light of Marshall's failure to explain in his Rule 32 brief how those items were both exculpatory and material, the issue is not properly before this court for review.

## 2.

Alternatively, Marshall has failed to establish a *Brady* violation. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To satisfy the materiality prong, Marshall must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1334 (11th Cir. 2012) (citations and quotation marks omitted).

Assuming *arguendo* that the State indeed suppressed evidence about the DNA samples and handcuffs, Marshall has failed to demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). Marshall must show that "in light of *all of the evidence*, including items untainted by the *Brady* violation, it is reasonably possible that the jury would entertain a reasonable doubt regarding [Marshall's] guilt." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1310 (11th Cir. 2005) (citations and quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 1316.

Considering the DNA samples and the fur handcuffs individually, and then collectively,[59] the court does not find that the absence of the items prohibited Marshall from receiving a fair trial or a verdict worthy of confidence. Marshall presents only conjecture—that the State suppressed the evidence, that his counsel did not know it existed,[60] that counsel could have used the evidence favorably had

---

[59] *See Maharaj*, 432 F.3d at 1310 (stating that the district court "should consider each *Brady* item individually, and only then making a determination about the cumulative impact.").

[60] Conjecture obviously does not establish that trial counsel did not know about this evidence. Marshall has also failed to demonstrate that trial counsel was negligent in seeking this evidence or was unaware of their existence. *See generally* doc. 7. And, "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the

they known about it, and that these favorable arguments would have significantly altered the case. *See* doc. 7 at 53-54; doc. 17 at 58. But the only indication Marshall provides that the handcuffs were favorable to him is a claim that his counsel could have prepared an alternative theory explaining their presence. Doc. 7 at 53. And Marshall's only argument regarding the purported favorability of the DNA evidence is an inference that if the State could have linked it to Marshall, they would have. *Id*. These contentions are insufficient.

Finally, Marshall offers nothing to prove prejudice. Docs. 7 at 53-54; 17 at 58. In fact, based on the other evidence, whatever arguments Marshall's counsel made regarding the handcuffs and the DNA would not rise to a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The State offered significant evidence of Marshall's guilt—he confessed to the murder; he led investigators to the body; the victim's stolen belongings were found outside of his home and near his workplace; and witnesses testified about his absence at work and his presence near his ex-wife's home on the day of the murder. Vol. 45, Tab 65 at 23-24. At most, the allegedly suppressed evidence would have provided counsel a couple more arguments to distance Marshall from the murder,

---

alleged *Brady* material, there is no suppression by the government." *United States v. Griggs,* 713 F.2d 672, 674 (11th Cir.1983).

but it could not rise to the level of changing the guilty verdict. Therefore, because Marshall provides nothing more than a mere citation and a conjecture to support his *Brady* claims, Claim E is due to be denied as well.

## IV.

For all these reasons, and after careful review, the court grants Marshall's petition for a writ of habeas corpus, doc. 7, as to his claim alleging ineffective assistance of counsel at the penalty phase of his trial. A writ of habeas corpus shall issue directing the State of Alabama to vacate and set aside the death sentence in *Marshall v. State*, 992 So. 2d 762 (Ala. Crim. App. 2007), unless within 90 days of this judgment's entry, the State of Alabama initiates proceedings to retry Marshall's sentence. In the alternative, the State of Alabama shall re-sentence Marshall to life without the possibility of parole. A separate order will be entered.

**DONE** the 23rd day of October, 2020.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE